UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────

DEREK A. HEYLIGER,

                                        Plaintiff,

                                                                9:18-cv-336
v.                                                              (TJM/TWD)

KARIN WEST and TOM FORBES,

                                        Defendants.

───────────────────────────────────────────

APPEARANCES:                                    OF COUNSEL:

DEREK A. HEYLIGER
  *Plaintiff, pro se*
12-B-0269
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

HON. LETITIA JAMES                              KASEY K. HILDONEN
Attorney General for the State of New York      Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

In this action, Derek A. Heyliger, an inmate at the Sing Sing Correctional Facility in New

York, claims Karin West and Tom Forbes ("Defendants") violated his rights under the United

States Constitution by denying his access to the courts and interfering with his legal mail.  (*See*

Dkt. Nos. 7, 8.)  Defendants' first motion for summary judgment was denied, and their request to

file a second motion for summary judgment was granted.  (*See* Dkt. Nos. 63, 66, 73.)  For the

following reasons, the undersigned recommends that the District Court DENY Defendants'

second motion for summary judgment.  (Dkt. No. 68.)

## I.    BACKGROUND

### A.    Procedural History

On March 19, 2018, Heyliger initiated this action *pro se* pursuant to 28 U.S.C. § 1983, asserting various claims against unknown officers at the Great Meadow Correctional Facility. (Dkt. No. 1.)  The Honorable Thomas J. McAvoy, Senior United States District Judge, granted Heyliger's application to proceed *in forma pauperis* and concluded three claims survived initial review: (1) denial of access to the courts; (2) interference with legal mail; and (3) gross negligence based on the alleged interference with legal mail.  (Dkt. No. 4.)  Because Heyliger could not identify the defendants, the Court requested help from the New York State Attorney General's Office ("AG's Office") ascertaining their names.  *See id.* at 13-15 (requesting help pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d. Cir. 1997)).

On July 19, 2018, Heyliger filed an Amended Complaint wherein he named Defendants Karen West and Tom Forbes.  (Dkt. No. 7.)  Judge McAvoy concluded the same three claims survived initial review.  (Dkt. No. 8 at 3-4; *see also Heyliger v. Doe*, No. 9:18-CV-0336 (TJM) (TWD), 2018 WL 3951340, at *2-3 (N.D.N.Y. Aug. 13, 2018).)  Defendants moved to dismiss those claims on various grounds, including for failure to exhaust administrative remedies.  (Dkt. No. 15-1 at 6-11.)  Judge McAvoy denied Defendants' motion to dismiss Heyliger's constitutional claims but granted their unopposed motion to dismiss his New York State common law claim for gross negligence.  (Dkt. No. 23 at 6-9; *see also Heyliger v. West*, No. 9:18-CV-0336 (TJM) (TWD), 2019 WL 4757334, at *3-4 (N.D.N.Y. Sept. 30, 2019).)  Defendants subsequently filed an Answer, and the case proceeded through discovery.  (*See* Dkt. Nos. 24, 25, 28, 38, 44, 47.)

On May 14, 2021, Defendants moved for summary judgment on the grounds that Heyliger had failed to exhaust his administrative remedies.  (Dkt. No. 56 at 8, 12-18.)  However, Defendants failed to file and serve a Statement of Material Facts, as required by Local Rule 56.1(a).  (*See generally* Dkt. No. 56; *see also Heyliger v. West*, No. 9:18-CV-336 (TJM) (TWD), 2021 WL 5605231, at *1 (N.D.N.Y. Nov. 2, 2021), *report and recommendation adopted*, 2021 WL 5585929 (N.D.N.Y. Nov. 30, 2021).)  Because of this failure, the Court denied Defendants' motion.  (Dkt. No. 63; *see also Heyliger v. West*, No. 9:18-CV-336 (TJM) (TWD), 2021 WL 5585929, at *1 (N.D.N.Y. Nov. 30, 2021).)  Defendants requested leave to file a second motion for summary judgment, which the Court granted over Heyliger's objection.  (Dkt. Nos. 65, 66, 67, 73.)  Defendants accordingly filed their second motion for summary judgment on February 25, 2022, and Heyliger filed an opposition on March 21, 2022.  (Dkt. Nos. 68, 72.)

### B.    Heyliger's Claims

Heyliger claims Defendants violated 28 U.S.C. § 1983 by blocking his access to the courts and interfering with his legal mail.  (*See* Dkt. Nos. 7, 8.)  His access to the courts claim stems from an incident at the Clinton Correctional Facility on October 28, 2015, where several officers allegedly assaulted him and used excessive force.  (Dkt. No. 7 at 5.)  Heyliger asserts Defendants blocked his ability to pursue a common law assault claim in the New York Court of Claims by: (1) refusing to send legal mail on October 26, 2016; (2) improperly opening that legal mail; (3) improperly returning that legal mail; (4) losing a piece of evidence (i.e., an envelope) included in that legal mail, (5) delaying the re-mailing of that legal mail for over a month, and (6) causing the dismissal of his untimely assault claim.  *Id.* at 5-10.

Heyliger's interference with legal mail claim stems from much of the same conduct.  (*See* Dkt. No. 7 at 5-10; *see generally* Dkt. No. 4 at 10-11 (describing the interference claim); *see also*

*Heyliger*, 2019 WL 4757334, at *3 (same).)  He claims that conduct interfered with his legal mail and chilled his access to the courts.  (Dkt. No. 7 at 5-10; Dkt. No. 72-1 at 14-15; *see also Heyliger*, 2019 WL 4757334, at *3.)

### C.     The Parties' Arguments

Defendants seek summary judgment on both of Heyliger's claims.  (*See* Dkt. No. 68-11.) First, Defendants argue Heyliger's access to courts claim fails as a matter of law because (1) he failed to produce evidence they acted deliberately and maliciously, and (2) he suffered no actual injury.  *Id.* at 7-13.[1]  Heyliger contends he produced evidence that Defendants acted deliberately and maliciously—they did not send his legal mail on October 26, 2016, they opened and improperly returned that legal mail, they delayed its re-mailing for nearly a month, and they lost evidence included in that legal mail.  (Dkt. No. 72-1 at 8-13.)  He asserts summary judgment is precluded because some, if not all, of this evidence raises triable issues of fact.  *Id.* at 9, 13.  He further contends he was injured by this conduct, which caused the dismissal of his common law assault claim before the New York Court of Claims on the grounds that it was untimely and thus jurisdictionally defective.  *Id.* at 12-13.

Second, Defendants argue Heyliger's interference with legal mail claim fails as a matter of law because (1) he produced no evidence that they engaged in an ongoing practice of censorship, and (2) any alleged tampering, if true, was insufficient to chill Heyliger's First Amendment activities.  (Dkt. No. 68-11 at 1-15.)  Heyliger contends Defendants interfered with his outgoing legal mail several times and chilled his access to the courts by causing the forfeiture of his common law assault claim in the New York Court of Claims.  (Dkt. No. 72-1 at 13-15.)

---

[1] Through their second motion for summary judgment, Defendants do not argue Heyliger failed to demonstrate they are individually responsible for the conduct and injuries alleged.  (*See generally* Dkt. No. 68-11.)

## II.    SUMMARY JUDGMENT STANDARD

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).[2]  "A material fact is one capable of influencing the case's outcome under governing substantive law, and a genuine dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Selevan v. New York Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013).  "The moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016).

The party moving for summary judgment bears the initial burden of identifying "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see generally* Fed. R. Civ. P. 56(c)(1).  "Where, as here, the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential

---

[2] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted.  *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).

On a motion for summary judgment, "the evidence of the non-movant is to be believed, all permissible inferences are to be drawn in [his] favor, and the court must disregard all evidence favorable to the moving party that the jury is not required to believe." *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012); *see also S. Katzman Produce Inc.*, 999 F.3d at 877; *see generally Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (explaining the jury is not required to believe contradicted evidence or impeached testimony).[3] "[I]n reviewing the evidence and considering what inferences may reasonably be drawn, the court may not make credibility determinations or weigh the evidence." *S. Katzman Produce Inc.*, 999 F.3d at 877. Moreover, "[t]he evaluation of ambiguous acts is a task for the jury, not for the judge on summary judgment." *Redd*, 678 F.3d at 174. "In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict . . . *i.e.*, it is quite clear what the truth is." *Id.*; *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010).

---

[3] The Court is mindful of the Second Circuit's instruction that a party's *pro se* pleading—including a written opposition to a motion for summary judgment—must be construed liberally and interpreted to raise the strongest arguments that it suggests. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### III.    DISCUSSION

Defendants are not entitled to summary judgment because there are genuine issues of material fact, and they have failed to demonstrate they are entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  First, a reasonable juror could believe that Defendants deliberately and maliciously prevented Heyliger from timely filing his assault claim with the New York Court of Claims.  *See Figueroa*, 825 F.3d at 98; *Selevan*, 711 F.3d at 256.  Moreover, Heyliger suffered actual injury when the New York Court of Claims dismissed his common law assault claim—he was completely foreclosed from seeking redress because his claim was untimely and dismissed as jurisdictionally defective.  *See Dixon v. von Blanckensee*, 994 F.3d 95, 106 (2d Cir. 2021); *Sousa v. Marquez*, 702 F.3d 124, 127 (2d Cir. 2012).  Second, a reasonable juror could find that Defendants interfered with Heyliger's outgoing mail several times and chilled his access to the courts by causing his common law assault claim to be dismissed.  *See Washington v. James*, 782 F.2d 1134, 1139-40 (2d Cir. 1986).  The undersigned accordingly recommends DENYING Defendant's motion for summary judgment.  (Dkt. No. 68.)

#### A.    Access to the Courts

"The First Amendment provides, in relevant part, that 'Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 90 (2d Cir. 2017) (quoting U.S. Const. amend. I.). "The right to petition, which applies to the states through the Fourteenth Amendment, extends to all departments of the Government, including the courts."  *Id.*  An individual's "constitutional right of access to the courts is violated where government officials obstruct legitimate efforts to seek judicial redress."  *Id.*; *see also Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) ("Decisions of this Court have grounded the right of access to courts in the Article IV Privileges

and Immunities Clause, . . . the First Amendment Petition Clause, . . . the Fifth Amendment Due

Process Clause, . . . and the Fourteenth Amendment Equal Protection, . . . and Due Process

Clauses"). "[M]eaningful access to the courts is the touchstone" of this right, which extends to

incarcerated individuals. *See Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Dixon*, 994 F.3d at

106; *Kaminski v. Semple*, 796 F. App'x 36, 38-39 (2d Cir. 2019).

"In general, claims alleging the loss of a right of access to the courts fall into two

categories: so-called 'forward-looking' and 'backward-looking.'" *Kern v. Contento*, No. 21-

1672, 2022 WL 1112767, at *3 (2d Cir. Apr. 14, 2022); *see generally Christopher*, 536 U.S. at

413. Through forward-looking claims, plaintiffs complain of "systemic official action" that

frustrates their ability to prepare or file suits at the present time. *Christopher*, 536 U.S. at 413;

*see also Sousa*, 702 F.3d at 127. "In cases of this sort, the essence of the access claim is that

official action is presently denying an opportunity to litigate for a class of potential plaintiffs."

*Christopher*, 536 U.S. at 413. Forward-looking claims accordingly aim "to place the plaintiff in

a position to pursue a separate claim for relief once the frustrating condition has been removed."

*Id.*

Through backward-looking claims, plaintiffs complain of "official acts" that "caused the

loss or inadequate settlement of a meritorious case, . . . the loss of an opportunity to sue, . . . or

the loss of an opportunity to seek some particular order of relief." *Id.* at 414. Backward-looking

claims "do not look forward to a class of future litigation, but backward to a time when specific

litigation ended poorly, or could not have commenced, or could have produced a remedy

subsequently unobtainable." *Id.*; *see also id.* at 415 (explaining "when the access claim (like this

one) looks backward, the complaint must identify a remedy that may be awarded as recompense

but not otherwise available in some suit that may yet be brought."). "The ultimate object of

these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself." *Id.* at 414.

The "justification for recognizing each kind of claim is the same . . . to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414-15. The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415. Accordingly, the underlying claim—the claim motivating plaintiffs' efforts to seek redress in the courts—must not be frivolous. *Id.* at 415-16; *see also Lewis*, 518 U.S. at 350-51.

Here, Heyliger asserts a backward-looking access to courts claim. (*See generally* Dkt. No. 7 at 5-10.) He claims Defendants' interference with his legal mail caused his common law assault claim to be delivered late, resulting in its dismissal on the grounds that it was untimely and thus jurisdictionally defective before the New York Court of Claims. *See id.* "The viability of backward-looking right-of-access claims is far from clear in this Circuit." *Sousa*, 702 F.3d at 128; *but see id.* ("Such claims, if recognized, would be available only if the governmental action caused the plaintiff's suit to be dismissed as untimely"); *Christopher*, 536 U.S. at 422 n.22 (suggesting a plaintiff may have lost a remedy, and thus suffered a backward-looking access to the courts violation, "where the statute of limitations had run" on the underlying claim). However, Defendants do not dispute the viability of Heyliger's backward-looking claim. (*See* Dkt. No. 68-11.) The undersigned accordingly assumes the validity of Heyliger's backward-looking claim for this analysis. *See, e.g.*, *Blake v. Dowe*, 36 F. Supp. 3d 271, 277 n.2 (D. Conn. 2014).

"Because the availability of a backward-looking access claim is unclear in this circuit, its elements are not well settled." *Jean-Laurent v. Lawrence*, No. 12-CV-1502 (JPO), 2015 WL

1208318, at *4 (S.D.N.Y. Mar. 17, 2015); *compare Mahon v. Moultrie*, 657 F. App'x 52, 53 (2d

Cir. 2016) ("To state a claim of denial of court access, a plaintiff must allege that the defendant

took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim and

that the defendant's actions resulted in actual injury to the plaintiff."), *with DeMeo v. Tucker*,

509 F. App'x 16, 18 (2d Cir. 2013) ("To succeed on a denial of access claim, a plaintiff must

show that the defendants (1) engaged in deliberate and malicious conduct that (2) resulted in

actual injury, *i.e.,* that hindered the plaintiff's effort to pursue a legal claim.").  However, "case

law from the Supreme Court and the courts in this circuit suggests four elements." *Jean-*

*Laurent*, 2015 WL 1208318, at *4.

"First, the plaintiff must identify a nonfrivolous, arguable underlying claim." *Id.*

"Second, the plaintiff must establish that the defendant took or was responsible for actions that

hindered a plaintiff's efforts to pursue a legal claim." *Id.*  "Third, the plaintiff must show that the

defendant's alleged conduct was deliberate and malicious." *Id.*[4] "Fourth, the plaintiff must

demonstrate that the defendant's actions resulted in an actual injury to the plaintiff." *Id.*

---

[4] Although many courts in this Circuit have applied this "deliberate and malicious" element, members of this Court have questioned its origins.  *See, e.g.*, *Rodriguez v. McKoy*, No. 9:15-CV-0610 (MAD) (TWD), 2021 WL 4743431, at *8 n.4 (N.D.N.Y. Oct. 12, 2021) (tracing the origins of this element to a decision that cited two cases in support of such a requirement, and observing that neither of the cases cited "appear to contain a 'malicious' interference requirement."); *Desmarat v. Artus*, No. 9:08-CV-977 (DNH) (RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011), *report and recommendation adopted*, 2011 WL 1557914 (N.D.N.Y. Apr. 25, 2011) (observing "published decisions from the Second Circuit do not impose this extra element of maliciousness, though many district cases nonetheless have interjected it into their analysis, often erroneously citing to cases that are not supportive"); *cf. Moreau v. Ellsworth*, No. 9:20-CV-124 (DNH) (ATB), 2021 WL 3813172, at *9 n.21 (N.D.N.Y. July 15, 2021), *report and recommendation adopted*, 2021 WL 3793772 (N.D.N.Y. Aug. 26, 2021) (observing that in *Desmarat*, the Court questioned whether maliciousness is a proper element of a backward-looking access to courts claim); *Roache v. Fisher*, No. 9:18-CV-825 (GLS) (ATB), 2021 WL 2366981, at *8 n.13 (N.D.N.Y. Feb. 8, 2021), *report and recommendation* adopted, 2021 WL 1920538 (N.D.N.Y. May 13, 2021) (same); *Jean-Laurent*, 2015 WL 1208318, at *4 n.7

### 1.    Deliberate and Malicious Action

Defendants argue they are entitled to judgment as a matter of law because Heyliger failed to produce evidence they acted deliberately and maliciously.  (Dkt. No. 68-11 at 13; *see also Nick's Garage*, 875 F.3d at 114.)  Heyliger contends summary judgment is improper because he did produce such evidence, and it raises triable issues of fact for the jury.  (Dkt. No. 72-1 at 8-13.)  Believing Heyliger's evidence and drawing permissible inferences in his favor, *see Anderson*, 477 U.S. at 248, 255, the undersigned concludes a reasonable juror could find that Defendants acted deliberately and maliciously, *see Figueroa*, 825 F.3d at 98.

First, Heyliger produced evidence indicating Defendants failed to send legal mail that was essential to preserve his common law assault claim before the New York Court of Claims.  (*See* Dkt. No. 72-1 at 17-18, 20, 30, 32-33.)  Heyliger produced evidence that on October 26, 2016, he gave a notice of claim to prison officials to mail to the New York Attorney General's Office.  *See id.* at 17-18, 26.  That evidence indicates he also gave copies of the notice of claim to prison officials to mail to the New York Court of Claims.  *See id.*  At his deposition on November 24, 2020, Heyliger testified that he mailed a notice of claim to the New York Court of Claims on October 26, 2016.  (*See* Dkt. No. 68-3 at 57-59.)  Heyliger also produced evidence indicating that after he sent his notice of claim to the New York Court of Claims, it was never mailed.  (*See* Dkt. No. 72-1 at 20, 30.)  In two letters, both dated October 28, 2016, Heyliger complained to the New York Court of Claims and the Inmate Grievance Resolution Committee

---

(observing the same, and noting "[o]ther circuits do not include such an element") (collecting cases).  The undersigned is accordingly unconvinced the "deliberate and malicious" element derives from binding Supreme Court or Second Circuit precedent.  *Accord Rodriguez*, 2021 WL 4743431, at *8 n.4; *Desmarat*, 2011 WL 1564605, at *7.

that his notice of claim was not timely mailed to the New York Court of Claims on October 26, 2016. *See id.* At his deposition, Heyliger testified that the notice of claim he mailed to the New York Court of Claims on October 26, 2016, was improperly returned to him on October 28, 2016. (Dkt. No. 68-3 at 57-61, 71-74.)

Second, Heyliger produced evidence indicating Defendants improperly opened and inspected his legal mail. (Dkt. No. 72-1 at 20, 30.) Heyliger produced two letters, both dated October 28, 2016, wherein he complained the notice of claim he mailed to the New York Court of Claims on October 26, 2018, was returned to him "ripped open with a postage stamp at the top right hand corner of the envelope," and "bears a reddish ink which also appears underneath the flap seal section of the envelope." *Id.* at 20, 30. He further stated the envelope was "substantive proof" that his legal mail "was deliberately ripped open, read, and returned to me after postage bar # 02IM-0008003361 was printed on my envelope." *Id.* at 20, 30. At his deposition, Heyliger testified that the mail was deliberately ripped opened, reviewed, and returned to him with a mark of red ink on the envelope. (Dkt. No. 68-3 at 49, 68-69, 72.)

Third, Heyliger produced evidence indicating Defendants failed to properly document the return of his legal mail. (Dkt. No. 72-1 at 46-47.) The evidence indicates he received no legal mail on October 28, 2016, the day his notice of claim for the New York Court of Claims was returned to him. *See id.* At his deposition, Heyliger testified the notice of claim he mailed to the New York Court of Claims on October 26, 2018, was returned to him via regular mail, not legal mail, on October 28, 2016. (Dkt. No. 68-3 at 71-72.) He testified that although the envelope had the serial bar number for legal mail in the upper right-hand corner, it was nonetheless returned to him via regular mail—which meant he did not have to sign for it in the legal mail log. *Id.* at 72-

74. He testified "this particular mail deliberately was sent back to me in the wrong batch . . . by way of regular mail" so that it "was deliberately not recorded." *Id.* at 74.

Fourth, Heyliger produced evidence indicating Defendants delayed the re-mailing of his legal mail for nearly a month. (Dkt. No. 72-1 at 20, 22, 28.)  The evidence suggests that on October 31, 2016, he gave his notice of claim to officials at his facility so they would re-mail it to the New York Court of Claims. *Compare id.* at 20, *with* Dkt. No. 68-3 at 79.  However, the postmark date on the envelope sent to the New York Court of Claims indicates the officials at the facility did not mail the notice of claim until November 30, 2016.  (Dkt. No. 72-1 at 22.)  Moreover, the New York Court of Claims did not receive Heyliger's notice of claim until December 2, 2016.  *Id.* at 28.  At his deposition, Heyliger testified the notice of claim he gave to the prison officials to re-mail on October 31, 2016, "wasn't mailed until November 30th of 2016."  (Dkt. No. 68-3 at 81.)

Fifth, Heyliger produced evidence suggesting that a key piece of evidence—an opened envelope of legal mail—was lost when he mailed it to the New York Court of Claims for safe keeping.  (*See* Dkt. No. 72-1 at 20, 52-59.)  Heyliger documented the return of his opened notice of claim in two letters—one sent to the New York Court of Claims, and the other sent to the Inmate Grievance Resolution Committee.  *See id.* at 20, 30.  He mailed the opened envelope to the New York Court of Claims, specifically asking the Court to preserve the envelope, which he told the Court was "substantive proof that this envelope was deliberately opened by Great Meadow Correctional Facility officials of the Inmate Correspondence Office and/or Business Office."  *Id.* at 20.  Months after he sent the envelope to the New York Court of Claims, Heyliger requested a copy of the envelope.  *See id.* at 54-59.  The New York Court of Claims did not produce a copy of the envelope.  *See id.*; *see also* Dkt. No. 72-1 at 11.

13

Finally, it is undisputed that the New York Court of Claims dismissed Heyliger's assault claim as jurisdictionally defective because he did not timely file his notice of claim.  (*See* Dkt. No. 68-5 at 3-5.)  In other words, the failed mailing and delayed re-mailing of Heyliger's notice of claim caused the New York Court of Claims to dismiss his assault claim as untimely and thus jurisdictionally defective.  *See id.*; *compare* Dkt. No. 72-1 at 17-18, 26 (indicating Heyliger's notice of claim was mailed to the New York Attorney General's Office on October 28, 2016), *with* Dkt. No. 68-5 at 3-5 (indicating Heyliger timely filed a notice of claim with the New York Attorney General's Office, but not with the New York Court of Claims).

In sum, Heyliger produced evidence that: (1) Defendants failed to send his notice of claim to the New York Court of Claims on October 26, 2016, despite his instructions to do so; (2) Defendants may have opened and inspected his notice of claim even though it was marked as legal mail; (3) Defendants improperly returned his notice of claim through regular mail instead of legal mail; (4) Defendants delayed the re-mailing of his notice of claim for nearly a month; (5) the envelope Heyliger intended to use as evidence that Defendants tampered with his legal mail was lost when he included it in his re-mailed notice of claim; and (6) the New York Court of Claims dismissed his common law assault claim as untimely and thus jurisdictionally defective. (*See generally* Dkt. No. 72-1; Dkt. No. 68-5 at 3-5.)  At his deposition, Heyliger described these events in detail.  (*See generally* Dkt. No. 68-3.)  Through their second motion for summary judgment, Defendants produced no evidence contradicting this version of events or impeaching Heyliger's deposition testimony.  (*See generally* Dkt. No. 68-1.)

Believing Heyliger's evidence and drawing all permissible inferences in his favor, *Redd*, 678 F.3d at 174, the undersigned concludes a reasonable juror could find that Defendants acted deliberately and maliciously, *see Figueroa*, 825 F.3d at 98; *see, e.g.*, *Jean-Laurent*, 2015 WL

1208318, at *5 (concluding ignoring an individual's "repeated oral and written requests for assistance . . . could plausibly rise to the level of deliberate and malicious behavior.").  Perhaps a single failed or delayed mailing might not give rise to a reasonable inference of deliberate and malicious conduct.  Yet, the evidence here indicates Defendants repeatedly failed to process Heyliger's legal mail in a timely and professional manner.  These delays caused Heyliger's notice of claim to be filed late at the New York Court of Claims, resulting in its dismissal as untimely and jurisdictionally defective.  Taken together, this evidence gives rise to a reasonable inference that Defendants acted deliberately and maliciously.  The undersigned accordingly recommends DENYING Defendants' motion for summary judgment on the grounds that Heyliger failed to produce evidence of deliberate and malicious conduct.  (*See* Dkt. No. 68-11 at 13; *see generally supra*, note 4.)

### 2.    Injury

Defendants claim they are entitled to judgment as a matter of law because Heyliger did not suffer an access to courts injury—he was able to pursue an Eighth Amendment excessive force claim in lieu of his common law assault claim.  (Dkt. No. 68-11 at 7; Dkt. No. 68-7 at 2-3; *see generally Heyliger v. Cymbrak*, No. 17-CV-912.)  Defendants accordingly argue Heyliger was "not completely foreclosed from seeking a judicial remedy with regard to the alleged October 28, 2015 excessive force incident."  (Dkt. No. 68-11 at 10.)  Heyliger contends he was "completely foreclosed from seeking a non-frivolous" judicial remedy because the New York Court of Claims dismissed his untimely assault claim for lack of jurisdiction.  (Dkt. No. 72-1 at 12.)  He further argues he "sought a different remedy in the State than that which he sought in the federal forum," and "the jury's determination in the federal court . . . has absolutely no bearing on what the outcome could have been in the State."  *Id.*  Because Defendants' actions, as

alleged, obstructed Heyliger's legitimate efforts to seek judicial redress in the New York Court of Claims, the undersigned concludes Heyliger suffered an access to courts injury.  *See Dixon v. von Blanckensee*, 994 F.3d 95, 106 (2d Cir. 2021); *Friedman*, 884 F.3d at 90.

First, Heyliger suffered an access to courts injury because he was completely foreclosed from pursuing a common law assault claim in the New York Court of Claims.  (*See* Dkt. No. 68-5 at 3-5.)  The notice of claim Heyliger gave to the prison officials to mail on October 26, 2016, was timely delivered to the New York Attorney General.  *See id.* at 4.  Yet despite Heyliger's efforts, the notice of claim he gave to the prison officials that same day was not timely mailed to the New York Court of Claims.  *Compare id.* at 5, *with* Dkt. No. 68-3 at 57-61, 71-74; Dkt. No. 72-1 at 17-18, 20, 30, 32-33.  Because he did not timely serve the New York Court of Claims with a notice of claim, his common law assault claim was dismissed for lack of jurisdiction. (Dkt. No. 68-5 at 5; *see generally Christopher*, 536 U.S. at 422 n.22 (suggesting a backwards-looking access to courts claim would be viable "where the statute of limitations had run" on the underlying claim); *Sousa,* 702 F.3d at 128 (suggesting a backwards-looking access to courts claim "would be available only if the governmental action caused the plaintiff's suit to be dismissed as untimely.").)  In effect, Heyliger was "completely foreclosed" from prosecuting his common law assault claim before the New York Court of Claims.  *Sousa*, 702 F.3d at 128.  His legitimate efforts to seek judicial redress in the New York Court of Claims were stifled—he "could not . . . commence[]" his common law assault claim in the New York Court of Claims. *See Christopher*, 536 U.S. at 414.  He enjoyed no access to the New York Court of Claims because it lacked jurisdiction over his untimely assault claim.  *See Friedman*, 884 F.3d at 90. Heyliger was accordingly injured because he was denied the opportunity to pursue a non-frivolous claim in the court of his choosing.  *See Dixon*, 994 F.3d at 106 ("In order to establish a

16

violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused

actual injury . . . *i.e.*, took or was responsible for actions that hindered a plaintiff's effort to

pursue a legal claim.").

Second, Heyliger's common law assault claim is a "species of property protected by the

Fourteenth Amendment's Due Process Clause." *NY State NOW v. Pataki*, 261 F.3d 156, 163 (2d

Cir. 2001); *see also Ponterio v. Kaye*, No. 06 CIV. 6289 (HB), 2007 WL 141053, at *9

(S.D.N.Y. Jan. 22, 2007) ("Ponterio correctly notes that his denial of access claim is based on the

alleged loss of his state court lawsuit itself, which is a species of property protected by the

Fourteenth Amendment's Due Process Clause.").  It is a "cognizable property interest," *see Rosu

v. City of New York*, 742 F.3d 523, 526 (2d Cir. 2014), that involves a "separate and distinct right

to seek judicial relief" than the property interest he has in an Eighth Amendment excessive force

claim asserted under 28 U.S.C. § 1983, *see Christopher*, 536 U.S. at 414-15.  Heyliger sought

redress in this Court for an alleged Eighth Amendment excessive force claim, but he was

prevented from seeking redress in the New York Court of Claims for a common law assault

claim.  (*See* Dkt. Nos. 68-5, 68-6.)  Heyliger was forced to forfeit his common law assault claim

before the New York Court of Claims because it was untimely.  (*See* Dkt. No. 68-5 at 4-5.)  He

was deprived of a "species of property protected by the Fourteenth Amendment's Due Process

Clause." *NY State NOW*, 261 F.3d at 163.  Heyliger was accordingly injured because he lost a

cognizable property interest without due process.

Third, the New York State common law tort of assault is substantially different than an

Eighth Amendment excessive force claim asserted under 28 U.S.C. § 1983.  *Compare Rivera v.

State*, 34 N.Y.3d 383, 389 (2019) (defining the common law torts of assault and battery), *with

Harris v. Miller*, 818 F.3d 49, 63-65 (2d Cir. 2016) (explaining the subjective and objective

elements of an Eighth Amendment excessive force claim).  The two claims are governed by

substantially different legal standards and are adjudicated in different judicial forums.  The

availability of any accompanying remedies is accordingly contingent upon Heyliger's ability to

satisfy different legal standards by navigating the rules in different judicial forums.  Heyliger had

meaningful access to this Court because he presented his Eighth Amendment excessive force

claim to a jury, which found for the defendants.  (*See* Dkt. No. 68-7.)  However, he did not have

"meaningful access" to the New York Court of Claims, because it dismissed his untimely

common law assault claim for lack of jurisdiction.  *Lewis*, 581 U.S. at 351; *see also Christopher*,

536 U.S. at 422 n.22; *Sousa*, 702 F.3d at 128.  Now, the only "remedy that may be awarded as

recompense but not otherwise available in some suit that may yet be brought" is through

Heyliger's instant access to courts claim.  *See Christopher*, 536 U.S. at 415.  Stated differently,

Heyliger's access to courts claim is the only "presently existing claim" through which he seeks a

judicial remedy for the underlying assault.  *See id.* at 415-16, 422; *see generally Kern*, 2022 WL

1112767, at *3 (dismissing without prejudice the claimant's access to courts claim because she

was "actively litigating the state law claims underlying her access claim," and observing "[o]ther

circuits in similar cases have concluded that such backward-looking claims were unripe and

ordered that they be dismissed without prejudice.") (collecting cases).  Because Heyliger lost an

opportunity to sue in the New York Court of Claims and no alternative existing claims can

remedy the underlying harm, he suffered an access to courts injury.  *See Christopher*, 536 U.S. at

415-16.

  For the foregoing reasons, the undersigned concludes Heyliger was injured.  *See Dixon*,

994 F.3d at 106; *Sousa*, 702 F.3d at 128.  The undersigned accordingly recommends that the

Court DENY Defendants' motion for summary judgment on the grounds that Heyliger suffered no injury. (*See* Dkt. No. 68-11 at 7-13.)

**B.    Interference with Legal Mail**

Defendants claim they are entitled to judgment as a matter of law on Heyliger's interference with legal mail claim because he failed to produce evidence essential to his claim. (Dkt. No. 68-11 at 14-15; *see generally Nick's Garage*, 875 F.3d at 114.) Specifically, Defendants argue Heyliger failed to produce evidence demonstrating they engaged in an ongoing practice of censorship, chilled his right of access to the courts, or impaired his legal representation. (Dkt. No. 68-11 at 14-15.) Heyliger contends Defendants are not entitled to judgment as a matter of law because he demonstrated that they repeatedly interfered with his outgoing legal mail, prevented him from timely filing his notice of claim, and caused him to forfeit an assault claim in the New York Court of Claims. (Dkt. No. 72-1 at 13-15.) Believing Heyliger's evidence and drawing permissible inferences in his favor, *see Anderson*, 477 U.S. at 248, 255, the undersigned concludes a reasonable juror could find that Defendants repeatedly interfered with his outgoing mail and prevented him from timely filing his notice of claim with the New York Court of Claims, *see Figueroa*, 825 F.3d at 98.

Prisoners have a First Amendment right to the free flow of incoming and outgoing mail. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). "Restrictions on prisoners' mail are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation . . . and must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail."

*Davis*, 320 F.3d at 351; *see, e.g.*, *LeBron v. Swaitek*, No. 9:05-CV-172 (GLS) (DRH), 2007 WL

3254373, at *7 (N.D.N.Y. Nov. 2, 2007) (declining to dismiss claimant's interference with

outgoing mail claim where "defendants ha[d] not proffered any reasons for the confiscation");

*Cancel v. Goord*, No. 00 CIV 2042 (LMM), 2001 WL 303713, at *7 (S.D.N.Y. Mar. 29, 2001)

(denying a motion to dismiss "because Defendants have interfered with Cancel's outgoing legal

mail without providing any legitimate penological interest").  The Supreme Court has

accordingly recognized that "[t]he implications of outgoing correspondence for prison security

are of a categorically lesser magnitude than the implications of incoming materials."

*Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

"The First Amendment protects prisoners' access to mail directly, unlike the right of

access to courts, which protects prisoners' access to mail only derivatively and with respect to

given claims." *Dublino v. McCarthy*, No. 9:19-CV-0381 (GLS) (DJS), 2019 WL 2053829, at

*10 (N.D.N.Y. May 9, 2019) (quoting *Bellezza v. Holland*, No. 09-CV-8434 (RWS), 2011 WL

2848141, at *6 (S.D.N.Y. July 12, 2011)).  "It is thus not necessary to allege actual injury when

asserting a violation of one's right to the free flow of mail." *Id.* (quoting *Antrobus v. City of New

York*, No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (collecting cases));

*see also Bradshaw v. Burns*, No. 9:19-CV-0931 (BKS) (DJS), 2020 WL 1129870, at *11

(N.D.N.Y. Mar. 9, 2020).  However, "an isolated incident of mail tampering is usually

insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351.

In *Washington v. James*, the Second Circuit evaluated a First Amendment interference

with mail claim where the claimant alleged the prison "administration *regularly* opened

[claimant's] outgoing mail to his legal counsel without any showing that a substantial

governmental interest required this procedure." 782 F.2d at 1139.  The defendants contended he

"did not state a constitutional claim because he asserted only an isolated instance of interference with privileged mail." *Id.* The Second Circuit explained that an isolated instance of interference "might not give rise to an action for damages under 42 U.S.C. § 1983 where the infraction was not in accordance with official policy or practice [of the prison] and where no showing had been made that the inmate's right of access to the courts was chilled or the legal representation he received was impaired." *Id.* Because the claimant alleged "two separate incidents of interference with mail," the Second Circuit denied defendants' motion to dismiss. *Id.* at 1039-40.[5]

The following rule emerged from *Washington*: "as few as two incidents of mail tampering could constitute an actionable [interference with mail] violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351; *see also Bradshaw*, 2020 WL 1129870, at *12. Courts apply the *Washington* rule to claims involving both incoming and outgoing mail. *See, e.g.*, *Davis*, 320 F.3d at 352 (applying the *Washington* rule to an instance of incoming mail tampering and an instance of outgoing mail tampering); *Amaker v. Boyd*, No. 9:19-CV-1253 (LEK) (ATB), 2020 WL 210317, at *8 (N.D.N.Y. Jan. 14, 2020) (applying the *Washington* rule to a claim involving incoming and outgoing mail); *but see Davis*, 320 F.3d at 351 (stating "courts have consistently afforded greater protection . . . to outgoing mail than to incoming mail."); *LeBron*, 2007 WL 3254373, at *7 (applying different standard to claim involving outgoing mail); *Cancel*, 2001 WL 303713, at *7 (same).

---

[5] The Court also concluded "summary judgment would not have been proper either" because there was "a genuine issue of material fact [concerning] whether there has been a regular, unjustified interference with Washington's outgoing legal mail." *Washington*, 782 F.2d at 1140.

Here, Heyliger produced evidence suggesting Defendants failed to send outgoing legal mail on October 26, 2016, improperly opened and returned that legal mail, delayed its re-mailing for nearly a month, may have been responsible for losing a key piece of evidence related to that legal mail, and caused the untimely delivery of his notice of claim to the New York Court of Claims.  (*See* Dkt. No. 68-3 at 49, 57-61, 68-69, 71-74, 79, 81; Dkt. No. 68-5 at 3-5; Dkt. No. 72-1 at 11, 17-18, 20, 22, 26-28, 30, 32-33, 46-47, 52-59.)  Defendants produced no evidence to contradict the evidence or impeach the testimony Heyliger offered in support of this version of events.  (*See* Dkt. Nos. 68-1, 68-11.)  Defendants have also failed to advance any reasons for why they needed to open or delay Heyliger's outgoing legal mail.  (*See* Dkt. No. 68-11; *see generally Acevedo v. Fischer*, No. 12-CIV-6866 (RA) (AJP), 2015 WL 7769486, at *10 (S.D.N.Y. Dec. 2, 2015), *report and recommendation adopted*, 2016 WL 884909 (S.D.N.Y. Mar. 2, 2016) (applying different standards to the incoming and outgoing legal mail, and observing, "[t]he connection between the restriction on Acevedo's outgoing legal mail and the government interest served is not clear"); *LeBron*, 2007 WL 3254373, at *7; *Cancel*, 2001 WL 303713, at *7.)

Viewing this evidence, a reasonable juror could find that Defendants interfered with Heyliger's outgoing mail on at least two—if not three—separate occasions.  *See Figueroa*, 825 F.3d at 98.  A reasonable juror could conclude Defendants opened his outgoing notice of claim on October 26, 2016, failed to mail it to the New York Court of Claims, and improperly returned it to Heyliger.  *See id.*  A reasonable juror could also conclude Defendants delayed the re-mailing of his notice of claim for nearly a month.  *See id.*  This evidence is sufficient to defeat Defendants' motion for summary judgment.  *See Washington*, 782 F.2d at 1139; *Rossi v. Stevens*, No. 04-CIV-1836 (CM) (LMS), 2005 WL 8146896, at *16-17 (S.D.N.Y. May 2, 2005); *see also*

*Antrobus v. City of New York,* No. 11 CIV. 2524 (RA), 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) ("Plaintiff's assertions that correction officers read, withheld, threw away, and refused to send out his mail for months at a time adequately allege a constitutional violation."). Moreover, a reasonable juror could find that Defendants chilled Heyliger's right of access to the courts by delaying his outgoing legal mail, thus causing the New York Court of Claims to dismiss his untimely assault claim for lack of jurisdiction. *See Figueroa*, 825 F.3d at 98. This evidence indicates Defendants did not simply chill, but completely blocked Heyliger's access to the New York Court of Claims. Defendants advanced no reason for opening, failing to send, improperly returning, and delaying the re-mailing of Heyliger's legal mail. (*See generally* Dkt. No. 68-11; *see also LeBron*, 2007 WL 3254373, at *7; *Cancel*, 2001 WL 303713, at *7.) Heyliger has accordingly produced sufficient evidence to suggest Defendants "unjustifiably chilled [his] right of access to the courts." *See Davis*, 320 F.3d at 351.

For the foregoing reasons, the undersigned concludes Heyliger met his burden of producing evidence that Defendants unjustifiably interfered with his outgoing mail and chilled his access to the courts. *See id.* The undersigned accordingly recommends that the Court DENY Defendants' motion for summary judgment on the grounds that Heyliger failed to produce evidence essential to his claim. (Dkt. No. 68-11 at 14-15; *see generally Nick's Garage*, 875 F.3d at 114.)

## IV.    CONCLUSION

For the foregoing reasons, the undersigned concludes Heyliger produced sufficient evidence for a reasonable juror to find in his favor on both claims, and Defendants are not entitled to judgment as a matter of law. *See Figueroa*, 825 F.3d at 98.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 68) be **DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: May 31, 2022
      Syracuse, New York

                                          Thérèse Wiley Dancks
                                          United States Magistrate Judge

---

[6] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 25 of 212

Heyliger v. Doe, Not Reported in Fed. Supp. (2018)
2018 WL 3951340

2018 WL 3951340
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derek HEYLIGER, Plaintiff,

v.

John/Jane DOE, et al., Defendants.

9:18-CV-0336 (TJM/TWD)
|
Signed 08/13/2018

**Attorneys and Law Firms**

DEREK HEYLIGER, 12-B-0269, Clinton Correctional Facility, P.O. Box 2000, Dannemora, NY 12929, pro se.

**DECISION AND ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Derek Heyliger commenced this action by filing a pro se complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an application to proceed in forma pauperis ("IFP"). Dkt. No. 1 ("Compl."); Dkt. No. 2 ("IFP Application"). By Decision and Order filed May 10, 2018, plaintiff's IFP Application was granted, and following review of the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), some of plaintiff's claims were dismissed and other claims survived sua sponte review. Dkt. No. 4 (the "May 2018 Order"). Because plaintiff's complaint named only unidentified "Doe" defendants, the Court requested, pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d. Cir. 1997) (per curiam), that the New York State Attorney General's Office attempt to ascertain the full names of the "Doe" defendants. *See id.* at 13-15.

On June 6, 2018, a representative from the New York State Attorney General's Office submitted a Status Report in an effort to assist plaintiff in identifying defendant "John/Jane Doe Inmate Correspondence Office/mail room officer" and "John/Jane Doe Business Office administrator." *See* Dkt. No. 5 ("Status Report"). With respect to the "Doe" defendant identified as the "legal mail processing room Sergeant," counsel for the New York State Attorney General's Office indicated that he has "been advised by multiple DOCCS employees that there is no Sergeant involved in that process[,

and] [t]hus, our Office is unable to identify this defendant." *Id.* at 2. By Order filed June 20, 2018, plaintiff was directed to review the Status Report and, to the extent he was able to do so, submit a proposed amended complaint which substitutes the named defendants in place of one or more of the "Doe" defendants, and which makes any other corrections necessary. *See* Dkt. No. 6.

Presently before the Court is plaintiff's amended complaint. Dkt. No. 7 ("Am. Compl."). [1]

[1]     The amended complaint was filed as of right pursuant to Federal Rule of Civil Procedure 15(a).

**II. DISCUSSION**

The factual assertions set forth in the amended complaint are virtually identical in content to those set forth in the original complaint, except that, in his amended complaint, plaintiff has removed certain causes of action that were plead in the complaint and dismissed in the May 2018 Order. *Compare* Compl. *with* Am. Compl. [2] The amended complaint also now identifies by name "John/Jane Doe Inmate Correspondence Office/mail room officer" as "Karin West" and "John/Jane Doe Business Office administrator" as "Tom Forbes." *See* Am. Compl. at 1, 3. In addition, plaintiff has removed the "John/Jane Doe legal mail processing room Sergeant" as a defendant.

[2]     The amended complaint also now asserts a due process claim under the Fourteenth Amendment instead of under the Fifth Amendment. *Compare* Compl. *with* Am. Compl.

In light of the May 2018 Order, and mindful of the requirement to liberally construe pro se pleadings, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the amended complaint alleges enough to warrant a responsive pleading from the defendants named therein. Thus, the amended complaint is accepted for filing and replaces the complaint in its entirety. In so ruling, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**\*2** Since the amended complaint does not include any John/ Jane Doe defendants, the Clerk is directed to terminate each of the "Doe" defendants.

2018 WL 3951340

## III. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the amended complaint (Dkt. No. 7) is accepted for filing and will supersede and replace the previously filed complaint; and it is further

**ORDERED** that the Clerk shall add Karin West, Inmate Correspondence Office/Mail Room employee, and Tom Forbes, Business Office Administrator, to the docket as defendants; and it is further

**ORDERED** that "John/Jane Doe Inmate Correspondence Office/mail room officer", "John/Jane Doe Business Office administrator", and "Jane/John Doe legal mail processing room Sergeant" are **DISMISSED** as defendants in this case; and it is further

**ORDERED** that the following claims asserted against defendants West and Forbes **SURVIVE** sua sponte review and require a response: (1) plaintiff's denial of access to the courts claim; (2) plaintiff's claim for interference with the free flow of legal mail; and (3) plaintiff's gross negligence claim based on the alleged interference with his legal mail; and it is further

**ORDERED** that, upon receipt from plaintiff of the documents required for service of process, the Clerk shall issue summonses and forward them, along with copies of the amended complaint, to the United States Marshal for service on defendants West and Forbes, together with a copy of this Order; [3] and it is further

[3]
The Court previously granted plaintiff leave to proceed with this action *in forma pauperis. See* May 2018 Order.

**ORDERED** that a response to the amended complaint be filed by defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on the plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3951340

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Heyliger v. West, Not Reported in Fed. Supp. (2019)

2019 WL 4757334

2019 WL 4757334
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derek A. HEYLIGER, Plaintiff,

v.

Karin WEST and Tom Forbes, Defendants.

9:18-cv-0336 (TJM/TWD)
|
Signed 09/30/2019

**Attorneys and Law Firms**

Derek A. Heyliger, Ossining, NY, pro se.

Erik Boule Pinsonnault, New York State Attorney General, Albany, NY, for Defendants.

## DECISION & ORDER

THOMAS J. McAVOY, Senior United States District Judge

## I. INTRODUCTION

 **\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Thérèse W. Dancks, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In her August 29, 2019 Order and Report-Recommendation ("Rep.-Rec."), Magistrate Judge Dancks recommends that Defendants' Rule 12(b)(6) motion to dismiss be granted on the ground that Plaintiff failed to exhaust available administrative remedies before commencing this action as required by the Prison Litigation Reform Act of 1995 ("PLRA"), that Plaintiff's federal claims be dismissed without prejudice, and that the Court decline to exercise supplemental jurisdiction over Plaintiff's New York state-law claims. *See generally*, Rep.-Rec., Dkt. No. 20. [1] Plaintiff filed objections. Dkt. No. 22.

[1]     The Court presumes familiarity with Magistrate Judge Dancks's Report-Recommendation.

## II. STANDARD OF REVIEW

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1); *see also United States v.*

*Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

## III. DISCUSSION

### a. Exhaustion of Administrative Remedies

#### 1. Background

The facts relevant to whether Plaintiff exhausted his administrative remedies are that on January 3, 2017, Plaintiff filed an appeal to the Central Office Review Committee ("CORC") concerning the denial of his facility grievance alleging that Defendants deliberately interfered with his legal mail preventing his timely access to the courts. On January 15, 2018, Plaintiff wrote Karen Bellamy, Director of the Inmate Grievance Program at the New York State Department of Corrections and Community Supervision ("DOCCS"), concerning his appeal. On March 7, 2018, still having received no response from CORC, Plaintiff commenced the instant action. [2] In April 2018, Plaintiff received a notice from CORC that his appeal had been received. On July 10, 2018, Plaintiff received a decision from CORC denying his grievance. The central argument raised by Plaintiff in opposition to Defendants' motion, and raised now in his objections, is that administrative remedies were unavailable because of CORC's delay.

[2]     As the report recommendation indicates:

> Here, in his opposition to Defendants' motion, Plaintiff further pleads, in relevant part:
>> Finally, after plaintiff failed to receive a response to plaintiff[']s grievance for over one (1) year from CORC, on January 15, 2018 Plaintiff wrote to Inmate Grievance Director Karen Bellamy of the Central Office Review Committee (CORC) concerning their failure to respond to his grievance appeal being that plaintiff did not receive a response from CORC informing him that his Grievance Appeal had been received, processed nor filed with CORC.

Heyliger v. West, Not Reported in Fed. Supp. (2019)

2019 WL 4757334

After not receiving a reply from CORC concerning his grievance appeal letter on February 25, 2018 plaintiff drafted an original complaint which was then signed on March 7, 2018.

Rep. Rec. at 16 (citing Dkt. No. 17 at 4). Magistrate Judge Dancks notes that "Plaintiff's opposition papers are properly considered in connection with Defendants' motion to dismiss only to the extent that they are consistent with the allegations in his complaint." *Id.*, at 16, n. 9 (citing *Resto-Otero v. Mohammad*, No. 9:17-CV-1115 (GLS/DEP), 2018 WL 5795508, at *2 n.4 (N.D.N.Y. Oct. 3, 2018) and *Planck v. Schenectady Cty.*, No. 12-CV-0336 (GTS/DRH), 2012 WL 1977972, at *5 (N.D.N.Y. June 1, 2012) (citing cases)).

## 2. PLRA Exhaustion

**\*2** As Magistrate Judge Dancks points out, under the PLRA "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "The PLRA requires 'proper exhaustion,' which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly." Rep.-Rec., at 8 (quoting *Jones*, 549 U.S. at 218, in turn citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006)("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).") In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"), concluding when CORC makes the final administrative determination on an inmate's appeal.

There is no dispute that Plaintiff commenced the instant action before receiving a decision from CORC on his appeal. However, "[a] prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate." *High v. Switz*, No. 9:17-CV-1067 (LEK/DJS), 2018 WL 3736794, at *4 (N.D.N.Y. July 9, 2018), *report and recommendation adopted sub nom. High v. PA Switz*, 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018)(citing *Ross*, 136 S. Ct. at 1858). In *Ross*, the Supreme Court stated "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S. Ct. at 1858. The Supreme Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

## 3. Analysis

Magistrate Judge Dancks examined cases involving situations where CORC engaged in delay in rendering its decision. As Magistrate Judge Dancks stated, "[c]ourts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies." Rep.-Rec. at 13 (collecting cases). Based on this case review, Magistrate Judge Dancks first indicated: "[A]ssuming, as alleged, that Plaintiff waited more than one year beyond the thirty-day deadline for CORC to issue its decision before commencing this action, this Court would recommend finding that Plaintiff's administrative remedies were unavailable under *Ross* and, therefore, would recommend denying Defendants' motion to dismiss on exhaustion grounds." *Id.*, at 15. However, Magistrate Judge Dancks then indicated that upon closer review she would not make this recommendation because Plaintiff alleges that he did not receive notice that his grievance was received by CORC until April 2018. *Id.* Citing to 7 N.Y.C.R.R § 701.5(d)(3)(i) and relying on the holding in *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-124, 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016)(plaintiff did not exhaust his administrative remedies because he failed to take further action under § 701.5(d)(3)(i)), *aff'd*, 692 F. App'x 668 (2d Cir. 2017)(summary order), Magistrate Judge Dancks concluded:

Here, like *Gizewski*, there was a specific direction in the procedures for Plaintiff to follow, *i.e.*, "[i]f a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC," 7 N.Y.C.R.R § 701.5(d)(3)(i), whereas in [*Mayandeunas v. Bigelow*, No. 9:18-cv-1161 (GTS/TWD), 2019 WL 3955484 (N.D.N.Y. Aug. 22, 2019)] and [*Bell v. Napoli*, No. 9:17-CV-850 (ATB), 2018 WL 6506072 (N.D.N.Y. Dec. 11, 2018)], the regulations contained no instructions on how an inmate should proceed if CORC continued to "ignore" a *received* appeal, making the administrative remedy unavailable under *Ross* and [*Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016)]. Consequently, the Court finds Plaintiff failed to exhaust his available administrative remedies prior to commencing suit.

**\*3** Rep.-Rec. at 16-17 (emphasis in original).

Accepting the allegations in the Amended Complaint as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must on this Rule 12(b)(6) motion, Plaintiff's appeal was received by CORC on January 3, 2017 yet ignored for over one year. It also appears that Plaintiff attempted to fulfill the functional equivalent of § 701.5(d)(3)(i) by writing to Director Bellamy before he commenced this action. While Director Bellamy is not the IGP supervisor referenced in § 701.5(d)(3)(i), Plaintiff apparently wrote to her to find out the status of his appeal, which is the purpose of § 701.5(d)(3)(i). The Court finds that the matter should not, at this stage, be dismissed for failing to exhaust administrative remedies. While discovery may reveal that Director Bellamy advised Plaintiff to comply with § 701.5(d)(3)(i), *see Woodward v. Lytle*, No. 916CV1174NAMDEP, 2018 WL 4643036, at \*3 (N.D.N.Y. Sept. 27, 2018), *reconsideration denied*, No. 9:16-CV-1174 (NAM/DEP), 2018 WL 6179427 (N.D.N.Y. Nov. 27, 2018)(DOCCS Acting Commissioner Annucci "referred Plaintiff's letter to Karen Bellamy, the DOCCS Director of the IGP, who wrote Plaintiff in response" that "[c]ontact with the [Cape Vincent] administration reveals that the IGP Supervisor did not receive or refuse to file a July 15, 2015 complaint from you alleging staff misconduct.... You are advised that Directive #4040 makes no provision for an inmate to refer grievances directly to Central Office, and that specific grievance concerns should be directed to the IGP Supervisor for the most expeditious means of resolution."), which might align this cases with *Gizewski*, that determination cannot be

made on the present record. Accordingly, the Court rejects the recommendation to dismiss the action at this time on the ground that Plaintiff failed to exhaust available administrative remedies.

### b. Substantive Claims

Magistrate Judge Dancks understandably did not address Defendants' arguments directed to the substantive merits of Plaintiff's claims. The Court will do so now. Defendants' arguments in this regard are twofold.

First, Defendants argue that a single incident of mail interference is not sufficient to establish a claim under 42 U.S.C. § 1983. Plaintiff responds by arguing that the Amended Complaint contains allegations of two incidents of mail tampering/interference sufficient to establish a viable§ 1983 claim. In this regard, Plaintiff points out that in the Amended Complaint he alleges that he sought to send legal mail to the New York Court of Claims on October 26, 2016, and that he sought to re-mail a claim to the Court of Claims on October 31, 2016. Plaintiff further alleges that his envelope delivered to the prison mailroom on October 26, 2016 was returned to him opened, and that his mail delivered to the prison mailroom on October 31, 2016 was held for a period of time before being shipped in "late November 2016." He alleges that the inmate Correspondence Office was on notice on October 26, 2016 of his "legal filing deadline date of October 28, 2016," and that, as a result of the mail be returned to him on the afternoon of October 28, 2016, his legal claim in the Court of Claims was dismissed as untimely. The Court will allow the claim to proceed on the basis that Plaintiff asserts two separate incidents where prison officials interfered with Plaintiff's legal mail. Accordingly, Defendants' motion on this ground is denied. Defendants can renew their argument on summary judgment.

**\*4** Second, Defendants argue that Plaintiff's state law claim of gross negligence by prison officials is barred by New York Correction Law § 24(1). Plaintiff did not respond to this aspect of the motion and, therefore, the claim is deemed abandoned. *See Forney v. Forney*, 96 F. Supp. 3d 7, 11 (E.D.N.Y. 2015); *Collins v. Goord*, 581 F. Supp. 2d 563, 579 (S.D.N.Y. 2008); *see also Thurmand v. Univ. of Connecticut*, No. 3:18-CV-1140 (JCH), 2019 WL 369279, at \*3 (D. Conn. Jan. 30, 2019)("Courts in this Circuit have presumed that plaintiffs have abandoned their claims when they do not oppose a motion to dismiss them.")(collecting cases); *Russell v. N.Y. Univ.*, No. 1:15-cv-2185, 2017 U.S. Dist. LEXIS 111209, 2017 WL 3049534, at \*99 (S.D.N.Y.

July 17, 2017)(failure to address defendant's arguments for dismissal of claims deems those claims abandoned); *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp.3d 387, 410 (S.D.N.Y. Sept. 30, 2015)(dismissing claim as abandoned when the plaintiff failed to respond to the arguments on a motion to dismiss). Furthermore, inasmuch as the Amended Complaint asserts that Defendants were acting within the scope of their employment when they were grossly negligent, Plaintiff's state law claim is barred under New York Correction Law § 24(1). *See Abreu v. Travers*, No. 9:15-CV-0540(MAD)(ATB), 2016 WL 6127510, at *17 (N.D.N.Y. Oct. 20, 2016); *Cruz v. New York*, 24 F. Supp. 3d 299, 310 (W.D.N.Y. 2014). Accordingly, this aspect of Defendants' motion is granted.

## IV. CONCLUSION

For the reasons discussed above, the Court rejects the recommendation in the Order and Report-Recommendation [Dkt. No. 20]. Also for the reasons discussed above, Defendants' motion to dismiss [Dkt. No. 15] is GRANTED in part and DENIED in part. The motion is granted inasmuch as Plaintiff's state law claim of gross negligence is DISMISSED. The motion is denied in all other respects.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4757334

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5605231
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derek A. HEYLIGER, Plaintiff,

v.

Karin WEST, Tom Forbes, Defendants.

9:18-CV-336 (TJM/TWD)
|
Signed 11/01/2021
|
Filed 11/02/2021

**Attorneys and Law Firms**

DEREK A. HEYLIGER, Plaintiff, pro se, 12-B-0269, Sing
Sing Correctional Facility, 354 Hunter Street, Ossining, New
York 10562.

HON. LETITIA JAMES, Attorney General for the State of
New York, Counsel for Defendants, The Capitol, Albany,
New York 12224, OF COUNSEL: KASEY K. HILDONEN,
Assistant Attorney General.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

 *1 Derek A. Heyliger ("Plaintiff"), an inmate in the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"), commenced this
*pro se* action pursuant to 42 U.S.C. § 1983, asserting
his constitutional rights were violated at Great Meadow
Correctional Facility ("Great Meadow C.F."). (Dkt. No. 7.)
The Honorable Thomas J. McAvoy, Senior United States
District Judge, reviewed the original and amended complaint
in accordance with 28 U.S.C. § 1915, and found the following
claims against Karin West and Tom Forbes (collectively
"Defendants") required a response: "(1) [P]laintiff's denial
of access to the courts claim; (2) [P]laintiff's claim for
interference with the free flow of legal mail; and (3)
[P]laintiff's gross negligence claim based on the alleged
interference with his legal mail." (Dkt. No. 8 at 4.)

Thereafter, Defendants moved to dismiss Plaintiff's claims.
In their motion, Defendants argued Plaintiff failed to exhaust
his administrative remedies and his claims were meritless in
any event. (Dkt. No. 15.) Judge McAvoy granted Defendants'
motion with respect to Plaintiff's gross negligence claim but
denied it in all other respects. (Dkt. No. 23.)

Now, at the close of discovery, Defendants move for summary
judgment. (Dkt. No. 56.) In so doing, they largely reiterate
their arguments with respect to exhaustion. Specifically,
Defendants argue the operative grievance in this case did not
put DOCCS on notice of the relevant claims. (Dkt. No. 56-5
at 12-13.) Defendants also argue Plaintiff failed to exhaust
his administrative remedies because he filed this action
before receiving a response from the Central Office Review
Committee ("CORC"). *Id.* at 13-18. Inexplicably, Defendants
did not file an accompanying Statement of Material Facts
and instead rely upon a declaration attaching certain exhibits.
(Dkt. No. 56.) Plaintiff responded, pointing out the recent
Second Circuit case *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d
Cir. 2020), forecloses most of Defendants arguments. (Dkt.
No. 60.) For the reasons that follow, the Court recommends
denying Defendants' motion.

**II. FAILURE TO COMPLY WITH THE LOCAL
RULES**

Local Rule 56.1(a) requires a party moving for summary
judgment to file and serve a Statement of Material Facts.
*See* L.R. 56.1(a) ("[a]ny motion for summary judgment *shall*
contain a separate Statement of Material Facts." (emphasis
added)). "The Statement of Material Facts shall set forth, in
numbered paragraphs, a short and concise statement of each
material fact about which the moving party contends there
exists no genuine issue." *Id.* "Failure of the moving party to
submit an accurate and complete Statement of Material Facts
shall result in a denial of the motion." *Id.* (emphasis in the
original).

The Local Rules are not "empty formalities," and courts
within this District have routinely denied a party's motion
for summary judgment based on their failure to file a
Statement of Material Facts. *See Jackson v. Broome Cty.
Corr. Facility*, 194 F.R.D. 436, 437 (N.D.N.Y. 2000) (denying
the defendant's motion for summary judgment for failure to
comply with the Local Rules); *Monroe v. Critelli*, No. 9:05-
CV-1590 (FJS/GHL), 2008 WL 508748, at *2-3 (N.D.N.Y.
Feb. 21, 2008) (same); *Kele v. Middaugh*, No. 9:04-CV-0377
(TJM/GHL), 2006 WL 1313348, at *2 (N.D.N.Y. May 12,
2006) (same); *see also Lore v. City of Syracuse*, No. 5:00-

CV-1833, 2007 WL 655628, at *1 (N.D.N.Y. Feb. 26, 2007) (internal quotation marks and citation omitted) (noting that the Statement of Material Facts "inform[s] the court of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for a trial."); *Riley v. Town of Bethlehem*, 5 F. Supp. 2d 92, 93 (N.D.N.Y. 1998) ("[t]he failure of a moving party to file a properly supported Local Rule 7.1 Statement of Material Facts is fatal to a summary judgment motion").

*2 Here, Defendants failed to support their motion for summary judgment with an accompanying Statement of Material Facts. (Dkt. No. 56.) Though, in some circumstances, Courts have overlooked such a glaring mistake, those cases have all involved a *pro se* litigant's motion. *See, e.g.*, *Fox v. Lee*, No. 915CV0390TJMCFH, 2018 WL 1211111, at *8 (N.D.N.Y. Feb. 5, 2018), *report and recommendation adopted*, No. 915CV390TJMCFH, 2018 WL 1185237 (N.D.N.Y. Mar. 6, 2018); *Bulter v. Hyde*, No. 9:08-CV-0299 (LEK/GHL), 2009 WL 3164753, at *3 (N.D.N.Y. Sept. 29, 2009) (declining to recommend dismissal of the pro se plaintiff's Motion for Summary Judgment due to the plaintiff's failure to file an "accurate and complete" Statement of Material Facts). The New York State Attorney General's Office represents Defendants in this matter and there is no reason—given that office's significant experience in federal litigation—to disregard such an error without consequences. Accordingly, the Court recommends denying Defendants' motion. [1]

[1]    The Court further finds that Defendants' motion is meritless. First, Defendants' argument regarding the content of the grievance is specious as that grievance specifically mentions Plaintiff's difficulties with the facilitiy's mail. (Dkt. No. 56-3 at 24.) Indeed, the investigatory documents related to that grievance show DOCCS' personnel treated the grievance as Plaintiff complaining about "staff destroy[ing] his mail...." *Id.* at 30; *id.* at 31 (D. Beebe's memo addressing Grievance GM# 61637-17 and stating he did not "tamper with [Plaintiff's] mail"). CORC's final review, on June 20, 2018, labeled the grievance "Mail Tampering" and specifically considered that "Sgt. B" denied "tampering with or confiscating the grievant's mail." *Id.* at 32. Accordingly, the Court finds Plaintiff's grievance put DOCCS on notice of the relevant issues.

With respect to Defendants' second argument, much of the case law relied upon has been squarely overruled. To that end, as Plaintiff pointed out, the Second Circuit recently held that "an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations." *Hayes*, 976 F.3d at 270. Defendants did not attempt to distinguish this case or even mention it in their memorandum of law. Given the state of the law, Defendants' argument that Plaintiff failed to exhaust his administrative remedies because he sued before receiving a decision from CORC is without merit.

In sum, had the Court considered the merits of Defendants' motion for summary judgment, it would still recommend that it be denied.

### III. CONCLUSION

For the reasons stated above, the Court recommends denying Defendants' motion for summary judgment.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 56), be **DENIED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. [2] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[2]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed

**Heyliger v. West, Slip Copy (2021)**

2021 WL 5605231

period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2021 WL 5605231

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 5585929
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derek A. HEYLIGER, Plaintiff,

v.

Karin WEST, and Tom Forbes, Defendants.

9:18-CV-336 (TJM/TWD)

|

Signed 11/30/2021

**Attorneys and Law Firms**

Derek A. Heyliger, Ossining, NY, Pro Se.

Kasey K. Hildonen, Lynn Marie Knapp, New York State Attorney General, Albany, NY, for Defendants.

### DECISION & ORDER

Thomas J. McAvoy, Senior United States District Judge

**\*1** The Court referred this *pro se* civil action, brought pursuant to 42 U.S.C. § 1983, to Magistrate Judge Thérèse Wiley Dancks for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff, a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges that the Defendants violated his constitutional rights by destroying legal mail that he handed over to them for delivery. Defendants have filed a motion for summary judgment in which they allege that Plaintiff's claim should be dismissed because he failed to exhaust his administrative remedies. See dkt. # 56.

Magistrate Judge Dancks's Report-Recommendation, dkt. # 61, issued on November 2, 2021, recommends that the Court deny the Defendants' motion. Judge Dancks finds that Defendants did not comply with the local rules when they failed to include in their motion papers a statement of undisputed material facts with citations to the record. The local rules require the Court to deny the Defendants' motion for failing to file the required statement, Judge Dancks finds. In any case, she concludes, Defendants' motion fails on the merits. Indeed, Judge Dancks points out, Defendants rely on case law related to exhaustion in the prison context which has been overruled.

Defendants objected to the Report-Recommendation. See dkt. # 62. Their objection includes the statement of material facts that should have been included within their original motion, and to which Plaintiff would have been required to respond. [1] Defendants contend that their motion should be denied without prejudice and with an opportunity to re-file with proper citations to the record. In the alternative, they argue, the Court should find that the evidence demonstrates that Plaintiff did not administratively exhaust his claims before he filed his complaint.

[1]    Defendants state that their failure to include the required statement "was in error and unintentionally omitted from Defendants' filing." The Court finds that Defendants' statement here does not explain the reason for the error and provides no excuse. The New York Attorney General's certainly employs attorneys familiar with the Northern District's procedures and capable of reading the rules of court.

When a party objects to a magistrate judge's Report-Recommendation, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and having considered the other issues raised in the Petitioner's objections, this Court has determined to accept and adopt Judge Dancks' recommendation for the reasons stated in the Report-Recommendation.

**\*2** The Report-Recommendation of Magistrate Judge Dancks, dkt. # 61, is hereby **ACCEPTED** and **ADOPTED**. Defendants' objections to the Report-Recommendation are hereby **OVERRULED**. Defendants' motion for summary judgment, dkt. # 56, is hereby **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 5585929

**Heyliger v. West, Slip Copy (2021)**

2021 WL 5585929

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

796 Fed.Appx. 36
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

John S. KAMINSKI, Plaintiff-Appellant,

v.

SEMPLE, Commissioner of Dept. of Corrections,
Declaratory Only, George Jepsen, Attorney General
(Formerly), State of Connecticut, Declaratory Only,
Walter Charles Bansley, IV, Attorney, of Bansley,
Anthony & Burdo (Inmate Legal Assistance Contractor)
(ILAP), Individual/Corporate, Defendants-Appellees.

19-973-cv
|
December 18, 2019

**Synopsis**
**Background:** Inmate brought pro se petition for writ
of habeas corpus under § 1983 action challenging the
provision of legal assistance to Connecticut inmates
against former Commissioner of Department of Corrections,
former Connecticut Attorney General, and legal assistance
contractor. The United States District Court for the District
of Connecticut, Stefan R. Underhill, Chief Judge, 2019 WL
1454950, dismissed inmate's complaint sua sponte and denied
inmate leave to amend his complaint. Inmate appealed.

**Holdings:** The Court of Appeals held that:

[1] action was barred by Eleventh Amendment to extent that
it sought retrospective relief;

[2] inmate failed to allege that denial of access to law library
resulted in actual injury; and

[3] inmate failed to sufficiently allege that private attorney to
provide legal services to inmates in legal assistance program
was state actor.

Affirmed.

**Procedural Posture(s):** On Appeal; Petition for Writ of
Habeas Corpus.

West Headnotes (4)

[1]    **Federal Courts** 🔑 **Prisons and jails**

Action by inmate under § 1983 seeking
declaration that former Commissioner of
Department of Corrections and former
Connecticut Attorney General violated his right
to access courts was barred by Eleventh
Amendment to extent that inmate sought
retrospective relief, since defendants were no
longer state officials and no longer denying
inmate access to library. U.S. Const. Amend. 11;
42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[2]    **Constitutional Law** 🔑 **Prisoners and pretrial
detainees**

**Prisons** 🔑 Law books, law libraries, and legal
materials

Inmate failed to allege that denial of access to
law library resulted in actual injury related to his
habeas corpus petition, as supported dismissal
of inmate's claim under § 1983 to extent that it
could be construed as seeking prospective relief
against former Commissioner of Department of
Corrections and former Connecticut Attorney
General, where inmate discovered dismissed
criminal charge on his own when none of his
appointed attorneys caught the issue, and inmate
was able to file and prosecute petition for writ
of mandamus without access to law library. 42
U.S.C.A. § 1983.

4 Cases that cite this headnote

**[3]    Civil Rights** 🔑 Attorneys and witnesses

Inmate failed to sufficiently allege that private attorney hired by Department of Corrections (DOC) to provide legal services to inmates in legal assistance program was state actor, and thus, private attorney was not subject to § 1983 action by inmate alleging denial of access to legal assistance, where attorney acted in capacity of legal aid society by performing legal services on behalf of state prisoners, and inmate did not allege that attorney performed duties outside of traditional counsel's role or that DOC controlled or supervised attorney. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[4]    Federal Civil Procedure** 🔑 Form and sufficiency of amendment;  futility

Amendment to inmate's § 1983 complaint would have been futile, as supported denial of motion to amend complaint against former Commissioner of Department of Corrections, former Connecticut Attorney General, and inmate legal assistance contractor challenging the provision of legal assistance to Connecticut inmates, since contractor was not state actor, and inmate could not allege that his habeas proceeding was harmed by any of defendants' actions. 42 U.S.C.A. § 1983.

**\*37**  Appeal from a judgment of the United States District Court for the District of Connecticut (Underhill, *J.*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: JOHN S. KAMINSKI, pro se, Suffield, Connecticut.

FOR DEFENDANTS-APPELLEES: No appearance.

PRESENT: ROBERT D. SACK, BARRINGTON D. PARKER, DENNY CHIN, Circuit Judges.

**\*38  SUMMARY ORDER**

Plaintiff-appellant John Kaminski, *pro se*, appeals the judgment of the district court, entered April 15, 2019, dismissing his complaint *sua sponte* for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The complaint, filed pursuant to 42 U.S.C. § 1983, alleged that Scott Semple, the former commissioner of the Connecticut Department of Corrections ("DOC"), George Jepsen, the former Connecticut Attorney General, and Walter Scott Bansley IV, a private attorney who was hired by the DOC to provide legal services to inmates in a legal assistance program, violated his rights by denying him access to the courts. Specifically, he alleges that after he elected to proceed *pro se* in his habeas proceeding, DOC denied him legal assistance and access to the law library. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review the *sua sponte* dismissal of a complaint *de novo*. *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). *Pro se* submissions are reviewed with "special solicitude," and "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citations omitted).

 **[1]** The district court properly dismissed Kaminski's claims against Semple and Jepsen to the extent he sought retrospective relief. If a complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," the Eleventh Amendment cannot bar it. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (internal quotation marks omitted); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) ("[A] plaintiff may sue a state official acting in his official capacity -- notwithstanding the Eleventh Amendment -- for prospective injunctive relief from violations of federal law." (internal quotation marks and citations omitted)). But a declaration dealing only with past events would be retrospective and barred. *See Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000) ("Any declaration could say no more than that Connecticut had violated federal law in the past ... [and] would have much the same effect as a full-fledged award of damages or

restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." (internal quotation marks omitted)). Here, Kaminski sought only a declaration that Semple and Jepsen violated his right to access the courts. Both defendants are no longer state officials; they are therefore no longer denying him a right to access the law library. The district court correctly held that claims against Semple and Jensen for retroactive relief are barred by the Eleventh Amendment. *See id.*

To the extent that Kaminski's complaint may be construed as seeking prospective relief, his claim for denial of access to the courts also fails. [1] While the Supreme Court has long recognized that prisoners have a right to meaningful access to the courts and that prison officials are barred from "actively interfering with inmates' attempts to prepare legal documents," **\*39** *Lewis v. Casey*, 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (citing *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)), prisoners do not have an abstract right to a law library or legal assistance. *Id.* To state a denial-of-access-to-the-courts claim, a prisoner must show that: (1) he suffered an "actual injury," *id.* at 349, 116 S.Ct. 2174, (2) to a non-frivolous legal claim, (3) concerning his criminal conviction, habeas corpus petition, or conditions of confinement. *Id.* at 352–54, 116 S.Ct. 2174. Actual injuries include the dismissal of a complaint for a technical deficiency that would have been cured with appropriate legal facilities, or that a prisoner was "stymied" from bringing an arguably actionable claim by the "inadequacies of the law library." *Id.* at 351, 116 S.Ct. 2174.

[1]    Where a public officer sued in his official capacity "resigns, or otherwise ceases to hold office while the action is pending," the action continues, and "[t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25 (d).

 **[2]**    Here, Kaminski has failed to allege that the denial of access to a law library resulted in any actual injury relating to his habeas corpus petition. Kaminski alleged that he discovered a dismissed criminal charge on his own, when none of his appointed attorneys caught the issue. Further, he was able to file and prosecute a petition for a writ of mandamus without access to a law library. His complaint suggests that his habeas proceeding was not hindered by his lack of access to a library. Indeed, the state court forgave a technical error (mislabeling of a motion) that Kaminski attributed to his lack of access to a law library or legal services.

Although Kaminski acknowledges that his individual claims do not establish a denial of access to the courts, he asserts that Connecticut's legal services for prisoners are worse than the system addressed in *Lewis*. But *Lewis* makes clear that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." 518 U.S. at 351, 116 S.Ct. 2174. Kaminski therefore cannot show any actual injury and he does not state a plausible claim for denial of access to the courts.

 **[3]**    The district court also properly dismissed the claims against Bansley. To be liable under § 1983, a defendant must be a state actor. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Generally, a court-appointed attorney "performing a lawyer's traditional functions as counsel" to a party is not a state actor under § 1983. *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997). We have also held that legal aid agencies are not state actors, "notwithstanding the receipt of substantial government funds," as long as the State does not "exercise control or supervision over the internal operations" of the agency. *See Graseck v. Mauceri*, 582 F.2d 203, 208 (2d Cir. 1978); *see also Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (reaffirming *Graseck*'s holding that "a legal aid society ordinarily is not a state actor amenable to suit under § 1983"). Bansley, as the Inmate Legal Assistance Program contractor, acted in the capacity of a legal aid society by performing legal services on behalf of Connecticut state prisoners. Because Kaminski offered no allegation that Bansley performed duties outside the traditional counsel's role, or that DOC controlled or supervised Bansley, he failed to sufficiently allege that Bansley was a state actor. *See Rodriguez*, 116 F.3d at 65–66; *Graseck*, 582 F.2d at 208.

 **[4]**    Finally, the district court also did not err in denying Kaminski leave to amend his complaint. A *pro se* plaintiff should be afforded leave to amend following dismissal "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation marks omitted). Here, **\*40** however, amendment would have been futile because Bansley is not a state actor and Kaminski cannot allege that his habeas proceeding was harmed by any of the defendants' actions. Accordingly, the district court properly dismissed Kaminski's complaint.

* * *

We have considered Kaminski's remaining arguments and conclude they are without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**All Citations**

796 Fed.Appx. 36

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 40 of 212

Kern v. Contento, Not Reported in Fed. Rptr. (2022)

2022 WL 1112767

2022 WL 1112767
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Emily KERN, as administrator of the
Estate of Riley Parker Kern and Emily
Kern, Individually, Plaintiff-Appellant,

v.

Police Chief Daniel CONTENTO, Police Officer
Ian Foard, Police Officer Jonathan E. Myers,
Town of Coeymans, Defendants-Appellees,
Travis D. Hagen, Ravena Club Inc., dba
Sycamore Country Club, Defendants.

No. 21-1672
|
April 14, 2022

Appeal from the United States District Court for the Northern
District of New York (Sharpe, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS
HEREBY ORDERED, ADJUDGED, AND DECREED**
that the judgment entered on July 26, 2021, is **AFFIRMED** in
part and **REVERSED** in part, and the case is **REMANDED**.

**Attorneys and Law Firms**

FOR APPELLANT: Clifford S. Nelson, Law Office of
Michael H. Joseph, PLLC, White Plains, NY.

FOR APPELLEES: Crystal R. Peck, Bailey, Johnson & Peck,
P.C., Albany, NY.

PRESENT: Barrington D. Parker, Susan L. Carney, Beth
Robinson, Circuit Judges.

**SUMMARY ORDER**

**\*1** Plaintiff-Appellant Emily Kern is the mother and
administrator of the estate of Riley Kern, who died in 2018,
at a tragically young age, after a motor vehicle collision in
Ravena, New York, a village within the Town of Coeymans.
In July 2020, Kern sued Defendants-Appellees Police Chief
Daniel Contento, Police Officers Ian Foard and Jonathan
Myers, and the Town of Coeymans (collectively, "the Town
Defendants"), seeking relief under 42 U.S.C. § 1983. She
alleges that, in violation of New York's Vehicle and Traffic

Law ("VTL") § 603-a and her federal due process rights, the
Town Defendants failed to conduct a mandatory field sobriety
test and refused to collect evidence concerning the collision.
She also alleges that individuals among them fabricated an
element of the related police report concerning the presence
of a witness. Kern also asserts that, by these failures and this
fabrication, the Town's police officers violated her right of
access to the courts, and that unconstitutional customs and
practices of the Town of Coeymans entitle her to relief under

Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658 (1978). [1]
In 2021, the district court granted the Town Defendants'
motion to dismiss for failure to state a claim. Kern now
appeals that decision. "We review de novo a district court's
dismissal of a complaint under Rule 12(b)(6), accepting all
of the complaint's factual allegations as true and drawing all
reasonable inferences in the plaintiff['s] favor." Forest Park
Pictures v. Universal Television Network, Inc., 683 F.3d 424,
429 (2d Cir. 2012).

[1]     Kern also asserted a claim for attorney's fees
        against the Town Defendants and state law claims
        against Hagen and the Sycamore Club. Those
        claims are not at issue in this appeal.

We assume the parties' familiarity with the underlying facts,
procedural history, and arguments on appeal, to which we
refer only as necessary to explain our decision.

1. Procedural due process claim

Kern contends that she has a constitutionally protected
property interest in the evidence that would have been derived
from a proper police investigation of the fatal collision. She
alleges that the Town Defendants wrongfully deprived her of
that interest and are liable for damages as a result.

To state a plausible due process claim, Kern "must identify
a property interest protected by the Due Process Clause."
Harrington v. County of Suffolk, 607 F.3d 31, 34 (2d Cir.
2010). Anticipated benefits from a governmental source may
be entitled to due process protections, but " '[t]o have a
property interest in a benefit, a person clearly must have more
than an abstract need or desire' and 'more than a unilateral
expectation of it.' " Town of Castle Rock v. Gonzales, 545
U.S. 748, 756 (2005) (quoting Board of Regents of State
Colleges v. Roth, 408 U.S. 564, 577 (1972)). Two particular
restrictions apply. First, the Supreme Court has ruled that "a
benefit is not a protected entitlement if government officials
may grant or deny it in their discretion." Id. at 756. Second,
"[a]n entitlement must also be individual in nature to qualify

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 41 of 212

Kern v. Contento, Not Reported in Fed. Rptr. (2022)

2022 WL 1112767

as a property interest protected by the Due Process Clause." *Harrington*, 607 F.3d at 34 (emphasis omitted). "Thus, where the 'intended beneficiaries' of a particular law 'are entirely generalized,' we have held that the law does not create a property interest protected by the Due Process Clause." *Id.* (quoting *West Farms Assocs. v. State Traffic Comm'n*, 951 F.2d 469, 472 (2d Cir. 1991)).

**\*2** To support her claim, Kern relies primarily on VTL § 603-a. VTL § 603-a provides that, when a motor-vehicle accident results in serious injury or death, "the investigating officer *shall ... request* that all operators of motor vehicles involved in such accident submit to field testing ... provided there are reasonable grounds to believe such motor vehicle operator committed a serious traffic violation in the same accident." N.Y. Veh. & Traf. Law § 603-a(1)(b) (emphasis added). Citing this language and VTL § 603-a's legislative history, Kern submits that the statute's use of the word "shall" deprives investigating officers of all meaningful discretion regarding whether to test drivers involved in serious accidents, and that here, the law required the officers to conduct a sobriety test on the driver of the vehicle that hit her son. With regard to the individual entitlement, Kern asserts that the state legislature required sobriety testing under VTL § 603-a to allow victims of drunk driving, or their survivors, to hold intoxicated drivers accountable for their unlawful and dangerous conduct.

One may question whether, looking at its text as a whole and its proviso in particular, the statute confers so little discretion on investigating officers that it could create a protected entitlement that overcomes the first *Castle Rock* restriction. *See Castle Rock*, 545 U.S. at 756. Assuming without deciding that, as Kern contends, it does so, we nevertheless conclude that it does not create a constitutionally protected private property right in the victims or survivors of victims of drunk drivers. Rather, the statute confers a general benefit on the public at large. VTL § 603-a contains no indication of any legislative intent to provide a private right of action or to create an actionable right and does not describe with specificity an entitlement from which such a right could properly be inferred. Although comments made by legislators when enacting VTL § 603-a support the general proposition that field testing requirements were designed to help the state hold drunk drivers "fully accountable for their reckless actions," the comments do not describe an individualized mechanism for doing so or give any indication that legislators anticipated creating a constitutionally protected property interest. App'x at 11–12 (quoting comments of State Senator

Pam Helming, a bill sponsor). Rather, the comments are more consistent with a general interest in public safety: VTL § 603-a "is about keeping our communities[ ] safe." *See id.* (quoting comments of State Senator Helming). [2]

[2]     In addition, the "Purpose" section of the bill that would become VTL § 603-a explains that the field-testing amendment is intended "[t]o provide a mechanism for greater enforcement of driving while intoxicated and driving while ability impaired laws involving motor vehicle accidents." S.B. S7306, 2017–2018 Sess. (N.Y. 2018).

Our conclusion that VTL § 603-a created no private entitlement sufficient to support a due process-protected entitlement echoes our ruling in *Harrington v. County of Suffolk*, 607 F.3d 31 (2d Cir. 2010). In *Harrington*, we affirmed the dismissal of surviving parents' similar attempt to recover for the loss of their child. Like Kern, the plaintiffs in *Harrington* brought a procedural due process claim against the County on the theory that the defendants "violated their constitutional rights by failing to conduct an adequate investigation into a traffic accident that resulted in the death of plaintiffs' son." 607 F.3d at 32. The plaintiffs argued that a Suffolk County regulation mandating investigations into fatal accidents conferred on them a property interest protected by the Due Process Clause. *Id.* at 34. We disagreed, concluding that the "duty imposed by the Suffolk County Code runs to the public generally, and not to the individual victims of crime." *Id.* at 35.

Similarly, we believe that no such private interest is created here. We therefore affirm the district court's dismissal of Kern's due process claim.

2. Access to the courts claim

**\*3** Next, Kern challenges the district court's ruling that she failed to allege a viable claim for a loss of her right of access to the courts. "A plaintiff's 'constitutional right of access to the courts is violated where government officials obstruct legitimate efforts to seek judicial redress.' " *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 90 (2d Cir. 2017) (quoting *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008)). In general, claims alleging the loss of a right of access to the courts fall into two categories: so-called "forward-looking" and "backward-looking." In forward-looking claims, "plaintiffs may allege that 'systemic official action' frustrated their ability to file a suit." *Sousa v. Marquez*, 702 F.3d 124, 127 (2d Cir. 2012) (quoting *Christopher v.*

Kern v. Contento, Not Reported in Fed. Rptr. (2022)

2022 WL 1112767

*Harbury*, 536 U.S. 403, 413 (2002)). A backward-looking claim, in contrast, "covers claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher*, 536 U.S. at 413–14. In a backward-looking claim, "[t]he official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case." *Id.* at 414. Kern's is of that nature: she alleges that the Town Defendants' failure to investigate the collision caused her to lose the right to have a court adjudicate her claims against the driver of the other vehicle and the Sycamore Club.

In *Sousa*, we recognized the viability of forward-looking claims, but declined to decide whether to follow other circuits in recognizing a backward-looking claim because the plaintiff's claims fell outside the scope of that purported right. 702 F.3d at 128. Likewise, in this case, even if we were to recognize the viability of backward-looking claims, at this juncture Kern's claims would fall outside the scope of that purported right because a harm of the type generally associated with the claim has not yet occurred. Thus, as we have previously observed, a backward-looking claim would be available only if the alleged misconduct by the Town Defendants "caused the loss or inadequate settlement of a meritorious case" against Hagen and the Sycamore Club or otherwise "rendered hollow" Kern's right to seek redress. *Id.* (internal quotation marks omitted). Because Kern is actively litigating the state law claims underlying her access claim, what effect (if any) the alleged misconduct had on those underlying claims cannot now be determined.

Other circuits in similar cases have concluded that such backward-looking claims were unripe and ordered that they be dismissed without prejudice. *See Harer v. Casey*, 962 F.3d 299, 308–11 (7th Cir. 2020) (ordering dismissal without prejudice because denial of access claim is not ripe for judicial review where underlying lawsuit remains pending and further factual development is required); *Waller*, 922 F.3d at 601–03 (same); *Delew v. Wagner*, 143 F.3d 1219, 1222–23 (9th Cir.

1998) (same). We agree this is the best approach and conclude that Kern's access claim, if any, has not yet accrued.

We therefore reverse the district court's dismissal of the right-of-access claim and remand with instruction to dismiss the claim without prejudice. Should Kern replead a backward-looking access to the courts claim, the district court would then have the opportunity to assess its legal viability in the first instance.

### 3. *Monell* claim

*Monell* creates a basis for imposing Section 1983 liability on a municipality when its "policy or custom" causes a "deprivation of rights protected by the Constitution." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690, 694 (1978). To state a valid *Monell* claim, Kern must allege that she suffered such a deprivation. In light of the foregoing analysis, it is plain that the district court did not err in dismissing Kern's procedural due process claim against the Town of Coeymans under *Monell*. Because Kern failed to allege that she suffered a procedural due process violation, "there is no basis for holding the municipality liable." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). However, to the extent that Kern asserts a *Monell* claim arising from her right-of-access claim, we conclude for the same reasons we have set forth above that the claim has not accrued, and we reverse and remand with instruction to dismiss the claim without prejudice.

**\*4**                                  \* \* \*

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in part and **REVERSED** in part and the case is **REMANDED** with instructions.

### All Citations

Not Reported in Fed. Rptr., 2022 WL 1112767

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1208318
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Phillip JEAN–LAURENT, Plaintiff,

v.

C.O. LAWRENCE, et al., Defendants.

No. 12–CV–1502 (JPO).
|
Signed March 16, 2015.
|
Filed March 17, 2015.

*OPINION AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Pro se plaintiff Phillip Jean–Laurent ("Plaintiff") brings this action alleging violations of his constitutional rights. Plaintiff's remaining claim asserts that Defendants Sergeant Joseph Seymour ("Seymour"), two unidentified sergeants designated as Sgt. John Doe # 1 and Sgt. Jane Doe # 1 [1] (collectively with Seymour, the "Sergeant Defendants"), and Superintendent Ada Perez ("Perez"; collectively with the Sergeant Defendants, "Defendants") violated his constitutional right of access to courts by failing to provide him with certain legal materials in a timely manner. Defendants now move for summary judgment. For the reasons that follow, the motion is granted.

[1]   Defendants urge the Court to dismiss the claims against the unidentified and unserved Sergeant Defendants pursuant to Rule 4 of the Federal Rules of Civil Procedure. (Dkt. No. 75 ("Def.Br.") at 1 n. 1.) Because Defendants' motion for summary judgment is granted on other grounds, the Court does not reach this argument.

**I. Background**

   **A. Facts** [2]

[2]   The following facts are taken from the parties' submissions relating to the motion for summary judgment and are undisputed, unless otherwise noted.

Plaintiff was incarcerated in the New York state prison system from July 25, 2005, through September 10, 2010. (Dkt. No. 74 ("Def. 56.1 Stmt.") 11; Dkt. No. 84 ("Pl. 56.1 Response") 11.) At the end of July 2008, Plaintiff was an inmate at Cape Vincent Correctional Facility ("Cape Vincent"). (Def. 56.1 Stmt. 16; Pl. 56.1 Response 16.) On July 29, 2008, Plaintiff was involved in a physical altercation with another inmate. (Def. 56.1 Stmt. 116, 11; Pl. 56.1 Response 116, 11; Dkt. No. 70 ("Harben Decl.") Ex. B ("Jean–Laurent Depo.") at 62.) In a prison disciplinary hearing on August 1, 2008, Plaintiff pleaded guilty to charges arising from the fight. (Def. 56.1 Stmt. 16; Jean–Laurent Depo. at 74–75.) As punishment, Plaintiff was given six months in the Special Housing Unit ("SHU"), a recommended loss of three months of "good time," and six months of lost privileges, and was also ordered to pay restitution in the amount of $45. (Def. 56.1 Stmt. 17; Pl. 56.1 Response 17.) Plaintiff asserts that his guilty plea to the disciplinary charges was involuntary because he was misled into believing that the other participant in the fight would also be disciplined. (Pl. 56.1 Response 16; Jean–Laurent Depo. at 62–64.)

On August 26, 2008, Plaintiff was transferred to Mid–State Correctional Facility ("Mid–State"), and then, on December 23, 2008, to Downstate Correctional Facility ("Downstate"). (Def. 56.1 Stmt. 117; Pl. 56.1 Response 117; Dkt. No. 72 ("Perez Decl.") Ex. A.) On December 30, 2008, Plaintiff was temporarily transferred from Downstate to a New York City facility on Rikers Island so that he could attend court proceedings in New York City. (Def. 56.1 Stmt. ¶¶ 18–19; Pl. 56.1 Response ¶¶ 18–19.) Plaintiff returned to Downstate on January 12, 2009. (Def. 56.1 Stmt. ¶ 20; Pl. 56.1 Response ¶ 20.)

On January 15, 2009, Plaintiff filed a grievance in which he requested access to certain legal materials that were not transferred with him to Downstate or to Rikers. [3] (Def. 56.1 Stmt. ¶ 21; Pl. 56.1 Response ¶ 21; Perez Decl. Ex. D.) In the grievance, Plaintiff explained that he was involved in several state and federal litigations and risked adverse consequences in those litigations if he could not access his legal materials. (Perez Decl. Ex. D.)

[3]   Plaintiff states that he filed the formal grievance only "after informal remedial procedures were ineffective." (Pl. 56.1 Response ¶ 21; *see also*

Jean–Laurent Depo. at 30–34, 38–39.) He also sent a letter to Brian Fischer, who was then the Commissioner of the New York Department of Correctional Services ("DOCS"), on January 26, 2009. (Dkt. No. 85 ("Pl.Br.") Ex. H.)

**\*2** On February 4, 2009, Plaintiff received some of the legal materials he sought. (Def. 56.1 Stmt. ¶ 24; Pl. 56.1 Response ¶ 24; Perez Decl. Ex. C.) Defendant Perez, the Superintendent of Downstate, responded to Plaintiff's grievance regarding the legal materials on February 19, 2009, and asserted her understanding that by that point Plaintiff had received all of his legal materials. (Perez Decl. Ex. C.) Plaintiff appealed from this decision on February 27, 2009, and stated that some of his legal materials still had not been provided to him at Downstate. (*Id.*) Ultimately, Plaintiff gained full access to his legal materials once he was transferred to Livingston Correctional Facility ("Livingston") on March 5, 2009. (Dkt. No. 85 ("Pl.Br.") Ex. Q ¶ 10.)

On April 16, 2009, Plaintiff filed an Article 78 petition in New York state court.[4] (Def. 56.1 Stmt. ¶ 34; Pl. 56.1 Response ¶ 34.) The Article 78 petition concerned the punishment Plaintiff had received as a result of his Tier III[5] prison disciplinary hearing, which Plaintiff claimed to be "unduly harsh." (Pl.Br.Ex.I.) On July 8, 2009, the Honorable Dennis S. Cohen, Acting Supreme Court Justice, denied the petition, ruling that

[4]    Plaintiff states that he attempted to file the Article 78 petition before his transfer to Downstate, but that his draft petition was rejected by the state court for technical reasons. (Def. 56.1 Stmt. ¶ 31; Pl. 56.1 Response ¶ 31; *see also* Pl. Br. Ex. J.)

[5]    "The most serious [prison disciplinary] violations are the subject of Tier III hearings and may result in SHU confinement for the remainder of the inmate's prison time, as well as forfeiture of 'good time' credits." *Porter v. Coughlin,* 421 F.3d 141, 142 n. 1 (2d Cir.2005).

[t]he statute of limitations in this case was four months and that time period has lapsed. The Tier III administrative appeal was affirmed on October 1, 2008. Petitioner received notice of this determination on October 6, 2008, while at Mid–State Correctional Facility. Petitioner filed this article 78 application on April 16, 2009.

(*Id.* (citation omitted).) Plaintiff's motion to reargue was denied on October 13, 2009, again on grounds of untimely filing. (Pl.Br.Ex.K.)

**B. Procedural Background**

Plaintiff, proceeding pro se, filed this suit on February 28, 2012. (Dkt. No. 2.) On June 13, 2012, Defendants moved to dismiss the complaint. (Dkt. No. 14.) In an opinion filed March 19, 2013, the Court granted the motion in part and denied it in part. *Jean–Laurent v. Lawrence,* No. 12 Civ. 1502(JPO)(SN), 2013 WL 1129813 (S.D.N.Y. Mar. 19, 2013). The opinion dismissed Plaintiff's claims against state officials in their official capacities on grounds of Eleventh Amendment immunity. *Id.* at \*4. The Court also dismissed Plaintiff's inadequate clothing claim, as well as Plaintiff's privacy and religious freedom claims, on grounds of qualified immunity. *Id.* at \*6–9. Plaintiff's access to courts claim against Perez and the Sergeant Defendants was permitted to proceed. *Id.* at \*4–6. On March 28, 2014, the Court denied Defendants' motion for reconsideration concerning the access to courts claim, ruling that Plaintiff had pleaded a nonfrivolous underlying claim. *Jean–Laurent v. Lawrence,* No. 12 Civ. 1502(JPO)(SN), 2014 WL 1282309 (S.D.N.Y. Mar. 28, 2014).

Following discovery, Defendants moved for summary judgment on July 30, 2014. (Dkt. No. 68.) After several extensions of time, Plaintiff opposed the motion on October 21, 2014. (Dkt. No. 85.) Defendants filed a reply on November 10, 2014. (Dkt. No. 88.)

**II. Legal Standards**

**\*3** Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party, *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the party bearing the burden of proof at trial must come forward with evidence on each element of its claim or defense illustrating its entitlement to relief. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). It cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its burden. *Kulak v. City*

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 45 of 212
Jean-Laurent v. Lawrence, Not Reported in F.Supp.3d (2015)

2015 WL 1208318

*of New York,* 88 F.3d 63, 71 (2d Cir.1996). If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.,* that reasonable jurors could differ above the evidence. Fed.R.Civ.P. 56(c); *Liberty Lobby,* 477 U.S. at 250–51. The court should view all evidence "in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor," and a motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal quotation marks omitted).

Because Plaintiff is proceeding pro se, the Court "read[s] his papers liberally and interpret[s] them to raise the strongest arguments that they suggest." *Gerstenbluth v. Credit Suisse Sec. (USA) LLC,* 728 F.3d 139, 142 (2d Cir.2013) (internal quotation marks omitted).

## III. Discussion

The constitutional right of access to courts guarantees inmates a "reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Lewis v. Casey,* 518 U.S. 343, 356 (1996). The courts of appeals have recognized two variants of claims for denial of access to courts: first, "forward-looking claims," where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and second, "backward-looking access claims," which cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. *Christopher v. Harbury,* 536 U.S. 403, 413–14 & n. 11 (2002). "The Second Circuit has emphasized, however, that the viability of [backward-looking] claims is far from clear, pointing out that the [Supreme Court's] *Harbury* decision was careful not to endorse their validity." *McNaughton v. de Blasio,* No. 14 Civ. 221(KPF), 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015) (quoting *Sousa v. Marquez,* 702 F.3d 124, 128 (2d Cir.2012)) (internal quotation marks and brackets omitted).[6]

[6]  Recent decisions by courts in this district have similarly hesitated to recognize a cause of action for backward-looking access to courts. *See McNaughton,* 2015 WL 468890, at *12 (ruling that, even assuming the existence of backward-looking access claims, such a claim failed as pleaded by plaintiff); *Tavares v. N.Y.C. Health & Hosps.*

*Corp.,* No. 13 Civ. 3148(PKC)(MHD), 2015 WL 158863, at *7–8 (S.D.N.Y. Jan. 13, 2015) (same). At least one court of appeals has also declined to rule on the validity of backward-looking access claims following *Harbury. See Jennings v. City of Stillwater,* 383 F.3d 1199, 1209 (10th Cir.2004). Several other circuits consider backward-looking access claims to be viable. *See, e.g., Flagg v. City of Detroit,* 715 F.3d 165, 173 (6th Cir.2013); *Broudy v. Mather,* 460 F.3d 106, 120 (D.C.Cir.2006).

**\*4**  Because the availability of a backward-looking access claim is unclear in this circuit, its elements are not well settled. *See Stevens v. Webb,* No. 12 Civ. 2909(KAM), 2014 WL 1154246, at *7 (E.D.N.Y. Mar. 21, 2014) ("There is scant case law on backward-looking access to the courts claims in this Circuit...."). The case law from the Supreme Court and the courts in this circuit suggests four elements. First, the plaintiff "must identify a nonfrivolous, arguable underlying claim." *Harbury,* 536 U.S. at 415 (internal quotation marks omitted). Second, the plaintiff must establish that the defendant "took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Casey,* 518 U.S. at 351) (brackets and internal quotation marks omitted). Third, the plaintiff "must show that the defendant's alleged conduct was deliberate and malicious."[7] *Jean–Laurent,* 2013 WL 1129813, at *4 (citing *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)) (internal quotation marks omitted). Fourth, the plaintiff must demonstrate that "the defendant's actions resulted in an actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008) (citing *Davis,* 320 F.3d at 351).

[7]  At least one district court in this circuit has questioned whether maliciousness is properly a part of the test for a backward-looking access to courts claim, given that this element may not be sanctioned by the Second Circuit. *See Desmarat v. Artus,* Civ. No. 08 Civ. 977 (DNH/RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011) (stating that "published decisions from the Second Circuit do not impose this extra element of maliciousness, though many district cases nonetheless have interjected it into their analysis" (citing cases)), *report & rec. adopted,* 2011 WL 1557914 (N.D.N.Y. Apr. 25, 2011). Other circuits do not include such an element. *See Broudy,* 460 F.3d at 120 (listing the elements of a backward-looking denial of access claim as (1)

"a non-frivolous, arguable underlying claim"; (2) a showing that plaintiffs were "denied a remedy for their underlying claims" and that such remedy was "completely foreclosed"; and (3) that "it was the defendants' actions that have cut off [the plaintiffs'] remedy" (internal quotation marks omitted)); *see also Flagg,* 715 F.3d at 174.

It is unnecessary here to determine the viability of a backward-looking right of access claim within this circuit. Even assuming that such a claim is actionable, Plaintiff has failed to show that there is sufficient evidence supporting each element of his claim to create a triable issue of fact.[8] "[W]hen the burden of proof at trial would fall on the nonmoving party," summary judgment is generally proper where the movant "point[s] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP,* 735 F.3d 114, 123 (2d Cir.2013) (internal quotation marks omitted). Here, Plaintiff has presented no evidence at summary judgment to demonstrate that Defendants' actions-that is, the conduct that deprived Plaintiff of access to certain legal materials-were deliberate or malicious. If Defendants' actions were negligent or even less culpable, then they cannot be held liable on Plaintiff's claim. *See, e.g., Holmes v. Grant,* No. 03 Civ. 3426(RJH)(RLE), 2006 WL 851753, at *12 n. 9 (S .D.N.Y. Mar. 31, 2006) (stating that "[m]ere negligence resulting in the loss of legal papers ... does not state an actionable claim" for denial of access to courts).

[8]    The Court also notes that there is some question about whether Defendants are entitled to qualified immunity on the backward-looking access to courts claim, given the Second Circuit's statement that the "viability of backward-looking right-of-access claims is far from clear in this Circuit." *Sousa,* 702 F.3d at 128. In the qualified immunity analysis, a court would determine whether Plaintiff's backward-looking access to courts claim was established "beyond debate," *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011), such that "any reasonable official in the defendant's shoes would have understood that he was violating it," *Plumhoff v. Rickard,* 134 S.Ct. 2012, 2023 (2014). Certain principles regarding the right of access to courts were clearly established during the relevant time period. *See, e.g., Bounds v. Smith,* 430 U.S. 817, 828 (1977) (holding that "the fundamental constitutional right of access to the courts

requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers"). It is unclear, however, whether the uncertain status of the backward-looking *claim* causes the access *right* at issue to be unsettled for purposes of qualified immunity. Because Defendants' motion for summary judgment is granted on other grounds, the Court declines to reach this question.

The evidence in the record demonstrates that, after Plaintiff filed a grievance in mid-January 2009, prison officials who are not parties to this suit looked into the situation and arranged for the shipment of legal materials to Plaintiff on February 4, 2009.[9] (Perez Decl. Ex. D.) Perez declared that she understood Plaintiff to have all of his legal materials by the time the matter reached her on February 19, 2009. (*Id.* Ex. C.) Plaintiff filed an appeal from this determination on February 27, 2009, and stated that only some of his legal materials had been made available to him. (*Id.*) Plaintiff states that he received all of his legal materials when he was transferred to Livingston on March 5, 2009. (*See* Pl. Br. at 13.) By this time, the statute of limitations had elapsed. (Def. 56.1 Stmt. ¶¶ 34–35; Pl. 56.1 Response ¶¶ 34–35.)

[9]    While there is no evidence that Defendants were specifically notified of the impending expiration of the statute of limitations for Plaintiff's Article 78 proceeding, Perez was on notice of the risk of a detrimental effect on Plaintiff's legal proceedings. In a letter dated January 26, 2009, Plaintiff wrote to then-DOCS Commissioner Brian Fischer (copied to Perez) that "certain limitations periods ... are very near approaching and because pertinent legal materials are being withheld from me, I am not able to timely begin certain legal proceedings that will indeed affect my substantial rights and interests." (Pl. Br. Ex. H, at 1.) However, while Plaintiff's letter enumerates matters including three trials, an "appeal matter" in the New York Appellate Division, and a federal habeas proceeding, there is no mention of a forthcoming Article 78 petition. (*Id.* at 1–2.)

**\*5** It is undisputed that Plaintiff was not able to access some of his papers for a period of time after his transfer to Downstate, and that the deadline for Plaintiff's Article 78 petition elapsed before he received all of his legal materials. But the evidence that Plaintiff has produced at summary judgment[10] simply does not show that Defendants engaged in any deliberate conduct—much less malicious conduct—

that denied Plaintiff access to the courts. *See Res. Developers, Inc. v. Statute of Liberty–Ellis Island Found.,* 926 F.2d 134, 141 (2d Cir.1991) (stating that summary judgment is permissible where mental state is in issue if "only speculative allegations are offered to demonstrate the existence of state of mind after ample opportunity to engage in relevant discovery"). [11]

10    The Court notes that Plaintiff was advised of the requirement that he oppose summary judgment by submitting evidence, and not by relying on the allegations of his complaint. (Dkt. No. 69.) *See, e.g., Jova v. Smith,* 582 F.3d 410, 414 (2d Cir.2009) (per curiam) (holding that a pro se litigant generally must receive "actual notice ... of the consequences of not responding adequately to a summary judgment motion").

11    Plaintiff also contends that Defendants did not provide certain information to him in discovery, despite his interrogatories and document requests. (*See* Pl. Br. at 7; *see also, e.g.,* Pl. 56.1 Response ¶¶ 3–4.) The Court notes that Plaintiff did not move to compel production of this information. *See* Fed.R.Civ.P. 37(a). More importantly, none of the discovery requests in question appear likely to produce information relevant to this factor of Plaintiff's claim, and Plaintiff does not argue that the purportedly withheld discovery has precluded him from presenting evidence on this element of his claim.

Plaintiff argues that the question of whether Defendants' conduct was deliberate and malicious was already decided in the motion to dismiss and, under the doctrine of the law of the case, should not be reconsidered. (Pl. Br. at 16.) "The 'law of the case' doctrine posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Sagendorf–Teal v. Cnty. of Rensselaer,* 100 F.3d 270, 277 (2d Cir.1996). However, "[a]pplication of the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Aramony v.. United Way of Am.,* 254 F.3d 403, 410 (2d Cir.2001).

The law of the case doctrine does not apply here. *See Maraschiello v. City of Buffalo Police Dep't,* 709 F.3d 87, 97 (2d Cir.) (holding that the doctrine of law of the case "would not preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations"), *cert. denied,* 134 S.Ct. 119 (2013). The Court's initial decision was made at the motion to dismiss stage, when it was bound to accept Plaintiff's allegations regarding deliberateness as true. *See Jean–Laurent,* 2013 WL 1129813, at *5 (holding that, "construed liberally, Plaintiff's allegations sufficiently indicate deliberateness and maliciousness"). Now, however, at summary judgment, Plaintiff-as the party who bears the burden of proof at trial—must show evidence of his entitlement to relief. *See Celotex,* 477 U.S. at 322 (stating that a district court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Plaintiff has failed to present sufficient evidence that Defendants' conduct was deliberate or malicious to permit a jury to "reasonably find" in his favor. *See Liberty Lobby,* 477 U.S. at 252. Because Plaintiff's claim cannot survive without support for this element, summary judgment must be granted to Defendants.

**IV. Conclusion**

 **\*6** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and Plaintiff's remaining claim is dismissed.

The Clerk of the Court is directed to terminate the motion at docket entry 68 and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1208318

---

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  5

657 Fed.Appx. 52 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Kalonji MAHON, Plaintiff–Appellant,

v.

Deborah MOULTRIE, Grievance Supervisor,
Roslyn McCall, N.Y.C. Corrections Officer,
Kimberly Williams, Defendants–Appellees.
Jane Doe, Mail Room Officer (Female),
7–3 tour on July 10, 2012, Defendant.

14–3986
|
August 24, 2016

Appeal from the United States District Court for the Southern
District of New York (Abrams, *J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of said District Court be and it hereby is
**AFFIRMED**.

**Attorneys and Law Firms**

Appearing for Appellant: Kalonji Mahon, pro se, Coxsackie,
NY.

Appearing for Appellees: Victoria Scalzo and Pamela Seider
Dolgow, Assistant Corporation, Counsel, for Zachary W.
Carter, Corporation Counsel of the City, of New York, New
York, NY.

Present: ROSEMARY S. POOLER, GERARD E. LYNCH,
SUSAN L. CARNEY, Circuit Judges.

**SUMMARY ORDER**

Plaintiff Kalonji Mahon, proceeding pro se, appeals from the
district court's judgment dismissing his 42 U.S.C. § 1983
complaint, which alleged that two corrections officers denied
him access to the courts by mishandling his legal mail. We
assume the parties' familiarity with the underlying facts, the
procedural history of the case, and the issues on appeal.

We review de novo a district court's dismissal of a complaint
for failure to state a claim, construing the "complaint liberally,
accepting all factual allegations in the complaint as true, and
drawing all reasonable inferences in the plaintiff's favor."
**\*53** *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d
Cir. 2002).

Mahon has effectively abandoned any challenge to the district
court's dismissal of his complaint by asserting that a state
court clerk, not defendants, denied him court access by failing
to properly file his motion, which he concedes was received
by the state court. See *LoSacco v. City of Middletown*, 71
F.3d 88, 93 (2d Cir. 1995). To state a claim of denial of court
access, "a plaintiff must allege that the defendant took or
was responsible for actions that hindered a plaintiff's efforts
to pursue a legal claim" and that the defendant's actions
resulted in actual injury to the plaintiff. See *Davis v. Goord*,
320 F.3d 346, 351 (2d Cir. 2003) (alterations and internal
quotation marks omitted). Because Mahon now concedes that
the corrections officers were not responsible for his alleged
injury, he cannot successfully challenge the district court's
decision to dismiss his claims against them. See *id*. Likewise,
Mahon's request that he be allowed to replead must fail: he
no longer asserts any claims against the corrections officers
and acknowledges that he later sued the state court clerk in
a separate action that has already been dismissed. See *Cuoco
v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that
futile requests to replead should be denied). Additionally,
Mahon's attempt to challenge the district court's denial of
reconsideration is unsuccessful: we lack jurisdiction to review
the denial of reconsideration because Mahon did not file an
amended notice of appeal challenging that decision. See Fed.
R. App. P 4(a)(4)(B)(ii); *see also Sorensen v. City of New
York*, 413 F.3d 292, 295–96 (2d Cir. 2005).

We have considered the remainder of plaintiff's arguments and find them to be without merit. Accordingly, the judgment of the district court hereby is AFFIRMED.

**All Citations**

657 Fed.Appx. 52 (Mem)

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

509 Fed.Appx. 16
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Derek DeMEO, Plaintiff–Appellee–Cross Appellant,

v.

Dorian TUCKER, Sharleen Spillenger, Ralph
Spillenger, The Bayou Café, Inc., Defendants,
Joshua Kean, M.K. Reyner, Defendants–Cross Appellees,
Phlip'N Spill, INC., Individually and Doing Business as
the Bayou Café, Defendant–Appellant–Cross Appellee.

Nos. 11–5154 (Lead), 11–5391(XAP)
|
Jan. 29, 2013.

**Synopsis**

**Background:** Bar patron brought § 1983 action against police
officers, bar owner, and bar's employee, alleging violations of
his federal constitutional rights and state law arising from an
altercation outside the bar. Following a jury trial, judgment
was entered dismissing claims against police officers and bar's
employee, but against bar owner in the amount of $110,000,
which included $10,000 in compensatory damages for the loss
of due process through evidence destruction and $100,000
in punitive damages. The United States District Court for
the Northern District of New York, David N. Hurd, J., 824
F.Supp.2d 334, denied bar owner's motion to amend, and for
new trial. Bar owner appealed.

**Holdings:** The Court of Appeals held that:

[1] bar owner could not be liable under § 1983 for violation
of bar patron's due process rights;

[2] adverse inference jury instruction was not required to
compel jury to draw adverse inference upon spoliation of
evidence; and

[3] any error in permitting expert testimony regarding blood-
alcohol levels from state trooper, a lay witness, was harmless
error.

Affirmed in part and reversed in part.

**Procedural Posture(s):** On Appeal.

West Headnotes (3)

[1]   **Civil Rights**  Cooperation with state actor

Bar owner could not be liable under § 1983 for
violation of bar patron's due process rights for
alleged altering, destroying, or losing of video
surveillance evidence; bar owner was private
citizen, not state actor, and there was no showing
that he engaged in joint activity with state
trooper or other state official to alter, destroy, or
lose the video surveillance evidence. U.S.C.A.
Const.Amend. 14; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[2]   **Federal Civil Procedure**  Necessity and
subject matter

Adverse inference jury instruction concerning
the spoliation of evidence was not required to
compel jury to draw adverse inference upon
spoliation of evidence.

1 Cases that cite this headnote

[3]   **Federal Courts**  Expert and opinion
testimony

Any error in permitting expert testimony
regarding blood-alcohol levels from state
trooper, a lay witness, was harmless error, in bar
patron's § 1983 action against bar owner, alleging
violations of his federal constitutional rights, in

connection with altercation outside bar, absent showing that jury's judgment was swayed in a material fashion by the alleged error. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**\*17** Appeal from a judgment of the United States District Court for the Northern District of New York (Hurd, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court be **AFFIRMED IN PART** and **REVERSED IN PART.**

**Attorneys and Law Firms**

Kevin A. Luibrand, Luibrand Law Firm, PLLC, Latham, NY, for Plaintiff–Appellee–Cross Appellant.

Kate H. Nepveu, Assistant Solicitor General, for Eric T. Schneiderman, Attorney General of the State of New York, and Barbara D. Underwood, Solicitor General of the State of New York (Denise A. Hartman, Assistant Solicitor General, Albany, NY, on the brief).

Gretchen M. Greisler, Albany, NY, for Defendant–Appellant–Cross Appellee.

PRESENT: DENNIS JACOBS, Chief Judge, ROSEMARY S. POOLER, DENNY CHIN, Circuit Judges.

**\*18** *SUMMARY ORDER*

Defendant Phlip'N Spill, the corporate owner of a bar called The Bayou Café, appeals from a judgment of the United States District Court for the Northern District of New York (Hurd, *J.*) following a jury verdict rendered against it for compensatory and punitive damages in the total amount of $110,000. Plaintiff Derek DeMeo cross appeals from the district court's denial of his motion for a new trial pursuant to Fed.R.Civ.P. 59(a). We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

Phlip'N Spill, along with State Defendants Joshua Kean and M.K. Reyner, argues that the district court erred by denying its motion to amend the judgment to rectify a clear error of law

with respect to DeMeo's due process claim. *See* Fed.R.Civ.P. 59(e); *Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135, 153 (2d Cir.2008). We agree.

DeMeo claimed that he was assaulted by Officer Kean and the bar bouncer, Dorian Tucker, and that Phlip'N Spill and the officers violated his due process rights under 42 U.S.C. § 1983 by altering, destroying, or losing video surveillance footage of the alleged assault, thereby impairing his right to access the courts. To succeed on a denial of access claim, a plaintiff must show that the defendants (1) engaged in deliberate and malicious conduct that (2) resulted in actual injury, *i.e.,* that hindered the plaintiff's effort to pursue a legal claim. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). To recover under § 1983, a plaintiff must establish in addition that the defendants deprived him of this right while acting "under color of law." *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 174 n. 44, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citation and internal quotation marks omitted). A person acts under color of law when, *e.g.,* "he is a willful participant in joint activity with the State." *Id.* (citation and internal quotation marks omitted). "It is not enough, however, for a plaintiff to plead state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege that the state was involved 'with the *activity that caused the injury*' giving rise to the action." *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257–58 (2d Cir.2008) (quoting *Schlein v. Milford Hosp., Inc.,* 561 F.2d 427, 428 (2d Cir.1977)).

**[1]** Here, the jury concluded that Phlip'N Spill acted as a willful participant in joint activity with Trooper Reyner and deprived DeMeo of due process by altering, destroying, or losing video evidence. However, the jury concluded that Trooper Reyner *did not* deprive DeMeo of due process by altering, destroying, or losing video evidence. After the verdict was rendered, Phlip'N Spill moved for an amended judgment dismissing the due process claim. The district court denied the motion, suggesting that Phlip'N Spill might have "engage[d] in legal joint activity involving the video evidence" or could have "destroyed or lost it at Reyner's suggestion or encouragement, or to curry favor with the police." A 199–200.

Both of these theories are flawed. First, as set out above, involvement in legal joint activity with a state official will not turn a private citizen into a state actor. *See* Sybalski, 546 F.3d at 257–58. The existence of "state action" depends on "whether there is a sufficiently close nexus between the

State and the challenged action of the [private citizen or entity] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). DeMeo could not satisfy this standard by **\*19** showing that Trooper Reyner and Phlip'N Spill engaged in just any joint activity; rather, DeMeo had to prove that they engaged in joint activity involving the loss of video evidence.

The district court's hypothesis that Trooper Reyner may have encouraged Phlip'N Spill to destroy the evidence would suffice to establish state action; but it rests on naked conjecture and has no basis in the facts of this case—a point that counsel was forced to concede at oral argument. [1] It is, quite simply, a fiction. Accordingly, because Phlip'N Spill was not a state actor, the district court erred by denying Phlip'N Spill's motion to amend the judgment and dismiss DeMeo's due process claim.

[1]    The amended complaint itself contains no allegation whatsoever concerning joint activity between Trooper Reyner and Phlip'N Spill involving the destruction of video surveillance footage. Phlip'N Spill contends that the court independently erred by allowing DeMeo to proceed on an unpleaded cause of action, but we need not reach this argument.

DeMeo's cross appeal seeks a new trial on several grounds. First, he argues that the jury's verdict (on the assault claims) was wholly unsupported by the record, highlighting the testimony favorable to his position. However, a "claim that the jury verdict was against the weight of the evidence," and that therefore a party is entitled to a new trial under Rule 59(a), "is not reviewable on appeal." *Espinal v. Goord,* 558 F.3d 119, 131 (2d Cir.2009) (citing *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,* 73 F.3d 1178, 1199 (2d Cir.1995)).

**[2]**    DeMeo also takes issue with the language of the adverse inference instruction concerning the spoliation of evidence. The court instructed the jury that if they find that the missing video evidence "would have been relevant and helpful to you in determining the facts of this case, you are permitted—but you are not required—to infer that the images contained on the harddrives would have supported plaintiff's version of the events." A 136. DeMeo urges that the court should have mandated this inference. But courts have "wide discretion" in formulating sanctions, *Reilly v. Natwest Markets Group, Inc.,* 181 F.3d 253, 267 (2d Cir.1999), and DeMeo offers no authority indicating that a trial court must compel the jury to draw an adverse inference.

**[3]**    Finally, DeMeo argues that the court erred in permitting the Defendants to elicit expert testimony regarding blood-alcohol levels from Trooper Reyner, a lay witness. DeMeo did not preserve this issue for appeal. His motion in limine sought to broadly exclude evidence of intoxication, but it did not raise the issue of lay witness testimony concerning blood-alcohol levels. Nor did DeMeo's counsel object when defense counsel inquired generally about the number of drinks needed to reach a certain blood-alcohol content. When an objection was raised, the court sustained it. But even if the district court made an erroneous ruling (which it did not) and even if DeMeo properly preserved his objection to this entire line of questioning, he cannot demonstrate that the "jury's judgment would be swayed in a material fashion by the error." *Arlio v. Lively,* 474 F.3d 46, 51 (2d Cir.2007).

For the foregoing reasons, and having considered the parties' other arguments, we hereby **REVERSE** the judgment insofar as it awards damages to DeMeo, and as to all remaining issues we **AFFIRM.** We direct the district court to enter judgment for Phlip'N Spill on DeMeo's due process claim.

**All Citations**

509 Fed.Appx. 16

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4743431
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jose RODRIGUEZ, Plaintiff,

v.

Jeffrey MCKOY, Dr. Mikhail Gusman, Dr. Ann Andola, Dr. Bipin Bhavsar, Nancy Anthony, Megan McGlynn, Amanda Demshick, David Jacobs, and Roger Traynor, Defendants.

9:15-CV-0610 (MAD/TWD)
|
Signed 10/12/2021

**Attorneys and Law Firms**

OF COUNSEL: JANE B. O'BRIEN, ESQ., ERIN J. MORGAN, ESQ., KATHRYN BRENNAN, ESQ., MATTEO GODI, ESQ., PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, Attorneys for Plaintiff.

OF COUNSEL: MATTHEW P. REED, AAG, KONSTANDINOS D. LERIS, AAG, OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff Jose Rodriguez commenced this action on May 19, 2015, pursuant to 42 U.S.C. § 1983, asserting claims arising out of an alleged failure to provide him with adequate medical attention and treatment in the period leading up to a stroke he suffered while he was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). [1] Plaintiff also alleges that, in retaliation for commencing this lawsuit, DOCCS transferred him to a correctional facility that was not easily accessible to his counsel and limited the number and length of his legal phone calls. In his fifth amended complaint, Plaintiff asserts three causes of action: (1) infliction of cruel and unusual punishment in violation of his Eighth Amendment rights

against Defendants Gusman, Andola, Bhavsar, and Anthony; (2) retaliatory transfer in violation of his First Amendment rights against Defendants McGlynn and Demshick; and (3) denial of access to the courts in violation of his First Amendment rights against Defendants McKoy, Jacobs, and Traynor. See Dkt. No. 96.

[1]     Although Plaintiff filed this action *pro se*, he has been represented by counsel since March 2017. See Dkt. Nos. 27, 134, 140, 141. On September 6, 2017, Plaintiff was released from custody and deported to the Dominican Republic, where he remains to this day. See Dkt. Nos. 102, 119.

Currently before the Court is Defendants' motion for summary judgment. See Dkt. No. 136.

**II. BACKGROUND**

Plaintiff was born on November 30, 1962. See Dkt. No. 136-8 at 16. In 2011, Plaintiff was in DOCCS custody at Eastern Correctional Facility ("Eastern"). Defendants Gusman, Andola, and Bhavsar were clinical physicians and Defendant Anthony was a registered nurse at Eastern (collectively, the "Medical Defendants"). In the time period leading up to his stroke in February 2012, Plaintiff regularly met with the Medical Defendants. *See generally* Dkt. No. 137-3 at 13-70. A summary of those meetings follows below. On January 4, 2011, Defendant Gusman saw Plaintiff after he requested a rubber ball for hand exercises. *See id.* at 34. On February 1, 2011, Plaintiff attended sick call with a question concerning a rescheduled doctor's appointment. *See id.* at 3, 33. Plaintiff was seen by Defendant Anthony, who recorded Plaintiff's blood pressure as 121/74. On February 3, 2011, Defendant Gusman saw Plaintiff related to occupational therapy Plaintiff was undergoing. *See id.* at 32.

On May 20, 2011, Plaintiff met with nursing staff at Eastern, complaining that he would occasionally have a racing heart rate, especially at night, where he could feel and hear his heart beating in his chest. *See id.* at 31. The medical records note that Plaintiff did not report any pain, headache, or dizziness, and recorded his blood pressure as 144/88. *See id.* The nurse requested a doctors appointment and, on May 25, 2011, Plaintiff was seen by Defendant Andola. *See id.* at 30. Defendant Andola recorded Plaintiff's complaints of a periodical racing heart beat and occasional heart palpitations, and recorded his blood pressure as 145/94, his heart rate

2021 WL 4743431

at 73, and the percentage of oxygen in his blood as 98%.
*See id.* Defendant Andola also noted that Plaintiff ran
daily without exertional chest pain, was a non-smoker, had
no added salt in his diet, and had denied any dizziness,
tremor, anxiety or diarrhea. *See id.* Defendant Andola ordered
an electrocardiogram ("EKG") and bloodwork, and issued
Plaintiff a blood pressure card, which allowed him to have his
blood pressure monitored by medical staff weekly to ensure
it stayed within normal limits. *See id.* [2]

[2]   Although Plaintiff appears to have had his blood
pressure monitored in accordance with the blood
pressure card, the results of that monitoring are not
included in the record.

**\*2** Defendant Andola reviewed Plaintiff's blood work
on June 23, 2011, and indicated that "no action [was]
required at [that] time." Dkt. No. 137-1 at 11. In her
declaration, Defendant Andola stated that she had "observed
no concerning abnormalities in [P]laintiff's labs." *Id.* at 4.
Defendant Andola reviewed Plaintiff's EKG on July 13, 2011,
and "observed that Plaintiff's EKG was normal, indicating
normal sinus rhythm." *Id.* at 4, 15. Defendant Bhavsar also
reviewed Plaintiff's EKG and came to the same conclusion.
*See* Dkt. No. 137-2 at 2.

On July 28 and July 29, 2011, Defendant Gusman met
with Plaintiff to review complaints of lower back pain
and issues related to Plaintiff's exercise routine. *See* Dkt.
No. 137-3 at 28, 29. Defendant Gusman recorded a blood
pressures of 130/80 and 140/82 and reviewed the bloodwork
ordered by Defendant Andola, "observ[ing] no concerning
abnormalities." *Id.* at 5, 28. Defendant Gusman ordered an x-
ray of Plaintiff's back. Plaintiff was seen again on August 2,
2011, and his blood pressure was recorded as 138/85. *See id.*
On August 9, 2011, Defendant Gusman reviewed the ordered
x-ray, and "observed no concerning abnormalities." *Id.* at 6-7.
Finally, on October 13, 2011, Plaintiff met with a nurse to
obtain an ice bucket to soak his sore ankles and feet from
running in the yard. *See id.* at 27. Plaintiff's blood pressure
was 149/86.

Plaintiff suffered a stroke while lifting weights at Eastern
on February 16, 2012. Plaintiff was transferred to Coxsackie
Correctional Facility ("Coxsackie") to receive medical
treatment. As a result of his stroke, Plaintiff was permanently
paralyzed on his left side, leaving him confined to a
wheelchair, and he suffers from slurred speech, blurred
vision, dizziness, and chronic headaches. After ten months

at Coxsackie, Plaintiff was transferred to Shawangunk
Correctional Facility ("Shawangunk"), a maximum-security
facility. On August 20, 2013, Plaintiff filed a grievance
with the Inmate Grievance Resolution Committee ("IGRC"),
alleging improper medical treatment at Eastern in connection
with his stroke. The IGRC concluded that Eastern's medical
personnel demonstrated deliberate indifference to Plaintiff's
serious medical condition. This finding was sent to the
Superintendent, who denied the grievance on September
30, 2013. Plaintiff appealed his claim to the Central
Office Review Committee which, in April 2014, upheld
the Superintendent's decision. Plaintiff then commenced
the present action in May 2015, alleging that his Eighth
Amendment rights had been violated when Eastern's medical
personnel demonstrated deliberate indifference to his serious
medical condition. *See* Dkt. No. 1.

In April 2016, a review of Plaintiff's security classification
was conducted by an automated computer system. *See* Dkt.
No. 136-5 at 4. These reviews occur every six months
and the computer generates a score based on a number of
characteristics, including: an inmate's disciplinary history,
their sentence length, the violence of the underlying offense,
how long the inmate has been incarcerated, and the inmate's
program history. *See id.* at 3. In this instance, the classification
review generated a recommendation that Plaintiff's security
classification be reduced from maximum to medium.

Defendant Demshick was the Offender Rehabilitation
Coordinator at Shawangunk at this time. It was her
responsibility to review the automated system's classification
recommendations and take the necessary steps to initiate
a transfer to another facility where appropriate. *See* Dkt.
No. 136-3 at 3. Defendant Demshick thereafter submitted
a transfer request to DOCCS' Central Office, noting that
the automated system had recommended reducing Plaintiff's
security classification and that he had displayed adequate
custodial adjustment and programming. *See id.* at 9.

**\*3** Defendant McGlynn, a Class and Movement Analyst at
DOCCS' Central Office, was then assigned to the transfer
request. Defendant McGlynn testified that it was DOCCS
policy "to house prisoners in the least restrictive appropriate
facility." Dkt. No. 136-5 at 4. Defendant McGlynn contacted
a health services analyst, seeking a list of medium security
facilities that were able to meet Plaintiff's specific medical
needs. *See id.* at 9. The health services analyst indicated
that only three correctional facilities could accommodate
Plaintiff's security and medical requirements: Franklin

Correctional Facility ("Franklin"), Livingston Correctional Facility, and Orleans Correctional Facility. *See id.* at 10. Defendant McGlynn testified that even though she was "not obligated to choose [the facility] that is closest to [an inmate's] present facility, or take any preference into consideration," and that "[a]n inmate has no right to be housed in a particular prison of their own choosing," she ultimately chose Franklin because "it appeared to be the closest to the [P]laintiff's desired region." *Id.* at 5. Defendant McGlynn "made this estimation simply by looking at a map, and did not plan a route or calculate the mileage." *Id.* Plaintiff was transferred to Franklin in July 2016.

Meanwhile, in May 2016 (two months before his transfer to Franklin), Plaintiff was approached by a Shawangunk correction officer while he was playing chess. *See* Dkt. No. 136-8 at 72-73. The correction officer handed Plaintiff a letter that he had received and stated, "[O]h, you're the one that wants money from the state." *Id.* The correction officer did not make any further statements.

Shortly after Plaintiff arrived at Franklin, DOCCS began restricting Plaintiff's telephone calls with his counsel to one call for a maximum of thirty minutes every thirty days. DOCCS stated that it was enforcing this restriction in accordance with DOCCS Directive 4423, which states in relevant part:

### IX. ATTORNEY LEGAL CALLS

A. Generally, attorneys are expected to communicate with their inmate clients through privileged correspondence in accordance with Part 721 of Title 22 NYCRR or during legal visits (see Directive #4404, "Inmate Legal Visits"). There may, however, be certain circumstances where an attorney will need to communicate confidentially with his or her inmate client by telephone.

B. In the absence of specific court order or written direction from the Department's Office of Counsel to the contrary, the following protocols shall apply to confidential attorney legal calls:

\* \* \*

5. The attorney must not have had a legal call with the inmate in the last 30 days;

\* \* \*

8. The call must not exceed 30 minutes in duration.

\* \* \*

E. If the correctional facility denies an attorney's request for a legal call, the attorney can call or write to the Office of Counsel using Office of Counsel contact information provided by the correctional facility;

Dkt. No. 136-6 at 18-19.

Defendant McKoy is the Deputy Commissioner for Program Services at DOCCS Central Office. In his role as Deputy Commissioner, Defendant McKoy signed and enacted Directive 4423. *See id.* at 2. Defendant Jacobs was Plaintiff's Offender Rehabilitation Coordinator at Franklin during the relevant time period, and was responsible for scheduling his legal calls. In the twelve month period between Plaintiff's arrival at Franklin and his release, Plaintiff was allowed eleven calls. *See* Dkt. No. 136-4 at 20. DOCCS denied a number of requests by Plaintiff's counsel for additional calls.

In October 2016, Plaintiff began filing grievances requesting transfer to a correctional facility closer to his counsel and challenging the restrictions on his legal phone calls.[3] Defendant Traynor, a Supervising Offender Rehabilitation Coordinator at Franklin, was assigned to review Plaintiff's grievances. Defendant Traynor ultimately denied the grievances, reasoning that there was no improper practice or procedure involved because Plaintiff's phone calls were properly restricted under Directive 4423 and he was not entitled to be housed in a correctional facility of his choice. *See* Dkt. No. 136-7 at 21-22.

[3]   Plaintiff addressed one of these grievances to Defendant McKoy. Defendant McKoy did not personally investigate or respond to this letter; instead, it appears it was referred to Inmate Grievance. *See* Dkt. No. 136-6 at 2, 8.

### III. DISCUSSION

**A. Standard of Review**

 **\*4**  A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can

only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e).

**B. Deliberate Indifference**

Defendants argue that Plaintiff "has failed to demonstrate that they intentionally denied or delayed his access to medical care, and therefore failed to preemptively prevent his stroke from occurring." Dkt. No. 136-1 at 5. Defendants assert that the record establishes they, in fact, "made repeated efforts to treat [P]laintiff's complaints" and that Plaintiff "received the standard of care that any reasonable medical provider in [D]efendants' position would have provided," precluding a finding that they were deliberately indifferent to Plaintiff's serious medical needs. *Id.* at 8-9. In opposition, Plaintiff argues that "there are genuine and material factual disputes as to whether Defendants ... failed to act while aware of 'a substantial risk' that [Plaintiff] would suffer 'serious' harm." Dkt. No. 142 at 11. Specifically, Plaintiff asserts that there is conflicting evidence in the record as to whether (1) his "elevated blood pressure levels were dangerously high" during the time leading up to his stroke, (2) the "level of medical care that [he] received departed from accepted professional standards," and (3) "defendants were able to communicate with [him] to treat him adequately" without providing a Spanish interpreter. *Id.* at 11, 13, 15 (internal capitalization omitted). The Court concludes that the record here demonstrates that Plaintiff's claim amounts to a

difference in opinion as to the medical treatment Plaintiff required.

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition encompasses the provision of medical care involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). However, the United States Supreme Court has recognized that not "every injury" a prisoner suffers "translates into constitutional liability for prison officials." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In order to establish an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See id.* This standard requires proof of both an objective and subjective element.

**\*5** The objective component "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). For purposes of this motion, Defendants concede and the Court will accept, that Plaintiff's condition constituted a sufficiently serious medical condition to meet the objective prong of deliberate medical indifference. *See* Dkt. No. 136-1 at 3.

Under the subjective component, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). Thus, the defendant "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Framer*, 511 U.S. at 837. Satisfying this standard "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *see also Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) (holding that an "inadvertent failure to provide adequate

medical care" does not constitute "deliberate indifference"); *Chance*, 143 F.3d at 703 (holding that "[m]ere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate); *Hathaway*, 99 F.3d at 553 (holding that "mere medical malpractice" does not constitute deliberate indifference unless the malpractice involved "culpable recklessness").

Defendants have met their initial burden of establishing that there is no genuine issue of material fact to be decided. The Medical Defendants' testimony and Plaintiff's medical records establish that the Medical Defendants continuously monitored Plaintiff's blood pressure in the period leading up to his stroke and, after he complained of a periodical racing heart beat and occasional heart palpitations, that Defendant Andola ordered an EKG, bloodwork, and issued Plaintiff a blood pressure card. Neither the EKG nor the bloodwork raised any concerning abnormalities and, despite meeting with the Medical Defendants five more times before his stroke, Plaintiff never again complained of a racing heart beat or heart palpitations. *See* Dkt. No. 137-3 at 27-29. Indeed, according to the Medical Defendants' testimony, Plaintiff did not present with any risk factors for a stroke other than his elevated blood pressure. *See id.* at 9, 30. With respect to Plaintiff's language barrier, Defendant Gusman testified that in-person interpretation was available when necessary and that, here, Plaintiff "conversed freely with [him] and other members of the staff in English." *Id.* at 11.

In opposition, Plaintiff does not offer the testimony or report of an independent medical expert to demonstrate that there is a genuine unresolved issue of material fact for trial. Instead, Plaintiff relies on the deposition testimony of the Medical Defendants, which he argues contains conflicting testimony that cannot be resolved on summery judgment. Initially, despite Plaintiff's characterizations to the contrary, the Medical Defendants consistently testified that Plaintiff's blood pressure was only mildly elevated or near the upper limit of normal blood pressure for someone of Plaintiff's age. *See, e.g.,* Dkt. No. 142-4 at 45, 51-52; Dkt. No. 142-3 at 106-07. Plaintiff does accurately note that the Medical Defendants generally acknowledged that (1) an EKG, alone, is not a method of diagnosing the risk of a potential stroke, (2) other types of tests, such as a cardiogram or MRI, could better diagnose such a risk, and (3) various types of medicine for treating high blood pressure could have been prescribed to Plaintiff. However, such testimony only establishes, at most, that there is a disagreement about the course of treatment Plaintiff's doctors chose—not that the Medical

Defendants were aware of a serious medical necessity or suffering, and nevertheless did nothing, knowing that failure to intervene would continue and exacerbate that suffering, or result in permanent damage. Furthermore, although Plaintiff testified that he spoke only "a little bit" of English and there were instances where he would have to use "English to the best of [his] ability and sometimes [medical staff] would understand," Dkt. No. 136-8 at 18, 39, Plaintiff does not establish how his inability to effectively communicate with medical staff actually affected the Medical Defendants' ability to treat him in this instance. *Cf. Clarkson v. Coughlin*, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) (holding that he failure to provide interpreters during medical treatment violated the Eighth Amendment where that communication was "essential to the efficacy of the treatment in question").

**\*6** Moreover, the Medical Defendants explained that in-person interpretation was available when necessary. *See* Dkt. No. 137-3 at 10-11. For example, at the nurses' station within the medical unit, a list was maintained of facility employees and their language capabilities. *See id.* at 11. This list included medical staff, counselors, and security staff. *See id.* Defendant Gusman remembers treating Plaintiff and indicated that he conversed freely with him and other members of the staff in English and that he never requested the assistance of an interpreter. *See id.*

Plaintiff argues that, under *Ruffin v. Deperio*, 97 F. Supp. 2d 346, 354 (W.D.N.Y. 2000), "evidence that a medical practitioner's conduct substantially departs from accepted professional judgment, practice, or standards is sufficient to meet the subjective prong," and asserts that here, there is a question of fact about whether the Medical Defendants substantially departed from accepted medical practice. Dkt. No. 142 at 10. *Ruffin*, however, is distinguishable from this case. There, the plaintiff, a diabetic, was injured when a table was dropped on his foot. Over the next several months, the plaintiff made "repeated complaints of pain, swelling, difficulty in walking, [and] inability to sleep due to foot pain," and his condition worsened, presenting symptoms such as "blackening of his toes" and "glycerin levels which were regularly three to five times the normal level." *Ruffin*, 97 F. Supp. 2d at 354. The court held that "the defendants' failure to act on [the plaintiff's] repeated complaints" despite the "obvious symptoms of serious medical problems in a diabetic" constituted "deliberate indifference to [the plaintiff's] serious medical needs." *Id.* Unlike *Ruffin*, Plaintiff did not complain of or present worsening or "obvious" symptoms of an impending stroke to the Medical Defendants.

Furthermore, unlike the plaintiff in *Ruffin*, who offered the report of an expert witness on his medical treatment, Plaintiff does not offer any such evidence to establish that his treatment substantially departed from accepted medical practice.

Additionally, the Court notes that, in the months leading up to Plaintiff's stroke on February 16, 2012, he was regularly seen by the medical staff at Eastern, but for treatment unrelated to his elevated blood pressure/heart palpitations. On February 16, 2012, Plaintiff was brought to the medical unit after he had been found sitting on the floor in the armory, responsive, but complaining of numbness. *See* Dkt. No. 137-3 at 7-8. Plaintiff had been lifting weights when he experienced a sudden onset of dizziness and weakness of his left side. *See id.* Defendant Gusman evaluated Plaintiff and immediately called for an ambulance to transport him to the Ellenville Emergency Room. *See id.* at 8.

The undisputed facts demonstrate that the Medical Defendants consistently and appropriately treated Plaintiff. When Plaintiff complained of elevated heart rate and heart palpitations in May of 2011, Defendant Andola ordered an EKG, bloodwork, and issued a blood pressure card so that his blood pressure would be more closely monitored. *See id.* at 4-5. In fact, Plaintiff received an EKG on four occasions at Eastern from 2008 to 2011. *See* Dkt. No. 142-1 at 4-5. Each EKG showed that Plaintiff's heart was experiencing normal sinus rhythm. *See id.* While Plaintiff believes that additional treatment and testing were warranted based on his earlier complaints, given the level of care provided, the undisputed facts demonstrate that Defendants were not deliberately indifferent to Plaintiff's serious medical needs. *See Gumbs v. Dynan*, No. 11-CV-857, 2012 WL 3705009, *14 (E.D.N.Y. Aug. 26, 2012)* ("[A] medical judgment is not deliberate indifference just because it is not the inmate's preferred course of treatment. 'Whether to order an MRI or similar diagnostic treatments is a classic example of a matter for medical judgment, and where the treatment provided is responsive to the prisoner's condition, ... the fact that a prisoner might prefer different treatment does not give rise to' a Constitutional violation") (quoting *Victor v. Milicevic*, 361 Fed. Appx. 212, 215 (2d Cir. 2010)).

 **\*7** Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's first cause of action.

**C. Retaliatory Transfer**

Defendants argue that (1) Plaintiff has failed to establish that Defendants took an adverse action against him, (2) Plaintiff has failed to establish a causal connection between the protected speech and the adverse action, and (3) even assuming Plaintiff had established a *prima facie* case, Defendants are entitled to judgment as a matter of law because they have satisfied the burden of establishing that the alleged adverse action would have been taken in the absence of any improper motive. *See* Dkt. No. 136-1 at 10-13; Dkt. No. 143 at 7-8. In opposition, Plaintiff argues that a transfer to a distant prison where family and counsel can not visit regularly may constitute an adverse action for First Amendment retaliation purposes and is sufficient evidence of adversity to survive summary judgment. *See* Dkt. No. 142 at 20. Plaintiff also argues that his testimony that his transfer was initiated because officials at the prison facility learned of his protected activity is sufficient circumstantial evidence to create a triable issue of fact as to whether (1) there was a causal connection between his protected speech and the transfer, and (2) the transfer would have occurred absent an improper motive. *See id.* at 21-24. The Court finds that the undisputed facts do not support Plaintiff's retaliation claim.

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation and other citation omitted). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show ... '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

Defendants concede, for the purposes of this motion, that Plaintiff's grievances and his commencement of this lawsuit constitute protected speech or conduct. Furthermore, it is clear that a transfer to another facility under the circumstances here may constitute an adverse action. *See Smith v. Levine*, 510 Fed. Appx. 17, 21 (2d Cir. 2013) (citing *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998)); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

2021 WL 4743431

As to the third element—whether a causal connection exists between the plaintiff's protected activity and a prison official's actions—factors to be considered include: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation." *Cole v. New York State Department of Correctional Services*, No. 9:10-CV-1098, 2012 WL 4491825, *11 (N.D.N.Y. Aug. 31, 2012) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). Upon satisfying his initial burden, "the burden shifts to [the] defendants to establish that the same adverse action would have been taken even in the absence of the plaintiff's protected conduct, *i.e.*, 'even if they had not been improperly motivated.' " *Davidson v. Desai*, 817 F. Supp. 2d 166, 194 (W.D.N.Y. 2011) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999); *see also Murray v. Hulihan*, 436 Fed. Appx. 22, 23 (2d Cir. 2011) ("Defendants cannot be liable for First Amendment retaliation if they would have taken the adverse action even in the absence of the protected conduct").

**\*8** Plaintiff has failed to put forth sufficient facts to support an inference that the protected conduct played a substantial part in the adverse action. Although Plaintiff's transfer was close in time to his protected activities, and Plaintiff had an exemplary disciplinary record, both Defendant Demshick and Defendant McGlynn testified that they were wholly unaware of Plaintiff's grievances and pending lawsuit when they processed Plaintiff's transfer. *See* Dkt. No. 136-3 at 4, Dkt. No. 136-5 at 2. Plaintiff argues that there is sufficient circumstantial evidence to create to a triable issue of fact as to whether officials at the prison facility had learned of his protected activities. Plaintiff relies on his testimony that, shortly before he was transferred to Franklin, he was approached by a prison guard who stated: "[O]h, you're the one that wants money from the state." Dkt. No. 136-8 at 73; *see* Dkt. No. 142 at 23. However, even after according Plaintiff deference as the non-moving party, it is not reasonable to infer, based on a single comment made by a corrections officer, that the entire staff of Shawangunk and DOCCS Central Office in Albany were aware of Plaintiff's protected actions—especially in light of the skepticism with which prisoner retaliation claims must be approached.

Even assuming that Plaintiff had raised a triable issue of fact as to the third element of the retaliation claim, Plaintiff's claim would still fail because the undisputed facts demonstrate that Plaintiff would have been transferred even in the absence of his protected conduct. The transfer process began with an automated security classification review conducted by a computer system that recommended Plaintiff's security classification be reduced from maximum to medium. Defendant Demshick then submitted the transfer request because it was DOCCS policy to house prisoners in the least restrictive appropriate facility, and Shawangunk was a maximum-security facility. Defendant McGlynn, in turn, chose Franklin—one of three available medium-security facilities that could meet Plaintiff's medical needs—because it appeared, to her, that it was the closest facility to Plaintiff's desired region. Plaintiff's assertion that Defendant Demshick actually chose Franklin to hinder his counsel's access is entirely speculative, and there is no evidence in the record that Plaintiff's prior grievances or pending lawsuit precipitated or influenced this process at any point.

Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's second cause of action.

**D. Denial of Access**
Defendants argue that Plaintiff cannot make a showing that the enforcement of DOCCS Directive 4423 restricted his access to the courts or caused him to suffer any actual injury. [4] Plaintiff contends that material factual disputes remain over whether Defendants' actions frustrated his right to access the courts, and that Defendants' actions "clearly frustrated this litigation, which could not progress efficiently and was delayed to the point that [Plaintiff] served his whole sentence and was deported—an event that led to the administrative closure of this case, another appeal, and more delay." Dkt. No. 142 at 27. As Defendants argue, Plaintiff has not made a showing that the enforcement of DOCCS Directive 4423 caused him to suffer any cognizable injury on this record.

[4]     Defendants also argue that Plaintiff must establish that they acted "maliciously" when they enforced DOCCS Directive 4423. *See* Dkt. No. 136-1 at 13; Dkt. No. 143 at 9. Defendants rely on *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003), which only mentions maliciousness in the parenthetical of a cite to the district court case *Cancel v. Goord*, No. 00 Civ.2042, 2001 WL 303713 at *4 (S.D.N.Y.

Mar. 29, 2001); *see also DeMeo v. Tucker*, 509 Fed. Appx. 16, 18 [2d Cir. 2013] (mentioning "deliberate and malicious conduct" in a denial of access claim and citing *Davis*). *Cancel* makes repeated reference to "deliberate and malicious interference" in its general statement of the legal standard, *see Cancel*, 2001 WL 303713 at *4-5, but relies on *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986), and *Lewis v. Casey*, 518 U.S. 343, 349 (1996)—neither of which appear to contain a "malicious" interference requirement. However, given the alternative ground for the dismissal of this cause of action detailed below, the Court finds it unnecessary to address this argument.

**\*9** To state a claim for denial of access to the courts, a plaintiff must prove that the defendant "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Davis*, 320 F.3d at 351 (citing *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997)); *see also Lewis v. Casey*, 518 U.S. 343, 351 (1996). A prison's restrictions on an inmate's telephone use may violate the inmate's First Amendment right to access the courts. *See Kwok Sze v. Annucci*, No. 13-CV-534, 2017 WL 913646, *2 (N.D.N.Y. Mar. 7, 2017). However, a plaintiff must "must demonstrate that a defendant caused 'actual injury.' " *Monsky*, 127 F.3d at 247.

Plaintiff cannot, based on this record, make a showing that the enforcement of DOCCS Directive 4423 caused him to suffer any cognizable injury. As Defendants note, Plaintiff has not missed a filing deadline nor has he had his case dismissed for failing to prosecute this action or comply with a court order. [5] Rather, Plaintiff argues that DOCCS Directive 4423's one-call-per-month policy caused unnecessary delay and "clearly frustrated this litigation, which could not progress efficiently." Dkt. No. 142 at 27. Delay and inefficiency, however, are not cognizable injuries for this claim. *See Lewis*, 518 U.S. at 356 (describing the dismissal of a case with prejudice and being prevented from filing legal actions as "two instances of actual injury").

[5]    The Court notes that the prior administrative closure of this case after Plaintiff's deportation was not the equivalent of a dismissal. *See Mire v. Full Spectrum Lending Inc.*, 389 F.3d 163, 167 (5th Cir. 2004) (holding that an administrative closure "is the functional equivalent of a stay, not a dismissal").

Contrary to Plaintiff's argument otherwise, *Simkins v. Bruce*, 406 F.3d 1239 (10th Cir. 2005), does not stand for the proposition that inefficiency and delay can be a cognizable injury. In *Simkins*, the plaintiff's failure to receive a motion for summary judgment and order in a prior action "resulted in (1) admission of the defendants' version of the facts, (2) inability to argue the legal issues, and (3) loss of an opportunity to appeal," which "present[ed] a compelling example of an impediment or hindrance demonstrating actual injury under *Lewis*." *Simkins*, 406 F.3d at 1243. The crux of the decision in *Simkins* was that the plaintiff was not required to "prove a case within a case" by showing that he would have filed a meritorious response if he had received a copy of the motion for summary judgment and that "cognizable harm arises not only when a claim is lost or rejected on account of the defendant's misconduct, but also when the plaintiff's efforts to pursue a claim are impeded." *Id.* at 1244 (citing *Lewis*, 518 U.S. at 351, 353 & n.4). Here, Plaintiff has not suffered any of the impediments described by the court in *Simkins* as a result of Directive 4423's restrictions on his legal calls.

Moreover, courts have consistently found that "a prisoner's access to counsel via telephone may be restricted so long as the prisoner has some other avenue to communicate, even if less than ideal." *Ahlers v. Townsend*, No. 12-CV-0575, 2014 WL 4365277, *5 (N.D.N.Y. Aug. 28, 2014). Plaintiff contends that he did not have alternative means of communicating with his attorneys because of his physical limitations after his stroke and because he is unable to read or write in English. *See* Dkt. No. 142-1 at 26-27. Plaintiff, however, acknowledges that he can read and write in Spanish. *See* Dkt. No. 136-8 at 17-18. Moreover, Plaintiff's counsel, Karen King, stated that whenever she spoke with Plaintiff, a Spanish speaking attorney on her team was present to provide interpretation. *See* Dkt. No. 142-9 at 2. That same Spanish-speaking attorney visited Plaintiff on multiple occasions before his transfer to Franklin. *See id.* While Plaintiff may have been limited in his ability to communicate with counsel by telephone, nothing prevented Plaintiff from corresponding with counsel through the mail, especially considering members of Plaintiff's legal team spoke Spanish. As such, the Court finds that Plaintiff had alternative means of communicating with counsel.

**\*10** Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's third cause of action.

**E. Qualified Immunity**

2021 WL 4743431

Defendants argue that, even assuming that a question of fact precludes summary judgment on Plaintiff's claims, the motion should nevertheless be granted because they are entitled to qualified immunity as a matter of law. In opposition, Plaintiff argues that each of the violations he alleged involved rights that were clearly established under existing law at the time of the challenged conduct, and it was not objectively reasonable for Defendants to believe their conduct was lawful.

"Officials are sheltered from suit, under a doctrine known as qualified immunity, when their conduct 'does not violate clearly established ... constitutional rights' a reasonable official, similarly situated, would have comprehended." *Wood v. Moss*, 572 U.S. 744, 748 (2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright*, 553 Fed. Appx. 16, 17 (2d Cir. 2014); *see also Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014). Here, as set forth above, Plaintiff has failed to raise a material issue of fact with respect to whether Defendants violated a constitutional right and, therefore, Defendants are shielded from suit under this doctrine. However, even assuming the Court needed to reach the remaining factors in the qualified immunity test, Defendants are still entitled to qualified immunity.

With respect to the Medical Defendants, although Plaintiff accurately notes that a prisoner's right to be free from deliberate indifference to his serious medical needs has been clearly established, Plaintiff fails to identify any authority that would have put the Medical Defendants on clear notice that their failure to take specific actions to prevent a stroke under these facts constituted deliberate indifference. Plaintiff cites only to *Tate v. Coffee County*, Tenn., 48 Fed. Appx. 176 (6th Cir. 2002). In *Tate*, an inmate complained via a written note of numbness and tingling, an inability to get out of bed, paralysis, and no feeling in one of his hands. Upon receiving the note, the defendant nurse suspected that the inmate might have had a stroke, but failed to examine him or conduct any diagnostic tests. The Sixth Circuit held that "a reasonable prison nurse would have been aware that a failure to examine a patient complaining of stroke symptoms was in derogation of the inmate's constitutional rights." *Tate*, 48 Fed. Appx. at 180. Here, however, Plaintiff presented different symptoms—chiefly, elevated blood pressure and a complaint

of a periodically racing heart beat with occasional heart palpitations—and at no point did the Medical Defendants suspect that Plaintiff was presenting the symptoms of an impending stroke.

**\*11** Similarly, although restrictions on an inmate's telephone use may, in certain circumstances, violate the inmates' First Amendment right to access the courts, it appears to have been reasonable here for Defendants Jacobs, McKoy, and Traynor to believe that enforcing Directive 4423 was lawful. "When officials follow an established prison policy ... their entitlement to qualified immunity depends on whether a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting the directive." *Barnes v. Furman*, 629 Fed. Appx. 52, 57 (2d Cir. 2015) (quotation marks omitted). The reasonableness of an action depends on "facts and circumstances of each particular case." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Here, the purpose of Directive 4423's limitation on the time and number of legal calls was "to ensure that all inmates had equal access to their attorneys" in light of increasing prison populations— clearly a legitimate penological interest. Dkt. No. 136-6 at 3. Furthermore, Directive 4423 allowed for inmate's attorneys to contact DOCCS Counsel's Office or obtain a court order to circumvent this policy. Thus, even assuming that the Court had found Directive 4423 to violate Plaintiff's constitutional rights, it was objectively reasonable for Defendants Jacobs, McKoy, and Traynor to believe that enforcing Directive 4423 did not unconstitutionally restrict Plaintiff's access to the courts.

Finally, it is well established that prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights. However, Defendants Demshick and McGlynn would also be entitled to qualified immunity. Even assuming that these defendants were aware of Plaintiff's lawsuit and grievances, the transfer here was started via an automated review of Plaintiff's security clearance and Defendants Demshick and McGlynn were thereafter required, under DOCCS policy, to transfer Plaintiff to a correctional facility with an appropriate security level. *Cf. Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005) (finding that the defendant *initiated* a transfer in retaliation for the inmate plaintiff's constitutionally protected action); *Williams v. Brown*, 347 Fed. Appx. 429, 435 (11th Cir. 2009) (same). [6]

6    Moreover, the Court notes that Defendants Demshick and McGlynn were not named defendants in this matter at the time of Plaintiff's transfer to Franklin. Rather, they were added as Defendants in this action only after the transfer had occurred.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 136) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance in the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 4743431

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.    10

Desmarat v. Artus, Not Reported in F.Supp.2d (2011)

2011 WL 1564605

2011 WL 1564605
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jean Marc DESMARAT, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Corr. Facility;
Linda Turner, Deputy Superintendent/Program, Clinton
Corr. Facility; Michael R. Vincent, Corr. Officer,
Clinton Corr. Facility; John Doe, APPU Inmate/Law
Library Clerk, Clinton Corr. Facility, Defendants.

Civ. No. 9:08–CV–977 (DNH/RFT).
|
March 25, 2011.

**Attorneys and Law Firms**

Jean Marc Desmarat, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Christopher W. Hall, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### REPORT–RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Jean Marc Desmarat brings this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging
principally that Defendants violated his constitutionally
protected right to access the courts. Dkt. No. 1, Compl.
Specifically, Plaintiff asserts that the photocopying procedure
at Clinton was deficient and caused the loss of integral
court documents that he had submitted to Defendant Michael
Vincent, per the facility's procedure, for photocopying.
Without those documents, Plaintiff claims that he was unable
to successfully lodge a collateral attack of his state criminal
conviction. Presently before the Court is Defendants' Motion
for Summary Judgment, pursuant to Federal Rule of Civil
Procedure 56, Dkt. No. 50, which Plaintiff opposes, Dkt.
No. 60. For the reasons that follow, it is recommended that
Defendants' Motion be **granted** and this action be **dismissed.**

### I. BACKGROUND

The following material facts are not in dispute. [1] At all times
relevant to the claims included in the Complaint, Plaintiff
was in the custody of the New York State Department of
Correctional Services (DOCS) and was housed at Clinton
Correctional Facility. Dkt. No. 50–1, Defs.' Statement of
Material Facts [hereinafter "Defs.' 7.1 Statement"] at ¶ 1.

[1]    We applaud Plaintiff for filing Opposition papers
that are in general compliance with this District's
Local Rules of Practice. In those papers,
Plaintiff clearly indicates those facts submitted
by Defendants that he agrees with, and provides
sufficient reason for many he denies. Plaintiff
admits to twenty-four of the forty paragraphs
contained in Defendants' Statement of Material
Facts. *Compare* Dkt. No. 50–1, Defs.' Statement
of Material Facts *with* Dkt. No. 60, Pl.'s Resp. and
Obj. to Defs.' [Statement of Material Facts]. Where
all parties agree on the material facts, the Court
will only cite to Defendants' Statement of Material
Facts. There were a few instances, however, where
Plaintiff neither admitted nor specifically denied
the Defendants' recitation of a certain fact. The
Local Rules of this District require the non-movant
to admit or deny "each of the movant's assertions ....
[and e]ach denial shall set forth a specific citation
to the record where the factual issue arises....
*The Court shall deem admitted any facts set
forth in the Statement of Material Facts that the
opposing party does not specifically controvert."
See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).
In the interests of fairness, where Plaintiff has
failed to specifically admit/deny a fact stated by the
Defendants, the Court will only accept as true those
facts that are provable and not contradicted by the
submitted record.

On May 4, 2005, Plaintiff was in need of the facility's
photocopying services. On that particular date, Defendant
Michael Vincent was supervising the unit that provided
inmates with photocopying services. *Id.* at ¶¶ 2–3. Plaintiff
explained to Defendant Vincent that he needed to photocopy
documents for a court deadline, but lacked sufficient funds in
his inmate account to pay the costs associated with copying
172 pages. *Id.* at ¶ 4. Defendant Vincent gave Plaintiff a
form to fill out so that he could get his documents copied
immediately and have his account billed at a later date when
Plaintiff had the funds to cover the $17.20 charge. *Id.* at ¶
5. Plaintiff alleges that during this encounter, Vincent, whom

Plaintiff describes as "a very humble" and "well-mannered" person, told Plaintiff to stop filing grievances about the law library. *Id.* at ¶¶ 6 & 8. Plaintiff handed over his documents to Vincent, and no further dialogue was exchanged on that date. *Id.* at ¶ 9.

Plaintiff asserts that his legal documents were never returned to him. Compl. at p 7. These documents were to be used in Plaintiff's appeal of the denial of his state "440" motion regarding his state criminal conviction for homicide. [2] Defs.' 7.1 Statement at ¶¶ 10–11. Plaintiff submitted the original 440 motion to the trial court on June 18, 2004. [3] *Id.* at ¶ 14. With the exception of roughly five pages, all of the 172 pages submitted to Defendant Vincent were also on file with the state trial court that had denied Plaintiff's 440 motion. [4] *Id.* at ¶¶ 15, 17, & 18. The documents that were permanently lost were: 1) a two-page affidavit, and 2) a three-page fingerprint comparison test report. *Id.* at ¶¶ 17–19. The two-page affidavit was that of a maintenance worker and served to contradict the testimony a detective gave at Plaintiff's state criminal trial regarding whether the hotel surveillance camera, where the homicide occurred, had been recording. *Id.* at ¶ 17. As to the second document, there is conflicting evidence as to whether this was a two-page or three-page report. The first two pages of the report indicate that it was only a two-page document, however, Plaintiff contends that a detective testified at his state criminal trial that the document was three pages long. *Id.* at ¶ 20. The third page of the fingerprint report is alleged to contain analysis of a civilian witness who testified against Plaintiff at the state criminal trial; Plaintiff claims the report revealed that this witness's fingerprints were found at the crime scene and on the surveillance camera in the hotel lobby. *Id.* at ¶ 19. [5] Instead of appealing the denial of his 440 motion, Plaintiff asked the trial court to renew and reargue the motion. *Id.* at ¶ 22. In that motion, Plaintiff described the missing documents and its exculpatory impact. *Id.* at ¶ 24. That motion was denied. *Id.* at ¶ 23. [6] Plaintiff maintains that if he had the missing documents, his 440 motion would have been granted and he would be released from DOCS' custody. *Id* . at ¶ 26.

[2]     On September 19, 2003, following a jury trial, Plaintiff was convicted of intentional murder in the second degree. Upon information and belief, when noting the "440" motion, Plaintiff is referencing a motion he filed in state court seeking to vacate his judgment of conviction pursuant to New York Criminal Procedure Law § 440.10. *See Desmarat v. Artus,* 2009 WL 2867900, at *3 (E.D.N.Y.

Sept. 3, 2009) (reviewing Desmarat's federal collateral attack of his state homicide conviction and reviewing the relevant underlying procedural history).

[3]     Upon information and belief, that 440 motion was summarily denied in a written decision, dated April 1, 2005, one month prior to Plaintiff's encounter with Defendant Vincent. *Desmarat v. Artus,* 2009 WL 2867900, at *3.

[4]     Plaintiff failed to admit or deny the Defendants' assertion that all but five of the 172 pages were on file with the trial court. Defendants' assertion is supported by the Plaintiff's testimony before trial. *See* Dkt. Nos. 50–3, Christopher W. Hall, Esq., Affirm., dated July 22, 2010, Ex. A, Pl.'s Dep., dated Jan. 20, 2010 (docketed at Dkt. No. 50–4, 50–5, & 50–6), at pp. 39–40 & 44.

[5]     Plaintiff failed to admit or deny the Defendants' assertion regarding what the third page of the fingerprint report would have shown. This omission is peculiar given that his testimony before trial not only directly supports the Defendants' recitation, but appears to be the sole source for this explanation. Pl.'s Dep. at pp. 52–53.

[6]     Plaintiff failed to admit or deny the Defendants' assertions regarding the filing and denial of a motion to renew and reargue the 440 motion. Defendants' assertions are not only supported by Plaintiff's testimony before trial, but also by Plaintiff's Exhibit attached to his Opposition. Pl.'s Dep. at pp. 56–57; Pl.'s Opp'n at pp. 25–26 (citation is to the Court's electronic case management page assignment); *see also Desmarat v. Artus,* 2009 WL 2867900, at *3.

**\*2** Plaintiff testified at his deposition that he included Defendant Dale Artus in this lawsuit because as the superintendent, "[h]e's the boss of all subordinates in the facility." *Id.* at ¶ 27. [7] He further indicated that Defendant Artus was aware of the purported inadequacy with the facility's photocopying procedure and failed to change the policy. *Id.* at ¶ 28. With regard to Defendant Linda Turner, Plaintiff also pointed to her position of authority and her failure to remedy or change the photocopying procedure even after having been informed of its inadequacy. *Id.* at ¶¶ 29 & 31.

Desmarat v. Artus, Not Reported in F.Supp.2d (2011)

2011 WL 1564605

---

7      It is not clear why Plaintiff failed to specifically
       admit/deny this quote, which is taken directly from
       his testimony before trial. Pl.'s Dep. at p. 88.

## II. DISCUSSION

### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." The moving party bears the burden to demonstrate
through "pleadings, depositions, answers to interrogatories,
and admissions on file, together with [ ] affidavits, if any,"
that there is no genuine issue of material fact. *F.D.I. C. v.
Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex
Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has
moved for summary judgment on the basis of asserted facts
supported as required by [Federal Rule of Civil Procedure
56(e) ] and has, in accordance with local court rules, served
a concise statement of the material facts as to which it
contends there exist no genuine issues to be tried, those facts
will be deemed admitted unless properly controverted by the
nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149,
154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant
must set out specific facts showing that there is a genuine
issue for trial, and cannot rest merely on allegations or
denials of the facts submitted by the movant. FED. R. CIV.
P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d
Cir.2003) ( "Conclusory allegations or denials are ordinarily
not sufficient to defeat a motion for summary judgment
when the moving party has set out a documentary case.");
*Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26
(2d Cir.1994). To that end, sworn statements are "more than
mere conclusory allegations subject to disregard ... they are
specific and detailed allegations of fact, made under penalty
of perjury, and should be treated as evidence in deciding
a summary judgment motion" and the credibility of such
statements is better left to a trier of fact. *Scott v. Coughlin,*
344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13
(2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d
Cir.1995)).

When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant. *Nora Beverages,*

*Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d
Cir.1998). "[T]he trial court's task at the summary judgment
motion stage of the litigation is carefully limited to discerning
whether there are any genuine issues of material fact to be
tried, not to deciding them. Its duty, is confined at this
point to issue-finding; it does not extend to issue-resolution."
*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d
1219, 1224 (2d Cir.1994). Furthermore, where a party is
proceeding pro se, the court must "read [his or her] supporting
papers liberally, and ... interpret them to raise the strongest
arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d
787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169,
173 (2d Cir.1995). Nonetheless, mere conclusory allegations,
unsupported by the record, are insufficient to defeat a motion
for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18,
21 (2d Cir.1991).

### B. First Amendment Claims

**\*3** In his Complaint, Plaintiff asserts that the inadequate
photocopying services provided to inmates at Clinton
were inadequate and infringed upon his constitutionally
protected right to access the courts. *See generally* Compl.
Plaintiff proffers that Clinton should allow inmates to
directly access a photocopier in the law library instead of
mandating that inmates surrender control and custody over
their legal documents. Additionally, though not included
in his Complaint, Plaintiff accuses Defendant Vincent of
deliberately destroying his legal documents as retaliation
for Plaintiff's complaints regarding the law library. The
Court begins with consideration of the latter claim against
Defendant Vincent.

### 1. Retaliation

At his examination before trial, Plaintiff, for the first
time, raised retaliation as an explanation for the loss of
the documents. Dkt. No. 50–3, Christopher W. Hall, Esq.,
Affirm., dated July 22, 2010, Ex. A, Pl.'s Dep., dated Jan.
20, 2010 (docketed at Dkt. Nos. 50–4, 50–5, & 50–6), at pp.
22–23 & 118–20. Specifically, Plaintiff accused Defendant
Vincent of deliberately destroying his legal materials as
retaliation for Plaintiff filing grievances. Though not included
in his Complaint, Plaintiff similarly raises this claim in his
papers submitted in opposition to Defendants' Motion. Dkt.
No. 60, Pl.'s Mem. of Law, at pp. 1 & 3. The Court notes
that at no point has Plaintiff sought permission from the

---

Court to amend his Complaint to add a cause of action for retaliation and, furthermore, opposition papers are not the proper vehicle to instill new causes of action. *See In re Private Capital Partners, Inc.,* 139 B.R. 120, 124–25 (Bankr.S.D.N.Y.1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by instituting new causes of action in his opposition papers to defendants' dispositive motion is in direct contravention of and amounted to an attempt to circumvent the Federal Rules of Civil Procedure, namely Rule 15(a)); *Harvey v. New York City Police Dep't,* 1997 WL 292112, at *2 n. 2 (S.D.N.Y. June 3, 1997) ("To the extent plaintiff attempts to assert new claims in his opposition papers to defendants' motion, ... the Court finds that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment' and accordingly disregards such claims.") (citation omitted). While a complaint need not correctly plead every legal theory supporting a claim, "a plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts ... have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 406 (S.D.N.Y.2006) (citations omitted).

Conspicuously absent from the Complaint are any of the underlying facts that would have alerted Defendants and this Court to the notion that a potential retaliation claim is being pursued. Indeed, it appears the first time these facts come to light is during Plaintiff's deposition, which was conducted more than a year after Plaintiff initiated this action. Though *pro se* litigants are not immune from following procedural rules, the Court is mindful of the Second Circuit's penchant for leniency with regard to *pro se* litigants as well as their preference that such litigants be afforded opportunities to amend prior to outright dismissal. *Burgos v. Hopkins,* 14 F.3d at 790 ("[W]e read [a *pro se* litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings."). Nevertheless, as explained below, because the bare facts provided by Plaintiff do not assert a valid retaliation claim, amendment at this late stage would not only be prejudicial to Defendants, but, more importantly, would be futile. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d

Cir.2000) (finding leave to replead would be futile where the complaint, even when read liberally, did not "suggest[ ] that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe").

**\*4** The Second Circuit has made clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find its roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002)); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002). Because of the relative ease with which claims of retaliation can be invoked, courts are advised to examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

During his deposition, Plaintiff described the brief encounter between him and Defendant Vincent on May 4, 2005. *See* Pl.'s Dep. at pp. 20–25. Plaintiff described Vincent as humbled and well-mannered and acknowledged that Vincent provided Plaintiff with the opportunity to obtain immediate photocopies, despite a lack of available funding in his account. This "simple" encounter took an "unusual" turn when, at some point, Vincent told Plaintiff to stop filing grievances regarding access to the law library. *Id.* at pp. 22–

23. Though Vincent stated this while remaining "humble and well-mannered," given his level of authority, Plaintiff felt intimidated and took the statement to be an order directing him to stop filing grievances. *Id.* at p. 24

Even taking Plaintiff's chronicle of the encounter as truth, this is hardly a case of retaliation. First, Plaintiff has failed to specifically identify the constitutionally protected activity he engaged in that establishes a connection to a motive for Vincent to retaliate. While Vincent purportedly tells him to "stop filing grievances," no underlying facts have been presented regarding these grievances to allow this Court to assess whether Plaintiff's exercise of a protected right was the motivating factor behind Vincent's purported retaliation. Indeed, nothing about the encounter as relayed by Plaintiff strikes this Court as acrimonious or rancorous, and Vincent's demeanor, as described by Plaintiff, and willingness to help Plaintiff belies the notion that he deliberately destroyed Plaintiff's legal papers as retaliation.

**\*5** Thus, we find that despite Plaintiff's failure to follow the proper procedure with regard to amending his Complaint, such amendment would nevertheless be futile as no retaliation claim has been properly presented and supported.

## 2. Access to Courts

Plaintiff's First Amendment access to courts claim is truly the crux of his Complaint. On the one hand, Plaintiff alleges that Defendant Vincent denied him access to the courts when he failed to return to Plaintiff all of the documents submitted for photocopying. On the other hand, he includes Defendants Artus and Turner in this litigation because Plaintiff's baseline criticism is of Clinton's photocopying procedure, which he believes is inadequate. Plaintiff takes great umbrage with the procedure that requires him to surrender physical custody over his legal documents in order to have photocopies provided. He believes, instead, that to comply with the Constitution, he should have direct access to photocopying services. In this regard, it is Plaintiff's theory that the inadequate photocopying procedure at Clinton interfered with his access to the courts.

Prisoners have a First Amendment right to "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822 (1977). This right gives rise to a number of derivative rights, including the right to either "adequate law libraries or adequate assistance from

persons trained in the law." *Id.* at 828. Prisoners do not, however, have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). Instead, "meaningful access to the courts is the touchstone." *Id.* (quoting *Bounds v. Smith,* 430 U.S. at 823). In this regard, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. at 825). While states must provide, at state expense, certain materials, such as "paper and pen to draft legal documents[,] with notarial services to authenticate them, and with stamps to mail them[,]" economic factors may nevertheless be considered when "choosing the methods used to provide meaningful access." *Bounds v. Smith,* 430 U.S. at 825. A state need not "provide the *best* manner of access, nor is it obligated to equalize the financial resources of each of its inmates.... So long as the State's procedure's [sic] meet constitutional minima, the courts should not second-guess them." *Pino v. Dalsheim,* 558 F.Supp. 673, 675 (S.D.N.Y.1983) (emphasis in original).

A prisoner who raises denial of access to courts must "demonstrate that the alleged shortcomings in the library or legal assistance hindered his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. at 351. In other words, the prisoner must show actual injury. *Id.* at 349; *see also Benjamin v. Fraser,* 264 F.3d 175, 184 (2d Cir.2001) (citing *Lewis v. Casey,* 518 U.S. at 351, for the proposition that the inmate must show "that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim—for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality").

**\*6** We can easily disabuse Plaintiff of the notion that the photocopying procedure in place at Clinton, by itself, violate Plaintiff's First Amendment right of access to courts. As noted above, the photocopying services are merely the means by which the state may opt to ensure that prisoners have adequate and meaningful access to the courts. The fact that Clinton, and probably numerous other facilities,[8] have opted to oversee such services rather than allow an inmate unfettered access to a photocopier does not diminish nor render unconstitutional the efforts the facility has taken to ensure adequate and meaningful access. *Collins v. Goord,* 438 F.Supp.2d 399, 416 (S.D.N.Y.2006) (citing cases for the proposition that "an inmate has no constitutional right to free copies and prison

regulations that limit access to such copies are reasonably related to penological interests" (internal quotation marks and citations omittted)). Nothing in the Constitution nor Supreme Court jurisprudence mandates that inmates be able to photocopy documents at will; in fact, the Supreme Court acknowledged that there is no one-size fits all approach when it comes to providing the means by which prison facilities ensure that inmates have meaningful and adequate access to the courts. See *Bounds v. Smith,* 430 U.S. at 832 ("[A] legal access program need not include any particular element we have discussed, and we encourage local experimentation."); *Dugar v. Coughlin,* 613 F.Supp. 849 (S.D.N.Y.1985) (citing *Bounds* for the proposition that the state may balance "prisoners' rights with the legitimate interests of the states, including economic concerns."). Because the photocopying procedure utilized at Clinton has not been shown to be inadequate, there is no basis to hold Defendants Artus and Turner liable as their sole connection to this lawsuit stems from their purported failure to change the policy. See Pl.'s Dep. at pp. 88 & 107–14 (explaining his bases for including Defendants Artus and Turner in this lawsuit).

8      Plaintiff testified at his deposition that other inmates informed him that photocopying procedure is different at other facilities. Pl.'s Dep. at pp. 31–32. He admitted, however, that the two facilities he had been housed at, Clinton and Downstate, had identical an procedure, and that such procedure complies with DOCS Directive 4483. *Id.* at pp. 29–33.

What remains then is Plaintiff's First Amendment denial of access claim against Defendant Vincent, which seems to have evolved during the pendency of this litigation from an allegation that documents were lost due to the inadequate procedure, to an accusation of deliberate destruction of those documents. To the extent Plaintiff's Complaint is read to raise injuries resulting from Defendant Vincent's negligent handling of Plaintiff's legal papers, such allegations fail because though § 1983 has no state-of-mind element, negligent conduct is nevertheless not actionable under several constitutional provisions, such as, for example, the First, Eighth, and Fourteenth Amendments. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind." (internal quotation marks and citations omitted)); *Daniels v. Williams,* 474 U.S. 327, 328–30 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." (emphasis

in original)); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 498 (N.D.N.Y.2009) (finding defendant's loss of plaintiff's legal documents amounted to negligence, which is not actionable under the First Amendment; see also *Hankins v. NYS Dep't of Corr. Servs.,* 2008 WL 2019655, at \*5 n. 40 (N.D.N.Y. Mar. 10, 2008) (citing cases). Thus, to the extent Plaintiff asserts that through Defendant Vincent's negligence, Plaintiff was denied access to the courts or denied property in violation of the First and Fourteenth Amendments, such claims must fail.

\*7  Given the evolution of Plaintiff's theory of his claim, we must also review whether his assertion that Defendant Vincent deliberately lost or destroyed the subject legal materials violated Plaintiff's right of access to courts. In moving for summary judgment, Defendants' counsel argues that Plaintiff fails to state a claim against Defendant Vincent because he cannot show that his conduct was deliberate and malicious, thus, counsel does not address whether Plaintiff suffered any actual injury. Defs.' Mem. of Law at pp. 5–6. In support of the proposition that Plaintiff must prove a deliberate and malicious state of mind, Defendants cite to *Lewis v.. Casey,* 518 U.S. 343, 349 (1996), and *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). While it is clear from these cases that a defendant's conduct must be deliberate, as opposed to negligent, neither of these Supreme Court cases stand for the proposition that in order to deprive an inmate of access to the courts, one must have a malicious state of mind. Similarly, published decisions from the Second Circuit do not impose this extra element of maliciousness, though many district cases nonetheless have interjected it into their analysis, often erroneously citing to cases that are not supportive. See *Deleon v. Doe,* 361 F.3d 93, 94 (2d Cir.2004) (no element of maliciousness included in analysis); *Morello v. James,* 810 F.2d 344 (2d Cir.1987) (same); *Monsky v. Moraghan,* 127 F.3d 243 (2d Cir.1997) (same); *but see Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (no element of maliciousness included in analysis, however, the court quotes a Southern District case which utilizes the term "malicious"). [9] Nevertheless, the law is clear that deliberate action is required, and that is where we begin our analysis.

9      In *Davis,* the Second Circuit dealt with the issue of whether interference with a prisoner's legal mail implicated a prisoner's right to access the courts. The Circuit stated the applicable law as follows:

To state a claim for denial of access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant "took or was responsible for actions that 'hindered

[a plaintiff's] efforts to pursue a legal claim.' " *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (citing *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996)); *see also Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) ("[I]n order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.") (citing *Lewis,* 518 U.S. at 353, 116 S.Ct. at 2181).

*Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003).

It is the latter cite to *Cancel* which has caused multiple district courts to cite *Davis* for the proposition that a prisoner must show maliciousness in order to prove a claim of denial of access to courts. This Court is not clear as to whether the Circuit intended to inject this element into the analysis by quoting *Cancel,* and, if so, whether this added element is limited to claims alleging interference with legal mail. Notably, as stated above, the cases cited do not support this added element. Thus, notwithstanding the dictum in *Davis,* we follow Supreme Court precedence and published Second Circuit cases and decline to interject an added element of maliciousness into our analysis.

In support of their request for summary judgment, Defendants provide the Court with Michael Vincent's Affidavit wherein he recounts how he accepted the documents from Plaintiff and what happened after that. Dkt. No. 50–2, Michael R. Vincent Aff., dated July 16, 2010. According to Vincent, on the date in question, he was supervising the A.P.P.U. unit, which was the program at Clinton where inmates could get their legal papers photocopied. *Id.* at ¶¶ 5–6. Upon accepting Plaintiff's documents, Vincent logged the work entry and then handed the documents to the inmate clerk who works in the program. *Id.* at ¶ 8. It was the inmate's job to copy the documents and place them into a large sealed envelope to be given back to Plaintiff. *Id.* at ¶ 9. It is Vincent's belief that, in light of the large volume of papers handled by the unit, the inmate clerk in charge of copying Plaintiff's materials "accidentally misplaced or mixed" Plaintiff's papers with another inmate's paperwork. *Id.* at ¶ 10. After learning that the documents were lost, Vincent searched, but could not find them. *Id.* at ¶ 12. These averments are mirrored in an interdepartmental memorandum, dated January 3, 2006, from Defendant Vincent regarding the loss of Plaintiff's papers. *Id.,* Ex. A.

**\*8** Plaintiff accuses Defendant Vincent of deliberately destroying his legal documents, though he acknowledges that he cannot prove that the documents were deliberately lost or destroyed. Pl.'s Dep. at p. 118. Nor does Plaintiff provide the Court with any facts from which any rational juror could find or deduce that the papers were deliberately destroyed or lost. Instead, his theory is that had the documents been misplaced or mixed with someone else's documents, that inmate would have turned the papers over to him, just as he turned the papers over that were erroneously sent to him. *Id.* at pp. 118–19. It is Plaintiff's opinion that because the documents were not returned to him, and because Defendant Vincent told Plaintiff to stop filing grievances, it is clear that his documents were deliberately lost or destroyed. *Id.* at pp. 119–20. He acknowledges that his documents could have been lost by the inmate clerk, but that would be "for a jury to decide." *Id.* at p. 120.

To defeat summary judgment, Plaintiff must do more than surmise how his documents were lost/destroyed. He must, at a minimum, provide some facts by which this Court could find that a material issue of fact exists warranting a trial in this matter. A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). Here, Plaintiff does not have any facts and simply relies on conjecture as to what really happened to his papers. His speculations and flawed logic, however, are not enough to raise an issue of material fact necessary to survive Defendants' Motion. Because Plaintiff fails to show that Defendant Vincent deliberately interfered with his access to the courts, we need not address whether he has shown that he suffered the requisite injury.[10]

10  As an aside, we note that it is Plaintiff's theory that the two permanently missing documents were integral to Plaintiff's efforts to overturn his

conviction and obtain freedom. *Ergo,* without these vital documents, Plaintiff is unable to effectively or, perhaps, successfully attack, either directly or collaterally, his state conviction causing him to suffer injury. However, Plaintiff has not explained how the offered evidence would have changed the outcome of his post-conviction motions or, for that matter, his trial. *See Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993).

### C. Other Claims

In his Complaint, Plaintiff emphasized that in no way was he seeking to use his civil rights action as a means of collaterally attacking his state criminal conviction. Compl. at p. 10. His stated causes of action in the Complaint seem to relate solely to the constitutional viability of the photocopying services he received at Clinton. *Id.* at pp. 9–11. During his deposition, Plaintiff confirms that his first cause of action challenges the denial of access to the Courts. Pl.'s Dep. at pp. 124–25. He also extrapolated further as to how his two subsequent causes of action are distinct. *Id.* at pp. 125–27. Plaintiff asserted that his first cause of action "was about the access to the courts," while the second one concerns the denial of his life and liberty —"causing [him] to be in prison when [he] could've been" released. *Id.* at p. 125. And the third cause of action concerns the deprivation of *Brady* and *Rosario* materials that he sought to present to the trial judge. *Id.* at p. 126. From this testimony, Defendants infer that Plaintiff attempts to raise *Brady* and *Rosario* claims and thus seek dismissal therewith. Dkt. No. 50–7, Defs.' Mem. of Law at pp. 8–9.

**\*9** Brady and Rosario materials refer to the prosecution's obligation to disclose exculpatory evidence to a criminal defendant prior to his criminal trial. *Brady* material, as defined under *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny, includes all evidence which may be favorable to the defendant and material to the issue of guilt or punishment, including exculpatory and impeachment material. *DiSimone v. Phillips,* 461 F.3d 181, 195 (2d Cir.2006) ("To constitute *Brady* material, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching.") (internal quotation marks and citations omitted). *Rosario* material includes any written or recorded statement of a prosecution witness, which must be turned over to the defendant regardless of whether it is favorable to the accused. *People v. Rosario,* 173 N.E.2d 881 (N.Y.1961); N.Y. CRIM. PROC. LAW §§ 240.44(1) & 240.45(1).

In a round-about way, it appears that Plaintiff is trying to hold Defendants responsible for losing or destroying documents he had in his possession that proved that the state prosecutor violated *Brady* and *Rosario.* This is actually part and parcel of his access to courts claim, which we have already recommended be dismissed. There is no stand-alone constitutional cause of action, cognizable under § 1983 or elsewhere in federal jurisprudence, that would allow for an inmate to sue for deprivation of *Brady* and *Rosario* materials. Both Plaintiff's second and third cause of actions, as explained through his testimony, are more properly categorized as statements regarding the injury he allegedly suffered as a result of his purported denial of access to the courts. They are not, in and of themselves, separate causes of action entitling Plaintiff to relief. Thus, to the extent Plaintiff's Complaint can be read as raising such independent claims, we recommend **dismissal .**

### D. Doe Defendant

In his Complaint, filed on September 15, 2008, Plaintiff names a John Doe Defendant, whom he identifies as the "APPU Inmate/Law Library Clerk, Clinton Correctional Facility." Compl. at p. 2. To date, Plaintiff has failed to identify this John Doe Defendant. Under FED. R. CIV. P. 4(c) (1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [11] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.* Because he failed to timely identify and serve the John Doe Defendant, and because, as outlined above, no cognizable cause of action is asserted herein, we recommend dismissal of all claims asserted against him. *Cooks v. Delpiano,* 2008 WL 4186337, at \*1 n. 1 (N.D.N.Y. Sept. 10, 2008); *Pravda v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998). [12]

[11]    Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

[12]    Additionally, we note that there are no allegations of fact asserted against this John Doe Defendant, though it appears that this Defendant may be the

inmate who assisted Defendant Vincent with the photocopying. Section 1983 permits a plaintiff to commence suit in federal court against a "person" who has, under color of law, violated Plaintiff's federal rights. Traditionally, the definition of acting under color of state law requires that the section 1983 defendant "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Kern v. City of Rochester,* 93 F.3d 38, 43 (2d Cir.1996) (quoting *West v. Atkins,* 487 U.S. 42, 49 (1988) (internal quotation marks and citation omitted)). A fellow inmate could not be sued under 1983 because he lacks the requisite authority to act under color of state law.

### III. CONCLUSION

**\*10** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 50) be **GRANTED** and this entire action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1564605

**End of Document**                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1557914
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jean Marc DESMARAT, Plaintiff,

v.

Dale ARTUS, Superintendent; Linda Turner,
Deputy Superintendent/Program; Michael
R. Vincent, Correctional Officer; and John
Doe, APPU Inmate/Law Library Clerk, All
of Clinton Correctional Facility, Defendants.

No. 9:08–CV–977.
|
April 25, 2011.

**Attorneys and Law Firms**

Jean Marc Desmarat, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Christopher W. Hall, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jean Marc Desmarat, commenced this civil
rights action in September 2008, pursuant to 42 U.S.C. §
1983. By Report–Recommendation dated March 25, 2011,
the Honorable Randolph F. Treece, United States Magistrate
Judge, recommended that defendants' notion for summary
judgment (Dkt. No. 50) be granted and the entire action be
dismissed. The defendants have filed objections to the report-
recommendation.

Based upon a de novo review of the entire file, including the
portions of the Report–Recommendation to which defendants
have objected, and the recommendations of Magistrate Judge
Treece, the Report–Recommendation is accepted and adopted
in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Dkt. No. 50)
is GRANTED;

2. The action is DISMISSED and the Clerk is instructed to
file judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1557914

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3813172
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emile MOREAU, Plaintiff,

v.

Sherry ELLSWORTH, et. al., Defendants.

9:20-CV-124 (DNH/ATB)
|
Signed 07/15/2021

**Attorneys and Law Firms**

EMILE MOREAU, Plaintiff pro se.

DAVID C. WHITE, Asst. Attorney General for Defendants.

**REPORT-RECOMMENDATION**

Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff's remaining [1] claims allege that defendants violated his First Amendment rights by interfering with his mail and his access to courts, and retaliating against him for the exercise of his constitutional rights. (Complaint ("Compl.") Dkt. No. 1). Plaintiff also claims that two of the defendants were deliberately indifferent to his medical condition in violation of the Eighth Amendment. (*Id.*) Plaintiff seeks substantial monetary relief. (Compl. ¶¶ 69-70).

[1]      Plaintiff's complaint also contained claims relating to the alleged failure to process his grievances and verbal harassment. Such claims were dismissed without prejudice in the court's initial review of this action. (Dkt. No. 8 at 23). Plaintiff did not amend his complaint with respect to the dismissed claims. Plaintiff's request for injunctive relief was also denied in the court's initial order. (*Id.*)

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 43). Plaintiff originally asked that the court deny the defendants' motion as untimely, or in the alternative, give plaintiff

additional time to respond. (Dkt. No. 45). Defendants filed a "reply," arguing that their motion was timely, but did not oppose giving plaintiff an extension of time to respond. (Dkt. No. 47. The court denied plaintiff's request to deny defendants' motion as untimely and afforded plaintiff the additional time he requested. (Dkt. No. 48). Plaintiff filed his papers in opposition to the defendants' motion on the merits, and the defendants filed a reply. (Dkt. Nos. 50, 53).

**DISCUSSION**

**I. Facts and Procedural History**

On December 27, 2013, while confined at Green Haven Correctional Facility, plaintiff filed a section 1983 civil rights action in the United States District Court for the Southern District of New York ("Southern District"). (Compl. ¶ 2). *See Moreau v. Peterson*, No. 7:14-CV-201, Dkt. No. 2 (S.D.N.Y. Jan. 8, 2014) ("*Moreau I*"). In July 2015, the Southern District court dismissed the action and entered judgment for defendants. *See Moreau I*, No. 7:14-CV-201 (NSR), 2015 WL 4272024 (S.D.N.Y. July 13, 2015). On July 10, 2015, plaintiff was transferred to Eastern Correctional Facility ("Eastern"). (Compl. ¶ 3). In August 2015, plaintiff appealed the decision in *Moreau I* to the United States Court of Appeals, Second Circuit ("Second Circuit"). *Id.*; *see Moreau v. Peterson*, No. 15-2534, Dkt. No. 1 (2d Cir. Aug. 11, 2015) ("*Moreau II*").

On June 8, 2016, plaintiff was elected as the inmate representative to the Inmate Grievance Resolution Committee ("IGRC"). (Compl. ¶ 46). Plaintiff explains that he complained to IGP Supervisor, Francois about the way that another inmate's grievance was handled. (Compl. ¶ 47). Plaintiff claims that, since then, he was the subject of retaliation. (Compl. ¶ 48). Defendant Correction Officer Justin von der Heyde [2] ("von der Heyde") and IGP Supervisor Francois would no longer allow plaintiff in the grievance office or would write him a note to tell him not to report for work. *Id.* On August 4, 2016, plaintiff sent a letter to K. Francois, the IGP Supervisor and Sergeant B. Liefeld explaining that he was resigning from his position because a knee condition prevented him from traversing the stairs to the IGRC office. *Id.* (Dkt. No. 1-2 at 25). Plaintiff states that after he left his position, he tried to avoid "unnecessary contact" with defendant von der Heyde. (Compl. ¶ 50).

[2]      In the complaint, plaintiff referred to this defendant as J. Vonderheyde. However, it is clear from the

2021 WL 3813172

defendants' papers that the correct spelling of this defendant's last name is "von der Heyde," and the court will use the proper spelling herein.

**\*2** The Second Circuit affirmed the judgment in *Moreau I* on January 12, 2017.[3] Compl. ¶¶ 4-6; *Moreau II*, 672 F. App'x 119 (2d Cir. 2017). On January 27, 2017, the Second Circuit mailed the decision to plaintiff. Plaintiff claims that the mail room supervisor at Eastern, defendant Sherry Ellsworth ("Ellsworth"), did not deliver the envelope to plaintiff until February 21, 2017. (Compl. ¶ 26; Dkt. No. 1-1 at 8).

[3]     Although plaintiff alleges that the appeal was denied on October 27, 2016 and then affirmed after a rehearing, plaintiff is incorrect. Plaintiff filed his appeal, but then incorrectly made a "motion" to reverse *Moreau I*. (*Moreau II*, Dkt. Nos. 95). The Second Circuit denied the "motion" on October 27, 2016 because it was procedurally improper. (*Moreau II*, Dkt. No. 99). Plaintiff then made a motion for "rehearing" of Dkt. No. 99, which was denied on November 28, 2016. (*Moreau II*, Dkt. Nos. 105, 108). The appeal itself was not denied after a rehearing. The district court's decision was simply affirmed on January 12, 2017. (*Moreau II*, Dkt. No. 112) (published at 672 F. App'x 119 (2d Cir. 2017).

Plaintiff alleges that on February 10, 2017, he received an envelope with a motion that he previously attempted to serve on the New York State Attorney General on January 10, 2017. (Compl. ¶ 21). Plaintiff claims that Ellsworth did not mail the motion, held it until February 10, 2017, and then returned it to Plaintiff "opened" in an envelope with an outdated 1994 U.S. Postal label from Springfield, Massachusetts. *Id.* The outside of the envelope included a notation that read, "found loose in mail." (Compl. ¶ 23). Plaintiff claims that the "goal" of defendant Ellsworth and her staff was to delay plaintiff's papers so that he missed his court deadlines, resulting in his continued incarceration. (Compl. ¶ 24).

On February 16, 2016, plaintiff states that he received a letter from the Second Circuit which was postmarked February 8, 2016 and which was opened outside of his presence. (Compl. ¶ 28). Plaintiff claims that he made a Freedom of Information Law ("FOIL") request to see the "log book" page for the date he received the mail and claims he discovered that the page was "falsified." (Compl. ¶ 28).

Plaintiff states that on February 16, 2017, he sent a "complaint" to the United States Court of Federal Claims. (Compl. ¶ 7). Defendant Ellsworth allegedly held the "complaint" for five days before she sent it to the court.[4] (*Id.*) On March 6, 2017, plaintiff received a letter from the Court of Federal Claims, dated February 28, 2017, returning plaintiff's papers because it was unclear whether plaintiff meant to file a "complaint" with the Court of Federal Claims or whether he meant to file his papers in the U.S. Supreme Court. (Compl. ¶ 9). Plaintiff states that his "correspondence" with the Court of Federal Claims took one month, when it should only have taken two weeks. (Compl. ¶ 10).

[4]     Plaintiff states that the Court of Federal Claims received his papers on February 27, 2017. (Compl. ¶ 8).

Plaintiff claims that on March 9, 2017, he sent the "complaint" to the U.S. Supreme Court. (Compl. ¶ 11). Plaintiff claims that Superintendent Lee[5] and defendant Ellsworth held the mail for four days before sending it. (*Id.*) Plaintiff alleges that on March 27, 2017, his "complaint" was returned to him by the Supreme Court, with a letter from the Clerk of the Supreme Court which "did not mention anything about plaintiff's claim," instead, it discussed a "petition for writ of certiorari," the time to file it, and informed plaintiff that any claims must first be decided by a Court of Appeals or by the highest State Court available for review. (Compl. ¶ 12). Plaintiff states that he did "exhaust" his remedies, and that the Court of Appeals did consider his claim. (Compl. ¶ 13). Plaintiff alleges that the letter from the Supreme Court indicated that the "Rules of Court" and a sample petition for writ of certiorari were inclosed, but those items were not attached when plaintiff received the papers. (Compl. ¶ 13).

[5]     Superintendent Lee is not a named defendant in this action.

**\*3** Plaintiff believes that "here's what happened:" when he sent his "complaint" to the Supreme Court on March 9, 2017,[6] Superintendent Lee and defendant Ellsworth held the complaint until March 13, 2017, opened the envelope, removed plaintiff's complaint, replaced it with their own "different" papers, and sent the papers to the court. (Compl. ¶ 14). Plaintiff then alleges that on March 22, 2017, the Clerk of the Supreme Court sent plaintiff the "priority mail," which Superintendent Lee and defendant Ellsworth received on Friday March 24, 2017, opened the envelope, removed their "fake" documents that they sent to the court and the

documents the court sent to plaintiff, replaced them with plaintiff's original complaint, and delivered the package to plaintiff on Monday March 27, 2017. (Compl. ¶ 15).

[6]    The court notes that later in the complaint, plaintiff seems to repeat the same claim with slightly different dates and facts. Plaintiff claims that on February 16, 2017, he sent his "appeal" in *Moreau II* to the U.S. Supreme Court. Plaintiff claims he was overcharged for postage and was "held" by defendant Ellsworth until February 23, 2017. (Compl. ¶ 30). However, plaintiff also claims that on March 19, 2017 (not March 9th as he claimed in ¶ 32), he sent his "appeal" to the Supreme Court, which he claims was held, opened, and replaced with "fake" papers before being sent to the Supreme Court. (Compl. ¶ 33). He repeats the allegation regarding the March 22, 2017 priority package which was sent to plaintiff by the Supreme Court, which plaintiff claims was again opened, and defendant Ellsworth replaced its contents with plaintiff's original papers, after falsifying the log book. (*Id.*) Plaintiff also repeats that he did not receive the package until March 27, 2017. (*Id.*)

Plaintiff states that, on April 12, 2017, he received mail dated "10, 2017" from the U.S. Supreme Court, signed by Redmond K. Barnes. (Compl. ¶ 35). Apparently, the notice signed by Mr. Barnes stated that an in forma pauperis ("IFP") application, along with other IFP-related documents were enclosed in the mailing. (*Id.*) Plaintiff alleges that no such documents were included in the package that he received, and he claims that defendant Ellsworth removed them. (*Id.*)

Plaintiff claims that even after he was transferred out of Eastern,[7] he discovered more instances in which defendant Ellsworth interfered with his mail. (Compl. ¶¶ 36-37). On February 26, 2018, plaintiff sent a letter to the Appellate Division, Second Department inquiring about an action entitled *Moreau v. State of New York*. (Dkt. No. 1-2 at 4). Plaintiff claims that on March 3, 2018, the Appellate Division, Second Department informed plaintiff that his criminal appeal was denied in September of 2016 for failure to timely perfect the appeal. (Compl. ¶ 38). Plaintiff states that he never received any notice about the dismissal in 2016, while he was at Eastern. (Compl. ¶ 39). Plaintiff states that he requested a copy of the log book from Eastern for September 30, 2016,[8] which indicated that plaintiff received two letters, but he never received either of them. Instead, plaintiff claims that

defendant Ellsworth falsified plaintiff's signature and never gave the letters to plaintiff.[9]

[7]    Plaintiff states that he was transferred to Mohawk Correctional Facility ("Mohawk") on February 22, 2018. (Compl. ¶ 37).

[8]    In another part of the complaint, plaintiff claims that on September 30, 2016, the Second Circuit Court of Appeals sent plaintiff "mail" that he never received. (Compl. ¶ 40).

[9]    Neither letter was from the Appellate Division, Second Department. (Compl. ¶¶ 39).

Plaintiff alleges that on March 3, 2017, defendant von der Heyde threatened to "break plaintiff's neck if he saw [him] close [to] the Grievance Office." (Compl. ¶ 18, 51). On March 8, 2017, plaintiff states that he got a "call-out" for an identification photograph, but that in order to go to that location, plaintiff would be required to have contact with defendant von der Heyde. (Compl. ¶ 52). Plaintiff claims that he explained to the "ID" Officer that defendant von der Heyde was retaliating against him, and in order to avoid contact with the defendant, plaintiff would "wait in the Guardroom Floor" to avoid seeing the defendant. Although plaintiff claims that the ID officer said "okay," plaintiff was keep-locked and issued a misbehavior report two hours later by defendant von der Heyde for failure to obey an order. (Compl. ¶ 52-53).

**\*4**   On May 8, 2017, plaintiff was scheduled to report to the Inmate Grievance Resolution Committee ("IGRC") office at 9:00 a.m. for a "callout."[10] (Pl.'s Ex. K) (Dkt. No. 1-2 at 49). At 8:20 a.m., plaintiff informed Correction Officer Leone ("Leone")[11] that he could not walk up the stairs to the IGRC office due to his knee condition.[12] (*Id.*) Defendant von der Heyde verbally harassed Plaintiff with racial slurs and reported the issue to defendant A. Black ("Black"), the Inmate Grievance Program Supervisor. (*Id.*); (Compl. ¶ 59).

[10]    These additional facts appear in Plaintiff's Exhibit K which is plaintiff's May 18, 2017 grievance. (Dkt. No. 1-2 at CM/ECF p.49).

[11]    Officer Leone is not a defendant herein.

[12]    Plaintiff claims that he had a "flat pass medical order" and annexed two such passes as exhibits to his complaint. (Compl. ¶ 59; Dkt. No. 1-2 at 40,

2021 WL 3813172

41). The passes are dated May 11, 2017 and June 22, 2017. (*Id.*)

At 8:30 a.m., Black arrived and continued to abuse and intimidate Plaintiff. (Pl.'s Exs. I, K) (Dkt. No. 1-2 at 36-37 (5/22/17 Letter to Sup't Lee), 50 (5/18/17 Grievance)). Black stated that he "didn't give a damn about [plaintiff's] medical problems" and directed plaintiff to go upstairs or "kill [him]self" because he wrote too many grievances. (Compl. ¶¶ 20, 59-61; Dkt. No. 1-2 at 50). Defendants von der Heyde and Black gave Plaintiff a "direct order" to walk up the stairs. (Dkt. No. 1-2 at 50). Plaintiff claims that as he walked up the stairs, his left knee gave out, and he fell down the stairs, injuring his head, neck, shoulders, and legs ("the staircase incident"). (Compl. ¶ 62). Plaintiff was taken to the infirmary for treatment, and as a result of the incident, he was in physical therapy for over two months. (*Id.*)

The following issues remain after the court's initial review of the complaint:

(1) First Amendment mail interference claims against defendant Ellsworth.

(2) First Amendment access to courts claims against defendant Ellsworth.

(3) Eighth Amendment deliberate indifference claims against defendants von der Heyde and Black in connection with forcing plaintiff to go up the stairs.

(4) Retaliation claims against defendants Ellsworth, von der Heyde, and Black.

## II. Summary Judgment

### A. Legal Standards

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

### B. Evidence Submitted

**\*5** Plaintiff attached a substantial number of exhibits to his complaint. (Dkt. No. 1-1 (Exs. A-E) and 1-2 (Exs. F-L)). Defendants have attached exhibits to their summary judgment motion, including plaintiff's January 5, 2021 deposition (Dkt. No. 43-1 (Ex. A; the Declarations of Rachel Seguin and of defendants Ellsworth, Black, and von der Heyde (Dkt. Nos. 43-4 - 43-7)). Although plaintiff has attached exhibits to his opposition papers, most of them are duplicates of the defendants' exhibits and include a copy of the complaint. (Dkt. No. 50-2 - 50-10). I will discuss the facts contained in the exhibits as they are relevant to the court's analysis of defendants' motion.

## III. Mail Interference

### A. Legal Standards

It is well established that " 'the First Amendment protects an inmate's right to send and receive both legal and nonlegal mail, although prison officials may regulate that right if the restrictions they employ are 'reasonably related to legitimate penological interests.' " *Abreu v. Travers*, No. 9:15-CV-540 (MAD/ATB), 2016 WL 6127510, at *10 (N.D.N.Y. Oct. 20, 2016) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989)). Legal mail is entitled to greater protection from interference than nonlegal mail. *Id.* (citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted)). In *Abreu*, the court noted that "[a] single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge." *Id.* (citing *Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975). *See also Ahlers v. Rabinowitz*, 684 F.3d

53, 64 (2d Cir. 2012) ("With regard to legal mail, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation.") (citation omitted). An inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Davis*, 320 F.3d at 351 (quoting *Cancel v. Goord*, No. 00 Civ. 2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001) (citing *Washington v. James*, 782 F.2d 1134,1139 (2d Cir. 1986))). "However, 'as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received.' " *Geneo v. City of New York*, No. 20-CV-2441, 2021 WL 2111817, at *5 (S.D.N.Y. May 25, 2021) (quoting *Davis*, 320 F.3d at 351 (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

Inmates' suits, alleging unconstitutional opening of their legal mail without any showing of damages have been dismissed. *Abreu*, 2016 WL 6127510, at *10 (citing *Pacheco v. Comisse*, 897 F. Supp. 671, 681 (N.D.N.Y. 1995) (dismissing inmate's claim based on a single instance in which defendants allegedly opened his legal mail outside of his presence because "he has shown no prejudice as a result of the allegedly unauthorized opening"); *Walton v. Waldron*, 886 F. Supp. 981, 986 (N.D.N.Y. 1995) ("Existing precedent on an inmate's claim that his 'legal' mail has been improperly handled by prison officials requires a showing of harm."); *Gittens v. Sullivan*, 670 F. Supp. 119, 124 (S.D.N.Y. 1987), *aff'd*, 848 F.2d 389 (2d Cir. 1988) (holding that inmate's allegation that his legal mail was "interfered with on one occasion is insufficient to state a cause of action given that the interference complained of did not affect plaintiff's access to the courts")).

### B. Analysis

**\*6** In this case, plaintiff alleges both improper opening and actual interference with his legal mail. Unfortunately, plaintiff's misuse of legal terminology and incomplete statement of facts makes some of the issues more confusing. The court has attempted to clarify the issues by researching the dockets of plaintiff's other federal actions in addition to reviewing the evidence presented by both plaintiff and defendants. *See Allah v. Murphy*, No. 9:14-CV-0438 (GTS/TWD), 2016 WL 4401069, at *6 n.11 (N.D.N.Y. May 16, 2016) (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (citations omitted) (docket sheets are public records, "of which the court could take judicial

notice.")), *report-recommendation adopted by*, 2016 WL 4386013 (N.D.N.Y. Aug. 17, 2016), *aff'd*, 699 F. App'x 41 (2d Cir. 2017).

Most of plaintiff's "interference" claims allege delay in either sending or receiving legal mail, based on plaintiff's opinion of how quickly the mail should have been processed. [13] Some of plaintiff's claims allege actual tampering with the mail, including removing plaintiff's documents and replacing them with "fake" documents as well as falsifying log book entries.

[13]     At his deposition, plaintiff conceded that he had never worked in a facility mail room. (Pl.'s Dep. at 69, 73).

The first part of the complaint alleges that, after the Second Circuit affirmed *Moreau v. Peterson*, 672 F. App'x 119 (2d Cir. 2017), plaintiff made several attempts to petition for certiorari which were tampered with by defendant Ellsworth. Plaintiff's allegations are not supported by the complaint, his own deposition testimony, or by the records of the action that he claims he was attempting to appeal.

Plaintiff alternately refers to the document that he sent to the Court of Federal Claims/Supreme Court as a "complaint" or "appeal." He claims that after *Moreau II* was decided, he sent a "complaint" to the Court of Federal Claims on February 16, 2017, but that on March 6, 2017, his papers were returned with a letter from the Clerk of the Court of Federal Claims. In conclusory fashion, he states that the correspondence took a month "when it should have taken about two weeks." (Compl. ¶¶ 7, 9, 10).

However, it is clear from the letter that plaintiff received from the Court of Federal Claims, [14] dated February 28, 2017, that plaintiff sent what he believed to be his appeal in *Moreau II*. The Court of Federal Claims sent the document back to plaintiff because it appeared that he meant to file the papers in the United States Supreme Court, and they were being sent back for him to do so. (Dkt. No. 1-1 at CM/ECF p.30). There is no indication that any delay was caused by defendant Ellsworth, and plaintiff only assumes this to be the case.

[14]     This letter is attached to plaintiff's complaint.

Plaintiff then claims that he sent the "complaint" to the United States Supreme Court on March 9, 2017, and that defendant Ellsworth "held" it for four days before she sent it out. (Compl. ¶ 11). Plaintiff states that on March 27, 2017, he

received an "open priority envelope" from the Supreme Court which contained a letter from the Court Clerk. Plaintiff claims that the Clerk's letter did not address plaintiff's claims, rather, the Clerk referred to a petition for certiorari and explained how plaintiff should proceed if he intended to file such a petition.

Because the Clerk did not address the "claims" in plaintiff's "complaint," he assumed that defendant Ellsworth had opened his outgoing mail to the Supreme Court, replaced his documents with some unknown "fake" documents, sent those documents to the Supreme Court, and then when the court sent correspondence to plaintiff, intercepted that correspondence, opened the envelope, took out the "fake" documents and put plaintiff's documents back in the envelope before delivering the mail to plaintiff.

**\*7** Plaintiff has attached the Supreme Court Clerk's letter to his complaint. (Dkt. No. 1-1 at CM/ECF p.42). The Clerk stated as follows:

> You may seek review of a decision only by filing a timely petition for writ of certiorari. The papers you submitted are not construed to be a petition for writ of certiorari. Should you choose to file a petition for writ of certiorari, you must submit the petition within the 90 day time limit allowed under Rule 13 of the Rules of this Court. A copy of the Rules of this Court and a sample petition for a writ of certiorari are enclosed.

> Your case must be reviewed by a United States court of appeals or by the highest state court in which a decision could be had. 28 U.S.C. 1254 and 1257.

(Dkt. No. 1-1 at CM/ECF p.42). Plaintiff claims that the Rules and the sample petition were not enclosed and accuses defendant Ellsworth of removing them. The complaint does not explain how plaintiff determined that defendant Ellsworth accomplished this. At his deposition, plaintiff did not sufficiently elaborate on how he concluded that defendant Ellsworth either delayed or tampered with plaintiff's documents to the point of removing documents and replacing them with "fake" ones. (Pl.'s Dep. at 51-64).

During his deposition, plaintiff alleged that the correspondence from the Supreme Court was actually delivered to the facility on March 24, 2017, but was not given to plaintiff until March 27, 2017, which would have given the defendant time to tamper with the contents. (Pl.'s Dep. at 68-72). Plaintiff claims that his family was "tracking" the

package, so he knew that it arrived at the facility on March 24, 2017. (Pl.'s Dep. at 69). However, even assuming that the package was delivered to the facility on March 24, 2017, defense counsel noted at the deposition that March 24, 2017 was a Friday. Plaintiff acknowledged that mail would not have been delivered to him on weekends. (Pl.'s Dep. at 72). Plaintiff's allegations about this particular correspondence are fanciful at best. It is inconceivable that defendant Ellsworth just happened to have "fake" papers to put in plaintiff's outgoing mail, keeping and replacing plaintiff's "real" papers when the package was sent back from the Supreme Court before it was delivered to the plaintiff.

Plaintiff apparently tried again to file, what he then referred to as a petition for certiorari in the United States Supreme Court. However, the document was sent back to him on April 10, 2017, noting various deficiencies, including the lack of a proper motion to proceed in forma pauperis ("IFP"). (Dkt. No. 1-1 at CM/ECF p. 43). In his letter, the Clerk of the Court indicated that plaintiff should "correct and resubmit as soon as possible,"[15] and plaintiff was given 60 days from the date of the letter to do so. (*Id.*) Plaintiff's handwritten note at the top of the document states that the Superintendent and defendant Ellsworth opened the Clerk's mail and took the documents; thus, plaintiff could not "do the petition." (*Id.*)

[15]   The letter indicated that a proper form IFP application was enclosed. (Dkt. No. 1-1 at CM/ECF p.43).

During his deposition, plaintiff claimed that defendant Ellsworth and the mail room staff behaved this way to prevent him from complying with deadlines and keep him in prison.[16] (Pl.'s Dep. at 100). Plaintiff testified that no one told him that, it was "just the way they behave." (Pl.'s Dep. at 101). Defendant Ellsworth denies tampering with any of plaintiff's mail, and has submitted evidence showing that she was not working on April 12, 2017, the day that she is alleged to have tampered with the most recent correspondence from the Supreme Court.[17] (Ellsworth Decl. ¶ 16).

[16]   The court would point out that *Moreau I* was a civil rights action that had nothing to do with plaintiff's conviction, and the result of which would have no effect on the length of his incarceration. *See Moreau I, supra,* 2015 WL 4272024. As discussed further herein, at the same time, plaintiff was proceeding with an application for a second or

successive application for habeas corpus under 28 U.S.C. § 2254.

17    Defendant Ellsworth also states that the log books show that plaintiff signed for legal mail on April 12, 2017. (Ellsworth Decl. ¶ 16).

**\*8**  Plaintiff also claims that on February 10, 2017, he "received back a motion under Newly Discovered Evidence" that plaintiff had served on the New York State Attorney General on January 10, 2017. (Compl. ¶ 21). Plaintiff implies that the motion was never sent to the Attorney General, that defendant Ellsworth held the motion for a month, and then placed it in a different envelope with the notation "found loose in the mail." (*Id.*) At his deposition, plaintiff claims that this motion was also to be sent to the United States Supreme Court, and the newly discovered evidence would have proven his innocence. (Pl.'s Dep. at 94-100). Plaintiff discussed his "newly discovered evidence," but failed to answer defense counsel's question, asking how plaintiff knew that defendant Ellsworth "held" his motion. (*Id.*)

The court notes that plaintiff's conclusory allegations are unsupported by any evidence. Defendant Ellsworth states in her affidavit that she was on extended leave until January 17, 2017, so she could not have "intercepted" or held anything that plaintiff mailed on January 10, 2017. (Ellsworth Decl. ¶¶ 12-13 & Ex. D) (Dkt. No. 43-5). In addition, a review of the docket sheet in the Second Circuit relative to *Moreau v. Ercole*, No. 17-126 shows that on January 12, 2017, plaintiff filed a motion for permission to file a second or successive habeas corpus petition. (Dkt. Nos. 1, 4 in 17-126). Plaintiff's submission was 201 pages long, and it was signed on January 9, 2017. (Dkt. No. 1-2, 4 in 17-126). Clearly, plaintiff's motion was not "held" or "intercepted" by anyone in the mail room and was sent promptly to the Second Circuit, where it was received only three days after plaintiff signed the document.[18] The motion was based on what plaintiff described as "Newly Discovered Evidence." (*Id.*) The Attorney General's Office appeared on February 7, 2017.[19] (Dkt. Nos. 23, 24 in 17-126). The Second Circuit denied plaintiff's motion **on the merits** on February 8, 2017. (Dkt. No. 26 in 17-126).

18    Plaintiff attempts to argue that defendant Ellsworth returned from her extended leave on January 17, 2017 and somehow located his papers in order to hold them. Clearly, since the papers were filed in the Second Circuit on January 12, 2017, plaintiff's

argument has no merit. It is unclear what plaintiff received "back" on February 10, 2017, but it is clear that his motion had already been decided, and defendant did not intercept or hold plaintiff's papers.

19    The court notes that the complaint indicates that the documents that were "returned" to plaintiff were intended for the Attorney General's Office, and perhaps were the copies of the motion that he attempted to serve. However, it is unlikely that defendant Ellsworth, even assuming she had been working on the date in question, would have intercepted and tampered with one set of documents, while promptly sending the other set to the court. In any event, plaintiff has not shown that he was injured in any way by the defendant's alleged conduct.

Defendant Ellsworth does concede that on February 16, 2017, a piece of plaintiff's legal mail was opened outside his presence in error. (Ellsworth Decl. ¶ 15). The matter was addressed with the mail room staff, and efforts were made to determine that such mistakes were not repeated. (*Id.*) There is no indication that plaintiff suffered any harm as a result of this single incident.

Plaintiff's complaint was vague, and neither his deposition, nor his response to defendants' motion have clarified or substantiated any of the conclusory accusations that he makes against defendant Ellsworth. To the extent that plaintiff claims that the defendant delayed his mail, there is no indication that plaintiff suffered any injury based on delays or that the delays were attributable to the defendant. The court will next examine the claim of denial of access to courts based on the same allegations.

## IV. Access to Courts

### A. Legal Standards

**\*9**  The United States Constitution guarantees prisoners a "meaningful right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 830 (1977). As the Supreme Court explained in *Bounds*, this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828. However, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance," nor did it "guarantee inmates the wherewithal to transform

themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). Instead, "the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.' " *Collins v. Goord,* 438 Supp. 2d 399, 415–16 (S.D.N.Y. 2006) (quoting *Lewis,* 518 U.S. at 355). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

The courts have recognized two variants of claims for denial of access to courts: first, "forward-looking claims," where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and second, "backward-looking access claims," which cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. *Jean-Laurent v. Lawrence,* No. 12-CV-1502, 2015 WL 1208318, at *3 (S.D.N.Y. Mar. 17, 2015) (citing *Christopher v. Harbury,* 536 U.S. 403, 413-14 & n. 11 (2002)). "The Second Circuit has emphasized, however, that the viability of [backward-looking] claims is far from clear, pointing out that the [Supreme Court's] *Harbury* decision was careful not to endorse their validity." *Id.* (quoting *McNaughton v. de Blasio,* No. 14 Civ. 221, 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015) (other citations omitted). Although the availability of a backward-looking access claim remains uncertain in this Circuit, [20] the existing case law suggests four elements:

> First, the plaintiff must identify a nonfrivolous, arguable underlying claim. Second, the plaintiff must establish that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim. Third, the plaintiff must show that the defendant's alleged conduct was deliberate and malicious. [21] Fourth, the plaintiff must demonstrate that the defendant's actions resulted in an actual injury to the plaintiff.

*Jean-Laurent v. Lawrence,* 2015 WL 1208318, at *4 (internal citations and quotations omitted). What does remain clear is that such denial-of-access claims are "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury,* 536 U.S. at 415; *see also Sousa,* 702 F.3d at 128 (citation omitted).

[20]  See *Sousa v. Marquez,* 702 F.3d 124, 128 (2d Cir. 2012) ("The viability of backward-looking right-of-access claims is far from clear in this Circuit ...")

[21]  But see *Desmarat v. Artus,* No. 08-CV-977 (DNH/RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011) (questioning whether 'maliciousness' is a proper element of a backward-looking access to court claim, based on Second Circuit jurisprudence).

**B. Analysis**

Notwithstanding plaintiff's attempts to show that his litigation was interrupted or his documents tampered with by defendant Ellsworth, there is absolutely no evidence showing that any of plaintiff's cases were adversely affected by the defendant's actions. Such lack of actual injury is fatal any claim of denial of access to courts. In fact, the evidence shows that plaintiff was able to litigate more than one case during the period in question. He was able to file a substantial motion for permission to file a second or successive habeas corpus petition. The denial of plaintiff's motion was due to its lack of merit and not due to any actions or omissions by defendant Ellsworth.

 **\*10**  Plaintiff's attempt at filing a petition for writ of certiorari in *Moreau II* was not impeded by defendant Ellsworth, despite plaintiff's conclusory allegations. It is clear from the letters sent to plaintiff from both the Court of Federal Claims and later from the Supreme Court, that any delays in filing were due to plaintiff's errors and not due to interference from this defendant. Thus, any claim of denial of access to courts may be dismissed.

**V. Retaliation**

 **A. Legal Standards**

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took

adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord*, 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 (2002)).

In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso*, No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon*, 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation.[22] *Cruz,* 2014 WL 2176256, at *6 (citing *Colon,* 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Thomas v. Waugh*, No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001).

22    This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

## B. Analysis

### 1. Ellsworth

Based on the findings above, this court has determined that plaintiff has failed to show that defendant Ellsworth intentionally delayed or interfered with plaintiff's mail. Thus, plaintiff cannot establish the second prong of the test for a First Amendment retaliation claim. He cannot show that the defendant took adverse action against him, and his claims of retaliation have been made in "wholly conclusory terms." This finding is supported by plaintiff's testimony at his deposition, during which he could not elaborate on the facts establishing the defendant's alleged interference with his mail. Thus, plaintiff's claims of retaliation may be dismissed as against defendant Ellsworth.

### 2. von der Heyde

**\*11** In his complaint, plaintiff states that defendant von der Heyde retaliated against plaintiff to "support" defendant Ellsworth's constitutional violations against him. (Compl. ¶ 17). This paragraph is followed by a variety of claims that defendant von der Heyde verbally harassed and threatened plaintiff with physical harm if he saw plaintiff near the grievance office. (Compl. ¶¶ 18-20, 51, 54). " '[V]erbal harassment and derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to support a retaliation cause of action.' " *Sanchez v. Shanley*, No. 9:20-CV-0648 (GTS/ML), 2021 WL 365912, at *3 (N.D.N.Y. Feb. 3, 2021) (quoting *Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM), 2013 WL 5441503, at *6 (N.D.N.Y. Sept. 27, 2013)).

Plaintiff does allege that on March 8, 2017, defendant von der Heyde issued a misbehavior report against plaintiff for failing to follow a direct order. (Compl. ¶ 51). Plaintiff vaguely asserts that he reported for an ID photograph and told another officer that defendant von der Heyde had been "retaliating" against him, so plaintiff was going to wait in "in the Guardroom Floor" to avoid any contact with the defendant. (*Id.*) Although plaintiff claims that the other officer told him that it was "okay," plaintiff was later issued a misbehavior report by defendant von der Heyde for failing to follow an order. (*Id.*) In the complaint, plaintiff states that he exhausted his administrative remedies, but does not clarify what he alleged in his grievance.

A review of plaintiff's exhibits shows that plaintiff filed a grievance on March 17, 2017, claiming that defendant von der Heyde was verbally harassing him, and ultimately filed the March 8, 2017 misbehavior report against plaintiff because "on February 27, March 1, and 6, 2017, I wrote [sic] grievance for tampering with my legal mails, and medical call-out harassment." (Pl.'s Ex. H) (Dkt. No. 1-1 at CM/ECF p.30). However, the grievances filed on the above dates were not against defendant von der Heyde, and the first grievance filed against defendant von der Heyde appears to have been written on March 17, 2017, more than a week after the defendant issued the misbehavior report in question.

While a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer ... faces a heightened burden of establishing a causal connection," this does not necessarily bar a retaliation claim where there are indications of "a retaliatory purpose - i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 338-39 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted). *See also Henderson v. Vanderwerff*, No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016). In this case, plaintiff does allege that on March 3, 2017, defendant von der Heyde threatened to break plaintiff's neck if he saw plaintiff near the grievance office. Thus, the court will not recommend dismissal based upon the fact that, until March 17, 2017, it appears that plaintiff's grievances were against other officers.

However, it is well-settled that, even where plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if he can show that the alleged retaliatory action would have occurred even without the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir.), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The defendant bears the burden of making the showing that she would have taken exactly the same action in the absence of an improper motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288). In this case, although plaintiff alleges that the March 8, 2017 misbehavior report was in retaliation for past grievances, he essentially acknowledged at least one of the charged violations–that he was not in an authorized location.[23] He was found guilty of that movement regulation violation charge after a hearing, and that finding was affirmed

on appeal. (Pl.'s Ex. I) (Dkt. No. 1-2 at CM/ECF pp. 33-35). Thus, the allegedly retaliatory action would have been taken regardless of the retaliatory motive and may not be the basis for a First Amendment retaliation claim. Since all the other "retaliatory" actions allegedly taken by defendant von der Heyde were verbal harassment, plaintiff has failed to raise a genuine issue of fact regarding his First Amendment retaliation claim against defendant von der Hyde.

[23]     While plaintiff believes that he had an explanation for his conduct, he nevertheless admits that he was waiting in a place where he was not authorized to be. (Compl. ¶ 52). Plaintiff claims that the officer on duty told plaintiff it was "okay" to wait "in the Guardroom floor." (*Id.*) Plaintiff was found "not guilty" of violating a direct order, but was found guilty of the movement violation. (Pl.'s Ex. I).

### 3. Black

**\*12**  Plaintiff alleges that defendant Black, who is the Inmate Grievance Supervisor at Eastern, retaliated against plaintiff by issuing a misbehavior report against him charging him with, inter alia, falsifying documents, in retaliation for the grievance that he attempted to file against defendant Black in relation to the May 8, 2017 staircase incident.[24] (Compl. ¶ 68). Defendant Black has filed a declaration, stating that the misbehavior report that he filed on June 14, 2017 was filed solely because the plaintiff violated facility rules and was in no way retaliatory. (Black Decl. ¶ 9) (Dkt. No. 43-6).

[24]     Plaintiff also claims that defendant Black prevented plaintiff from exhausting his administrative remedies in relation to the May 8th staircase incident as will be discussed below.

Plaintiff claims that on May 18, 2017, he filed a grievance against defendant Black in relation to the staircase incident of May 8, 2017. Plaintiff has filed affidavits signed by three other inmates who state that they saw plaintiff place the grievance in the proper receptacle. (Compl. ¶ 66 & Pl.'s Ex. K, CM/ECF pp. 55-57). Plaintiff claims that when he did not receive a response from the Inmate Grievance Resolution Committee, he attempted to "appeal" the grievance to the Superintendent. (Compl. ¶ 64).

Defendant Black explains that, instead of an appeal, he received plaintiff's initial grievance on June 8, 2017, and

2021 WL 3813172

determined that the grievance was untimely because it had been filed more than 21 days after the alleged incident. (Black Decl. ¶ 10 & Ex. B). A copy of the plaintiff's grievance, dated May 18, 2017, but stamped "received" by the IGRC on June 8, 2017 is attached to the complaint as Exhibit K. (Dkt. No. 1-2 at CM/ECF p. 49-52). The last page of the document contains a form for the IGRC "response." (*Id.* CM/ECF p. 52). The "Response of the IGRC" section is blank, and next to "date returned to inmate," plaintiff wrote "no date." Next to Chairperson, plaintiff wrote "no Chairperson," and next to "IGRC Member decision," plaintiff wrote "no IGRC Member decision." (*Id.*)

In the space for the written basis for appeal, plaintiff explained that, on May 18, 2017 he "sent" his grievance against "A. Black who directed me to harm myself on May 8, 2017." (*Id.*) The plaintiff wrote that since he had not received the IGRC decision, he was "appealing" to the Superintendent. (*Id.*) The document is notarized on June 7, 2018. (*Id.*) Then, plaintiff claims that, after defendant Black denied the grievance as untimely, plaintiff tried to appeal to the CORC, using a Department of Corrections and Community Supervision ("DOCCS") form upon which the Superintendent's decision is usually written. (*Id.* at CM/ECF p. 53).

The top of the form is where the Superintendent writes the appeal determination, and the bottom of the form is the "Appeal Statement," which is the space where the inmate indicates that he wishes to appeal. (*Id.*) Plaintiff completed both parts of the form himself, using the top part of the form as a space for additional explanation of the incident. (*Id.*) At his deposition, plaintiff admitted filling out the form and argued that he should have been allowed access to the form in order to appeal the Superintendent's failure to decide. (Pl.'s Dep. at 90-91).

On June 14, 2017, defendant Black issued a misbehavior report based on plaintiff's improper use of the form, charging plaintiff with "false information," possession of an "unauthorized item," "counterfeiting," possession of "contraband," "possession of a facility document," and "impersonation." (Black Decl. Ex. A). The misbehavior report explains as follows:

> **\*13** On 6/14/17, I received in the IGRC Box an envelope from inmate Moreau containing a fabricated and falsified Superintendent's Response

> form (2133). The form used by inmate Moreau is an official NYS DOCCS document that he is attempting to portray as original, but it has clearly been altered by him. The information contained in the fabricated/counterfeited document is false. He does not have the permission of the Superintendent or myself to use this form in any such manner.

*Id.* Plaintiff claims that he had no other way to appeal the failure of the IGRC and the Superintendent to respond to his grievance and claims that this misbehavior report was issued in "retaliation." (Compl. ¶ 68, Pl.'s Dep. at 93).

Defendant Black has filed a copy of the memorandum that he sent to the plaintiff, dated June 8, 2017. (Black Decl. Ex. B). In this memorandum, defendant Black acknowledges that on June 8, 2017, he received plaintiff's grievance, which was dated May 18, 2017 but was untimely because it complained about an incident on May 8, 2018. The memorandum stated that plaintiff included a "fabricated IGRC response form." (*Id.*) The memorandum further reminded plaintiff that he could have asked for an extension of time to file his grievance, but no request for such extension was received with the untimely documents.[25] (*Id.*) The court notes that, even though defendant Black mentioned the falsified IGRC response in his memorandum of June 8, 2017, he did not issue a misbehavior report until plaintiff filed the next altered document in an effort to "appeal" to the CORC on June 14, 2017.

[25]  As stated above, for a short time, plaintiff was an IGRC member, and was thus presumably familiar with the rules and regulations of the grievance program. At his deposition, plaintiff testified that, in all, he had filed over one hundred grievances total, and had filed approximately 25-30 grievances at Eastern alone. (Pl.'s Dep. at 87). In addition a review of the Seguin declaration and of plaintiff's deposition shows that he filed a substantial number of grievances and was well aware of the procedures involved. (Seguin Decl.) (Dkt. No. 43-4).

Plaintiff uses the term "retaliation" very loosely in his complaint, and it is unclear what alleged conduct that he

attributes to defendant Black is "retaliation" and which constitutionally protected activity is the alleged basis for the retaliation. Plaintiff's strongest argument [26] for retaliation against defendant Black, based on the facts in his complaint, is that the June 14, 2017 misbehavior report was in retaliation for the grievance that plaintiff tried to file against defendant Black, dated May 18, 2017. [27]

[26]    It is well-settled that the court must interpret a pro se plaintiff's complaint to raise the strongest arguments it suggests. *Gause v. Claude*, No. 20-CV-4148 (JMA/SIL), 2021 WL 25356, at *2 (E.D.N.Y. January 4, 2021) (citing inter alia *United States v. Akinrosotu*, 637 F.3d 165, 167 (2d Cir. 2011) (per curiam)).

[27]    If the court assumes that plaintiff is also alleging that defendant Black attempted to prevent plaintiff from exhausting his administrative remedies, it is unclear if plaintiff claims that this conduct was in retaliation for past grievances against other officers. The May 18, 2017 grievance appears to be the first grievance plaintiff filed against defendant Black, and defendants argue that it is more difficult for a plaintiff to show that an officer retaliated against an inmate for a grievance that was directed at other officers. It appears from plaintiff's deposition that he is only using the allegedly "blocked" grievance as an excuse for failure to exhaust his remedies with respect to the staircase incident and the June 14, 2017 misbehavior report as the basis for his retaliation claim.

**\*14**  However, defendant Black has shown that he would have filed the June 14, 2017 misbehavior report against plaintiff in the absence of any retaliatory motive. It is clear from defendant Black's June 8, 2017 memorandum, that he believed that plaintiff had filed a late grievance without asking for an extension of time to do so and had already tampered with the IGRC form. He did not issue a misbehavior report until plaintiff disregarded the memorandum and filed a new "appeal," using a different form which he again altered. The misbehavior report was issued because plaintiff insisted on violating the rules of which he was well-aware. Such misbehavior report may not be the basis of a retaliation claim, and that part of the complaint against defendant Black may be dismissed.

## VI. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g.*, *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*15** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, — U.S. ——, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, — U.S. at ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, — U.S. at ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that it [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, — U.S. at ——, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage

of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

**B. Analysis**

Defendants argue that plaintiff has failed to exhaust his deliberate indifference claim with respect to the staircase incident. As defendants note, using May 8, 2017 as the date of the incident, plaintiff had until May 29, 2017 to file a grievance and until June 22, 2017 within which to file a request, supported by a showing of mitigating circumstances, for an extension of time to file a grievance if the original deadline had passed. 7 NYCRR §§ 701.5(a), 701.6(g)(1)(i)(a). Defendants argue that, even though the grievance is dated May 18, 2017, plaintiff did not "file" the grievance until June 8, 2017, and he did not request an extension of time to do so. He opted instead to falsify documents in an effort to "appeal" the alleged failure to respond to his original grievance.

Plaintiff claims that defendant Black "blocked" his grievance by refusing to file it because it was late. Plaintiff also testified during his deposition that defendant Black prevented him from filing the grievance. (Pl.'s Dep. at 88). Although a little unclear in his testimony, plaintiff stated that

> [The Superintendent] said he never received it, as I just stated before, that ... wasn't the way that I do to exhaust my administrative remedy. Then, if you go to the court, the court will deny you if you did not exhaust your administrative remedy, but I always get an argument for that.
>
> If you banned me from exhausting my administrative remedies, you're not going to get to say it, you're going to use it, but it's not going to work. You give the Judge and say what - - which one you pardon for your administrative remedies.

(*Id.*) It is clear that plaintiff is well-aware that if a defendant "blocked" plaintiff's ability to exhaust his administrative remedies, plaintiff could avoid the exhaustion requirement. [28] Plaintiff's opposition to the defendants' motion for summary judgment clarifies his argument and specifically states that defendant Black "barred" inmates from exhausting their remedies. [29] (Dkt. No. 50-1, ¶ 62). However, plaintiff still admits, even in his response to the motion for summary judgment, that he "had a hold [sic] Form 2133, *he make a copy of it, without any superintendent's signature*, and on June 14, 2[0]17, he appeal to CORC. [sic] the non-decision

of the superintendent." [30] (Dkt. No. 50-1, ¶ 64) (emphasis added).

28    The court notes that at the deposition, it appeared that plaintiff had some language issues. However, other parts of his testimony indicate that he was well-aware of case law, and his difficulty with English did not appear to impair his understanding of the issues in the case.

29    Plaintiff may have slightly overstated his argument because he seems to allege that defendant Black barred all inmates from appealing their grievances. (Dkt. No. 50-1, ¶ 62-63).

30    Plaintiff referred to himself in the third person in his memorandum of law.

 *16  Plaintiff seems to argue that he is entitled to have "Form 2133" so that he could appeal the "non-decision," and he did not falsify the document. However, it is clear that Form 2133 is only available if the Superintendent makes a decision, and plaintiff appeals therefrom. Defendant Black's June 8th memorandum to plaintiff clearly explains that plaintiff could have submitted a request for an extension of time to file his grievance. He had plenty of time to do so. Instead, plaintiff created his own problems by obtaining an old form, copying it, and attempting to submit his "appeal" when he was not appealing any determination and utilized the DOCCS form improperly.

After the Supreme Court decided *Ross*, the Second Circuit tackled the issue of "availability" of administrative procedures if a grievance is never filed, is never assigned a grievance number, and plaintiff has no notice of what happened to the grievance. *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams* the court found that the administrative remedy would be "unavailable," notwithstanding the regulations providing that an inmate may appeal "to the next step" if they do not receive a response within the required time limit, because the regulatory scheme was "so opaque" that "no reasonable prisoner" could use it. 829 F.3d at 124.

Appealing "to the next step" was only reasonably applicable if the initial grievance had actually been filed, and plaintiff did not receive a response. Then, the IGRC or the Superintendent's failure to respond was appealable "to the next step." *Id.* Because no reasonable inmate would have been able to determine how to use the procedure if the

grievance had not been filed, the Second Circuit found that the administrative remedy was "unavailable," and the exhaustion requirement was excused.

In *Williams*'s case, as in this case, the plaintiff contended that his grievance was not initially filed. [31] However, this case is distinguishable from *Williams* because receipt of the grievance was acknowledged by defendant Black in his June 8, 2017 memorandum to the plaintiff. In this memorandum, defendant Black specifically informed plaintiff that he needed to submit the late grievance together with a request for an extension of time to file. If plaintiff had done so, an extension could have been granted, and plaintiff could have exhausted his administrative remedies. Instead, adamant in his assertion that he had already filed the complaint and was appealing a "failure to decide," plaintiff took it upon himself to unsuccessfully and inappropriately devise a way to appeal. Plaintiff was no stranger to the grievance process and simply chose to ignore the defendant's direction. Thus, unlike the plaintiff in *Williams*, the administrative procedure was not unavailable, plaintiff simply chose to ignore it. Thus, he cannot argue that defendant Black "blocked" his attempt at exhausting his administrative remedies, and plaintiff's deliberate indifference claim may be dismissed for failure to exhaust.

31    The court assumes for purposes of argument that plaintiff in this case did mail the grievance on May 18, 2017.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' summary judgment motion (Dkt. No. 43) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

### All Citations

Slip Copy, 2021 WL 3813172

**Moreau v. Ellsworth, Slip Copy (2021)**

2021 WL 3813172

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 3793772
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emile MOREAU, Plaintiff,

v.

Sherry ELLSWORTH et al., Defendants.

9:20-CV-124
|
Signed 08/26/2021

**Attorneys and Law Firms**

EMILE MOREAU, Plaintiff, Pro Se, 04-A-1588, Marcy Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

HON. LETITIA JAMES, New York State Attorney General, Attorneys for Defendants, The Capitol, Albany, NY 12224, OF COUNSEL: DAVID C. WHITE, ESQ., Ass't Attorney General.

**ORDER ON REPORT & RECOMMENDATION**

David N. Hurd, U.S. District Judge

**\*1** On February 5, 2020, *pro se* plaintiff Emile Moreau ("plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Eastern Correctional Facility, filed this 42 U.S.C. § 1983 action alleging, *inter alia*, that defendants violated his First Amendment rights by interfering with his mail and his access to the courts, and by retaliating against him for the exercise of those rights. Dkt. No. 1. Following

some preliminary motion practice and a period of discovery, defendants moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on all of plaintiff's remaining claims. Dkt. No. 43.

On July 15, 2021, U.S. Magistrate Judge Andrew T. Baxter advised by Report & Recommendation ("R&R") that defendants' motion be granted and that plaintiff's complaint be dismissed. Dkt. No. 56. Plaintiff has filed objections to the R&R. Dkt. No. 57.

Upon *de novo* review of the portions to which plaintiff has objected, the Report & Recommendation will be accepted and adopted in all respects. *See* 28 U.S.C. § 636(b)(1)(C).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ADOPTED;

2. Defendants' motion for summary judgment is GRANTED; and

3. Plaintiff's complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and to close the file.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 3793772

---

2021 WL 2366981
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Walter J. ROACHE, Plaintiff,

v.

Brian FISHER, et al., Defendants.

9:18-CV-825 (GLS/ATB)
|
Signed 02/08/2021

**Attorneys and Law Firms**

WALTER J. ROACHE, Plaintiff, pro se

CHRIS LIBERATI-CONANT, Asst. Attorney General for Defendants

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Senior United States District Judge. Plaintiff's surviving causes of action in this civil rights amended complaint involve defendants' alleged failure to provide plaintiff with copies of his treatment and rehabilitation records, violating plaintiff's First and Fourteenth Amendment rights. (Dkt. No. 42). Plaintiff alleges that he required these records to prepare his defense for the trial and hearings held to determine plaintiff's civil management status under Article 10 of the New York Mental Hygiene Law. (*Id.*).

Presently before the court is a motion for judgment on the pleadings filed by remaining defendants Connell, Nowicki, Licari, and Powell. (Dkt. No. 66). Plaintiff has responded in opposition to the motion. (Dkt. No. 74). For the following reasons, although the court does not agree with all of the defendants' arguments, this court agrees that dismissal of the amended complaint in its entirety is appropriate.

### I. Judgment on the Pleadings
After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). *Arias v. Hanocka*, No. 18 Civ. 10648 (GBD), 2020 WL 7261108, at *1

(S.D.N.Y. Dec. 10, 2020); *Doe v. Zucker*, No. 1:17-CV-1005 (GTS/CFH), 2020 WL 7024386, at *3 (N.D.N.Y. Nov. 30, 2020) (citing *Maggette v. Dalsheim*, 709 F.2d 800, 801 (2d Cir. 1983) (citations omitted)). *See* Fed. R. Civ. P. 12(b), 12(c) and 12(h)(2). The motion for judgment on the pleadings is then treated according to the same standard as a motion to dismiss under Rule 12(b)(6). *Cleveland v. Caplaw*, 448 F.3d 518, 521 (2d Cir. 2006).

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008)(quoting *inter alia* *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). *See* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citations omitted). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

**\*2** Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See* *Kavowras v. New York Times, Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (citing *inter alia* *County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 154 (S.D.N.Y. 2002) (taking judicial notice of NLRB decisions)). *See also* *Combier-Kapel v. Biegelson*, 242 F. App'x 714, 715 (2d Cir. 2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the

administrative record of an IDEA case); *In re Howard's Exp., Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC*, No. 3:12-CV-1066, 2013 WL 3299708, at *6 (D. Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## II. Procedural Background and Relevant Facts

In order to clarify the issues in this case, I will review the facts leading up to the filing of this action. [1] In 1977, plaintiff pled guilty to public lewdness resulting from two incidents that occurred within two months of each other. 2019 WL 4327271, at *1. (citation to record omitted). In 1978, plaintiff was also convicted, after a jury trial, of two counts of first-degree rape and two counts of third-degree rape for offenses that occurred while plaintiff was serving a one-year probation term on the public lewdness conviction. *Id.* Plaintiff was sentenced to 100 months to 25 years imprisonment on the four rape counts. *Id.* In 1992, plaintiff pled guilty to first-degree sexual abuse for molesting two young girls who were picking berries. *Id.* For those offenses, plaintiff was sentenced to 3 to 6 years imprisonment, to run consecutively with the 11 years of undischarged time remaining on plaintiff's 1978 rape conviction. *Id.*

[1] Some of these facts have been taken from the decision in one of plaintiff's previous actions in this court. *See Roache v. McCullough*, No. 9:16-CV-1069, 9:17-CV-574 (JKS), 2019 WL 4327271 (N.D.N.Y. Sept. 12, 2019) (denying petition for habeas corpus). In their memorandum, defendants in this case have also cited to the facts in *Roache v. McCullough*.

On December 14, 2009, the County Court in Orange County (De Rosa, J.), designated plaintiff a level three sex offender pursuant to New York Corrections Law § 168-n,[2] and the Appellate Division, Second Department affirmed that designation on October 9, 2013. [3] *People v. Roache*, 110 A.D.3d 776 (2d Dep't 2013), *lv. denied*, 22 N.Y.3d 861 (2014). Plaintiff's aggregate prison sentence was set to expire in 2010. 2019 WL 4327271, at *1. However, prior to the expiration of plaintiff's sentence, the State petitioned under New York Mental Health Law ("MHL") § 10 for plaintiff to remain civilly confined in state custody. *Id.* Plaintiff was assigned counsel from the Mental Hygiene Legal Services. *Id.* On April 23, 2010, the Supreme Court, Orange County found probable cause pursuant to MHL § 10.06 to believe that plaintiff

would require civil management. *Id.* In 2012, a jury rendered a unanimous verdict that plaintiff suffered from a "mental abnormality," predisposing him to commit sex offenses. *See State v. Walter R.*, 118 A.D.3d 714 (2d Dep't 2014).

[2] This law is known as the Sex Offender Registration Act ("SORA").

[3] In that decision, the court held, inter alia, that "irrespective of the points scored on the risk assessment instrument, the defendant was presumptively a level three sex offender." 110 A.D.2d at 777 (citation omitted). The court also held that plaintiff had effective assistance of counsel at the trial level. *Id.*

*3 Plaintiff appealed, and on June 4, 2014, the Appellate Division set aside the 2012 verdict and ordered a new trial, holding that the State's experts improperly provided considerable hearsay, but failed to establish that the hearsay was reliable in violation of *State v. Floyd Y.*, 22 N.Y.3d 95 (2013). *Id.* at 715. Following a second trial in 2015, a jury found that plaintiff was "a detained sex offender who suffers from a "mental abnormality" as defined in MHL § 10.03(i)." *Roache v. McCullough*, 2019 WL 4327271, at *1. Following the jury verdict, the Supreme Court, Orange County held a "dispositional" hearing on September 16, 2016 and determined that plaintiff "is a 'dangerous sex offender requiring confinement' as defined by MHL § 10.03(e)." *Id.* Thus, the Supreme Court, Orange County granted the State's petition and directed that plaintiff remain committed to a secure facility for care and treatment. (*Id.*)

Plaintiff appealed the commitment order, represented by counsel. *Id.* He also filed a pro se supplemental brief, raising various additional challenges to the commitment. *Id.* On October 31, 2018, the Appellate Division affirmed the county court's finding that plaintiff is a dangerous sex offender requiring civil confinement. *State v. Walter J.R.*, 165 A.D.3d 1267 (2d Dep't 2018). While the plaintiff's appeal was pending in state court, plaintiff filed two petitions for federal habeas corpus relief, challenging his civil confinement and seeking immediate release, one in the Northern District of New York (9:16-CV-1069) and a subsequent case in the Southern District of New York (9:17-CV-574). [4] The two petitions for habeas corpus were consolidated and assigned to visiting United States District Court Judge James K. Singleton. Plaintiff raised a variety of challenges to his civil commitment, including ineffective assistance of counsel, relating to his attorney's alleged failure to obtain plaintiff's

treatment records for use at the 2015 trial.[5] *See* 2019 WL 4327271, at *8. (discussion of ineffective assistance of counsel claims).

[4]    The original civil number of plaintiff's Southern District habeas corpus action was 1:16-CV-6966, and the number was changed to 9:17-CV-574 when it was transferred to the Northern District of New York.

[5]    Plaintiff raised additional bases for ineffective counsel which are not relevant to the issues in this case.

Judge Singleton denied plaintiff's application for habeas relief, finding that notwithstanding plaintiff's failure to exhaust his state court remedies, his claims were meritless pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). 2019 WL 4327271, at *4 (citing *Rhines v. Weber*, 544 U.S. 269, 277 (2005)). Judge Singleton denied plaintiff's claims on the merits and dismissed the petition "with prejudice." *Id.*

Plaintiff filed this action on July 16, 2018, asserting a variety of claims, many of which were transferred by this court to the Southern District of New York upon initial review.[6] (Dkt. Nos. 1, 3). The court reviewed the remaining allegations and directed defendants Commissioner Brian Fischer, Superintendent Susan Connell, Oneida Correctional Facility FOIL Officer John Doe, FOIL Officer Chad Powell, Commissioner Anne Marie T. Sullivan, Director Jeffery Nowicki, and Program Director Sal Licari to respond to the following claims: (1) First Amendment access-to-courts claims related to the 2015 jury trial;[7] and (2) due process claims. (Dkt. No. 3 at 10, 12-13). On January 17, 2019, defendants Fischer, Sullivan, and Nowicki moved for partial dismissal of the original complaint. (Dkt. No. 19). On April 12, 2019, I recommended that the court grant defendants' motion to dismiss with leave to amend. (Dkt. No. 32).

[6]    Plaintiff has filed various other actions in the Northern District of New York, some of which are related to his confinement at CNYPC. *See e.g. Roache v. Attorney General's Office*, No. 9:12-CV-1034 (LEK/DEP) (dismissed on March 26, 2015) (Dkt. No. 63 in 12-CV-1034). Plaintiff was afforded pro bono counsel in 12-CV-1034

for purposes of filing an amended complaint, but the resulting amended complaint failed to allege due process violations against any of the original defendants. Although new defendants were named in the amended complaint, the court found that the statue of limitations had run as against the newly named defendants. (Dkt. No. 56) (report-recommendation adopted Dkt. No. 63). Although plaintiff did not appeal the court's decision in 12-CV-1034, he filed three motions for reconsideration of the court's dismissal order. (Dkt. Nos. 63, 79, and 81). All plaintiff's motions for reconsideration were denied. (Dkt. Nos. 78, 82). Plaintiff has been attempting to challenge his confinement in CNYPC and his sex offender designation for many years, each time making different claims relative to the defendants' alleged conduct.

[7]    The court found that any claims which accrued prior to July of 2015 would likely be time-barred unless plaintiff could establish a meritorious tolling argument. (Dkt. No. 3 at 11-12)

**\*4** On May 13, 2019, the court adopted my recommendation and afforded plaintiff the opportunity to file a proposed amended complaint. (Dkt. No. 33). Plaintiff filed his proposed amended complaint on July 31, 2019. (Dkt. No. 42). The court conducted an initial review of the proposed amended complaint and determined that the remaining claims were the same as those previously identified: access-to-courts and due process. (Dkt. No. 47 at 6-7). The court then found that plaintiff had added sufficient facts to establish the personal involvement of defendants Connell[8] and Nowicki, but not of defendant Fischer and Sullivan. (Dkt. No. 47 at 7-9). With these limitations, the court ordered that plaintiff's proposed amended complaint become the "operative pleading." (Dkt. No. 47 at 10). On September 14, 2020, defendants made the instant motion for judgment on the pleadings, and plaintiff responded in opposition to the motion on December 7, 2020. (Dkt. Nos. 66, 74).

[8]    The court noted that defendant Connell had not been served and directed that defense counsel assist in obtaining a proper address for service based on *Valentin v. Dinkins*, 121 F.3d 72, 75-76 (2d Cir. 1997). (Dkt. No. 47 at 10). Although an address was obtained and a summons issued, it does not appear that defendant Connell was ever served because the summons was returned "unexecuted"

on April 29, 2020. (Dkt. No. 60). However, defense counsel has moved for judgment on the pleadings on defendant Connell's behalf, and it appears that he represents her. Thus, the court will consider the motion on behalf of all the remaining defendants, including defendant Connell.

## III. Jurisdiction

### A. *Rooker-Feldman* [9] Doctrine

[9] *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

#### 1. Legal Standard

A challenge under the *Rooker-Feldman* doctrine asserts a lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Remy v. New York State Dep't of Taxation and Finance*, 507 F. App'x 16, 18 (2d Cir. 2013). This doctrine divests the federal court of jurisdiction to consider actions that seek to overturn state court judgments. *Fernandez v. Turetsky*, No. 12-CV-4092, 2014 WL 5823116, at *3 (E.D.N.Y. Nov. 7, 2014) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The doctrine also bars the federal court from considering claims, whether or not raised in state court, that assert injury based on a state judgment and seek review and reversal of that judgment. *Hensel v. City of Utica*, 6:15-CV-374 (LEK/TWD), 2016 WL 1069673, at *4 (N.D.N.Y. March 16, 2016) (citing *Hoblock v. Albany Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005)). Such claims are "inextricably intertwined" with the prior state court determination. *Id.*

As applied in this circuit, four prerequisites must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal court plaintiff lost in state court; (2) plaintiff complains of injuries flowing from the state court judgment; (3) the action invites the district court to review and reject the state court judgment; and (4) the state court judgment was rendered prior to commencement of the federal court proceedings. *Hoblock*, 422 F.3d at 85.

#### 2. Analysis

Defendants argue that the amended complaint should be dismissed based on *Rooker-Feldman* because plaintiff is seeking to overturn plaintiff's adjudication as a level-3 sex offender and civil commitment. (Def.s' Mem. at 4-6). Defendants cite to a portion of the amended complaint in which plaintiff alleges that in all of the trials - "2009, Level Hearing, 2012 Jury Trial, 2012-2013 Dangerous Hearing for SIST Release, and 2015 Jury Trial, and 2016 Dangerous Hearing for SIST Release, and 'all' said Appeals, the Prosecutors' entire case has either been cases that were not this plaintiff at bar ... or that this plaintiff at bar went to prison and did not program, and went to Central New York Psychiatric Center, Marcy, New York and did nothing.' " [10] (Def.s' Mem. at 7) (citing AC ¶ 17). Defendants' argument implies that plaintiff is simply challenging the results of all of his previous unsuccessful hearings, together with their respective unsuccessful appeals, and therefore, *Rooker-Feldman* applies to deprive this court of jurisdiction to review the amended complaint.

[10]    It must be noted that, although plaintiff continues to refer to all of his hearings and trials, this court found that all claims accruing prior to July of 2015 would be barred by the statute of limitations unless plaintiff established equitable tolling. Because the court's initial review of the amended complaint did not discuss the statute of limitations, I will do so below.

**\*5** First, to the extent that the amended complaint can be read as a simple challenge to the "results" of plaintiff's state court actions, defendants are correct. Under *Rooker-Feldman*, plaintiff cannot use this action to collaterally attack the state court judgments. However, the defendants in this action were not involved with any of the plaintiff's state court proceedings, and on initial review, this court interpreted plaintiff's complaint and amended complaint as alleging that, the failure to provide plaintiff with the documents he requested, adversely affected his state court proceedings. He is challenging the defendants' actions rather than the results of the proceedings. The "injury" did not flow from the state court judgment, but rather from the defendants' alleged actions which "arguably" violated his right to "access" the court. *See Austin v. Cuomo*, No. No. 1:20-CV-893, 2020 WL 7352664, at *5 (W.D.N.Y. Dec. 15, 2020) ("despite the fact that Plaintiff seeks a result in this court that is opposed to the one he received in his state court habeas petition, his claims are not barred by *Rooker-Feldman*") (citing *Hoblock v. Albany Bd. of Elections*, 422 F.3d at 87). The fact that the state court did not "remedy" the alleged injury does not require the application of *Rooker-Feldman. Id.* This is true whether plaintiff alleges

his access to courts claim or a "due process" claim based on the defendants' failure to produce the records for his 2016 trial.

In this case, to the extent that plaintiff challenges the defendants' alleged failure to produce his facility records, such claim is separate from the state court's 2015 and 2016 judgments. Thus, neither plaintiff's remaining access-to-courts, nor his due process claim would be barred by *Rooker-Feldman*, except to the extent that plaintiff claims that he is "illegally detained" at CNYPC because of defendants' actions.

### B. *Heck v. Humphrey*, 512 U.S. 477 (1994)

#### 1. Legal Standard

Under *Heck v. Humphrey*, a claim that, if successful, would "necessarily imply the invalidity" of the plaintiff's prior state conviction is "not cognizable under § 1983" unless that conviction has already been invalidated, either by appeal or by being called into question by a petition for habeas corpus. *Heck*, 512 U.S. at 487. *Heck* applies to prison disciplinary proceedings, parole determinations and other proceedings which affect the plaintiff's length or duration of confinement. *See Wilkinson v. Dotson*, 544 U.S. 74, 78-82 (2005) (discussing the evolution of *Heck* and its application to various types of proceedings). However, in *Wilkinson*, the Court held that the plaintiffs [11] sought relief that would render invalid the "procedure" used to deny parole eligibility and suitability, which would not necessarily lead to a speedier release, but at best, would require new hearings at which the authorities might still refuse to shorten the plaintiffs' prison term. 544 U.S. at 82. The Court stated that "[b]ecause neither prisoner's claim would necessarily spell speedier release, neither lies at 'the core of habeas corpus.' " *Id.* (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973)).

[11]  There were two plaintiffs/petitioners in *Wilkinson*, one sought invalidation of the procedures used to determine parole eligibility and the other sought to invalidate procedures used to determine parole suitability. 544 U.S. at 78.

#### 2. Analysis

As stated above, plaintiff's two remaining claims deal with the alleged failure of the defendants to provide him with his treatment and program records for use at his 2015 jury trial and 2016 hearing which related to his Level 3 sex-offender status and civil commitment. The court finds that this case is similar to *Wilkinson*, except to the extent that plaintiff's "due process" claim may be read as alleging that plaintiff is "illegally detained" at CNYPC. The defendants had no involvement in the hearings themselves, instead their alleged conduct involved a failure to produce evidence that could be used in court.

The information relative to plaintiff's programming at CNYPC is only one factor in the State's determination. At best, a decision in plaintiff's favor would only allow plaintiff to have a new hearing with the documents in question as evidence. [12] Thus, in accordance with *Wilkinson, Heck v. Humphrey* would not apply to prevent the court's consideration of the merits of this plaintiff's claims to the extent that they are related to the defendants' alleged failure to produce documents. However, neither claim can survive the defendants' motion to dismiss.

[12]  This result assumes that plaintiff did not have the documents or that the defendants in this case actually prevented plaintiff from obtaining them. The court will discuss this matter below.

### IV. Statute of Limitations

#### A. Legal Standards

**\*6**  In Section 1983 actions, the applicable statute of limitations is the State's "general or residual [state] statute [of limitations] for personal injury actions[.]" *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, a three-year statute of limitations applies for personal injury actions and thus to Section 1983 actions. *Id. See* N.Y. C.P.L.R. § 214(5). Although state law provides the relevant limitations period, federal law determines when a Section 1983 action accrues, which has been held to be the time "when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (quotation omitted). *See Covington v. City of New York*, 916 F. Supp. 282, 285 (S.D.N.Y. 1996) (quotation omitted) (same). "Thus, in determining when the statute begins to run, the proper focus is on the time of the [wrongful] act, not the point at which the consequences of the act become painful." *Covington*, 916 F. Supp. at 285 (quotation omitted).

**B. Analysis**

Defendants have included a statute of limitations argument in their motion papers. (Def.s' Mem. at 7-11). In Judge Sharpe's review of plaintiff's original complaint, he noted that, unless plaintiff demonstrated that equitable tolling applied, all the claims that accrued prior to July of 2015 would be time-barred. (Dkt. No. 3 at 11-12). The court stated that it was giving plaintiff "notice" and "an opportunity to be heard" prior to dismissal with prejudice based on timeliness. (Dkt. No. 3 at 12). When Judge Sharpe reviewed plaintiff's amended complaint, there was no discussion of whether plaintiff had established any basis for equitable tolling. Judge Sharpe's order found only that plaintiff had alleged sufficient personal involvement by defendants Connell and Nowicki in each of the two remaining claims. (Dkt. No. 47 at 6-7).

This court agrees with Judge Sharpe's original finding that plaintiff's claims accruing prior to 2015 are time-barred. The harm relating to the alleged failure to produce documents would have accrued, if at all, when plaintiff was not able to use the documents during a judicial proceeding and lost that proceeding. The proceedings prior to 2015 were years apart, and each alleged denial would have been a separate occurrence. In 2013, plaintiff was offered over 300 pages of documents by defendant Powell, and the Appellate Division reversed plaintiff's 2012 trial, giving him another opportunity to make his arguments. Before the 2015 trial, plaintiff's attorney subpoenaed documents from the Department of Corrections and Community Supervision ("DOCCS") in preparation for plaintiff's trial, and in 2016, plaintiff was informed that he had been approved for additional documents that he sought. (Pl.'s Ex. A-C). While plaintiff alleges that these documents were insufficient, he was told in 2016 to contact defendant Licari, who does not seem to have been involved in prior requests. (*See* Dkt. No. 42 at ¶ 15, 18, 22 & Ex. C) (plaintiff was told by Nowicki and by T. Fazio to write to Licari in 2016). Thus, the plaintiff cannot establish that he was subject to a "continuing violation."

Plaintiff's amended complaint did not address any of the statute of limitations issues or attempt to establish equitable tolling for any of the claims accruing prior to 2015. Plaintiff's response to the defendants' motion addresses the statute of limitations issue by alleging that the defendants' violations are "ongoing" since 2009. (Dkt. No. 74 at 4-5, 11). However, as stated above, the fact that plaintiff may have made multiple requests to different individuals does not establish a "continuing violation" for purposes of the statute of

limitations. Thus, any conduct occurring prior to 2015 would be time barred, leaving the court with plaintiff's claims that his constitutional rights to access to courts and to due process were violated with respect to any proceedings occurring after July of 2015. This court finds no basis for equitable tolling. Plaintiff had the opportunity at the conclusion of each proceeding to challenge the alleged inability to present the appropriate evidence.

**V. Access to Courts**

**A. Legal Standards**

**\*7** The First Amendment provides, in relevant part, that " 'Congress shall make no law ... abridging ... the right of the people ... to petition the Government for redress of grievances.' " *Rosado v. Maxymillian*, Nos. 9:13-CV-359, 9:15-CV-489, 9:15-CV-1327 (TJM/TWD), 2020 WL 6384768, at \*10 (N.D.N.Y. Oct. 30, 2020) (quoting *City of New York v. Baretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (quoting U.S. Const. amend. 1)). This right includes a right of access to the courts, and applies to prisoners and detainees. *Id.* (citing *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004)) (citing *Bounds v. Smith*, 518 U.S. 343, 350 (1996)). The standard for access to the courts is also the same for civilly committed persons, like plaintiff. *Id.* (citing *Lane v. Carpinello*, No. 07-CV-751, 2009 WL 3074344 at \*32 n.26 (N.D.N.Y. Aug. 31, 2009)) ("Although plaintiff was not a prisoner but involuntarily committed at CNYPC at all times relevant to this claim, the right of access to court evolves from the First Amendment and thus the analysis is the same in either context."); *Samuels v. Stone*, No. 98 Civ. 776, 1999 WL 624549 at \*4 (S.D.N.Y. Aug. 17, 1999) (civilly committed "plaintiff unquestionably enjoyed a right of access to the courts during the period of his confinement"); *Lombardo v. Holanchock*, No. 07 Civ. 8674, 2008 WL 2543573 at \*6 n.6 (S.D.N.Y. June 25, 2008) (treating a First Amendment free exercise claim by civilly committed person the same as one by a prisoner); *Aiello v. Lamitie*, No. 16-CV-53, 2020 WL 918989 at \*8 (N.D.N.Y. Feb. 26, 2020) ("The analysis for a denial [of] access to the courts claim is the same for both civilly committed individuals and prisoners.").

As the Supreme Court explained in *Bounds*, this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828. However, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance," nor did it

"guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Instead, "the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.' " *Collins v. Goord*, 438 F. Supp. 2d 399, 415-16 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 355). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

The courts have recognized two variants of claims for denial of access to courts: first, "forward-looking claims," where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and second, "backward-looking access claims," which cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. *Jean-Laurent v. Lawrence*, No. 12-CV-1502, 2015 WL 1208318, at *3 (S.D.N.Y. Mar. 17, 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413–14 & n. 11 (2002)).

"The Second Circuit has emphasized, however, that the viability of [backward-looking] claims is far from clear, pointing out that the [Supreme Court's] *Harbury* decision was careful not to endorse their validity." *Id.* (quoting *McNaughton v. de Blasio*, No. 14 Civ. 221, 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015)) (other citations omitted). Although the availability of a backward-looking access claim remains uncertain in this Circuit (*see Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) ("The viability of backward-looking right-of-access claims is far from clear in this Circuit ...")), the existing case law suggests four elements:

> First, the plaintiff must identify a nonfrivolous, arguable underlying claim. Second, the plaintiff must establish that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim. Third, the plaintiff must show that the defendant's alleged conduct was deliberate and malicious [13]. Fourth, the plaintiff must demonstrate that the defendant's

actions resulted in an actual injury to the plaintiff.

**\*8** *Jean-Laurent v. Lawrence*, 2015 WL 1208318, at *4 (internal citations and quotations omitted).

13    But see *Desmarat v. Artus*, Civ. No. 08 Civ. 977 (DNH/RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011) (questioning whether 'maliciousness' is a proper element of a backward-looking access to court claim, based on Second Circuit jurisprudence).

**B. Analysis**

Plaintiff in this case cannot establish a denial of access to courts. This is clearly a "backward looking" claim. To the extent that such a claim exists, a review of plaintiff's multiple challenges to his sex offender status shows that he had substantial access to the courts, and that these defendants did nothing to prevent that "access." Plaintiff was represented by counsel at most, if not all, of his state court proceedings as provided for by New York State statutes. In fact, as outlined above, in 2014, represented by counsel, plaintiff obtained a reversal of his first trial on grounds other than the lack of treatment records.

As stated above, *Bounds* creates only the "right to have prison authorities assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds, supra* at 828. Plaintiff's appointed counsel afforded him "access to courts." The alleged denial of documents by these defendants did not prevent plaintiff from challenging his sex offender status or dangerousness determination. Plaintiff has already unsuccessfully blamed his attorney for failing to obtain the records that he alleges would have made the difference in his state court proceedings. The state rejected his argument, [14] and Judge Singleton found that plaintiff's counsel was not "ineffective" because he used the information regarding plaintiff's programs during the trial. [15] 2019 WL 4327271, at *8. Plaintiff cannot show that the defendants failure to "produce" his requested documents prevented him from bringing or pursuing the various challenges to his status. The fact that he "lost" his case, alone, does not create an access to courts claim. *See Olivia v. Town of Greece*, 630 F. App'x 43, 45 (2d Cir. 2015) (defendant must have taken or been responsible for actions

that had the actual effect of frustrating the plaintiff's effort to pursue a legal claim). The defendants' conduct must have caused the plaintiff's case to be dismissed as untimely or must have been so severe as to render "hollow" his right to seek redress. *Sousa*, 702 F.3d at 128. Plaintiff has established neither.

14      *State v. Walter J.R.*, 165 A.D.2d at 1268-69 (plaintiff's appeal from the 2015 jury trial and September 2016 hearing). Although the state court did not mention the records specifically in its affirmance, the court stated that all of plaintiff's other claims, including those in his pro se supplemental brief were either unpreserved or lacked merit. *Id.* In his habeas corpus decision, Judge Singleton did cite the claims that plaintiff raised in his supplemental brief in state court. 2019 WL 4327271 at *1. One of those claims was his ineffective counsel claim, based on the failure to obtain the plaintiff's educational and treatment records. *Id.*

15      Plaintiff has included the subpoena for the records in his amended complaint. (Pl.'s Ex. B). Judge Singleton stated as follows:

> Roache also contends that Siper failed to timely seek records that demonstrated Roache's satisfactory completion of educational and treatment programs during his confinement. To the contrary, Roache admits on reply that Siper presented to the jury evidence demonstrating that Roache completed various courses and certificates regarding anger and aggression management. Docket No. 28 at 9. Moreover, the record demonstrates Siper's familiarity with the programs Roache completed and that Siper made use of them at trial. See Docket No. 24-1 at 156-57; 166-67; 191-94; 206-14; and 220.

Thus, the defendants herein did not prevent plaintiff's "access to courts" even if they failed to provide plaintiff himself with the specific documents that he says that he required - a finding that this court does not make. To the extent that plaintiff argues in his response to the defendants' motion that these records were not presented to "any court" or in conjunction with "any appeal," (Dkt. No. 74 at 4), the case law does not support this argument. Whether the documents themselves were considered or whether the information in those documents was considered, plaintiff still had access to the court and had the information he needed to make his arguments for release.

**\*9**  A claim could arise if public officials withheld key facts that would form the basis for plaintiff's claims of relief. *Id.* However, this claim is available only if the judicial remedy was foreclosed by the alleged cover-up. *Id.* Although plaintiff in this case is alleging that the defendants failed to produce documents, plaintiff and his attorney were well aware of the programs that he completed. In 2013, and in 2016, plaintiff was given the opportunity to obtain documents, and to the extent that he claims that certain of the documents were not produced, this failure did not preclude plaintiff from making the appropriate argument at trial or on appeal. Thus, plaintiff cannot establish that he was denied access to courts by these defendants.[16]

16      The court notes that plaintiff continues to mention the defendants' alleged violations of New York's Freedom of Information Law ("FOIL"). However, plaintiff's FOIL claims were dismissed in Judge Sharpe's initial review of plaintiff's original complaint. (Dkt. No. 3 at 9-10).

## VI. Due Process

### A. Legal Standard
In order to state a valid Section 1983 claim for violating the Due Process Clause of the Fourteenth Amendment, a plaintiff must allege he or she was deprived of life, liberty, or property without due process of law. *See Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *Abdul-Matiyn v. Pataki*, No. 9:06-CV-1503 (DNH/DRH), 2008 WL 974409, at *10 (N.D.N.Y. Apr. 8, 2008). "When a person's liberty interests are implicated [by involuntary commitment], due process requires at a minimum notice and an opportunity to be heard." *June v. Blair*, No. 9:09-CV-323 (FJS/TWD), 2012 WL 1048463, at *7 (N.D.N.Y. Mar. 28, 2012).

### B. Analysis
To the extent that plaintiff has a "due process" argument relating to the "denial" of these records, the claim fails for the same reasons cited above. Plaintiff certainly had the opportunity to be heard several times regarding his claims. Assuming that at any point after 2015, defendants failed to

produce or prevented the production of the records requested by plaintiff, plaintiff was not prevented from having the opportunity to be heard regarding the effect of these records.

## VII. Opportunity to Amend

### A. Legal Standard

Generally, when the court dismisses a pro se complaint for failure to state a claim, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *See Ellis v. Wilkinson*, 81 F. Supp. 3d 229, 238-39 (E.D.N.Y. Jan. 28, 2015) (considering whether to grant plaintiff leave to amend after finding that plaintiff failed to state a plausible claim under section 1983) (citing *Cuoco v. Moritsugo*, 222 F.3d 99, 112 (2d Cir. 2000)). In *Cuoco*, the Second Circuit held that "leave to amend should be denied where "better pleading will not cure" the defects in a plaintiff's complaint."

### B. Application

In this case, plaintiff has already amended his complaint once, and this court finds that it would be futile to allow plaintiff another chance to amend because plaintiff cannot establish that the defendants' actions denied him access to the courts or denied him due process with respect to his sex-offender status or confinement at CNYPC. Thus, the complaint may be dismissed on the pleadings without the opportunity for amendment.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion for judgment on the pleadings (Dkt. No. 66) be **GRANTED**, and that plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

## All Citations

Slip Copy, 2021 WL 2366981

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1920538
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Walter J. ROACHE, Plaintiff,
v.
Susan CONNELL et al., Defendants.

9:18-cv-825 (GLS/ATB)
|
Signed 05/13/2021

**Attorneys and Law Firms**

Walter J. Roache, Marcy, NY, Pro Se.

Christopher Liberati-Conant, New York State Attorney General, Albany, NY, for Defendants Susan Connell, John Doe, Chad Powell, Jeffery Nowicki, Sal Licari.

### SUMMARY ORDER

Gary L. Sharpe, U.S. District Judge

*\*1* Plaintiff *pro se* Walter J. Roache commenced this civil rights action against defendants Susan Connell, Chad Powell, Jeffrey Nowicki, Sal Licari, and other parties that have since been dismissed.[1] (Am. Compl., Dkt. No. 42.) After initial review and the resolution of a previously-filed motion to dismiss, Roache has two surviving claims: (1) a First Amendment denial of access to the courts claim and (2) a Fourteenth Amendment due process claim. (*Id.*; Dkt. Nos. 3, 33, 47.) Both of Roache's claims revolve around defendants' alleged failure to provide him with copies of treatment and rehabilitation records that he allegedly needed to prepare his defense for the trial and hearings that were held to determine his civil management status under Article 10 of the New York Mental Hygiene Law. (*See generally* Am. Compl.) Now pending is defendants' motion for judgment on the pleadings. (Dkt. No. 66.)

[1]   Defendant John Doe has yet to be identified by Roache, and, thus, is hereby dismissed from the action. *See* Fed. R. Civ. P. 4(m) (providing that, absent a showing of "good cause," dismissal of claims against a defendant who is not served

within ninety days of the filing of the complaint is appropriate).

On February 8, 2021, Magistrate Judge Andrew T. Baxter issued a Report-Recommendation (R&R), which recommends that defendants' motion for judgment on the pleadings, (Dkt. No. 66), be granted and that Roache's amended complaint be dismissed. (Dkt. No. 75.) Roache filed timely objections to the R&R. (Dkt. No. 78.) For the reasons that follow, the R&R is adopted in its entirety, defendants' motion for judgment on the pleadings is granted, and Roache's amended complaint is dismissed.

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo*. *See Almonte v. N.Y. State Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049, at \*3 (N.D.N.Y. Jan. 18, 2006). In cases where no party has filed an objection, or only vague or general objections have been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*5.

Judge Baxter recommends dismissal of Roache's amended complaint because, among other reasons, he "cannot show that the defendants['] failure to 'produce' his requested documents prevented him from bringing or pursuing the various challenges to his [sex offender] status" or "dangerousness determination," and he "had the opportunity to be heard several times regarding his claims." (*See generally* Dkt. No. 75.)

Roache's objections to the R&R either raise new arguments and factual assertions not presented to Judge Baxter in the initial briefing, rehash arguments previously presented to, and rejected by, Judge Baxter and the court, or constitute a misapprehension of the law and the procedural posture of the case.[2] (*See generally* Dkt. No. 78.) Accordingly his objections invoke review only for clear error. *See Smurphat v. Hobb*, No. 8:19-CV-804, 2021 WL 129055, at \*2 (N.D.N.Y. Jan. 14, 2021) ("[W]hen an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review." (citations omitted)); *Smith v. Hulihan*, No. 11 CV 2948, 2012 WL 4928904, at \*1 (S.D.N.Y. Oct. 17, 2012) ("[N]ew arguments and factual assertions cannot properly be raised for the first

time in objections to the R & R, and indeed may not be deemed objections at all." (citations omitted)).

[2]
    For example, Roache discusses at length claims that were previously dismissed from this action, and attempts to re-litigate issues that were presented to, and rejected by, Judge Baxter and the court in previous phases of this litigation. (*See generally* Dkt. No. 78.)

**\*2** The court has carefully considered the R&R, and finds no clear error in Judge Baxter's thorough analysis, which squarely addresses Roache's arguments and provides multiple, appropriate reasons for granting defendants' motion for judgment on the pleadings and dismissing Roache's amended complaint. Accordingly, the R&R is adopted in its entirety. [3]

[3]
    In his objections, Roache argues that the allegations in his amended complaint satisfy the four elements of backward-looking access to courts claims. (Dkt. No. 78 at 16-18.) To the extent that this argument can be considered a specific objection given that defendants did not expressly discuss these elements in their brief, (*see generally* Dkt. No. 66, Attach.

1), the court, in an abundance of caution, has conducted a *de novo* review, and adopts the findings in the R&R for the reasons stated therein, (Dkt. No. 75 at 17-20).

Accordingly, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 75) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for judgment on the pleadings (Dkt. No. 66) is **GRANTED**; and it is further

**ORDERED** that Roache's amended complaint (Dkt. No. 42) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1920538

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 141053
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frank V. PONTERIO, Plaintiff,

v.

Judith S. KAYE, Chief Judge of the State of New
York, Jonathan Lippman, Chief Administrative
Judge of the Courts, John T. Buckley, Presiding
Justice of the Appellate Division, First Department,
A. Gail Prudenti, Presiding Justice, Appellate
Division, Second Department, Anthony V. Cardona,
Presiding Justice, Appellate Division, Third
Department, Eugene F. Pigott, Jr., Presiding Justice,
Appellate Division, Fourth Department, and the
Administrative Board of the Courts, Defendants.

No. 06 Civ. 6289 HB.
|
Jan. 22, 2007.

*OPINION AND ORDER*

BAER, J.

**\*1** Plaintiff Frank V. Ponterio ("Plaintiff" or "Ponterio"),
a retired New York State Supreme Court Justice, brings this
action pursuant to 42 U.S.C. § 1983. His claims arise out
of the Administrative Board of the Courts' [1] (the "Board's")
2003 and 2004 denials of his applications for recertification
as a retired Justice. Ponterio alleges that 1) the Board's 2003
denial of his recertification was a retaliatory act that violated
his rights under the First Amendment of the United States
Constitution; 2) the Board's failure to set forth reasons for
its denial effectively constituted a "denial of access to the
courts"; and 3) the Board's 2004 denial of his application for
recertification violated his rights to Equal Protection under
the Fourteenth Amendment. Ponterio also brings a state law
claim of retaliation pursuant to N.Y. EXECUTIVE LAW §
296. Ponterio has moved for preliminary injunctive relief,
*i.e.* an order directing the Board to recertify him as a retired
Justice and thus place him back on the bench.

[1]    The Administrative Board of the Courts consists of
the Chief Judge of the New York Court of Appeals

and the Presiding Justices of the four Appellate
Divisions. N.Y. CONST., Art. VI, § 28(a); N.Y.
JUDICIARY LAW § 210(2).

Defendants Judge Judith S. Kaye, Judge Jonathan Lippman,
Justice John T. Buckley, Justice A. Gail Prudenti, Justice
Anthony V. Cardona, Justice Eugene F. Pigott, and the
Administrative Board of the Courts (collectively,
"Defendants") have moved to dismiss Ponterio's claims
pursuant to FED. R. CIV. P. 12(b)(1) and FED. R. CIV. P.
12(b)(6), on the grounds that 1) *Rooker-Feldman* doctrine
bars Plaintiff's claims, 2) *Younger* abstention doctrine bars
Plaintiff's claims, 3) *res judicata* and collateral estoppel bar
Plaintiff's claims, and 4) Plaintiff's claims fail as a matter of
law.

At the outset, I am denying Plaintiff's request for injunctive
relief in its entirety because Plaintiff does not show a
likelihood of "success on the merits" on his claims, for the
reasons outlined below. *See Moore v. Consol. Edison Co. of
N.Y., Inc.,* 409 F.3d 506, 510 (2d Cir.2005).

Because Plaintiff's First Amendment claim and state law
retaliation claim are barred by *res judicata* and collateral
estoppel principles, and alternatively fail on their merits,
I must dismiss those claims. Because Plaintiff's "denial of
access" claim fails on its merits, I must dismiss that claim.
Plaintiff's Equal Protection claim is a much closer question,
and for now, that branch of Defendants' motion to dismiss is
denied.

I. BACKGROUND

The following facts are taken from Plaintiff's Complaint, as
well as opinions and relevant documents from Plaintiff's prior
state court litigation. [2]

[2]    "In resolving a motion to dismiss for lack of
subject matter jurisdiction, the court may consider
evidence outside the pleadings, such as affidavits
and other documents." *Leitner v. New York,* 2000
U.S. Dist. LEXIS 3767 (E.D.N.Y.2000), *citing
Kamen v. American Tel. & Tel. Co.,* 791 F.2d
1006, 1011 (2d Cir.1986). As such, on Defendants'
unopposed motion, I take judicial notice of the
pertinent documents to Ponterio's prior state court
litigation, *i.e.* Ponterio's state court complaint, *see*
Affirmation of Constantine Speres, November 3,

2007 WL 141053

2006 ("Speres Aff."), Ex. A; the State Supreme Court opinion, *see Ponterio v. Kaye,* Index No. 400281/04 (N.Y.Sup.Ct. May 17, 2004) (Friedman, J.), *at* Speres Aff., Ex. B; the Appellate Division opinion, *see Ponterio v. Kaye,* 25 A.D.3d 865 (N.Y.App. Div. 3rd Dep't 2006); and relevant documents regarding Ponterio's prior certification and denial of recertification. *See Conopco, Inc. v. Roll Int'l,* 231 F.3d 82, 86 (2d Cir.2000); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (Court may judicially notice publicly filed documents on 12(b)(6) motion).

A. *Ponterio's 1998 Reassignment*
On November 6, 1996, Plaintiff Ponterio was elected to a 14-year term as a Justice of the Supreme Court in the Second Judicial District, effective January 1, 1997. Plaintiff's Complaint ¶ 4 ("Pl.Compl."). Plaintiff was assigned to the matrimonial part of Supreme Court in Richmond County. Pl. Compl. ¶ 9; *Ponterio v. Kaye,* 25 A.D.3d 865, 866 (N.Y.App. Div. 3rd Dep't 2006). Subsequently, a second matrimonial part was created and both parts were consolidated. *Ponterio v. Kaye,* 25 A.D.3d 865, 866. Plaintiff's part was transformed into a general civil part. *Id.* Plaintiff was removed from his matrimonial part in September 1998. *Ponterio v. Kaye,* Index No. 400281/04, at 4 (N.Y.Sup.Ct. May 17, 2004) (Friedman, J.), *at* Speres Aff., Ex. B. Plaintiff heard civil matters and a limited number of matrimonial cases. *Ponterio v. Kaye,* 25 A.D.3d 865, 866.

**\*2** Plaintiff alleges generally that his reassignment to a civil part stemmed not from the needs of judicial reorganization, but from an accusation of gender bias levelled at him by Justice Betty Weinberg Ellerin. Pl. Compl. ¶ 10; *Ponterio v. Kaye* at 866-67. Ponterio alleges that on March 6, 1998, Hon. Michael Pesce, the Administrative Judge for his court, told him that he had a communication from defendant Jonathan Lippman ("Lippman"), Chief Administrative Judge of the Courts. The communication was that Ponterio "was being summarily removed from the matrimonial part based upon an accusation of gender bias," and "if [Ponterio] resisted such removal, he could jeopardize his opportunity for recertification." [3] Pl. Compl. ¶ 10; *see also* Plaintiff's Complaint, December 1, 2003, *Ponterio v. Kaye,* Index No. 400281/04 ("Pl. State Compl."), ¶ 21. Ponterio alleges more specifically, but without any corroboration, that Justice Ellerin "sought to replace [him] with a female judge of her choosing in order to influence decisions in matrimonial cases

to favor female litigants." Pl. Compl. ¶ 11; Pl. State Compl. ¶ 22, 23.

[3]        In actuality, at this point in time, Ponterio had not yet been certified, let alone recertified.

Ponterio alleges that on April 16, 1998, he informed Court of Appeals Judge Vito Titone, allegedly "acting as an intermediary," that he would expose to the press Justice Ellerin's "scheme to influence judicial decisions" by putting a woman in the matrimonial part if he was removed from the matrimonial part. Pl. Compl. ¶ 12. [4] Ponterio additionally alleges that Appellate Division Justice Guy Mangano threatened him with "consequences" if he exposed Justice Ellerin's scheme to the press. Pl. Compl. ¶ 13. [5] Around this time, by Ponterio's account, Defendants Chief Judge Kaye ("Kaye") and Lippman gave him "assurances" that his reassignment "was made in the ordinary course," that "there were no complaints against him," that "Justice Ellerin had been instructed to cease her efforts to have [him] removed," and that there would be "no future adverse consequences for [his] resisting a reassignment." Pl. State Compl. ¶¶ 24, 27, 28, 31, 36. After an April 17, 1998 telephone call with Judge Kaye, presumably during which he was given such "assurances," Ponterio, "fearing he would jeopardize his opportunity for certification, gave up his plan to expose Justice Ellerin's scheme." Pl. Compl. ¶ 14; *see also* Pl. State Compl. ¶¶ 24, 27, 28, 31, 36. As noted above, Ponterio was removed from his matrimonial part in September 1998. *Ponterio v. Kaye,* Index No. 400281/04, at 4, *at* Speres Aff., Ex. B.

[4]        Plaintiff did not allege this fact in his state court complaint.

[5]        Plaintiff did not allege this fact in his state court complaint.

B. *Ponterio's 2001 Certification and Subsequent Denials of Recertification*
Ponterio reached the mandatory retirement age of 70 in 2001. [6] He applied for certification and was certified by the Board as a retired Justice for a two-year term beginning on January 1, 2002. *Ponterio v. Kaye,* 25 A.D.3d at 867; *Ponterio v. Kaye,* Index No. 400281/04, at 3.

[6]        Pursuant to N.Y. CONST., Article VI, § 25(b) and N.Y. JUDICIARY LAW § 115, Justices of the

Supreme Court are required to retire once they reach age 70. They may, however, be certified by the Administrative Board of the Court to serve as Justices for a two-year term, and may be recertified for two additional two-year terms, for a total of six years, until they reach the age of 76.

**\*3** On February 7, 2003, Judge Lippman advised Ponterio by letter that he was eligible for a recertification for a second two-year term. *Ponterio v. Kaye,* Index No. 400281/04, at 3. Ponterio completed the application and the required mental and physical examinations. *Id.;* Pl. Compl. ¶ 16. However, the Richmond County Bar Association did not recommend Ponterio's recertification. *Ponterio v. Kaye,* 25 A.D.3d at 867; Plaintiff's Opposition to Motion to Dismiss ("Pl.Opp."), November 28, 2006, at 3. [7] On September 30, 2003, the Board declined to recertify Ponterio for a second two-year term. Pl. Compl. ¶ 17; Pl. State Compl. ¶ 12. [8] By Ponterio's account, no reasons were given for his denial. Pl. Compl. ¶ 17, 18.

[7]     Ponterio alleges that the negative recommendation of the Richmond County Bar Association was "the product of personal vendettas by 3 highly placed members," and that "as a direct consequence of the Association's rating ... the Association's by-laws relating to judicial screening were subsequently completely revised." Pl. Opp. at 3.

[8]     In his state complaint, Ponterio alleged that the Board approved 46 retired Justices for certification and denied four. Pl. State Compl. ¶ 16; *Ponterio v. Kaye,* Index No. 400281/04, at 3. In his current complaint, Ponterio alleges that he was the only Justice of the four denied whose supervising judge recommended his certification. Pl. Compl. ¶ 17.

On May 28, 2004, Ponterio wrote Judge Lippman asking for application forms for recertification. Affidavit of John Eiseman ("Eiseman Aff."), November 28, 2006, at Ex. H. On June 28, 2004, Ponterio wrote Judge Kaye stating his belief that the prior denial of certification was not a permanent bar to his application and offering to serve without compensation. Eiseman Aff., Ex. H; Pl. Compl. ¶ 19. On August 16, 2004, Judge Lippman wrote Ponterio informing him that his letters were considered by the Board, and that the Board declined to reconsider its denial of his application. Eiseman Aff., Ex. I. Ponterio alleges that he was the only retired Justice denied the opportunity to apply for recertification in 2004, out of at least 30 eligible Justices. Pl. Compl. ¶ 39.

C. *Ponterio's State Court Action*
On December 1, 2003, Ponterio brought an action in New York State Supreme Court, alleging 1) that his reassignment constituted employment discrimination based on sex, in violation of N.Y. EXECUTIVE LAW § 296; 2) that Judges Lippman and Kaye's 1998 "assurances" constituted intentional misrepresentation; 3) that Judges Lippman and Kaye's 1998 "assurances" constituted breach of fiduciary duty; and 4) that the Board's 2003 denial of recertification constituted unlawful retaliation for his 1998 "complain[ts] to defendants [Kaye] and [Lippman] concerning Justice Ellerin's efforts to replace him with a female judge ..." *See Ponterio v. Kaye,* 25 A.D.3d at 867; Pl. State Compl., *e.g.* at ¶ 42.

Defendants characterize Ponterio's state action as a "hybrid Article 78 proceeding/damage action." Eiseman Aff. ¶ 20. [9] Regarding Ponterio's first three claims, he sought monetary damages. Pl. State Compl., p. 6, ¶¶ 1-3. Regarding Ponterio's claim that the 2003 denial of his recertification constituted unlawful retaliation, Ponterio sought monetary damages and an injunction annulling the Board's determination and directing Lippman to place him back on the bench. Pl. State Compl., p. 6, ¶ 4.

[9]     *See Ponterio v. Kaye,* Index No. 400281/04, at 1 ("Although the action was commenced by summons and complaint, it seeks relief in the nature of an Article 78 proceeding to the extent it requests an order annulling the Board's determination. The complaint also pleads three causes of action for damages arising out of alleged sex discrimination against plaintiff in connection with Judge Lippman's transfer of plaintiff from a matrimonial part in 1998.").

Justice Friedman, a Supreme Court Justice sitting in New York County, dismissed Ponterio's employment discrimination claim as barred by the statute of limitations. *Ponterio v. Kaye,* Index No. 400281/04, at 6. Justice Friedman dismissed Ponterio's intentional misrepresentation claim as barred by the statute of limitations, and alternatively because it failed as a matter of law. *Id.* at 7-8. Justice Friedman dismissed Ponterio's breach of fiduciary duty claim because it failed as a matter of law. *Id.* at 9. Lastly, Justice Friedman dismissed Ponterio's unlawful retaliation claim because it failed as a matter of law, on two counts. First, the five year delay between Ponterio's 1998 complaints and the 2003 denial of his recertification, as well as the Board's intervening certification in 2001, negated the requisite causal connection

as a matter of law. *Id.* at 10-11. Secondly, Ponterio did not sufficiently plead facts to establish any showing of the requisite retaliatory animus on the part of Judge Lippman. *Id.* at 11-12.

**\*4** The Appellate Division, Third Department, noting that the "gravamen of [Ponterio's] complaint [was] a challenge to the Administrative Board's decision to deny him recertification," affirmed the ruling in its entirety. *Ponterio v. Kaye,* 25 A.D.3d at 867. [10] The Court of Appeals denied Ponterio's motion for leave to appeal, Judge Kaye taking no part in the decision. *Ponterio v. Kaye,* 6 N.Y.3d 714 (N.Y. May 9, 2006).

[10] The First Department transferred the case to the Third Department for hearing and disposition. *Ponterio v. Kaye,* 2005 N .Y.App. Div. LEXIS 8207 (N.Y.App.Div. July 21, 2005).

### D. *Ponterio's Federal Action*
On August 17, 2006, Ponterio filed his complaint in this Court. First, Ponterio alleges that the Board's 2003 denial of his recertification was a retaliatory act violating his First Amendment rights, "motivated in whole or part by the intent of defendants Kaye and Lippman to retaliate against plaintiff for his threat to expose Justice Ellerin's scheme to influence judicial decisions." Pl. Compl. ¶ 22. (Additionally, Ponterio alleges that the Board's 2003 denial of his recertification was a retaliatory act in violation of N.Y. EXECUTIVE LAW § 296. *Id.,* ¶¶ 43-51.) Secondly, Ponterio alleges that the Board's failure to set forth reasons for its 2003 denial constituted a "denial of access to the courts," in violation of the Fifth and Fourteenth Amendments, in that it wholly prejudiced his initial state court lawsuit to the extent that he was effectively denied the chance to bring the lawsuit at all. *Id.,* ¶¶ 28-37. Lastly, Ponterio alleges a "class of one" Equal Protection claim. Ponterio's theory is that the Board's 2004 denial of his application for recertification was based on Lippman and the Board's "irrational" and "wholly arbitrary" intent to punish him without any basis or legitimate governmental purpose. *Id.,* ¶ 40.

Ponterio seeks damages in the form of back pay, pain and suffering and punitive damages, attorneys' fees and costs, and injunctive relief placing him back on the bench. Pl. Compl. at p. 10-11.

## II. STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe all factual allegations in the complaint in favor of the non-moving party. *See Krimstock v. Kelly,* 306 F.3d 40, 47-48 (2d Cir.2002). "However, factual allegations must be distinguished from '[c]onclusory allegations or legal conclusions masquerading as factual conclusions,' as the latter will not be accepted as true." *Burns v. Cook,* 2006 U.S. Dist. LEXIS 77625, at \*10 (N.D.N.Y.2006), *citing Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002). The Court's consideration is normally limited to facts alleged in the complaint, documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. *See Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky,* 391 F.3d 106, 112 (2d Cir.2004), *quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

## III. DISCUSSION

**\*5** Defendants move to dismiss on the grounds that 1) *Rooker-Feldman* doctrine bars Plaintiff's claims 2) *Younger* abstention doctrine bars Plaintiff's claims, 3) *res judicata* and collateral estoppel bar Plaintiff's claims, and 4) Plaintiff's claims fail as a matter of law.

I will address each argument in turn.

### A. Rooker-Feldman *Doctrine*
Under *Rooker-Feldman* doctrine, "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 84 (2d Cir.2005) (*"Hoblock"* ), *citing, e.g., Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 414-15 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983). *Rooker-Feldman* is a narrow doctrine to begin with, and narrowed further by this Circuit's decision in *Hoblock,* where the Court held that the doctrine is "confined to ... cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district

court review and rejection of those judgments." *Hoblock,* 422 F.3d 77, 85, *quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005) ( *"Exxon-Mobil"* ). Rooker-Feldman "does not deprive a district court of subject-matter jurisdiction 'simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party ... then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." ' *Hoblock* at 86 (internal citations omitted), *citing Exxon-Mobil,* 544 U.S. 280, 293.

Thus, there exists a "set of federal suits ... raising 'independent claims' that are outside Rooker-Feldman's compass even if they involve the identical subject matter and parties as previous state-court suits." *Hoblock* at 86. Here, the question of whether Ponterio's lawsuit raises such "independent claims" turns on whether Ponterio's lawsuit complains of an "injury caused by a state court judgment."

The Second Circuit, in *Hoblock,* recently distinguished between state court judgments that "cause" the injury plaintiff complains of, as opposed to state judgments that merely "ratify," "acquiesce in," or "leave unpunished" the actions of a third party.[11] *See Hoblock* at 87-88. The former category is barred by *Rooker-Feldman;* the latter category is not.[12]

[11]   The Second Circuit stated the test as such: "a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Hoblock* at 88.

[12]   For example, if a state court terminated a parent's rights to his child, that would be an injury "caused" by the state court judgment. Thus, a parent could not subsequently sue in federal court, alleging that his substantive due process parental rights were violated, and seek to overturn the state's determination. Such a lawsuit would effectively be an appeal of the state-court judgment, and thus barred by *Rooker-Feldman. Hoblock* at 87.

However, "[s]uppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses. If the plaintiff then brings the same suit in

federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment. Instead, he will be alleging injury *based on the employer's discrimination.* The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by Rooker-Feldman, of the state-court judgment." *Hoblock* at 87-88 (emphasis added).

Here, Ponterio's federal action complains of injuries allegedly committed upon him by the Board and defendants Lippman and Kaye (i.e ., the denials of his recertification), and subsequently ratified by the New York state courts. Ponterio's action falls squarely into *Hoblock'* s second category of lawsuits that do not complain of injuries caused by state court judgments. Thus, *Rooker-Feldman* doctrine does not bar Ponterio's instant claims, and the Defendants' view is misplaced.

B. Younger *abstention*

**\*6** Defendants argue that *Younger* abstention bars Ponterio's claims from consideration, as federal courts should generally refrain from interfering in ongoing state proceedings that implicate important state interests and afford plaintiff an adequate opportunity to raise federal constitutional claims. *See Spargo v. N.Y. State Comm'n on Judicial Conduct,* 351 F.3d 65, 74-75 (2d Cir.2003), *citing Younger v. Harris,* 401 U.S. 37 (1971).

Because state proceedings do not appear to be "ongoing," it does not appear that *Younger* abstention applies here. Ponterio has litigated and lost his state claims up to the New York Court of Appeals. As *Younger* requires, he appears to have exhausted his state-court remedies.[13] See *Kirschner v. Klemons,* 225 F.3d 227, 234 (2d Cir.2000), *citing Huffman v. Pursue,* 420 U.S. 592, 608 (1975).[14] Again, the Defendants may not succeed on this ground.

[13]   It should be noted that it does not appear that Ponterio has appealed his state case to the United States Supreme Court.

[14]   Additionally, the Second Circuit has disapproved of the use of *Younger* where a plaintiff seeks money damages pursuant to 42 U.S .C. § 1983, on the theories that 1) money damages do not

pose the spectre of interference with state interests
that injunctive relief might, and 2) in New York,
plaintiffs typically cannot obtain damages for
civil rights violations in Article 78 proceedings.
*Kirschner v. Klemons,* 225 F.3d 227, 237-39.
Ponterio sought money damages on all his claims
in state court.

C. Res Judicata *and Collateral Estoppel*
Neither *Rooker-Feldman* nor *Younger* abstention doctrines,
however, speak to whether Ponterio's claims are barred by
principles of *res judicata* or collateral estoppel. *See, e.g.,*
*L.A .M. Recovery v. Dep't of Consumer Affairs,* 184 Fed.
Appx. 85, 87-88 (2d Cir.2006) ("Although *Rooker-Feldman*
is not applicable, the prior state court judgment may still
collaterally estop [plaintiff] from re-litigating its claims in
federal court."); *Hoblock* at 87 n. 6 ("The subsequent federal
suit could, of course, be barred by ordinary preclusion
principles.").

I will first consider Ponterio's First Amendment claim.

i. Res Judicata
"The doctrine of res judicata, or claim preclusion, provides
that a 'final judgment on the merits of an action precludes the
parties or their privies from relitigating issues that were or
could have been raised in that action." ' *Carlen v. Department
of Health Servs.,* 1996 U.S.App. LEXIS 25241, at *2 (2d
Cir.1996); *see also Monahan v. New York City Dep't of
Corr's.,* 214 F.3d 275, 284-85 (2d Cir.2000). "The preclusive
effect of a New York judgment in a subsequent federal action
is determined by New York law." *Carlen v. Department of
Health Servs.,* 912 F.Supp. 35, 39 (E.D.N.Y.1996), *citing* 28
U.S.C. § 1738; *Migra v. Warren City School Dist. Bd. of
Educ.,* 465 U.S. 75, 81 (1984). New York requires an "identity
of issues" and "identity of parties" for *res judicata* to apply.
*Ruiz v. Commissioner of Dep't of Transp .,* 858 F.2d 898,
902 (2d Cir.1988). In determining "identity of issues," New
York uses a "broad transactional analysis." *Id., citing Reilly v.
Reid,* 379 N.E.2d 172 (1978); *see also Hoblock* at 95 (claim
preclusion bars claims if they "could have been raised in state
court and they arise from the same transaction or series of
transactions") (citation omitted).

Ponterio's First Amendment claim arises from the same series
of transactions that served as the subject of his state law
complaint. As the Appellate Division noted, the "gravamen of
[Ponterio's] complaint [was] a challenge to the Administrative

Board's decision to deny him recertification, a determination
which he [sought] to have annulled." *Ponterio v. Kaye,* 25
A.D.3d at 867. Ponterio, in both actions, alleged substantially
the same facts as to Justice Ellerin's alleged scheme, his
reassignment, his interaction with Judges Kaye and Lippman,
and his eventual denial of recertification in 2003. [15] In state
court, Ponterio challenged the Board's actions as a retaliatory
act in violation of state employment law; in federal court,
Ponterio now challenges the Board's actions as a retaliatory
act in violation of the First Amendment. Nothing prevented
Ponterio from bringing his First Amendment claim in state
court. Ponterio's First Amendment claim is barred by claim
preclusion because he could have brought it in state court.
*See Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1232 (2d
Cir.1977) (the "crucial element underlying [claim preclusion]
standards is the factual predicate of the several claims
asserted ... not the legal theory upon which a litigant relies.").

[15]     It is true that Ponterio has alleged more specific
facts in his federal complaint that appear styled to
support his First Amendment claim; namely, that
he informed Judge Titone that he would "expose"
Justice Ellerin's "scheme," and that Justice
Mangano threatened him with "consequences" if he
did so. However, these facts were entirely within
Ponterio's possession at the time of his state court
lawsuit, and nothing precluded him from stating
those facts then.

**\*7** Ponterio notes, correctly, that "claim preclusion ... does
not apply where the initial forum did not have the power
to award the full measure of relief sought in the subsequent
litigation." *Carlen v. Department of Health Servs.,* 1996
U.S.App. LEXIS 25241, at *3, *citing Rameau v. New York
State Dep't of Health,* 741 F.Supp. 68, 71 n. 2 (S.D.N.Y.1990);
*Davidson v. Capuano,* 792 F.2d 275, 281-82 (2d Cir.1986).
Thus, Ponterio argues, because damages from civil rights
violations are not recoverable in an Article 78 action, his
§ 1983 claim should not be barred by *res judicata. See
Carlen v. Department of Health Servs.,* 1996 U.S.App.
LEXIS 25241, at *3. However, Ponterio brought a "hybrid"
Article 78 proceeding and damages action. Ponterio sought
money damages on all his claims in state court, including
his retaliation claim that is nearly identical to the First
Amendment claim he brings now. The concerns that counsel
raise against applying *res judicata* to § 1983 claims in New
York are not present in Ponterio's case.

ii. *Collateral Estoppel*

Alternatively, Ponterio's First Amendment claim is barred by issue preclusion, as distinct from claim preclusion. "[U]nder collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Carlen v. Department of Health Servs.,* 1996 U.S.App. LEXIS 25241, at *3; *Buechel v. Bain,* 766 N.E.2d 914, 919 (N.Y.2001). For collateral estoppel to apply, New York law requires an "identity of issues," necessarily decided in the prior action and decisive of the present action, and that the litigant had a "full and fair opportunity" to contest the prior decision. *Buechel v. Bain,* 766 N.E.2d 914, 919. [16] Issue preclusion can unquestionably bar a litigant bringing a § 1983 claim from relitigating issues decided in a prior Article 78 proceeding. *Carlen v. Department of Health Servs.,* 1996 U.S.App. LEXIS 25241, at *4, *citing Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987); *Rameau v. New York State Dep't of Health,* 741 F.Supp. 68, 70-71.

[16]    Ponterio argues that because the Board failed to set forth reasons for its denial, he was denied a "full and fair opportunity" to litigate his claims in state court, and thus claim preclusion and issue preclusion should not apply. "[A] full and fair litigation opportunity is provided if the procedures in the initial forum meet the minimum demands of procedural due process." *Rameau v. New York State Dep't of Health,* 741 F.Supp. 68, 71 n. 3. The New York Court of Appeals has held that the failure to set forth reasons to retired Justices who are denied recertification does not violate due process. *Marro v. Bartlett,* 389 N.E.2d 808 (N.Y.1979). Ponterio's argument is thus unavailing.

The state courts decided two issues that now have preclusive effect on Ponterio's instant claim. First, the state courts found that Ponterio could not, as a matter of law, establish a causal connection between his 1998 complaints of sex discrimination alleged against Kaye and Lippman and his 2003 denial of recertification, because of the length of the five-year delay and the intervening 2001 recertification. *See Ponterio v. Kaye,* Index No. 400281/04, at 10-11; *Ponterio v. Kaye,* 25 A.D.3d at 869. This failure to establish a causal connection, coupled with the failure to show any discriminatory animus, was essential to the state court's holding that Ponterio's retaliation claim failed as a matter of law. [17] The existence of a causal connection is equally essential to Ponterio's First Amendment claim. *See Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) ("causal connection between the protected speech and the adverse employment action" is essential to First Amendment retaliation claim), *citing, e.g., Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283-87 (1977). Ponterio is estopped from arguing otherwise here, and his First Amendment claim fails as a matter of law.

[17]    *See Ponterio v. Kaye,* Index No. 400281/04, at 11 ("[T]his lengthy delay precludes plaintiff from establishing causality based on temporal proximity, particularly given the intervening event of the Board's favorable action on plaintiff's certification application in 2001.").

 **8** It matters little that Ponterio argued then for a "causal nexus" to his 1998 complaints, as distinct from his 1998 "threats to expose Justice Ellerin's scheme." District courts in this Circuit have regularly held that issue preclusion bars relitigation of issues necessary to First Amendment claims, if based on the same factual predicate as prior retaliation claims. *See Carlen v. Department of Health Servs.,* 912 F.Supp. 35, 40 ("The Appellate Division's finding ... that there was no support for plaintiff's retaliation claim precludes plaintiff's free speech claim. Plaintiff's free speech claim is inextricably intertwined with, if not identical to, his claim that he was retaliated against ... ), *aff'd,* 1996 U.S.App. LEXIS 25241; *Scott v. Goodman,* 961 F.Supp. 424, 433 (E.D.N.Y.1996) (prior determination that union employee was not retaliated against for union activities barred subsequent First Amendment claim of retaliation against "speech and associational activities"); *see also Rameau v. New York State Dep't of Health,* 741 F.Supp. 68, 70-71 (determinations in an Article 78 proceeding barred subsequent § 1983 claim of retaliatory discharge based on race and ethnicity). Fundamentally, the issue being given preclusive effect is the state court's holding regarding the five-year delay, which is equally applicable whether the starting point is Ponterio's complaints generally, or his threats to expose Justice Ellerin's scheme specifically. [18]

[18]    Additionally, Plaintiff has stated no facts to indicate that he ever communicated his "threat to expose Justice Ellerin's scheme" to Lippman or Kaye, nor that Lippman or Kaye were ever made aware of his communication of his threat to Judge Titone or Justice Mangano. Ponterio does state that Judge Titone was "acting as an intermediary." However, "conclusory statements" cannot "substitute for

minimally sufficient factual allegations." *Furlong v. Long Island College Hospital,* 710 F.2d 922, 927 (2d Cir.1983). The lack of any facts indicating a causal connection between Ponterio's "threats" and the Board's 2003 denial additionally supports dismissal of Ponterio's claim.

Ponterio's state law retaliation claim pursuant to Executive Law § 296 is squarely barred by issue preclusion. The state courts ruled directly on Ponterio's claim and dismissed it. *See Ponterio v. Kaye,* 25 A.D.3d at 869. Thus, I must also dismiss Ponterio's state law retaliation claim. [19]

> [19]    Were the state law retaliation claim not barred by issue preclusion or claim preclusion, it would fail on its merits, following the same reasoning as that of the state courts. *See Ponterio v. Kaye,* 25 A.D.3d at 869.

Finally, even if Ponterio's First Amendment claim was not barred by issue preclusion, it would fail on the merits following the same analysis as the state courts'. To state a First Amendment claim, Ponterio must allege a causal connection between his alleged protected speech and the adverse employment action, "sufficient to support the inference that the speech played a substantial part in the employer's adverse employment action." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (citation omitted). Ponterio has not stated facts to sufficiently allege a causal connection here, either by circumstantial evidence based on temporal proximity, or direct evidence of retaliatory animus. [20]

> [20]    *See, e.g., Morris v. Lindau,* 196 F.3d 102, 113 (based on two-year time lapse, "no inference of causation is justified"); *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 274 (U.S.2001) ("The cases that accept mere temporal proximity ... hold that the temporal proximity must be 'very close....' Action taken ... 20 months later suggests, by itself, no causality at all.") (citations omitted).
>
>    Plaintiff's citation to *Mandell v. County Of Suffolk & John Gallagher,* 316 F.3d 368 (2d Cir.2003), is unavailing. In *Mandell,* the Second Circuit held that plaintiff could state a *prima facie* First Amendment retaliation claim even where a five-year delay existed between plaintiff's speech and the retaliatory act. *Mandell,* 316 F.3d 368, 383. However, in *Mandell,* plaintiff relied on direct evidence

of retaliatory animus, rather than temporal proximity. *Id.* As noted above, Ponterio offers no direct evidence of retaliatory animus here.

In short, whether barred by claim preclusion or issue preclusion, or because it fails as a matter of law, I must dismiss Ponterio's First Amendment claim.

## D.  *"Denial of Access" Claim*

Ponterio claims that the Board's failure to set forth reasons for its denial of recertification violated his constitutional right of access to the courts. The Second Circuit has recognized a right of access to the courts, stemming from the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments. *Monsky v. Moraghan,* 1997 U.S.App. LEXIS 36158, at *11 (2d Cir.1997).

 **\*9**  "Denial of access" claims typically fall into one of two categories. First, litigants may claim that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits." *Christopher v. Harbury,* 536 U.S. 403, 413 (U.S.2002). Thus, prisoners have sued for access to a law library, [21] or indigent plaintiffs have sued for waivers of filing fees. [22] *Id.* Secondly, litigants may claim that they have irrevocably lost the ability to file a lawsuit, typically because of a massive governmental cover-up denying plaintiffs the ability to gather evidence. *Id.* [23]

> [21]    *See, e.g., Bounds v. Smith,* 430 U.S. 817, 828 (1977); *Lewis v. Casey,* 518 U.S. 343, 346-348 (1996).
>
> [22]    *See, e.g., Boddie v. Connecticut,* 401 U.S. 371, 372 (1971) (divorce filing fee); *M.L.B. v. S.L.J.,* 519 U.S. 102, 106-107 (1996) (record fee in parental-rights termination action).
>
> [23]    *See, e.g., Barrett v. United States,* 798 F.2d 565, 568 (2d Cir.1986) (Administrator of estate brought denial of access claim where testator died as a result of the Army secretly injecting testator with hallucinogenic drugs, and government covered up Army's actions in subsequent litigation); *Bell v. Milwaukee,* 746 F.2d 1205, 1261 (7 [th] Cir.1984) (police cover-up of shooting for twenty years, including planting of evidence and concocting false

statements, constituted denial of access to the courts).

At the outset, Ponterio's "denial of access" claim is not barred by *res judicata* or collateral estoppel. Ponterio correctly notes that his "denial of access" claim is based on the alleged loss of his state court lawsuit itself, which is a "a species of property protected by the Fourteenth Amendment's Due Process Clause." *N.Y. State NOW v. Pataki,* 261 F.3d 156, 163 (2d Cir.2001); *see also Christopher v. Harbury,* 536 U.S. 403, 415 ("the right [of access to the courts] is ancillary to the underlying claim"). Put another way, Ponterio claims he did not have a full and fair opportunity to litigate his "denial of access" claim in the prior state action, since his prior action forms the basis of his "denial of access" claim now.

However, Ponterio's denial of access claim fails on its merits. "In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' i.e., took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Monsky v. Moraghan,* 1997 U.S.App. LEXIS 36158, at *12 (citations omitted). The essence of a denial of access claim is that a plaintiff must have effectively lost (or was severely hampered in) the ability to file a lawsuit, typically by egregious or systemic violations of due process. Yet Ponterio ably filed his lawsuit in New York state court challenging the denial of his recertification. True, he filed that lawsuit without the benefit of the Board's reasons for his denial. However, under New York law, the Board's failure to set forth reasons for denial of recertification does not violate due process. *Marro v. Bartlett,* 389 N.E.2d 808 (N.Y.1979). [24] It follows that if the Board's failure to set forth reasons for denial of recertification did not violate due process, Ponterio's lawsuit based on that recertification was not hampered by any violation of due process (and certainly not such an egregious or systemic violation of due process typically required for a "denial of access" claim). Ponterio's claim, albeit creative, fails because he cannot state "actual injury." [25]

[24]    The Board "has nearly unfettered discretion which is not subject to judicial review in the absence of claims of substance that there has been a violation of constitutional or statutory prescription unrelated to the certification process itself." *Marro,* 389 N.E.2d 808, 809-10. "[I]nasmuch as the function of the certification is that of an initiatory action, rather than that of determining a continuing

entitlement, due process requirements are virtually nonexistent." *Id.* at 812.

[25]    It should be noted that if Ponterio brought a direct challenge to the Board's failure to set forth reasons for his denial as violative of Due Process, it would in all likelihood fail. *See Marro v. Bartlett,* 389 N.E.2d 808; *Schwartz v. Mayor's Committee on Judiciary,* 816 F.2d 54, 57 (2d Cir.1987) (no property or liberty right by New York City family court judge to reappointment); *Levine v. McCabe,* 357 F.Supp.2d 608, 610 (E.D.N.Y.2005) (former judge had no property or liberty interest in future judicial hearing officer position); *Meyer v. Lippman,* 1999 U.S. Dist. LEXIS 8807 (S.D.N.Y.1999) (judicial hearing officer had no property right to reappointment).

E. *Equal Protection Claim*

Ponterio alleges a "class of one" Equal Protection claim, under the theory that the Board's 2004 denial of his application for recertification was based on Lippman and the Board's "irrational" and "wholly arbitrary" intent to punish him without any basis or legitimate governmental purpose.

**\*10**    The Second Circuit has recognized such "class of one claims," where the "plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001), *citing Willowbrook v. Olech,* 528 U.S. 562, 563 (U.S.2000); *Morron v. City of Middletown,* 2006 U.S. Dist. LEXIS 87932, at *19-21 (D.Conn.2006).

At the outset, Ponterio's Equal Protection claim is not barred by *res judicata* or collateral estoppel, as it stems from the 2004 denial of his application for reconsideration. Ponterio's 2004 denial constitutes "new evidence" which was not available to him when he instituted his state court action in 2003. [26] *See King v. Fox,* 418 F.3d 121, 130 (2d Cir.2005) (noting that availability of new evidence, among other factors, counsels against application of collateral estoppel), *citing Gilberg v. Barbieri,* 423 N.E.2d 807 (N.Y.1981). Similarly, Ponterio's Equal Protection claim is not barred by *Rooker-Feldman,* as the state courts have not previously ruled on his 2004 denial of recertification.

[26]    As noted above, although Ponterio is estopped from arguing that Lippman was motivated by personal

animus concerning his 2003 denial, he is not so estopped from arguing that Lippman was motivated by personal animus concerning his 2004 denial.

Ponterio has sufficiently stated a "class of one" claim by pleading that the Board and Lippman, at the time of his 2004 denial, possessed an intent to treat him differently from others similarly situated, without any rational basis. Ponterio has alleged that he was similarly situated to the other retired Justices who were granted recertification in 2004. It appears plausible that a rational basis for the Board's and Lippman's actions exists-e.g., the Richmond County Bar Association's 2003 recommendation against Ponterio's recertification. However, on a motion to dismiss, this Court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Burns v. Cook,* 2006 U.S. Dist. LEXIS 77625, at *10, *citing Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). I therefore decline to dismiss Ponterio's Equal Protection claim at this time.

Defendants cite authority that plaintiffs may not bring a retaliation claim pursuant to the Equal Protection clause. *See Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996) ("Although claims of retaliation are commonly brought under the First Amendment, and may also be brought under Title VII ... we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination.") (internal citations omitted); *see also Levine v. McCabe,* 357 F.Supp.2d 608, 622 (E.D.N.Y.2005). [27]

[27]   *See also, e.g., Watkins v. Bowden,* 105 F.3d 1344, 1354-55 (11th Cir.1997) ("A pure or generic retaliation claim ... does not implicate the Equal Protection Clause"), *citing Ratliff v. DeKalb County,* 62 F.3d 338, 340 (11th Cir.1995); *Gray v. Lacke,* 885 F.2d 399, 414 (7th Cir.1989) (plaintiff's "right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause").

However, these prior holdings address retaliation claims in the context of traditional Equal Protection analysis, based on a suspect classification or violation of fundamental rights. *See Bernheim v. Litt,* 79 F.3d 318, 323 ("The Fourteenth Amendment guarantee of equal protection is 'a right to be free from invidious discrimination in statutory classifications and other governmental activity.' "), *citing Harris v. McRae,* 448

U.S. 297, 322 (1980). Here, Ponterio brings a "class of one" Equal Protection claim, based not on a suspect classification or violation of fundamental rights, but on animus on the part of a government actor. *See Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 ("[T]he equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials."). Such animus may include retaliatory animus. *See, e.g., Trihealth, Inc. v. Bd. of Comm'rs,* 430 F.3d 783, 789 (6th Cir.2005) (noting that plaintiff's "class of one" claim could survive a motion to dismiss where it alleged that plaintiff "was similarly situated to others who received different treatment, and that his disparate treatment was motivated by invidious, retaliatory animus."). Thus, so long as Ponterio meets the independent requirements of a "class of one" Equal Protection claim, the fact that his "class of one" claim alleges retaliatory activity, or that he concurrently alleges a First Amendment retaliation claim, does not bar him from bringing his "class of one" claim. [28]

[28]   Although the Second Circuit has not ruled squarely on the issue, district courts in this Circuit have not ruled to the contrary. *SeeMorron v. City of Middletown,* 2006 U.S. Dist. LEXIS 87932, at *19-21 (D.Conn.2006) (ruling that because First Amendment retaliation claim survived motion to dismiss, "class of one" Equal Protection claim survived as well); *Russo v. City of Hartford,* 184 F.Supp.2d 169, 191 (D.Conn.2002) (denying motion to dismiss "class of one" Equal Protection claim, as well as First Amendment retaliation claim); *see also Levine v. McCabe,* 357 F.Supp.2d 608, 622 (dismissing Equal Protection retaliation claim, citing *Bernheim,* but analyzing "class of one" claim separately); *Santossio v. City of Bridgeport,* 2004 U.S. Dist. LEXIS 21109, *14-15 (D.Conn.2004) (holding that plaintiff could not state retaliation claim under Equal Protection clause, but analyzing "class of one" Equal Protection claim separately).

**\*11** Ponterio's "class of one" Equal Protection claim will go forward. This Court will entertain limited discovery on the issue-namely, if Plaintiff so chooses, the deposition of Judge Lippman at a convenient time, but within thirty days from the date of this Opinion. Thereafter, each side may brief what has been gleaned from the deposition and submit ten pages or less, and the deposition transcript, to the Court. If there is a

2007 WL 141053

material issue of fact, the matter will go forward. If not, I will resolve the issue in Defendants' favor. Either side may request oral argument by calling the Court's chambers.

Ponterio's motion for an injunction, however, is denied as to his Equal Protection claim. Ponterio's delay of two years in bringing his motion for injunctive relief on his Equal Protection claim counsels against a finding of "irreparable harm." *Shady v. Tyson,* 5 F.Supp.2d 102, 109 (E.D.N.Y.1998), citing *Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir.1985). Additionally, I cannot say at this time that Ponterio shows a likelihood of "success on the merits." *See Moore v. Consol. Edison Co. of N.Y., Inc.,* 409 F.3d 506, 510 (2d Cir.2005). [29]

29      Additionally, because Ponterio seeks a mandatory injunction-i.e., an order "alter[ing] the status quo by commanding some positive act," in this case, an order annulling the Board's denial of certification and certifying him to the bench-he must meet a higher standard, i.e. "a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *See Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995). Thus, Ponterio cannot succeed

in gaining an injunction by showing "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Id.* at 33. I do not find that Ponterio makes such a clear showing here.

## IV. CONCLUSION

Because Plaintiff's First Amendment claim and state law retaliation claim are barred by *res judicata* and collateral estoppel principles, and alternatively fail on their merits, I must dismiss those claims. Because Plaintiff's "denial of access" claim fails on its merits, I must dismiss that claim. I am denying Defendants' motion to dismiss as to Plaintiff's Equal Protection claim. I am denying Plaintiff's motion for a preliminary injunction on all grounds.

The Clerk of the Court is directed to close these motions and remove them from my docket.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 141053

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

LeBron v. Swaitek, Not Reported in F.Supp.2d (2007)

2007 WL 3254373

2007 WL 3254373
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Elvin LeBRON, Plaintiff,
v.
D. SWAITEK, et al., Defendants.

No. 9:05-CV-172 (GLS/DRH).
|
Nov. 2, 2007.

**Attorneys and Law Firms**

Elvin LeBron, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General,
Stephen M. Kerwin, Assistant Attorney General, of Counsel,
Albany, NY, for the Defendants.

*MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, U.S. District Judge.

### I. *Introduction*

**\*1** Plaintiff Elvin LeBron brings this action pursuant to 42
U.S.C. § 1983 alleging that defendants, ninety-two employees
of the New York State Department of Correctional Services
("DOCS"), violated his constitutional rights under the First
and Fourteenth Amendments. LeBron's amended complaint
was referred to Magistrate Judge David R. Homer pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Northern
District of New York. Upon the motion of sixty-nine of the
defendants, Judge Homer issued a Report-Recommendation
and Order recommending dismissal of all claims against the
moving defendants. *See Report-Recommendation and Order;
Dkt. 127.* [1] Additionally, Judge Homer recommended that the
amended complaint be dismissed without prejudice as to the
non-moving defendants, for failure to serve. *Id.* Now pending
before the court is LeBron's timely objection to the Report-
Recommendation. *See Dkt. 130.*

[1]     The Clerk is directed to append Judge Homer's
Report-Recommendation to this decision, and
familiarity is presumed. *See Dkt. 127.*

Upon careful consideration of the arguments, the record, and
the applicable law, the court concludes that five of LeBron's
seven claims should be dismissed in their entirety. However,
the claim denominated "Claim Four" in LeBron's amended
complaint survives, but only to the extent that it states a due
process claim against certain defendants, and to the extent that
it states a First Amendment retaliation claim against certain
defendants. Additionally, the claim denominated "Claim
Seven" survives, but only to the extent that it states a First
Amendment claim of interference with mail. Thus, for the
reasons stated below, the Report-Recommendation is adopted
in part and rejected in part.

### II. *Standard of Review*

Before entering final judgment, this court routinely reviews
all report-recommendations in cases it has referred to a
Magistrate Judge. If a party has objected to specific elements
of the Magistrate Judge's findings and recommendations, this
court reviews those findings and recommendations *de novo.*
*See Almonte v. N.Y. State Div. of Parole,* No. 9:04-CV-484,
2006 WL 149049, *6-7 (N.D .Y. Jan. 18, 2006). Even in
those cases where no party has filed an objection, this court
reviews the findings and recommendations of a Magistrate
Judge under a clearly erroneous standard. *Id.*

LeBron has filed several specific objections to Judge Homer's
Report-Recommendation. *See generally Dkt. 130.* First,
LeBron objects to Judge Homer's recommendation that
Claims One and Two be dismissed as untimely. [2] Second,
LeBron objects to Judge Homer's determination that LeBron
was not subjected to the type of atypical and significant
confinement that is required to establish a due process
claim. Third, LeBron argues that Judge Homer erroneously
concluded that the named defendants lacked the authority
to expunge his disciplinary record. Finally, LeBron asserts
that Judge Homer failed to consider his First Amendment
claims, and that the Report-Recommendation erroneously
recommended dismissal of Claim Four in spite of Judge
Homer's determination that said claim was not barred by the
statute of limitations. In light of LeBron's specific objections,
the court has reviewed the foregoing determinations *de novo.*
The court has reviewed the remainder of Judge Homer's
Report-Recommendation for clear error.

**LeBron v. Swanek, Not Reported in F.Supp.2d (2007)**

2007 WL 3254373

2    LeBron also argues that Claim Five is not barred by
the statute of limitations. However, Judge Homer
did not hold that Claim Five was time-barred.

### III. *Discussion*

**A. *Equal Protection and Fourth Amendment Claims***

**\*2** LeBron asserts seven claims in his amended complaint,
each alleging "First Amendment, due process, and equal
protection violations." *See Dkt. 6 at ¶¶ 38, 84, 112, 200, 251,
291, 352* . Judge Homer determined that LeBron's amended
complaint is devoid of any allegations that would support
an equal protection claim. LeBron has not challenged this
determination, and this court agrees with Judge Homer's
conclusion. Accordingly, LeBron's equal protection claims
are dismissed.

On its face, LeBron's amended complaint asserts no
Fourth Amendment claims. However, reading the amended
complaint liberally, Judge Homer recognized that LeBron
may have alleged a deprivation of his Fourth Amendment
protection against unreasonable searches and seizures. Even
assuming that LeBron had alleged a Fourth Amendment
violation, Judge Homer concluded that LeBron had no viable
claim on that ground. *See Dkt. 127, p. 15, n. 14.* LeBron
has not objected to this conclusion, and the court is in full
agreement with Judge Homer. Accordingly, LeBron's Fourth
Amendment claims, if any, are dismissed.

**B. *Due Process Claims***

Judge Homer has recommended that the due process claims
asserted in Claims One, Two, Five, Six, and Seven be
dismissed in their entirety. The Report-Recommendation may
also be construed as recommending dismissal of the due
process claim asserted in Claim Four, although it mentions
this claim only in passing. *See Dkt. 127, p. 12, n. 11.* [3]

3    As to Claim Three, Judge Homer construed this
claim as asserting only a violation of LeBron's right
of access to the courts. Thus, neither Judge Homer's
Report-Recommendation, nor this opinion, should
be read as ignoring the purported "due process"
claim asserted in Claim Three. Rather, as discussed
below, Claim Three is dismissed in its entirety,
because LeBron has failed to state a claim for denial
of access to the courts.

Upon *de novo* review, the court agrees with and adopts Judge
Homer's recommendation that the due process claims asserted
in Claims One, Two, Five, Six and Seven should be dismissed.
With respect to Claim Four, the court concludes that the due
process claim asserted therein should survive dismissal only
with respect to those defendants whose personal involvement
is alleged.

### 1. Claims One and Two are Barred by the Statute of Limitations

Judge Homer recommended dismissal of Claims One and
Two on statute of limitations grounds. In his objections to
the Report-Recommendation, LeBron asserts that a prisoner
must exhaust his state remedies as well as his administrative
remedies before bringing a § 1983 claim. Thus, with respect
to Claim Two, he argues that his state action tolled the running
of the statute of limitations until January 14, 2002, the date
that the results of the subject disciplinary proceedings were
administratively reversed. *See Dkt. 130, p. 1.* [4]

4    LeBron also argues that Claims Five, Six, and
Seven are not time-barred. *See Dkt. 130, p. 1.*
However, Judge Homer did not base his dismissal
of these claims on the statute of limitations. LeBron
also argues that Claim One constituted an ongoing
violation for which the statute of limitations did not
accrue until July 2, 2000. *Id.* Even accepting this
as true, the complaint, deemed filed on January 13,
2005, was still untimely with respect to Claim One.

LeBron's contention that pursuit of state remedies tolls the
statute of limitations in a § 1983 action is an incorrect
statement of law. *See Abbas v. Dixon,* 480 F.3d 636, 641 (2d
Cir.2007) ("We have held ... that a plaintiff's pursuit of a state
remedy, such as an Article 78 proceeding, does not toll the
statute of limitations for filing a claim pursuant to section
1983."). Thus, under the three year statute of limitations
applicable to LeBron's § 1983 claims, [5] Claims One and
Two are time-barred. As Judge Homer noted, the statute of
limitations began to run on these claims when LeBron knew
his rights were violated. *See Singleton v.. City of New York,*
632 F.2d 185, 191 (2d Cir.1980). As such, LeBron's first
and second causes of action accrued, at the latest, on June
19, 2000 and August 24, 2000, respectively, the dates that
his administrative appeals were denied. Therefore, LeBron's
objections based on tolling of the statute of limitations are
without merit.

LeBron v. Swanek, Not Reported in F.Supp.2d (2007)

2007 WL 3254373

5      See *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994).

**\*3** Accordingly, defendants' motion to dismiss is granted as to the due process claims asserted in Claims One and Two. Moreover, to the extent that Claims One and Two assert equal protection and First Amendment claims, such claims are dismissed as untimely as well.

### 2. Claims One, Two, Five, Six and Seven Fail to State a Due Process Claim

In Claims One, Two, Five, Six and Seven, LeBron asserts due process violations arising out of procedurally improper disciplinary hearings. As a threshold matter, in order to establish a due process violation, a prisoner must demonstrate that a liberty interest has been infringed. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

With respect to Claims One, Two, Five, and Seven, Judge Homer determined that LeBron could not establish, as a matter of law, that the confinement to which he was subjected was "atypical and significant," because in each case LeBron was sentenced to keeplock of 30 days or less. *See Dkt. 127, pp. 11-12.* The court concurs with Judge Homer's conclusion–which LeBron does not contest-that, absent additional allegations of atypicality, keeplock of 30 days or less is not alone "atypical and significant" confinement. *See Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *Davidson v. Murray,* 371 F.Supp.2d 361, 368-69 (W.D.N.Y.2005).[6] Therefore, LeBron has not established that a liberty interest has been infringed. Accordingly, the due process claims asserted in Claims One, Two, Five, and Seven are dismissed.

6      LeBron's amended complaint contains no allegations that would indicate that the keeplock confinement to which he was sentenced was atypical and significant. In his objections to the Report-Recommendation, LeBron has attempted to supplement the allegations in his amended complaint by setting forth a laundry list of deprivations to which he was subjected. The court will not consider these belated allegations. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998) (noting that it is within the district court's discretion

to refuse to allow supplementation of the record upon its review of a Report-Recommendation); *Bester v. Dixion,* No. 03-cv-1041, 2007 WL 951558, \*3 (N.D.N.Y. March 27, 2007) ("Allowing Plaintiff to raise in his objections legal and factual arguments not presented to the Magistrate Judge defeats the very purpose of the report and recommendation procedure ....").

With respect to Claim Six, LeBron has alleged that he was sentenced to 180 days in the special housing unit ("SHU"). The court need not decide whether a sentence of this length is "atypical and significant," because, as Judge Homer noted, LeBron's sentence was administratively reversed before he had served any portion of it. *See Dkt. 127, pp. 12-14.* LeBron has not contested Judge Homer's finding in this regard. The court agrees with Judge Homer that LeBron suffered no interference with a liberty interest with respect to Claim Six, and, accordingly, the due process claim asserted in Claim Six is dismissed.

### 3. Claim Four States a Due Process Claim With Respect to Certain Defendants

The court agrees with Judge Homer that Claim Four is not barred by the statute of limitations. *See Dkt. 127, pp. 10-11.* Since LeBron has alleged a loss of good time credit as a result of the subject disciplinary hearing, LeBron's cause of action did not accrue until October 23, 2002, when the disciplinary hearing was administratively reversed.[7] *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999).

7      Moreover, it appears that the last event giving rise to Claim Four occurred on January 21, 2002, *see Dkt. 6, ¶ 164,* within three years of the deemed filing of LeBron's complaint on January 13, 2005.

Although Claim Four survives dismissal on statute of limitations grounds, it fails to adequately allege the personal involvement of many of the defendants. It is axiomatic that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citation and quotation omitted).[8]

8      In assessing whether Claim Four states a due process claim, the court has considered only the issue of personal involvement. The parties have not briefed the issue of whether the disciplinary hearing conducted on or about January 16, 2002, was, in

fact, procedurally improper, and the court will not address that issue at this time.

**\*4** Under a liberal construction of LeBron's amended complaint, defendants Mehrmann, Faulkner, and McLaughton are the only defendants who are alleged to have conducted or participated in the allegedly procedurally defective disciplinary hearing conducted on or about January 16, 2002. *See Dkt. 6, ¶¶ 149-162.* Accordingly, LeBron has stated a due process claim with respect to these three defendants. [9]

[9]    However, as discussed below, these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron has also alleged that certain defendants failed to reverse his sentence upon being notified of the due process violations that occurred at his disciplinary hearing. *See Dkt. 6, ¶¶ 166-198.* The Second Circuit has held that an official has the requisite personal involvement for liability under *§ 1983* when, *inter alia,* "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A number of district courts have held that the language in *Colon* should not be construed so broadly as to impose liability on any and all officials to whom a prisoner complains. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (collecting cases). This makes eminent sense; certain officials, even those in supervisory positions, simply may not have the authority to review and redress a prisoner's complaints. However, personal involvement will be found "where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Id.* LeBron's amended complaint adequately alleges, for purposes of withstanding a motion to dismiss under Rule 12(b)(6), that the following defendants reviewed his appeals, and declined to rectify the alleged constitutional violations: L. Leclaire, [10] Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, LeFevre, Pasquil, Annucci, Murphy, and McCoy. *See Dkt. 6, ¶¶ 166-198.* Accordingly, LeBron has stated a due process claim with respect to these defendants. [11]

[10]    LeBron's amended complaint does not specify which of the three "LeClaire" defendants is alleged to have denied his grievances; however, the

defendants have indicated that it was "L. LeClaire." *See Dkt. 112, p. 14.*

[11]    However, as discussed below, several of these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron also alleges that certain defendants planted evidence and wrote misbehavior reports prior to the January 16, 2002, disciplinary hearing. *See Dkt. 6, ¶¶ 134-147.* However, the filing of a misbehavior report-even a false one-"does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams,* 781 F.2d at 324. Similarly, the act of planting evidence does not, of itself, violate due process. Due process is implicated only at the point that a prisoner is denied the procedural protections that would enable him to prove that the evidence against him has been fabricated. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law."). Accordingly, LeBron fails to state a due process claim with respect to those defendants who are only alleged to have engaged in conduct prior to the disciplinary hearing.

**\*5** In summary, Claim Four states a due process claim only with respect to the following 18 defendants: Mehrmann, Faulkner, McLaughton, L. LeClaire, Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Lefevre, Pasquil, Annucci, Murphy, and McCoy. Accordingly, with the exception of these 18 defendants, the due process claims asserted in Claim Four are dismissed *with prejudice* as to all other defendants. Moreover, the due process claims asserted in Claim Four are dismissed *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, Lefevre, and Pasquil, for failure to serve. [12]

[12]    The docket indicates that John Mehrmann has been served. *See Dkt. 80.* However, the acknowledgment of service indicates that, in fact, a "James Meehan" was served. *Id.*

### C. First Amendment Claims

In his objections to the Report-Recommendation, LeBron notes that Judge Homer failed to analyze his First Amendment

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 115 of 212
LeBron v. Swanek, Not Reported in F.Supp.2d (2007)

2007 WL 3254373

claims.[13] This is only partly correct. Judge Homer did address LeBron's claim of denial of access to courts, which is a species of First Amendment claim. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *Cancel v. Goord,* No. 00-cv-2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001). Nevertheless, to the extent that LeBron's amended complaint may also be read as alleging First Amendment retaliation claims and claims of interference with outgoing mail, the court will address the merits of such claims in the first instance herein.

[13]   Each of LeBron's seven claims may be read as asserting some form of First Amendment claim. However, as noted above, Claims One and Two are barred by the statute of limitations. Thus, in this section, the court discusses only the First Amendment claims asserted in Claims Three through Seven.

### 1. *Retaliation Claims*

With respect to Claims Four, Five, and Six, LeBron's objections to the Report-Recommendation clarify that he believes that defendants retaliated against him after he had engaged in protected speech. *See Dkt. 130, p. 3.* To survive dismissal, a plaintiff asserting a First Amendment retaliation claim must advance non-conclusory allegations "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis,* 320 F.3d at 352 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In regards to causation, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (citation omitted).

In Claim Four, LeBron alleges that his complaints of harassment and his filing of a "facility claim" led to multiple acts of retaliation, including random searches of his cell, the planting of contraband in his cell, and the fabrication of misbehavior reports. *See Dkt. 6, ¶¶ 115-141.* With respect to the first prong of a retaliation claim, LeBron's complaints of harassment constituted protected speech. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). As to the second prong, LeBron has alleged that the defendants took adverse action against him, in the form of retaliatory misbehavior reports and the retaliatory planting of evidence. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239-240

(S.D.N.Y.2005).[14] Finally, LeBron has sufficiently alleged the causation element of a First Amendment retaliation claim by showing a temporal proximity between his protected speech and the adverse actions taken against him. *See Dkt. 6, ¶¶ 132-147.*

[14]   By contrast, the alleged searches of LeBron's cell provide no support for a First Amendment retaliation claim. Inmates have no reasonable expectation of privacy in their prison cells, and thus "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005) (collecting cases).

**\*6** Thus, Claim Four states a claim for First Amendment retaliation. Accordingly, the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is denied with respect to all defendants, with the exception of defendants Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment retaliation claim asserted in Claim Four is dismissed with respect to defendants Woodroof, Olson, M. LeClaire, and Bushie, because LeBron has not alleged that these defendants participated in any prohibited retaliatory conduct.[15]

[15]   Additional defendants named in Claim Four have also moved for dismissal, arguing lack of personal involvement. *See Dkt. 112, pp. 13-15.* However, the court is unable to conclusively determine, at this stage, that these additional defendants were not involved in the alleged retaliatory conduct (or the failure to redress). Hence, the retaliation claim alleged in Claim Four is dismissed only with respect to Woodruff, Olson, M. LeClaire, and Bushie.

Turning now to Claims Five and Six, LeBron has failed to state a retaliation claim. There are, quite simply, no allegations of retaliation in Claim Five. LeBron asserts that he was issued a misbehavior report, *see Dkt. 6, ¶ 217,* but nowhere in the amended complaint does he state that this misbehavior report was issued in retaliation for his exercise of First Amendment rights.[16] The same is true of Claim Six; the claim does not allege, even in conclusory terms, that any retaliatory conduct occurred.

[16]   In his opposition to the motion to dismiss, LeBron makes conclusory allegations of retaliation. *See*

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 3254373

*Dkt. 121, p. 7.* However, unlike Claim Four, discussed above, the allegations in Claim Five of the amended complaint provide no basis for believing that circumstantial evidence might exist that would support LeBron's bare allegations of retaliation. *See Boddie v. Schnieder,* 105 F .3d 857, 862 (2d Cir.1997) (dismissing, upon motion pursuant to Rule 12(b)(6), allegations of retaliation that were "unsupported, speculative, and conclusory").

### 2. *Access to Courts Claims*

Construing LeBron's amended complaint broadly, Judge Homer interpreted Claims Three and Five as alleging a denial of access to courts. Judge Homer recommended that these claims be dismissed. LeBron has not objected to this recommendation. The court agrees with Judge Homer's conclusion that Claims Three and Five do not state a claim for denial of access to courts, because LeBron has failed to allege any actual injury. *See Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' *i.e.,* took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' ") (citing *Lewis v. Casey,* 518 U.S. 343, 349-51 (1996)) (internal citations omitted). Accordingly, to the extent that Claims Three and Five allege a denial of access to courts, these claims are dismissed. [17] Moreover, to the extent that Claim Six may be read as alleging a denial of access to courts, this claim is dismissed as well, for the same reasons.

[17]      The court declines to provide LeBron the opportunity to amend his complaint, yet again, to include allegations of injury. In a Conditional Order of Dismissal, dated March 7, 2005, the court explicitly advised LeBron that his allegations regarding denial of access to courts were inadequate, and that "[i]n order to establish standing for a claim for denial of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials." *See Dkt. 4, p. 5.* The court accepted LeBron's amended complaint because it cured many of the defects of the original complaint. *See Dkt. 7.* However, upon closer review, at least insofar as the denial of access to courts claims are concerned, LeBron's amended complaint suffers from the same infirmities as his original complaint.

### 3. *Interference With Mail Claim*

In Claim Seven, LeBron alleges that two of his outgoing letters were confiscated. *See Dkt. 6, ¶¶ 296, 299.* LeBron does not assert that the confiscation of the two letters interfered with his access to the courts, and, indeed, does not even allege that the letters constituted legal mail. Thus, he has not stated a claim for denial of access to courts. Accordingly, to the extent that Claim Seven may be read as asserting a claim of denial of access to courts, such claim is dismissed.

However, apart from the right of access to courts, "a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351; *see Moore v. Gardner,* 199 F.Supp.2d 17, 33 (W.D.N.Y.2002) ("Although prisoners' First Amendment mail claims are often intertwined with claims for denial of court access, they may exist separately."). Thus, the court will address whether LeBron has stated a claim for the violation of his First Amendment rights arising out of the confiscation of two pieces of outgoing mail.

*7 In short, for purposes of a Rule 12(b)(6) motion, he has. The Second Circuit has held that restrictions on a prisoner's mail are justified only if they further the substantial governmental interests of security, order, and rehabilitation. *Davis,* 320 F.3d at 351 (citation omitted). Moreover, "courts have consistently afforded greater protection ... to outgoing mail than to incoming mail." *Id.* (citations omitted). This is because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989).

It may be the case that the confiscation of LeBron's outgoing mail was justified by legitimate governmental interests. However, the defendants have not proffered any reasons for the confiscation, [18] and thus, it would be inappropriate to dismiss LeBron's claim at this time. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (reversing the district court's dismissal of claims relating to interference with plaintiff's outgoing and incoming mail, and noting that even two instances of mail interference may be sufficient to suggest a continuing activity); *Knight v. Keane,* 247 F.Supp.2d 379, 384 (S.D.N.Y.2002) (affirming magistrate judge's determination that dismissal was inappropriate where the record evidence was insufficient to establish that inspection of plaintiff's mail was based on good cause). Accordingly, Claim Seven

survives to the extent that it alleges a violation of LeBron's First Amendment right to send mail. [19]

[18]    The defendants' brief in support of their motion to dismiss did not address the First Amendment claim asserted in Claim Seven. *See Dkt. 112, pp. 23-25.*

[19]    In holding that the First Amendment mail claim asserted in Claim Seven survives, the court rejects the defendants' argument that LeBron has failed to exhaust his administrative remedies with respect to Claim Seven. The parties dispute the issue of exhaustion, and the court is not able to resolve this dispute on the basis of the facts before it. Moreover, LeBron has suggested that even if he did not exhaust his administrative remedies, such failure to exhaust may be attributed to inhibitions imposed by the defendants. *See Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) ("Defendants may ... be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures.").

Additionally, the court rejects the defendants' argument that venue for Claim Seven is improper. As defendants correctly note, venue is proper in "a judicial district where any defendant resides ." 28 U.S.C. § 1391(b). In this case, at least one defendant named in Claim Seven resides in the Northern District of New York. *See Dkt. 11 (Acknowledgement of Service as to Anthony Annucci).* The defendants have not argued that Annucci was not personally involved in the First Amendment violations asserted in Claim Seven; indeed, as stated above, the defendants' brief does not address Claim Seven insofar as it asserts a First Amendment claim. Moreover, for the reasons discussed above in connection with Claim Four, the court is unwilling to hold, at this stage of the proceedings, that LeBron's amended complaint does not state a claim with respect to defendants such as Annucci, who are alleged only to have failed to remedy a claimed constitutional violation.

**D. Injunctive Relief**

Judge Homer recommended that LeBron's request for injunctive relief be denied because LeBron has sued the defendants in their individual capacities only. LeBron has objected to this recommendation, arguing that "it is a given that the named defendants are in a position to expunge the disciplinary determinations made against plaintiff." *Dkt. 130, p. 3.* Notwithstanding LeBron's unsupported assertion to the contrary, the court agrees with Judge Homer that the injunctive relief LeBron seeks is unavailable because the defendants have been sued in their individual capacities. *See Ziemba v. Armstrong,* No. 3:02-cv-2216, 2004 WL 1737447, *2 (D.Conn. July 30, 2004) ("Injunctive relief may only be recovered from parties in their official capacities.") (citations omitted). Accordingly, LeBron's claims for injunctive relief are dismissed.

### IV. *Conclusion*

Having considered LeBron's objections and reviewed Judge Homer's findings of fact and conclusions of law, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of all of LeBron's equal protection and Fourth Amendment claims, as well as the due process claims asserted in Claims One, Two, Three, Five, Six, and Seven. The court rejects the Report-Recommendation to the extent that it recommends the complete dismissal of the due process claim asserted in Claim Four. The due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy.

**\*8** As to the First Amendment claims, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of the denial of access to courts claims asserted in Claims Three and Five. Additionally, all First Amendment claims asserted in Claims One, Two, Three, Five, and Six are dismissed. The First Amendment retaliation claim asserted in Claim Four survives as to all defendants except Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment claim of interference with mail asserted in Claim Seven survives as to all defendants.

Finally, the court adopts the Report-Recommendation to the extent that it recommends dismissal of LeBron's requests for injunctive relief.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Homer's September 25, 2006 Report-Recommendation (*Dkt. No. 127* ) is accepted in part and rejected in part; and it is further

**ORDERED** that Claims One, Two, Three, Five, and Six are dismissed in their entirety; and it is further

**ORDERED** that the equal protection claims asserted in Claims Four and Seven are dismissed; and it is further

**ORDERED** that the Fourth Amendment claims asserted in Claims Four and Seven, if any, are dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Seven is dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy, and that such dismissal is *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, LeFevre, and Pasquil, but is *with prejudice* as to all other defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is DENIED as to all defendants *except* that the motion to dismiss

the First Amendment retaliation claim asserted in Claim Four is GRANTED as to defendants Woodroof, Olson, M. LeClaire, and Bushie; and it is further

**ORDERED** that the denial of access to courts claim asserted in Claim Seven is dismissed as to all defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment claim of interference with outgoing mail asserted in Claim Seven is DENIED; and it is further

**ORDERED** that the defendants' motion to dismiss LeBron's claims for injunctive relief is GRANTED; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3254373

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 303713
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Frankie CANCEL and Melvin Owens, Plaintiffs,

v.

Glenn S. GOORD, Commissioner of New York State
Department of Correctional Services, et al. Defendants.

No. 00 CIV 2042 LMM.
|
March 29, 2001.

*MEMORANDUM AND ORDER*

MCKENNA, J.

**\*1** Frankie Cancel and Melvin Owens (collectively "Plaintiffs"), inmates at Fishkill Correctional Facility ("Fishkill"), bring this pro se civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Glenn S. Goord, Commissioner of the New York State Department of Correctional Services ("DOCS"); Anthony Annucci, Deputy Commissioner of DOCS; Jennifer Jones, Staff Attorney at DOCS; William Mazzuca, Fishkill Superintendent; Robert Ercole, Fishkill Deputy Superintendent; Robert Erbert, Fishkill Deputy Superintendent, Administration; Ada Perez, Fishkill Deputy Superintendent, Programs; Stephan Lowry, Fishkill Captain; Lewis Goidel, Fishkill Inmate Grievance Program ("I.G.P.") Supervisor; Christine O'Dell, Fishkill Senior Mail Clerk; Sandie Breen, Fishkill Mail Clerk; and John/Jane Doe[s], unknown Members of the Fishkill Mail Room Staff (collectively "Defendants") for unconstitutionally implementing the inmate grievance program and for deliberately tampering and interfering with their regular and legal mail. The Plaintiffs seek injunctive relief as well as compensatory and punitive damages from each Defendant individually and in their official capacities. The Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below the Defendants' motion is granted in part and denied in part. [1]

[1] Plaintiffs' independently move pursuant to Fed.R.Civ.P. 37(d) for an order compelling defendants to comply with Plaintiffs' interrogatories. As Defendants do not oppose this

motion, and because the court has partially denied Defendants' motion to dismiss, Plaintiffs' motion is granted. Defendants are hereby required to respond to Plaintiffs' interrogatories, except those regarding the Inmate Grievance Program, within sixty days of the date hereof.

Statement of Facts [2]

[2] The facts set forth herein are adduced from a liberal reading of Plaintiffs' complaint. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1998).

On Friday August 28, 1998 Plaintiff Cancel received a piece of legal mail marked as such from the Criminal Term Clerk's Office of the Supreme Court in the State of New York which had been opened outside his presence. (Am.Compl.¶ 22.) The letter had been opened by Defendants O'Dell, Breen, and unknown members of Fishkill mail room staff even though it was clearly marked as privileged legal mail. (*Id.* ¶¶ 22–24.)

On August 31, 1998 Cancel filed a grievance with the Fishkill I.G .P. Supervisor, Defendant Goidel, regarding the August 28 legal mail incident. (*Id.* ¶¶ 25–26.) Goidel failed to process Cancel's grievance. (*Id.*) Subsequently, on October 5, 1998 Cancel filed a second grievance, this time against Goidel for refusing to process Cancel's original grievance. (*Id.* ¶¶ 27–28.) This second grievance was not processed. (*Id.*) On October 19, 1998 Cancel wrote a letter to the I.G.P. Director informing him of Goidel's refusal to process the two grievances. (*Id.*) Subsequently, on November 2, 1998 both grievances were processed (*Id.* ¶ 29) and on November 19, 1998 Cancel received a grievance decision by Defendant O'Dell who wrote that "such mistakes should not occur in the future." (*Id.* ¶ 36.) Despite this statement both Cancel's legal mail and regular mail were continually interfered with. (*Id.* ¶ 37.)

On December 4, 1998 Cancel put together a complaint pursuant to New York State Civil Service Law § 75 seeking a hearing, disciplinary action and the removal of Goidel for his improper actions and unlawful manner of running the I.G.P. [3] (*Id.* ¶ 33.) On December 9, 1998 the complaint was mailed to Defendants Goord and Goidel. (*Id.* ¶¶ 33–35.) The complaint was ignored by both of these Defendants. (*Id.*) On December 14, 1998 Cancel sent a letter with a copy of the complaint to Defendant Annucci who also did not respond. (*Id.* at 35.)

[3] New York Civil Service Law § 75 provides a cause of action for civil service employees unlawfully

removed. Although neither party addressed this claim in their motion papers, the Court notes that § 75 specifically delineates five categories of persons who may maintain a cause of action for removal. Because Cancel does not fall into one of these five categories he has no standing to bring suit under this provision.

**\*2** On June 28, 1999 Cancel filed another grievance stating that both his regular and legal mail were being withheld. (*Id.* ¶ 38.) Subsequent to the filing of this grievance, but on the same day, Cancel received sixteen pieces of regular mail that had been withheld for several weeks by Defendants Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Cancel filed a grievance about this interference with his regular mail recommending there be an investigation; however, his recommendation was denied. (*Id.* ¶ 39.)

On December 21, 1999 Cancel received another piece of legal mail which had not been processed or handled as legal mail because it was opened outside his presence. (*Id.* ¶ 40.) Cancel filed a complaint regarding this incident and attached photocopies of the legal mail that had been opened outside his presence. (*Id.* ¶ 41.)

On April 17, 2000 Cancel notarized two documents for a personal Family Court matter concerning his son, placed the legal documents in an envelope, sealed it, placed stamps on it and placed it in the outgoing mail addressed to "the other party in the matter." (*Id.* ¶ 49.) The envelope was intercepted, opened and photocopied by Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff and the photocopies were placed in Cancel's file. (*Id.* ¶¶ 49–51.) On July 12, 2000 Cancel met with a member of the Parole board who had Cancel's file which contained a memo from Mazzuca with the Family Court documents attached. (*Id.* ¶ 51.) Defendants continue to withhold Cancel's legal and regular mail. (*Id.*)

On November 5, 1999 Plaintiff Owens picked up a piece of legal mail that had been opened and photocopied outside his presence and had been withheld for about a week. (*Id.* ¶ 45.) As a result, Owens was unable to "research and file a timely Criminal motion for which he received an adverse decision." (*Id.*) The Defendants responsible for withholding this piece of legal mail were Mazzuca, Ercole, Erbert, Perez, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Owens filed a grievance for the opening and

photocopying of his legal mail denying him access to the courts, but it was denied. (*Id.* ¶ 47.)

Legal Standard

On a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept as true all well pleaded factual allegations set forth in the complaint and must draw all positive inferences in favor of the pleader. *Hudson v. Greiner,* No. 99 Civ. 12339, 2000 U.S. Dist. LEXIS 17913, at \*4 (S.D.N.Y. Dec. 12, 2000). A case should only be dismissed when "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). A plaintiff must do more than plead mere "conclusory allegations or legal conclusions masquerading as factual conclusions" to survive a motion to dismiss. *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000).

**\*3** Furthermore, since the Plaintiffs are proceeding pro se their submissions should be judged on a more lenient standard than that accorded to formal pleadings drafted by lawyers. *McNeil v. United States,* 508 U.S. 106, 113 (1993). The court must make some reasonable allowances so that a pro se plaintiff does not forfeit his rights by virtue of a lack of legal training. *Hudson,* 2000 U .S. Dist. LEXIS 17913, at \*3. However, proceeding pro se does not altogether relieve a plaintiff from the usual pleading requirements. *Id.* at \*4.

Plaintiffs' Civil Rights Claims

A plaintiff has a civil cause of action under § 1983 against:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action

Cancel v. Goord, Not Reported in F.Supp.2d (2001)

2001 WL 303713

at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983.

Plaintiffs bring this action under § 1983 alleging that Defendants violated their rights under the First, Fourth, Sixth and Fourteenth Amendments by unconstitutionally implementing the inmate grievance programs and by deliberately tampering and interfering with their regular and legal mail thereby denying them access to the courts and impinging on their rights to free speech.

Discussion

1. Denial of Access to Grievances and the Unlawful Operation of the Inmate Grievance Program

The amended complaint alleges that Defendant Goidel failed to process Cancel's grievance complaints and that the improper and unlawful running of the I.G.P. violated Cancel's First Amendment right to petition the government for redress and right of access to the courts. (Am.Compl.¶ 52.) Cancel also claims that Defendants Goord, Annucci, Mazzuca, Ercole, Perez, Erbert and Lowry failed to take action to "curb the unlawful practices of Defendant Goidel" even though they were aware that his unlawful conduct proximately caused the above constitutional violation. (*Id.* ¶ 53.)

While there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, *e.g* ., *Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741 (1983) (finding that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"), inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983. *Justice v. Coughlin, III,* No. 94–CV–1287, 1996 U.S. Dist. LEXIS 15341, at \*11 (N.D.N.Y. July 1, 1996). When an inmate sets forth a constitutional claim in a grievance to prison officials and the grievance is ignored, the inmate has the right to directly petition the government for redress of that claim. *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983. *Id.*

**\*4** Thus, Cancel's claim that the Defendants violated his First Amendment right of access to the courts and right to petition the government for redress by failing to process his grievances lacks merit and is dismissed with prejudice.

Cancel also claims that Goidel's failure to process his grievances and his unlawful and unfair running of the inmate grievance program violates New York State Correction Law § 139 which sets forth prison grievance procedures. (Am.Compl.¶ 52.) First, the failure to process a grievance in a timely manner only entitles an inmate to review at the next appeal level in the grievance process. *See Cliff v. Goodman,* 710 N.Y.S.2d 718 (App.Div.2000) (citing 7 NYCRR § 701.8 (2001)). Second, under New York law a claim generally challenging the constitutionality of the inmate grievance program does not constitute an actual controversy reviewable in an Article 78 proceeding or otherwise. *Matter of Hall v. State of N.Y. Dept. of Corr.,* 453 N.Y.S.2d 58 (App.Div.1992). When Cancel's grievances were ignored by Goidel, Cancel sought review at the next level and his grievances were subsequently processed. Further, Cancel's general dissatisfaction with the inmate grievance program does not constitute an actual controversy reviewable by the Court. *Id.* Therefore, Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

2. Denial of Access to the Courts as a Result of Legal Mail Tampering

Prisoners have a First Amendment right of access to the courts, and where there is a deliberate and malicious interference with that right they may seek redress from the court. *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). To state a valid § 1983 claim for denial of access to the courts due to interference with an inmate's legal mail, an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action. *Lewis v. Casey,* 518 U.S. 343, 349 (1996). Therefore, in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim. *Id.* at 351. In other words "the plaintiff must show that a 'non-frivolous legal claim had been frustrated or was being impeded' due to the actions of prison officials." *Warburton v. Underwood,* 2 F. Supp .2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis,* 518 U.S. at 353); *see also Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997).

Plaintiff Cancel does not state a cognizable § 1983 claim for denial of access to the courts because he has not alleged any actual injury resulting from Defendants' actions. Cancel alleges three instances where his legal mail was handled inappropriately. [4] Cancel must show that because Defendants opened his outgoing and incoming legal mail he was prejudiced in a legal action he sought to pursue. Because Cancel has not alleged such an injury, his claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations, if true, that (1) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (2) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail. [5]

[4]     Liberally construing Plaintiffs' complaint, the Court assumes that the Family Court documents Cancel mailed on April 17, 2000 were in an envelope addressed to a person or entity that would clearly identify the letter as legal mail or that the envelope was marked as "legal mail." Plaintiff only alleges that he sent these Family Court documents to "the other party in the matter" (Am.Compl.¶ 49) and the Court assumes for the purpose of this motion only that the envelope in question was clearly identified as legal mail.

[5]     "[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir.1999) (quoting Branum v. Clark, 927 F.2d 698, 705 (2d Cir.1991)).

*5 As to Plaintiff Owens' claim with respect to legal mail, the amended complaint alleges that because Owens' mail was opened and withheld for about a week he was "unable to research and file a timely response to a Criminal motion for which he received an adverse decision." (Am.Compl.¶ 45.) A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation. Jermosen v. Coughlin, 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing Jones v. Smith, 784 F.2d 149, 151–52 (2d Cir.1986)). However, if Owens' adverse judgment to his otherwise meritorious Criminal motion was the result of the named Defendants' opening and withholding of his legal mail then he has stated a claim under § 1983 for denial of

access to the courts. For purposes of this motion, the Court accepts all allegations as true and draws all positive inferences in favor of Plaintiff. See Hudson, 2000 U.S. Dist LEXIS 17913, at *3. Therefore, Defendants' motion is denied as to Plaintiff Owens' claim under the First Amendment for denial of access to the courts.

3. Violation of the First Amendment Right to Free Speech for Interference with Cancel's Mail

Cancel alleges that Defendants' continuous actions of opening and reading his incoming legal mail, the temporary withholding of his regular mail and the opening and photocopying of his outgoing legal mail impinges on his constitutional right to free speech. (Am.Compl.¶¶ 54, 60, 63.) Inmates unquestionably have a First Amendment right of free speech to send and receive mail, Wolfish v. Levi, 573 F.2d 118, 130 (2d Cir.1978), rev'd in part on other grounds sub nom., Bell v. Wolfish, 441 U.S. 520 (1979), and a prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the "right to be free from unjustified governmental interference with communication." Brewer v. Wilkinson, 3 F.3d 816, 820 (5th Cir.1993).

The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise. However, when analyzing such claims courts have consistently made distinctions between outgoing and incoming mail and legal and non-legal mail based on the various rights and interests at stake. See Taylor v. Sterrett, 532 F.2d 462, 475 (5th Cir.1976) (holding that the governmental interest in monitoring incoming mail is more substantial than its interest regarding outgoing mail); see also Lewis, 518 U.S. at 353 (holding that prison regulations or practices that affect a prisoner's legal mail are of particular concern because of the potential for interference with a prisoner's right of access to the courts).

With respect to the first distinction, the Supreme Court has recognized that "the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." Thornburgh v. Abbott, 490 U.S. 401, 413 (1989). Therefore, the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail. Davidson v. Scully, 694 F.2d 50, 53 (2d Cir.1982).

**\*6** As to the second distinction, many courts have held that a prisoner's legal mail is entitled to a higher degree of protection than his regular mail. *See Morgan v. Montanye,* 516 F.2d 1367, 1368 (2d Cir.1975) (holding that although prison officials can inspect an inmate's general correspondence, different procedures apply to an inmate's legal mail which should be treated as confidential material); *see also Taylor,* 532 F.2d at 475. Therefore, prison polices or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Washington,* 782 F.2d at 1139 (citing New York State Department of Corrections Directive 4421).

A. Incoming Mail

1. Withholding of Incoming Non–Legal Mail

Cancel alleges that Defendants withheld his incoming non-legal mail and relies on a single instance when he received sixteen pieces of regular mail on the same day he filed a grievance about the opening of his legal mail. (Am.Compl.¶ 38.) These sixteen pieces of regular mail had been withheld for several weeks. (*Id.*) Prison regulations or practices affecting a prisoner's receipt of non-legal mail must be "reasonably related to legitimate penological interests," *Abbott,* 490 U.S. at 409 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)), and "prison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986). However, this general security interest will not justify a regular pattern and practice of such interference absent other prison concerns with regards to a particular inmate. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999).

This Court agrees with the reasoning of the Seventh Circuit in *Rowe* that in order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern. *Id.* Because Cancel only alleges that prison officials withheld his regular mail on one occasion, rather than showing a pattern and practice of such behavior, his First Amendment free speech claim for the withholding of his regular incoming mail is dismissed with leave to amend the complaint to include specific allegations, if true, establishing such a pattern and practice.

2. Opening and Withholding of Incoming Legal Mail

Cancel alleges two occasions upon which the Defendants opened his incoming legal mail outside his presence. (Am.Compl.¶¶ 22, 40.) Although legal mail is "privileged" and is afforded a higher degree of protection, there still must be a showing that prison officials regularly and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident. *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

**\*7** In *Washington,* the Second Circuit held that more than one incident of interference with legal mail could give rise to a constitutional claim if it indicated ongoing activity. 782 F.2d at 1139; *see also Bieregu v. Berman,* 59 F.3d 1445, 1452 (3d Cir.1995) (finding that an allegation that prison officials had opened an inmate's incoming legal mail on fifteen occasions was sufficient to show a pattern and practice of deliberate interference). However, in the present case Plaintiff proffers only two instances of opening incoming legal mail with no indication that such practices are ongoing. Without alleging additional facts to establish a pattern and practice that rises to the level of constitutionally impermissible censorship, Plaintiff's complaint is deficient. Therefore, Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint to include specific allegations, if true, that establish the requisite pattern and practice of interference. [6]

[6]     Plaintiffs' also allege that in October 1999 Defendant Lowery ordered mail sent to any inmate by the Legal Aid Society regarding contemplated litigation against the New York State Parole Board to be confiscated if seen. (Am.Compl.¶ 42.) In addition, Defendant Ercole also instructed the Fishkill mail room staff to confiscate all mail envelopes larger than regular size, to transfer the contents to a facility envelope and then forward it to the inmate to whom it is addressed. (*Id.* ¶ 43.) Plaintiffs make these allegations in their complaint without stating that they personally were to receive this letter from the Legal Aid Society or that Ercole's policy affected their mail in any way. Because there is no allegation that Plaintiffs' mail was affected by either policy they have no standing to bring a suit for these allegations and they are not addressed by the Court. Plaintiffs' are given leave to amend the complaint to allege, if that be the case,

that these policies affected their personal legal mail. If such allegations are made they will be considered in establishing a pattern and practice of interference with legal mail.

**B. Outgoing Legal Mail**

Cancel's claim that prison officials interfered with his outgoing legal mail poses a different question. As previously stated, the Supreme Court has explicitly recognized that there are "differing penological concerns with respect to outgoing and incoming mail." *Brewer v. Wilkinson,* 3 F.3d 816, 825 (5th Cir.1993) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a "rational justification" for doing so. *Davidson,* 694 F.2d at 54 (citing *Wolfish,* 573 F.2d at 130.). The Fifth Circuit has applied the same standard to an instance where an inmate's outgoing legal mail was opened and censored without a "legitimate penological interest" and found the practice to violate the inmate's First Amendment right to free speech. *Brewer,* 3 F.3d at 825.

In the present case, Defendants have failed to state any rational justification for opening and photocopying Cancel's outgoing legal mail. Because interference with outgoing legal mail cannot be based on a general prison security interest, Defendants must provide additional justification for their actions. Therefore, because Defendants have interfered with Cancel's outgoing legal mail without providing any legitimate penological interest, Cancel has stated a valid claim under the First Amendment right to free speech.[7] Defendants' motion to dismiss Cancel's claim for violation of his First Amendment right to free speech is denied with respect to his outgoing legal mail.

[7]     As originally stated in footnote 4, the Court again presumes that the Family Court documents were placed in an envelope marked or addressed in such a way that it could be identified as legal mail. If in fact this document was not privileged legal mail, this First Amendment free speech claim may require a different analysis.

**4. Money Damages Barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act**

Defendants argue that the money damages Plaintiffs seek are barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act because the complaint does not allege any

physical injury. (Defs.' Mem. at 8–9.) Section 1997e(e) states, "[n]o federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in the custody without a prior showing of physical injury." *Id.*

**\*8** The plain language of the statute does not prohibit a plaintiff's First Amendment claim. Section 1997e(e) specifically prohibits federal civil action[s] for mental or emotional injury without a showing of physical injury. In this case Plaintiffs do not allege any claim of mental or emotional distress for which they are seeking redress. Furthermore, the few courts that have addressed this issue have held that:

> the deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment claims regardless of the form of relief sought.

*Reynolds v. Goord,* No. 98 Civ. 6722, 2000 U.S. Dist LEXIS 2140, at *23 (S.D.N.Y. Mar. 1, 2000) (quoting *Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir.1998)). Therefore, § 1997e(e) is not applicable to the present case and does not bar Plaintiffs from seeking recovery for First Amendment claims of denial of access to the courts and violation of free speech.

**5. Lack of Personal Involvement of Defendants**

The personal involvement of defendants in an alleged constitutional violation is a prerequisite under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A plaintiff must allege that each defendant was directly and personally responsible for the purported conduct and establish fault and causation on the part of each defendant. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883 (2d Cir.1987).

Defendants move to dismiss all claims against Defendants Goord, Annucci, Jones, Mazzuca, Ercole, Perez and Erbert for lack of personal involvement. Plaintiffs' amended complaint as to Owens' legal mail claim alleges that Defendants Mazzuca, Ercole, Perez, and Erbert were personally involved in the opening and withholding of his legal mail. Additionally, Mazzuca is implicated in Cancel's claim for violating his First

Amendment right to free speech. Accepting these allegations as true, the Defendants' motion to dismiss for lack of personal involvement against Mazzuca, Ercole, Perez, and Erbert is denied.

As to Defendants Goord, Annucci and Jones, in a § 1983 action supervisors cannot be held liable under the theory of respondeat superior for the acts of their subordinates. *Id.* at *7. A supervisor can only be found to be personally involved if there is evidence that there was: (1) direct participation in the alleged constitutional violation, (2) failure to remedy a wrong after learning of it, (3) creation or maintenance of a policy under which unconstitutional violations occurred, (4) gross negligence in managing subordinates who committed the unconstitutional acts, or (5) deliberate indifference by failing to act on information indicating that constitutional violations were occurring. *Id.; see also Colon,* 58 F.3d at 873. Allegations that a supervisor ignored an inmate's grievance letter of protest and request for an investigation is insufficient to find that a supervisor is personally involved in the alleged constitutional violations. *Kinch v. Artuz,* No. 97 Civ. 2419, 1997 U.S. Dist. LEXIS 13998, at *8 (S.D.N.Y. Sept. 15, 1997).

**\*9** Plaintiffs' amended complaint contains no allegations relating to the personal involvement of Defendants Goord, Annucci and Jones either through direct participation, maintenance of a policy or deliberate disregard for Plaintiffs' rights. Plaintiffs' sole claim against these three Defendants is that they were sent grievances and complaints by Cancel which were ignored. Plaintiffs' claims as to these three Defendants are dismissed with prejudice.

Conclusion

For the above stated reasons the Defendants' motion is granted in part and denied in part as follows:

(1) Cancel's claims against Goidel under the First Amendment right to petition the government for redress and right of access to the courts for failure to process grievances and for the unlawful running of the I.G.P. are dismissed with prejudice.

(2) Cancel's claims against Defendants Goord, Annucci, Mazzuza, Ercole, Perez, Erbert and Lowry for failure to curb the unlawful practices of Goidel in his unlawful running of the I.G.P. are dismissed with prejudice.

(3) Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

(4) Cancel's claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations that (a) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (b) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail.

(5) Defendants' motion is denied as to Owens' claim under the First Amendment for denial of access to the courts against Mazzuca, Ercole, Perez, Erbert, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(6) Cancel's claim under the First Amendment right to free speech for the withholding of his regular incoming mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference.

(7) Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference with Cancel's incoming legal mail.

(8) Defendants' motion is denied as to Cancel's claim under the First Amendment for a violation of free speech for interference with his outgoing legal mail against Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(9) Defendants' motion to dismiss the claims against Mazzuca, Ercole, Perez, and Erbert for lack of personal involvement is denied.

(10) Defendants' motion to dismiss the claims against Goord, Annucci and Jones for lack of personal involvement is granted with prejudice.

(11) The Court also considered Plaintiffs' claim that Defendants' actions violated Article 14 and 17 of the International Covenant on Civil and Political Rights ("ICCPR"). (Am.Compl.¶ 54, 55, 58, 60.) However, courts have uniformly held that the ICCPR is not self-executing and does not give rise to a private right of action. *See Beazley v. Johnson,* No. 99–41383, 2001 WL 118393, at *18– *19 (5th

2001 WL 303713

Cir.2001) (citing additional cases). Therefore, the Court sua
sponte dismisses Plaintiffs' claims under the ICCPR.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 303713

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

2019 WL 2053829
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark DUBLINO, Plaintiff,

v.

Timothy MCCARTHY et al., Defendants.

9:19-CV-0381 (GLS/DJS)
|
Signed 05/09/2019

**Attorneys and Law Firms**

MARK DUBLINO, 18-B-0793, Plaintiff, pro se, Auburn Correctional Facility, P.O. Box 618, Auburn, NY 13021.

**DECISION and ORDER**

Gary L. Sharpe, U.S. District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a pro se civil rights complaint filed by plaintiff Mark Dublino pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an application to proceed in forma pauperis (IFP) and motion for a preliminary injunction. Dkt. No. 1 ("Compl."); Dkt. No. 2 ("IFP Application"); Dkt. No. 3 ("Preliminary Injunction Motion"). [1] Plaintiff is incarcerated at Auburn Correctional Facility and has not paid the filing fee for this action.

[1]    Following plaintiff's submission of his complaint and IFP Application, the action was administratively closed based on plaintiff's failure to submit the Inmate Authorization Form required in this District. Dkt. No. 5. Plaintiff then properly filed the Inmate Authorization Form required in this District, and this action was re-opened. Dkt. Nos. 9, 10.

**II. IFP APPLICATION**

Upon review, the Court finds that plaintiff has submitted a completed and signed IFP Application, (Dkt. No. 2), which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization form required in this District. Dkt. No. 9. Accordingly, plaintiff's IFP Application is granted.

**III. SUFFICIENCY OF THE COMPLAINT**

**A. Governing Legal Standard**

Section 1915(e) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [2] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in forma pauperis. *See id.*

[2]    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 128 of 212

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotation marks and alterations omitted).

### B. Overview of Plaintiff's Complaint and Supplemental Submissions

**\*2** Plaintiff's complaint is comprised of a cover page and attachment that identifies the defendants in this action. *See generally* Compl. The complaint does not contain a statement of claims or a request for relief. *Id.* However, attached as an exhibit to plaintiff's Preliminary Injunction Motion is a typed set of "claims," with supporting documentary evidence. *See* Dkt. No. 3-4 ("Claims and Supporting Documents"). These "claims" include factual allegations of wrongdoing against the individuals named in the complaint as defendants, as well as requests for relief. *Id.* The Court therefore construes the "claims" to be part of the complaint.

In addition, less than four weeks after plaintiff signed his complaint, he submitted a two-page "affidavit" with the following notation at the top of each page: "Attach to Claim #6." Dkt. No. 11 ("Supplement to Complaint"). [3]

[3]    Roughly one week after this action was opened, and two weeks before the Supplement to Complaint was filed, plaintiff submitted a cover letter to which he attached an affidavit and additional documentary evidence. Dkt. No. 6. Because plaintiff indicates in his cover letter that the affidavit and additional documentary evidence are offered in further support of his claims and request

for injunctive relief, and does not ask the Court to attach these documents to his complaint, the Court does not consider this submission as an attempt to supplement the complaint with new claims arising out of events that allegedly occurred after the complaint was signed.

Supplemental pleadings are governed by Rule 15(d) of the Federal Rules of Civil Procedure, which permits the Court, "on motion," to allow the filing of a supplemental pleading "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). "[T]he purpose of a supplemental complaint is to allow the inclusion of new defendants and new claims arising since the date of the original pleading, if the new claims are 'adequately related to the original claims.' " *Smith v. Goord*, No. 04-CV-6432, 2006 WL 2850597, at \*1 (W.D.N.Y. Sept. 22, 2006).

The Local Rules of Practice for this District require that any proposed supplemental pleading contain paragraphs that are numbered "consecutively to the paragraphs contained in the pleading that it seeks to supplement." N.D.N.Y. L.R. 7.1(a)(4). Although plaintiff has not filed a motion to supplement, and his proposed supplemental pleading does not include numbered paragraphs, the Court will overlook these procedural defects and accept the supplemental submission in light of plaintiff's pro se status and the early stage of this action.

Accordingly, and for the sake of clarity, the Clerk is directed to file as part of the complaint (1) a copy of the Claims and Supporting Documents, (Dkt. No. 3-4), immediately following the signature page of the complaint, and (2) a copy of the Supplement to Complaint, (Dkt. No. 11), immediately following the Claims and Supporting Documents insert. References in this Decision and Order will be made to the complaint as supplemented. [4]

[4]    As discussed more fully below, liberally construed, the Supplement to Complaint asserts wrongdoing against the Hearing Officer, "Babin," who presided over plaintiff's disciplinary hearing that began on March 26, 2019. The Clerk is therefore directed to amend the docket to add Hearing Officer Babin, Auburn Correctional Facility, as a defendant.

In the future, plaintiff is advised that piecemeal submissions will not be considered or combined with other filings. Plaintiff is further advised that, to the extent he sought for the Court

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

to consider one or more of his other filings as part of his complaint, he must file a complete pleading by way of a single document in the form required by Local Rule 10.1, which will be treated as an amended complaint that supersedes the original pleading as supplemented.

**C. Summary of the Complaint as Supplemented**

**\*3** In his complaint, plaintiff asserts claims arising out of his confinement at Auburn Correctional Facility ("Auburn C.F.") and Wende Correctional Facility ("Wende C.F."). *See generally* Compl. The following facts are set forth as alleged by plaintiff in his complaint.

On September 18, 2018, while plaintiff was at Auburn C.F. "receiving notary services on many legal documents from [defendant] librarian Brenda Walsh[,]" defendant Corrections Officer Grady and defendant Corrections Officer Kirkwood entered the library and issued plaintiff a "disciplinary report regarding being out of place." Compl. at 22. Plaintiff explained that defendant Corrections Officer Wheeler "gave [him] permission to receive notary service from the law library[,]" but he was nonetheless placed in keeplock as a result of the charge. *Id.*

On September 25, 2018, Corrections Lieutenant Abate (not a party) found plaintiff not guilty on three of the five charges and removed him from keeplock status. Compl. at 22. As a result of the charges, plaintiff was denied access to "assistance [and] library materials" for eight days. *Id.*

On October 5, 2018, plaintiff was advised by defendant Corrections Officer Vendetti at 1:15 P.M. that he had an attorney visit. Compl. at 6. At 1:35 P.M., plaintiff met with his attorney who was handling his direct appeal. *Id.* Because the private attorney rooms remained under construction due to "contractor issue[s,]" plaintiff's meeting took place in the "common area with other visitors and inmates along with Corrections Officers." *Id.*

During the meeting, plaintiff's attorney advised plaintiff that he had been waiting to meet plaintiff for "at least two hours," and was told that the wait was because plaintiff was showering. Compl. at 6. Plaintiff asked the desk visiting room officer (not a party) why he was not notified earlier of his attorney's arrival, and the officer responded that defendant Vendetti told him that plaintiff was showering. *Id.*

Plaintiff's meeting with his attorney was "awkward and uncomfortable[,]" and ended prematurely at 3:00 P.M.,

when all daily visits conclude. Compl. at 6. Plaintiff filed a grievance regarding the inadequacies surrounding his meeting, and learned through the grievance process that "the first call" to notify plaintiff of his visitor occurred at 12:50 P.M. *Id.* The Inmate Grievance Review Committee (IGRC) granted plaintiff's grievance to the extent that the IGRC agreed that "visits should be called in a just and timely manner." *Id.* Plaintiff "agreed with the response and appealed to the Superintendent[,]" defendant McCarthy, who "upheld the findings" and granted the appeal to that extent. *Id.*

On October 20, 2018, while plaintiff was incarcerated at Wende C.F. for a court appearance, "[t]he visiting room reception officers" denied plaintiff a visit with his attorney. Compl. at 9. Plaintiff's visit was "scheduled as follow up from the shortened visit [he] had [with his attorney] on October 5, 2018[.]" *Id.*

On October 30, 2018, while plaintiff was incarcerated at Auburn C.F., defendant Vendetti prevented him from attending law library services by not opening his cell during "automatic law library callout." Compl. at 22.

On December 7, 2018, plaintiff's attorney traveled to Auburn C.F. for "a confirmed attorney visit[.]" Compl. at 9. Prior to this date, plaintiff's counsel had contacted defendant Liaison Officer Anthony Smith and defendant Liaison Associate Officer Leanne Callahan to obtain approval for this visit. *Id.* at 9, 11. When the attorney arrived at Auburn C.F., he was incorrectly advised that plaintiff was "on a court transfer" and at Wende C.F. *Id.* at 9. Although plaintiff was being housed at Wende C.F., he was moved there on November 28, 2018, following his placement in keeplock at Auburn C.F. the previous day. *Id.*

**\*4** On December 22, 2018, plaintiff "inquired about possible missing mail" to defendant Corrections Sergeant Sheftic and defendant Steward Vanni. Compl. at 17. Plaintiff did not receive a response to his inquiries. *Id.*

On December 28, 2018, when plaintiff was back at Auburn C.F., defendant Walsh refused plaintiff's request to notarize certain documents after reading the contents of those documents. Compl. at 24.

On December 31, 2018, at approximately 4:00 P.M., the water feed to plaintiff's toilet was shut off. Compl. at 24. Later that day, defendant Corrections Officer Remington conducted a random search of plaintiff's cell. *Id.* During the search,

**Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)**

2019 WL 2053829

defendant Remington indicated on a cell search checklist that plaintiff's toilet was working even though it was not. *Id.*

The next day, defendant Corrections Officer Penello threatened plaintiff that his toilet would not be fixed if he asked about it again. Compl. at 24. On or about January 3, 2019, plaintiff was transferred to Wende C.F. *Id.*

On January 16, 2019, plaintiff again raised a concern about missing mail to defendant Sheftic, as well as defendant Deputy of Programs Shanke. Compl. at 17. On January 30, 2019, plaintiff also complained to defendant Corrections Sergeant Carhardt about possible missing mail. *Id.* Plaintiff did not receive an "answer or resolution" from any of these officials. *Id.*

On February 4, 2019, plaintiff received sixteen legal parcels from "multiple legal sources." Compl. at 17. Defendant Corrections Officer Powell brought the parcels to plaintiff at his cell. *Id.* The dates on the parcels "covered a time period" of November 29, 2018 through January 31, 2019. *Id.*

On February 22, 2019, plaintiff "was expecting [a] scheduled attorney visit around noon." Compl. at 12. As plaintiff was returning from lunch, he overheard a "company officer" state that "company 13 cell 24 has a visit." *Id.* The referenced cell belonged to plaintiff. *Id.*

"A few minutes later[, the] company officer opened cell 34." Compl. at 12. The inmate confined to that cell stated that he did not have a visit scheduled. *Id.* The A-man for Block C, defendant Corrections Officer Simmons, then "confirmed the visit was for an attorney for 13 company cell 34." *Id.* The inmate confined to that cell refused the visit, and plaintiff's cell was never opened. *Id.* As a result, plaintiff "missed the opportunity to visit with [his] attorney." *Id.*

The next day, plaintiff spoke with defendant Simmons. Compl. at 12. She "checked her board" from the previous day and acknowledged that she made a mistake. *Id.* However, on the same day that plaintiff was denied his attorney visit, his attorneys successfully met with another inmate at Auburn C.F. "without incident." *Id.*

In addition to submitting a grievance regarding this incident, plaintiff wrote to Corrections Sergeant Sirvent (not a party). Compl. at 12. On March 1, 2019, after meeting with plaintiff to discuss the incident, Sergeant Sirvent arranged for plaintiff to have a private telephone call with his attorney in the

Media Center. *Id.* Plaintiff declined the arrangement because "a phone call[,] although appreciated[,] isn't a visit." *Id.*

On March 3, 2019, plaintiff "received an erroneous disciplinary inmate misbehavior report" authored by defendant Corrections Officer Pickett, charging him with a disciplinary violation after officials were unable to locate a razor during a random search of plaintiff's cell. Compl. at 27. Although plaintiff produced the razor for defendant Corrections Officer Nowak, he was placed in keeplock the next day. *Id.*

**\*5** On March 6, 2019, plaintiff spoke with defendant Nowak about the misbehavior report. Compl. at 27. Defendant Nowak acknowledged seeing the razor and indicated that he would be a witness for plaintiff at his disciplinary hearing. *Id.*

The next morning, plaintiff received "another erroneous disciplinary misbehavior report[,]" which was authored by defendant Nowak. Compl. at 27. The misbehavior report charged plaintiff with "not following a direct order and interference during ... count." *Id.*

On March 8, 2019 and March 12, 2019, disciplinary hearings were conducted by different Corrections Lieutenants regarding the misbehavior reports. Compl. at 27. Plaintiff "was exonerated and found not guilty of all allegations" and removed from keeplock. *Id.* However, as a result of plaintiff's keeplock confinement, he "lost the time to work on [his] legal issues using the law library for research." *Id.*

On or about March 20, 2019, plaintiff was charged with violating multiple prison rules. Compl. at 28-29. As a result of the charges, plaintiff was afforded a Tier III disciplinary hearing, which began on March 26, 2019. *Id.* at 28. Defendant Babin presided over plaintiff's hearing, which was conducted without plaintiff having access to an employee assistant. *Id.*

After plaintiff identified fourteen witnesses and "provided an actual innocence statement," defendant Babin closed the hearing to investigate. Compl. at 28. During the adjournment, plaintiff was confined in the Special Housing Unit (SHU). *Id.*

The hearing was resumed on April 4, 2019, during which time defendant Babin indicated that he was unable to contact any of the witnesses plaintiff identified. Compl. at 28. Plaintiff then provided the names of five more staff officers as potential witnesses, and "stressed the need of providing the names of the other ... three officers who were involved with the alleged

incident." *Id.* Defendant Babin again adjourned the hearing. *Id.*

On April 11, 2019, plaintiff's hearing was resumed. Compl. at 28. Defendant Babin stated that he interviewed one corrections official, one nurse, and one inmate regarding the incident giving rise to the charges against plaintiff. *Id.* Plaintiff was not given an opportunity to provide defendant Babin with questions for these witnesses, and "no recorded testimony or written responses" from these witnesses was introduced. *Id.* The inmate who was questioned also "confirm[ed] the alleged incident was not committed by [plaintiff]." *Id.* at 29.

Defendant Babin found plaintiff guilty of several of the charges and sentenced him to thirty days of SHU confinement, without giving plaintiff credit for the twenty-three days of SHU confinement he had served since the charges were brought against him. Compl. at 29. Defendant Babin also imposed a loss of one month of "good behavior" time. *Id.*

In addition to the aforementioned events, between August 2018 and March 2019, plaintiff was also denied access to the law library, legal assistance, notary services, and legal documents by various corrections officials at Auburn C.F. and Wende C.F., lost an attorney, and experienced problems with accessing a properly working computer and typewriter. Compl. at 20, 22-27. With respect to these deprivations that occurred as Auburn C.F., plaintiff names Auburn C.F., as well the following individuals, as defendants: Corrections Counselor Jones; Law Library Supervisor Michael C. Polcovich; Corrections Officer Vullwhite; Corrections Officer Knapp; Corrections Officer Vanderwerff; Corrections Officer "D"; Corrections Officer Milnane; Corrections Sergeant Carhart; Corrections Captain Norris; Deputy of Security Corey; Deputy Superintendent Schenk; and the Commissioner of the Commission of Correction Thomas J. Loughren.[5]

[5]    As noted below in Section III.D, plaintiff's claims arising out of his confinement at Wende C.F. are transferred to the Western District of New York.

**\*6** Construed liberally, plaintiff asserts the following claims with respect to alleged wrongdoing that occurred during his incarceration at Auburn C.F.: (1) First Amendment access-to-courts claims based on the alleged denials of access to the law library, legal assistance, legal property,

typewriter and computer services, and counsel; (2) a First Amendment free-flow-of-mail claim; (3) a First Amendment claim for denial of access to notary services; (4) a First Amendment retaliation claim; (5) First and Sixth Amendment interference with access-to-counsel claims; (6) Fourteenth Amendment due process claims based on the alleged issuance of false misbehavior reports and imposition of disciplinary penalties; (7) an Eighth Amendment conditions-of-confinement claim; and (8) a claim for violations of New York State Department of Corrections and Community Supervision (DOCCS) directives.[6]

[6]    Plaintiff also asserts a Fourteenth Amendment substantive due process claim. *See* Compl. at 20. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ... but not against government action that is 'incorrect or ill-advised' " *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)). The Court does not construe the complaint to assert such a claim.

Plaintiff has sued the named defendants in their individual and official capacities, and seeks both monetary and injunctive relief. Compl. at 2, 6, 9, 12, 17, 20. For a complete statement of plaintiff's claims, reference is made to the complaint.

**D. Severance and Transfer of Claims Arising Out of Wende C.F.**

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately. Fed. R. Civ. P. 21. In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3)

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). "A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." *Cain v. New York State Bd. of Elections*, 630 F. Supp. 221, 225-26 (E.D.N.Y. 1986). "A decision to sever lies within the discretion of the Court." *Id.* at 225.

Here, plaintiff's claims arising out of his confinement at Wende C.F. are more appropriately heard in the Western District of New York, where that facility is located. The allegations pertaining to Wende C.F. involve different defendants than the allegations pertaining to Auburn C.F., and, although plaintiff may assert similar legal theories in support of some of his claims arising out of both locations, the witnesses and documentary proof will be distinct. In addition, the Court is sensitive to the burden, upon both the individuals and the taxpayers of New York, of requiring individuals who are employed and most likely reside in the Western District to travel to the Northern District to defend against allegations that occurred in the Western District.

**\*7** For the foregoing reasons, plaintiff's claims arising out of wrongdoing that allegedly occurred at Wende C.F. (and the named defendants against whom those claims are asserted) are severed from this complaint and venue of those claims (and defendants) is transferred to the Western District in the interests of justice and judicial efficiency. The Court makes no ruling as to the sufficiency of the claims asserted against the named defendants from Wende C.F., thereby leaving that determination to the Western District of New York.

**E. Analysis of Claims Arising Out Auburn C.F.**
Plaintiff asserts claims pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

**1. Eleventh Amendment Immunity**

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. New York*, No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996).

State immunity extends not only to the states, but also to state agencies. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *McGinty v. New York,* 251 F.3d 84, 95 (2d Cir. 2001) ("The Eleventh Amendment extends immunity not only to a state, but also to entities considered 'arms of the state.' "); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999) ("An official arm of the state enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself."). Thus, plaintiff's claims against Auburn C.F. fail because it is a "branch" of the New York State Department of Corrections and Community Supervision, and is therefore absolutely immune from this lawsuit. *Will v. Michigan Dep't of Police,*

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 133 of 212

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

491 U.S. 58, 71 (1989); *Rivera v. Goord*, 119 F. Supp. 2d 327, 336 (S.D.N.Y. 2000) (defendant correctional facility immune from suit since it is a branch of a state agency, the Department of Corrections); *Simmons v. Gowanda Corr. Facility*, No. 13-CV-0647, 2013 WL 3340646, at *1 (W.D.N.Y. July 1, 2013) ("[T]he New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself."); *Millhouse v. New York State Dep't of Corr. Servs.*, No. 9:09-CV-1297 (LEK/RFT), 2009 WL 10675929, at *3 (N.D.N.Y. Dec. 31, 2009) ("[A] state correctional facility, which has no separate legal existence, is generally referred to as a "branch" of DOCS and, as such, is immune from § 1983 liability.").

 **\*8**  Similarly, plaintiff's claims for money damages against the named defendants in their official capacities fails because the Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.")

Accordingly, to the extent that plaintiff seeks any relief against Auburn C.F., or monetary damages under Section 1983 against any non-severed defendant in his or her official capacity, such claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment. [7]

[7]  In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges

an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). In this case, as discussed more fully below, plaintiff has not alleged facts which plausibly suggest the existence of an ongoing violation of law or the Constitution. *See generally* Compl.

### 2. Access-to-Courts Claims

In *Bounds v. Smith*, the Supreme Court held that access to the courts is a fundamental right that requires prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. 817, 828 (1977). The right of access to the courts is also implicated when a prisoner experiences interference with his mail. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).

The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds*, 430 U.S. at 828, *modified on other grounds by Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004). [8] "However, this right is not 'an abstract, freestanding right....' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

[8]  "[A] person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment." *Lasher v. Dagostino*, No. 9:16-CV-0198 (BKS), 2016 WL 1717205, at *4 (N.D.N.Y. Apr. 28, 2016) (collecting cases).

 **\*9**  To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. *Lewis*, 518 U.S.

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

at 353; *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261 (N.D.N.Y. 2003) ("Prison officials may only be held liable for such injury if they frustrated or impeded a prisoner's efforts to pursue a non-frivolous legal claim.").

"A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 349, 351-53 (noting that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense"). "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis*, 320 F.3d at 352 (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)).

The Supreme Court has stated that in order to allege a denial of access to the courts claim, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The Supreme Court instructed that the underlying claim "must be described well enough to apply the 'nonfrivolous' test and so show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 415-16. "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417-18 (footnote omitted).

"Finally, ... the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. Rather, the injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] ... to challenge the conditions of [his] confinement." *Id.* at 355. "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

Here, plaintiff does not allege that he has been continuously denied access to legal mail, legal materials, legal assistance, or the law library while incarcerated at Auburn C.F. Rather, he alleges that he was denied access to the law library on three isolated occasions, experienced a delay in receipt of legal mail, was deprived of legal property during transports (which was eventually returned to him), and at times was unable to use a typewriter or computer because the machines did not work. Compl. at 20, 22-27. [9] Moreover, the complaint is devoid of any allegations which plausibly suggest that plaintiff suffered an "actual injury" in any legal proceeding as a result of the alleged issues plaintiff experienced with access to his mail, the law library, legal assistance, legal property, or a properly functioning typing machine. Indeed, the complaint lacks any allegations explaining how any of these alleged issues "hindered" his pursuit of a legal claim. *Lewis*, 518 U.S. at 351 ("[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." (internal quotation marks and citations omitted); *see Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (dismissing claim for interference with access to courts where plaintiff did not make showing as to how challenged conduct hindered him).

[9]  Plaintiff alleges that he was denied access to the law library at Auburn C.F. on the following days: October 30, 2018; November 10, 2018; and December 22, 2018. Compl. at 22, 24. Plaintiff further alleges facts which plausibly suggest that he received law library services on October 31, November 3, November 6-9, November 11, and December 28, 2018. *Id.*

**\*10** Accordingly, plaintiff's First Amendment access-to-courts claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Free-Flow-of-Mail Claim

"In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis*, 320 F.3d at 351. A prisoner's mail may only be restricted to further " 'one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 135 of 212

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

to mail only derivatively and with respect to given claims."
*Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at
*6 (S.D.N.Y. July 12, 2011) (dismissing access-to-the-courts
claim for failure to allege injury, but holding that plaintiff
adequately alleged a violation of his right to send and receive
mail). "It is thus not necessary to allege actual injury when
asserting a violation of one's right to the free flow of mail."
*Antrobus v. City of New York*, No. 11-CV-2524, 2014 WL
1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (citations omitted).

As courts have attempted to balance the competing interests
implicated when facilities place restrictions on prison mail,
the courts have "consistently afforded greater protection to
legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351.
"While a prisoner has a right to be present when his legal mail
is opened, ... an isolated incident of mail tampering is usually
insufficient to establish a constitutional violation." *Davis*,
320 F.3d at 351 (citations omitted). However, in *Washington
v. James*, the Second Circuit found that "as few as two
incidents of mail tampering could constitute an actionable
violation (1) if the incidents suggested an ongoing practice of
censorship unjustified by a substantial government interest,
or (2) if the tampering unjustifiably chilled the prisoner's right
of access to the courts or impaired the legal representation
received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782
F.2d at 1139); *see Turner v. Safley*, 482 U.S. 78, 84-91 (1987)
(prison regulations impinging constitutional rights must be
"reasonably related to legitimate penological interests").

Here, plaintiff alleges that he experienced a delay in receiving
"sixteen legal ... parcels" addressed to him "from multiple
legal sources." Compl. at 17. Plaintiff also specifically
identifies each piece of mail, its date, the dates he was
incarcerated at Auburn C.F., and the date he received this
mail. *Id.* at 19.

At this stage of the proceeding, and mindful of the Second
Circuit's direction that a pro se plaintiff's pleadings must be
liberally construed, *see Sealed Plaintiff v. Sealed Defendant*,
537 F.3d 185, 191 (2d Cir. 2008), the Court finds that
plaintiff's free-flow-of-mail claim against defendants Sheftic,
Vanni, Shanke, and Carhardt survives sua sponte review and
requires a response. In so ruling, the Court expresses no
opinion as to whether this claim can withstand a properly filed
dispositive motion.

**\*11** The Court, however, reaches a different conclusion
with respect to defendants Powell and McCarthy. The only
allegation in the complaint regarding defendant Powell is that

he delivered plaintiff sixteen parcels of mail on February 4,
2019. Compl. at 17. Plaintiff does not allege that he made
defendant Powell aware, prior to this date, that he was missing
mail. Nor does plaintiff allege any facts which plausibly
suggest that defendant Powell was responsible for the delay
in plaintiff's receipt of his mail. Thus, there is no basis for
the Court to infer that defendant Powell, solely through
delivering plaintiff his mail, was personally involved in the
alleged constitutional violation.

With respect to defendant McCarthy, the complaint alleges
that he is "ultimately responsible for subordinates['] actions."
Compl. at 17. Prior to *Iqbal*, the Second Circuit held
that supervisory personnel may be considered "personally
involved" in an alleged constitutional violation only if they
(1) directly participated in the violation, (2) failed to remedy
that violation after learning of it through a report or appeal,
(3) created, or allowed to continue, a policy or custom under
which the violation occurred, (4) had been grossly negligent
in managing subordinates who caused the violation, or (5)
exhibited deliberate indifference to the rights of inmates by
failing to act on information indicating that the violation
was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.
1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir.
1986)). [10]

[10]    The Second Circuit has not yet addressed how
the Supreme Court's decision in *Iqbal* affected the
standards in *Colon* for establishing supervisory
liability. *See Grullon v. City of New Haven*, 720
F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may
have "heightened the requirements for showing a
supervisor's personal involvement with respect to
certain constitutional violations" but not reaching
the impact of *Iqbal* on *Colon* because the complaint
"did not adequately plead the Warden's personal
involvement even under *Colon*); *see also Hogan
v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013)
(expressing "no view on the extent to which [*Iqbal*]
may have heightened the requirements for showing
a supervisor's personal involvement with respect to
certain constitutional violations[.]" (citing *Grullon*,
720 F.3d at 139)). For purposes of this Decision and
Order, the Court assumes that all five categories
under *Colon* remain valid.

Plaintiff does not allege any facts which plausibly suggest
that he complained to defendant McCarthy about missing
mail, or that defendant McCarthy otherwise became aware

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

of plaintiff's missing mail before it was delivered to him. Nor does he allege facts which plausibly suggest that he was denied access to legal mail pursuant to a custom or policy at Auburn C.F. Moreover, a "failure to remedy" theory of liability is not available against a supervisor with respect to discrete and completed violations. *See Jackson*, 256 F.3d at 96 (citing *Blyden*, 186 F.3d at 259, 264 and *Wright*, 21 F.3d at 501); *see also Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) ("[T]he wrong must have been ongoing or otherwise capable of mitigation at the time the supervisory official was apprised thereof."). Thus, plaintiff's claim against defendant McCarthy can only be based on the fourth *Colon* factor.

"An allegation that a defendant failed to adequately train or supervise subordinates implicates the fourth *Colon* factor, *i.e.*, that 'the defendant was grossly negligent in supervising subordinates who committed the wrongful acts.' " *Samuels v. Fischer*, 168 F. Supp. 3d 625, 638 (S.D.N.Y. 2016) (quoting *Colon*, 58 F.3d at 873). To support a finding of personal involvement on that basis, a "plaintiff must show that the defendant knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff." *Id.* (internal quotation marks and citation omitted). "Vague and conclusory allegations that a supervisor failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability." *White v. Fischer*, No. 9:09-CV-0240 (DNH/DEP), 2010 WL 624081, at *6 (N.D.N.Y. Feb. 18, 2010).

**\*12** The complaint is devoid of any allegations which plausibly suggest that defendant McCarthy knew or should have known there was a high degree of risk that his subordinates would behave inappropriately with respect to the handling of legal mail. *See Nash v. McGinnis*, 585 F. Supp. 2d 455, 460 (W.D.N.Y. 2008) ("Although plaintiff need not plead facts in great detail, the formulaic allegation that [the Superintendent] was aware of the alleged violations and did nothing to stop them from occurring, without some factual allegations to explain the basis for that conclusion, is insufficient to render it plausible that [the Superintendent] was personally involved in the alleged constitutional deprivations."); *Diaz v. Burns*, No. 6:10-CV-6595, 2013 WL 5951866, at *5 (W.D.N.Y. Nov. 6, 2013) ("Essentially Plaintiff is asking the Court to hold that the filing

of grievances is sufficient to put a supervisory official on notice that the grievant will be subjected to unconstitutional conduct at the hands of his or her staff members. The Court agrees with Defendants that Plaintiff has not sufficiently alleged personal involvement by Commissioner Fischer and Superintendent Kirkpatrick in any of the asserted constitutional violations."). Rather, plaintiff's claim against defendant McCarthy is entirely conclusory, and appears to be based solely on his role as Superintendent of Auburn C.F., which is not a basis for supervisory liability. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (internal quotation marks omitted)); *Rose v. Garritt*, No. 16-CV-3624, 2018 WL 443752, at *5 (S.D.N.Y. Jan. 16, 2018) ("To the extent Plaintiff alleges that Lee and Burnett were aware of the violent proclivities of Freeman and C.O. Miller before the excessive force incident, the Complaint does not plausibly allege that Lee and Burnett were personally on notice of the likelihood that they would assault Plaintiff."); *Rahman v. Fischer*, No. 08-CV-4368, 2010 WL 1063835, at *5 (S.D.N.Y. Mar. 22, 2010) (finding allegation that defendant "received 'several' complaints of staff assaulting prisoners" as "an insufficient allegation of notice of any policy or custom of assaults by correction officers").

Accordingly, plaintiff's free-flow-of-mail claim against defendants Powell and McCarthy is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. First Amendment Access to a Notary

The Supreme Court has also held that "indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them." *Bounds*, 430 U.S. at 824-25. "However, '[t]here is no constitutional right to a notary service five days a week,' ... and 'it is within the discretion of prison officials to establish reasonable procedures governing access to prison legal facilities, including access to notary publics.' " *Flowers v. Dalsheim*, 826 F. Supp. 772, 774-75 (S.D.N.Y. 1993) (quoting *Washington v. Vincent*, 361 F. Supp. 942, 943 (S.D.N.Y. 1973)).

The governing DOCCS guidelines, set forth in Directive No. 4483, call upon facilities to establish a schedule ensuring

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 137 of 212

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

"inmates in general population with reasonable access to the services of a notary public within 72 hours of request excluding weekends and holidays," and "[i]nmates confined to special housing, keeplock and protective custody" with access to "notarial services at least two times per week."[11] In *Washington v. Vincent*, the court upheld facility procedures providing inmates with notary services at least twice per week. *See* 361 F. Supp. at 943.

[11]   The Court takes judicial notice of Directive 4483. *See, e.g., Williams v. Fischer*, No. 11-CV-0379 (NAM/TWD), 2015 WL 1137644, at *4 n.7 (N.D.N.Y. Mar. 11, 2015) (taking judicial notice of DOCCS Directive 4202); *Phelan v. Zenzen*, No. 10-CV-06704, at *4 (W.D.N.Y. Nov. 6, 2012) (taking judicial notice of DOCCS Directive 4421).

In this case, plaintiff alleges that he obtained notary services from defendant Walsh on September 18, 2018, but thereafter experienced complications. Compl. at 22-27. More specifically, plaintiff alleges that on October 31, 2018, defendant Walsh denied him notary services, and between November 6 and November 9, 2018, no notary was available in the prison library, which prevented him from obtaining notary services until November 11, 2018. *Id.* at 22. Plaintiff further alleges that he submitted a request for notary services on December 22, 2018, which was ignored, and on December 28, 2018, defendant Walsh agreed to notarize only certain of the documents plaintiff sought to have notarized. *Id.* at 24. In addition, on February 6, 2019, defendant Walsh refused to notarize plaintiff's "legal requests related to DOCCS[,]" and advised him that she had been "instructed not to." *Id.* at 27.

**\*13** In total, these allegations plausibly suggest, at most, that plaintiff experienced an eleven-day delay in access to notary services on one occasion, a seven-day delay in access to notary services on a separate occasion, and a refusal to have certain documents notarized on two occasions. Plaintiff does not allege any facts which plausibly suggest that any of the documents that defendant Walsh refused to notarize were legal documents that needed to be notarized for a legal proceeding. Nor does he allege facts which plausibly suggest that he suffered an actual injury as a result of either the delays in access to a notary, or the refusal to notarize certain documents. *See Ramsey v. Coughlin*, 1 F. Supp. 2d 198, 205 (W.D.N.Y. 1998) (slow response time for notary services not prejudicing ongoing lawsuit states no constitutional violation); *Hudson v. Robinson*, 678 F.2d 462, 466 (3d Cir. 1982) (inmate required to wait ten days to have

a document notarized who suffered no "actual injury" as a result of that delay did not state a claim for denial of access to the courts).

Accordingly, plaintiff's First Amendment denial of access to notary services claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 5. Retaliation Claim

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation– can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

The filing of a prison grievance is a constitutionally protected activity for the purpose of meeting the first prong of the retaliation test. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) (same).

Here, plaintiff alleges that on October 5, 2018, defendant Vendetti delayed plaintiff's visit with his criminal appellate attorney. Compl. at 6. Plaintiff has also attached to his complaint copies of a grievance and Superintendent's response regarding this incident, wherein plaintiff states in the "Appeal Statement," among other things, that "[o]n 8/30/18 [he] submitted a grievance which involved [defendant]

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

Vendetti[, and] consisted of the same issue (not being released for institution privileges)[.]" *Id.* at 7. In addition, plaintiff alleges that defendant Vendetti denied him law library services on October 30, 2018, by refusing to open his cell door, in retaliation for a "previous grievance." Compl. at 22. [12]

[12] Plaintiff also alleges in conclusory fashion that he has "grieved some ... issues" related to law library services and legal assistance, and "due to this ... had retaliatory acts committed against [him] in treatment cell confinement[.]" Compl. at 20. These allegations are entirely conclusory. Moreover, the complaint fails to identify any individual(s) other than defendant Vendetti who allegedly took "adverse action" against plaintiff in retaliation for him filing one or more grievances.

**\*14** Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's retaliation claim against defendant Vendetti survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 6. Access-to-Counsel Claims

The Supreme Court long ago held that "in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights[,] ... inmates must have a reasonable opportunity to seek and receive the assistance of attorneys." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *partially overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). In addition, under the Sixth Amendment, a criminal defendant has the right to effective assistance of counsel. This protection "applies to a defendant's trial and first appeal as of right, [though] not to appeals afforded on a discretionary basis, collateral proceedings, or civil proceedings such as civil rights claims challenging prison conditions." *Bourdon*, 386 F.3d at 96 (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555-57 (1987)).

These protections, however, have limits, as the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89 (upholding, among other things, restrictions on inter-inmate correspondence as reasonably related to prison officials' legitimate security concerns). In the specific context of criminal defendants' access to attorneys, the Second Circuit has found that regulations restricting defendants' contact with their attorneys are "unconstitutional where they unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense." *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) (quotation and citation omitted). "Examples of unconstitutional limits on prisoners' rights to counsel include a ban on all visits by paralegals employed by criminal defense counsel and repeated delays in meetings between prisoners and attorneys that resulted in attorneys forgoing the meetings." *Schick v. Apker*, No. 07-CV-5775, 2009 WL 2016926, at \*2 (S.D.N.Y. July 10, 2009) (citations omitted). Conversely, courts have found that denying an inmate one method of communicating confidentially with his attorney does not give rise to a constitutional violation. *Lowery v. Westchester Cty. Dep't of Correction*, No. 15-CV-4577, 2017 WL 564674, at \*3-4 (S.D.N.Y. Feb. 10, 2017) (collecting cases); *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at \*7 (S.D.N.Y. Mar. 11, 2014) ("Because Groenow has not alleged that he was denied all opportunities to consult confidentially with his attorney, he has not plausibly alleged a Sixth Amendment violation" even though "monitoring telephone calls with his attorney most likely had a chilling effect on Groenow's ability to communicate effectively with his attorney"); *Schick*, 2009 WL 2016926, at \*2 (finding, where the plaintiff "neither allege[d] nor offer[ed] evidence that defendants restricted other means of access to his attorneys, such as mail, monitored telephone calls, and in-person visits regarding pending criminal matters[,]" that refusing to grant plaintiff's request for an unmonitored call with his criminal appellate attorney on three occasions "did not 'unreasonably burden' his opportunity to consult with counsel and to prepare his appeal"); *Bellamy v. McMickens*, 692 F.Supp. 205, 214 (S.D.N.Y. 1988) ("[S]tates have no obligation to provide the best manner of access to counsel. Rather, restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel.").

**\*15** Here, plaintiff alleges that on two occasions between August 2018 and March 2019, while he was incarcerated at Auburn C.F., he was denied a scheduled visit with his criminal appellate attorney. Compl. at 9, 12. Plaintiff further alleges that on one occasion when he met with his attorney, his visit was delayed, and occurred in an area in which other corrections officials and inmates were present. *Id.* at 6.

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 139 of 212
Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)
2019 WL 2053829

As an initial matter, with respect to the two scheduled visitations that did not occur, the complaint lacks any allegations which plausibly suggest that plaintiff missed these visits as a result of a prison rule, policy, or practice. Indeed, plaintiff does not allege that any of the named defendants were personally involved in more than one incident in which a scheduled visit did not occur. Nor does plaintiff allege that he was prevented from speaking with his criminal appellate attorney by telephone before or after either missed visit. In fact, by his own allegations, plaintiff was offered an opportunity to have a "semi-private" telephone call with his appellate attorney after one of his scheduled visits did not occur, and he turned down this offer. Compl. at 12, 27. Thus, plaintiff has failed to allege facts which plausibly suggest that any of the named defendants "unreasonably burdened [his] opportunity to consult with his attorney and to prepare his defense" through actions which caused him to miss two visits.

Similarly, with respect to plaintiff's shortened visit with his attorney in a non-private area of Auburn C.F., as noted, the complaint lacks allegations which plausibly suggest that plaintiff was denied other means of communicating privately with his criminal appellate attorney before or after this visit. Moreover, denying an inmate a private room to meet with his attorney on one occasion, by itself, does not amount to a constitutional violation. *See* Schick, 2009 WL 2016933, at *10 ("The Constitution simply does not guarantee Plaintiff unlimited communications with several attorneys, or the means of communication that Plaintiff might consider the most convenient or productive.").

Accordingly, plaintiff's access-to-counsel claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 7. False Misbehavior Report Claims

Plaintiff alleges that he was issued false misbehavior reports on the following dates and by the following defendants: (1) on March 3, 2019, by defendant Pickett; (2) on March 6, 2019, by defendant Nowak; and (3) on March 20, 2019, by an unidentified official. Compl. at 27-28. [13]

[13]     Plaintiff also alleges that defendants Grady and Kirkwood issued him a misbehavior report on September 18, 2018, and that three of the five

charges in that report were dismissed, but he does not allege that the misbehavior report was entirely unwarranted or based on false statements. *See* Compl. at 22.

It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)); *accord Pittman v. Forte*, No. 9:01-CV-0100, 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.); *see Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior report by a correctional officer does not state a claim for relief."). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862. Here, plaintiff alleges no facts which plausibly suggest that any of the named defendants who allegedly issued him a false misbehavior report did so in retaliation for his exercise of a constitutional right. In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." [14] *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (rejecting prisoner's "but for" argument as to guard who prepared misbehavior report but was not involved in Tier III hearing) (citation omitted).

[14]     "The only constitutional violation that could occur in this situation is if plaintiff were not provided adequate due process in any proceeding which is based upon the misbehavior report. In that case, the claim is not based on [the] truth or falsity of the misbehavior report but instead on the conduct of the hearing itself." *Santana*, 2007 WL 2712992, at *2. Plaintiff's Fourteenth Amendment due process claim arising from one of his disciplinary hearings is addressed separately, below.

**\*16** Accordingly, plaintiff's false misbehavior report claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 8. Disciplinary Due Process Claim

2019 WL 2053829

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*. The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin*. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)). [15] The "atypicality" inquiry under *Sandin* is normally a question of law. *Colon*, 215 F.3d at 230-31; *Sealey*, 197 F.3d at 585. In making that determination the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof. *Id.*

[15]     A New York state inmate confined in SHU is placed in a solitary confinement cell for twenty-three hours a day. The inmate may exercise in the yard for one hour each day; is limited to two showers a week; and may not work or attend programming. *See Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000); N.Y. Comp. Codes R. & Regs., tit. 7, §§ 304.1-.14 (2008). An inmate on "keeplock" is confined to his cell, room or housing unit and does not enjoy full participation in the normal prison routine. *See Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); N.Y. Comp. Codes R. & Regs. tit. 7, § 251-1.6 (2008).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *See*

*Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Here, liberally construed, plaintiff's complaint alleges that defendant Babin denied him due process during his disciplinary hearing arising out of charges in a misbehavior report issued on March 20, 2019, by refusing to call or interview certain witnesses, not allowing him to question the witnesses that were interviewed, and disregarding a witness's statement of plaintiff's innocence. Compl. at 28-29. The complaint further alleges that defendant Babin sentenced plaintiff to thirty days of SHU confinement beyond the twenty-three days plaintiff spent in SHU while awaiting the completion of his disciplinary hearing, as well as one month of lost good time credits. *Id.* at 29.

*17 As an initial matter, plaintiff filed his supplemental pleading regarding his disciplinary sentence on the same date that the sentence was imposed. *See* Compl. at 28-29. As of that date, plaintiff had served only twenty-three days in SHU while awaiting the completion of his disciplinary hearing. *Id.*

It is impossible that plaintiff could have administratively appealed or exhausted a claim arising out of his disciplinary hearing at the time he filed his supplemental pleading. Thus, plaintiff's claim is premature.

In any event, neither a twenty-three day confinement in SHU, nor a fifty-three day confinement in SHU, by itself, implicates atypicality. *See Colon*, 215 F.3d at 231; *Elleby v. Martucello*, No. 9:16-CV-1335 (MAD/DEP), 2018 WL 3769965, at *3 (N.D.N.Y. Aug. 9, 2018) ("The Court notes that Plaintiff was sentenced to 90 days in SHU which, without additional allegations, is insufficient to establish that he suffered from an atypical and significant confinement as required by *Sandin*."). Because plaintiff has not even completed his disciplinary sentence, and the complaint is totally devoid of any facts regarding the conditions of his SHU confinement during the twenty-three day period he has already served, there is no basis for this Court to infer that plaintiff's SHU conditions differed in any way from normal SHU conditions, or that the confinement was an atypical and significant hardship in relation to the ordinary incidents of prison life. Thus, plaintiff has also failed to plead the existence of a valid liberty interest with respect to his SHU confinement. *See, e.g., Elleby*, 2018 WL 3769965, at *3 ("Plaintiff does not allege

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 141 of 212

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

that the conditions in which he was kept were more onerous than normal SHU conditions. Because Plaintiff fails to allege that he suffered from an atypical and significant confinement, Magistrate Judge Peebles correctly found Plaintiff's due process claim should be dismissed."); *Shuler v. Brown*, No. 9:07-CV-0937, 2009 WL 790973 (TJM/GHL), at *1, *9 (N.D.N.Y. Mar. 23, 2009) (adopting the view "that a motion to dismiss can be granted where a prisoner who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU[,]" noting that a prisoner's right to relief under a procedural due process theory based solely on a contention "that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, ... is purely speculative").

Based upon the foregoing, plaintiff's due process claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.[16]

[16]    The Court would also note that plaintiff's disciplinary sentence involves "mixed sanctions," *i.e.*, "sanctions that affect both (a) the duration of his imprisonment and (b) the conditions of his confinement." *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006). In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a Section 1983 action seeking money damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless that "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ... or called into question by a federal court's issuance of a writ of habeas corpus...." *Heck*, 512 U.S. at 487 (internal citation omitted). In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court made clear that *Heck*'s favorable termination rule applies to challenges made under Section 1983 to procedures used in disciplinary proceedings that deprived a prisoner of good time credits. *See Peralta*, 467 F.3d at 103. In *Peralta*, the Second Circuit held that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but ... he can only*

*do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement.*" *Id.* (emphasis in original).

### 9. Conditions-of-Confinement Claim

**\*18**    The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that the conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 303-04 (1991).

The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.' " *Helling v. McKinney*, 509 U.S. 25, 30, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 (1989)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, plaintiff alleges that the water feed to his toilet was turned off on December 31, 2018, at approximately 4:00 P.M. Compl. at 24. Plaintiff further alleges that at some point later that day, defendant Remington became aware that plaintiff's toilet was not working when he conducted a random search

of plaintiff's cell, and the next day, defendant Penello also became aware of the issue. *Id.*

Plaintiff does not allege when his toilet began working again. [17] Moreover, plaintiff does not allege that he experienced any complications as a result of not having a properly functioning toilet, either in the form of exposure to human waste or physical discomfort caused by an inability to use the toilet in his cell. Accordingly, the complaint fails to allege facts which plausibly suggest that the conditions of plaintiff's confinement resulted in "unquestioned and serious deprivations of basic human needs." *See, e.g., Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *6 (S.D.N.Y. Aug. 28, 2017) (no claim for unsanitary cell conditions, since plaintiff did not allege details showing "the duration and the severity of [his] experience being exposed to unsanitary conditions" (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015)); *Whitted v. Lazerson*, No. 96-CV-2746, 1998 WL 259929, at *3 (S.D.N.Y. May 21, 1998) ("The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation."); *Odom v. Keane*, No. 95-CV-9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (holding that the absence of a working toilet in one's prison cell for approximately ten hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment").

[17]    Plaintiff separately alleges that he was transferred to Wende C.F. at some point on January 3, 2019. Compl. at 19. Thus, at most, plaintiff did not have a properly working toilet for roughly three days. However, the Court has no basis to infer that the duration of the alleged deprivation was anything more than several hours.

**\*19** In addition, while plaintiff identifies two defendants who were allegedly aware that plaintiff did not have a working toilet less than one day after the issue arose, the complaint lacks any allegations which plausibly suggest that either of these individuals were also aware that plaintiff faced a substantial risk of serious harm based on the non-working toilet. Thus, the complaint also fails to allege facts which plausibly suggest that any named defendant from Auburn C.F. acted with "deliberate indifference" to plaintiff's basic human needs.

Accordingly, plaintiff's conditions-of-confinement claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 10. Violation of DOCCS Directives

In one section of the complaint, plaintiff alleges that "staff officers" from Auburn C.F. have failed to "follow or respect their own directives on how to handle legal work only in the presence of an inmate." *See* Compl. at 20. A section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations. *See Hyman v. Holder*, No. 96-7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001) (concluding that allegations that prison officials failed to follow prison regulations are not sufficient to give rise to a Section 1983 claim). Because an official's failure to comply with a DOCCS directive does not give rise to a Section 1983 claim, all claims asserted in plaintiff's complaint on that basis are dismissed pursuant to 28 U.S.C. 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### IV. PRELIMINARY INJUNCTION MOTION

Preliminary injunctive relief " 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d Cir. 2010). To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Id.* at 35; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011). However, when the moving party seeks a mandatory injunction that alters the status quo by commanding a positive act, the burden is "even higher." *Cacchillo*, 638 F.3d at 405-06; *see Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup*

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

*Global Markets*, 598 F.3d at 35 n.4 (internal quotation marks omitted).

" 'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.' " *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983). Rather, a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118 (internal citation and quotation marks omitted).

**\*20** Plaintiff's Preliminary Injunction Motion seeks wide-ranging affirmative relief addressing potential future harm associated with cell searches, attorney visits, harassment, and access to mail, the law library, legal materials, and a working typewriter. *See* Preliminary Injunction Motion at 1-2. Plaintiff essentially seeks an order from this Court directing DOCCS officials to properly follow DOCCS Directives and not violate plaintiff's constitutional rights. *Id.* Plaintiff's request is denied for several reasons.

First, the only claims that now remain in this action are plaintiff's retaliation and free-flow-of-mail claims. Plaintiff has not explained how his requested relief bears any relationship to these claims, which relate to discrete events that occurred on and before February 4, 2019, *i.e.*, more than two months before plaintiff filed his motion.[18]

18    With regard to legal mail, plaintiff seeks an order that he be provided with confirmation from the "mail room" when items delivered by him are placed in the mail. *See* Preliminary Injunction Motion at 2. Plaintiff's free-flow-of-mail claim, however, relates to incoming mail.

Second, much, if not all, of the injunctive relief plaintiff seeks would require restrictions placed on officials who are not defendants in the present action. Injunctive relief is available against non-parties only under very limited circumstances, none of which are present here. *See* Fed. R. Civ. P. 65(d)(2); *Doctor's Associates, Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302-03 (2d Cir. 1999); *United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988); *see also In re Rationis Enterprises,*

*Inc. of Panama*, 261 F.3d 264, 270 (2d Cir. 2001) ("A court may not grant a final, or even an interlocutory, injunction over a party over whom it does not have personal jurisdiction.").

Third, plaintiff's request for DOCCS officials to properly follow DOCCS Directives and not violate his constitutional rights is tantamount to a request that all officials at Auburn C.F. "obey the law." "Obey the law" injunctions are vague, do not require a defendant to do anything more than that already imposed by law, subject the defendant to contempt rather than statutorily prescribed sanctions, and are not readily capable of enforcement. As such, these injunctions are not favored. *See N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941); *see also Rowe v. New York State Division of Budget*, No. 1:11-CV-1150 (LEK/DRH), 2012 WL 4092856, at *7 (N.D.N.Y. Sept. 17, 2012); *New York v. Shinnecock Indian Nation*, 560 F. Supp. 2d 186, 189 (E.D.N.Y. 2008). According to the Second Circuit, " '[u]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law.' " *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) (quoting *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996)).

Fourth, plaintiff's fear that named and unnamed officials at Auburn C.F. might mistreat him in the future is purely speculative and, therefore, patently insufficient to make the showing required for the issuance of preliminary injunctive relief. *See Slacks v. Gray*, No. 9:07-CV-0501 (NAM/GJD), 2008 WL 2522075, at *1 (N.D.N.Y. June 25, 2008) (allegations of future injury without more do not establish a real threat of injury).

Fifth, plaintiff's submissions, which are construed to seek mandatory injunctive relief, fail to demonstrate, with evidence, a "clear and substantial" showing of a likelihood of success or that extreme or very serious damage will result if the motion is denied. Indeed, plaintiff offers no evidence to even meet the lesser standard required for a prohibitory injunction – a likelihood of success on the merits of his underlying claims, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *See Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."); *Moore*, 409 F.3d at 510 (preliminary injunctive relief " 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 144 of 212

clear showing, carries the burden of persuasion.' ") (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *8 (N.D.N.Y. Feb. 28, 2012) ("Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief."); *Fox v. Anthony*, No. 6:10-CV-839 (GTS/ATB), 2010 WL 3338549, at *2 (N.D.N.Y. July 15, 2010) ("Plaintiff has submitted no evidence, other than his own speculation that defendants ... will retaliate against him when they find out that he filed this law suit. The same claim could be made by any inmate who names corrections officers as defendants in any action."), *report and recommendation adopted by* 2010 WL 3338558 (N.D.N.Y. Aug. 23, 2010).

**\*21** Based upon the foregoing, plaintiff's request for injunctive relief is denied. [19]

[19]    Plaintiff is advised that concerns regarding his current conditions of confinement at Auburn C.F. should be addressed through administrative channels at the facility and DOCCS and, if necessary, by means of a properly filed action.

## V. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; [20] and it is further

[20]    Although his IFP Application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form (Dkt. No. 9), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the entire statutory filing fee of $ 350.00 pursuant to 28 U.S.C. § 1915; [21] and it is further

[21]    "28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). "Although an indigent, incarcerated individual

need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

**ORDERED** that the Clerk provide a copy of plaintiff's authorization form (Dkt. No. 9) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk file a copy of the Claims and Supporting Documents (Dkt. No. 3-4) immediately following the signature page of the complaint, and a copy of the Supplement to Complaint (Dkt. No. 11) immediately following the Claims and Supporting Documents insert; and it is further

**ORDERED** that the Clerk is directed to amend the docket to add Babin, Hearing Officer, Auburn Correctional Facility, as a defendant; and it is further

**ORDERED** that the claims arising out of plaintiff's confinement at Wende Correctional Facility are severed and transferred to the Western District of New York; and it is further

**ORDERED** that the Clerk shall advise the Clerk of the Western District of New York, in writing, of the entry of this Order and provide that Clerk with a certified copy of this Order and of the docket sheet for this action, together with all information necessary for the Western District Clerk to electronically access the documents filed in this action; and it is further

**ORDERED** that the Clerk shall remove Wende Correctional Facility, Mr. Klepp, Mr. Ferrell, Mr. Wade, J. Krygier, Mr. Kintzel, Mr. Sears, Mr. Shaneley, Mr. Brown, Mr. McQuire, Mr. Byron, Mr. Martin, Mr. Thomas, Mr. Lyman, Mr. Mancini, Mr. Barlow, Mr. Kroel, Mr. Bradley, Mr. Wade, Stewart Eckert, Benjamine A. Wilson, and Mr. Brown from the docket as defendants in the Northern District action; and it is further

**\*22 ORDERED** that plaintiff's First Amendment free-flow-of-mail claim against defendants Sheftic, Vanni, Shanke, and Carhardt and First Amendment retaliation claim against defendant Vendetti **SURVIVE** sua sponte review and require a response; and it is further

Dublino v. McCarthy, Not Reported in Fed. Supp. (2019)

2019 WL 2053829

**ORDERED** that plaintiff's claims for monetary damages against Auburn Correctional Facility and the **non-severed** named defendants in their official capacity are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment; [22] and it is further

[22]    Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see Pucci v. Brown*, 423 F. App'x 77, 78 (2d Cir. 2011). Because these claims are barred by the Eleventh Amendment, leave to amend to would be futile.

**ORDERED** that all remaining claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; [23] and it is further

[23]    Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**ORDERED** that Auburn Correctional Facility is **DISMISSED with prejudice** as a defendant; and it is further

**ORDERED** that the following individuals are **DISMISSED without prejudice** as defendants: Ms. Jones, Mr. Kirkwood, Mr. Wheeler, Ms. Vullwhite, Mr. Knapp, Mr. Norris, Mr. Vanderwerff, J. Remington, Mr. "D", Mr. Milnane,

Mr. Nowak, Mr. Pickert, Mr. Penello, Mr. Corey, Mr. Grady, Anthony Smith, Ms. Simmons, Mr. Powell, Timothy McCarthy, Brenda J. Walsh, Michael C. Polcovich, Thomas J. Loughren, Leanne Callahan; and it is further

**ORDERED** that plaintiff's Preliminary Injunction Motion (Dkt. No. 3) is **DENIED without prejudice**; and it is further

**ORDERED** that the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon defendants Sheftic, Vanni, Shanke, Carhardt, and Vendetti. The Clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that a response to the complaint be filed by defendants Sheftic, Vanni, Shanke, Carhardt, and Vendetti, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action**; and it is further

  **\*23** **ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2053829

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2848141
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frank BELLEZZA, Plaintiff,
v.
D. HOLLAND; L. Clark; R.J.
Cunningham; B. Fischer, Defendants.

No. 09 Civ. 8434.
|
July 12, 2011.

**Attorneys and Law Firms**

Frank Bellezza, Albion, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of N.Y,
by: Kevin R. Harkins, Esq., Assistant Attorney General, New
York, NY, for Defendants.

OPINION

SWEET, District Judge.

**\*1** Defendants D. Holland ("Holland"), L. Clark ("Clark"),
S. Katz ("Katz"), R.J. Cunningham ("Cunningham") and
B. Fischer ("Fischer") (collectively, the "Defendants") have
moved pursuant to Federal Rules of Civil Procedure 12(b)
(6) to dismiss the Amended Complaint of plaintiff Frank
Bellezza ("Bellezza" or the "Plaintiff") alleging a violation of
42 U.S.C. § 1983. Upon the conclusions set forth below, the
motion is granted in part and denied in part.

**Prior Proceedings**

The complaint in this action was filed by Plaintiff, an inmate
at the Orleans Correctional Facility, *pro se* on October 5,
2009. It alleged that Holland and Clark, in concert with the
remaining Defendants, withheld legal documents pursuant
to a policy "instituted and enforced" by Holland, whereby
Plaintiff "is and shall be subjected to disciplinary action" if he
participates in any civil litigation and "is required to prove any
allegations raised in legal claims to an unspecified burden of
proof set arbitrarily by Holland." (Compl.¶ 15.) Specifically,
Plaintiff alleged that Clark opened mail addressed to Plaintiff
on April 15, 2009 and withheld a check for $55.98 (the
"Settlement Check") contained in the mailing, with the

knowledge and consent of the remaining Defendants and
did not issue a receipt for the Settlement Check following
its confiscation. (*Id.* ¶¶ 16–18, 20.) Plaintiff also alleged
that on April 21, 2009, as a result of having received the
Settlement Check, he was issued an Inmate Misbehavior
Report ("IMR") by Holland, charging him with 103.20
Solicitation, 111.10 Impersonation, 180.11 "Correspondence
Rule Violation," 107.20 Lying, and 180.17 "Unauthorized
Legal Assistance." (*Id.* ¶ 21.) He was found guilty of the
charges and on appeal his penalty was modified, but not
vacated. (*Id.* at ¶ 25.) The complaint alleged that Plaintiff
is precluded from participating in future, unspecified class
actions because he could "reasonabl[y] expect [ ] to be
subjected to disciplinary action" if he did so. (*Id.* at ¶ 28.)

On February 19, 2010, Defendants moved to dismiss the
original complaint. On July 27, 2010, the Court dismissed
the Complaint with leave to replead within 40 days, on the
grounds that Plaintiff's (1) denial of access to the courts
by interference with legal mail and (2) First Amendment
violation by the denial of the free flow of mail claims had
not been adequately alleged, and because Plaintiff's claim for
deprivation of property was precluded because adequate state
law remedies existed which he had not pursued. The Court
additionally dismissed the claims against Katz, Cunningham
and Fischer for failure to allege their personal involvement in
the alleged constitutional deprivations.

On August 18, 2010, Plaintiff filed an Amended Complaint.
On October 8, 2010, Defendants moved to dismiss the
amended complaint. The instant motion was marked fully-
submitted on December 15, 2010.

**Allegations Asserted in the Amended Complaint**

**\*2** The Amended Complaint alleges that on at least two
separate occasions, defendants Clark and Holland opened,
read, photocopied, and withheld Plaintiff's privileged legal
correspondence outside of his presence, in violation of New
York State Department of Correctional Services regulations
and federal caselaw. (Amend.Compl.¶ 10.) Specifically,
Plaintiff alleges that on April 15, 2009 Clark opened, read,
photocopied, and withheld mail from the Court Appointed
Settlement Administrator in the class action of *Wilson v.
Airbourne,* of which Plaintiff alleges he was a class member
(*id.* ¶ 11), and that Clark and Holland withheld the Settlement
Check enclosed in that correspondence (*id.* ¶ 15). Plaintiff
asserts that on another separate occasion Defendant Clark
opened, read, copied, and withheld legal correspondence in
connection with a class action of "TRACK 1 AWP" of which

Bellezza v. Holland, Not Reported in F.Supp.2d (2011)

2011 WL 2848141

Plaintiff alleges he was a class member. (*Id.* ¶ 18.) Plaintiff further asserts that the practice of opening, reading, copying, and withholding legal correspondence was "wide spread" and included the same with regard to legal mail related to the class action of *Wilson v. Airbourne* sent to inmates Marcelo Rogriguez, DIN# : 76–A–3247, Francisco Jaureuqi, DIN# : 87–A–2530, and Juan Martinez, DIN# : 90–A–3108. (*Id.* ¶ 14.)

Plaintiff also alleges Holland and Clark fabricated rules "requiring inmates to get permission from the facility superintendent before corresponding with court appointed settlement administrators, participating in civil litigation, or receiving court authorized settlement funds" (*id.* ¶ 17), and that Holland created a policy requiring inmates to "prove their legal claims to [the Department of Correctional Services] before raising same in a legal claim" (*id.* ¶ 18). Plaintiff states that the Central Office Review Committee advised that no such policy exists, in response to grievances which Plaintiff filed (WB–14580–09 and WB–14578–09). (*Id.* ¶ 19.) Plaintiff asserts that nonetheless Holland subjected him to disciplinary action, resulting in the loss of good time, placement in Special Housing at the Southport Correctional Facility, and the confiscation of the Settlement Check. (*Id.* ¶ 20.)

Plaintiff avers that the Defendants' actions "did deter Plaintiff from taking part in any additional class action lawsuit settlements and continue[s] to do so." (*Id.* ¶ 24.) Specifically, Plaintiff states that his claim in the *Airbourne* action was not frivolous and had been approved by the Court appointed settlement administrators and that he "is qualified to take part in several other class action claims, including" against De Beers Diamonds and Air Cargo Shipping companies, as well as with regard 'to AWP Track 2 prescription drugs and "untold others." (*Id.* ¶ 28.)

Plaintiff disclaims pursuing a property claim in his amended complaint (AC ¶ 33), and abandons any claims against Defendants S. Katz, R.J. Cunningham, and B. Fischer (AC ¶ 7). Plaintiff likewise disclaims seeking reinstatement of any good time. (Pl. Reply ¶ 6.)

### The Law of the Case Doctrine Does Not Control The Outcome Here

**\*3** At the threshold, Defendants assert that the Amended Complaint should be dismissed pursuant to the law of the case doctrine because the Amended Complaint is "substantively identical to the Original Complaint." (Mem. of Law in Support of Defs.' Mot. to Dismiss 9.) Under that doctrine, a court adheres " 'to its own decision at an earlier stage of the litigation' unless there are 'cogent' or 'compelling' reasons not to, such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " *Sanders v. Sullivan,* 900 F.2d 601 (2d Cir.1990) (quoting *Doe v. New York City Dept. of Social Services,* 709 F.2d 782, 789 (2d Cir.1983). The law of the case doctrine does not control here, however, as the Amended Complaint alleges materially different and more detailed claims than the original Complaint, as discussed below.

### The 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (citing *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)). Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 570). In other words, Plaintiff must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

As the Second Circuit has recognized, in *Iqbal,* the Supreme Court suggested a "two-pronged approach" to evaluate the sufficiency of a complaint. *Iqbal,* 129 S.Ct. at 1949–50. *See also Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010). A court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal,* 129 S.Ct. at 1950. "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.' " *Hayden,* 594 F.3d at 161 (quoting *Iqbal,* 129 S.Ct. at 1950). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

In addressing the present motion, the Court is mindful that Bellezza is proceeding *pro se.* "Since most *pro se* plaintiffs

lack familiarity with the formalities of pleading requirements, [courts] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than [they] would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections in City of N.Y.,* 232 F .3d 135, 139– 40 (2d Cir.2000). Courts "interpret [*pro se* pleadings] 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 279 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). However, *"pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Triestman v.. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

## I. Plaintiff's Interference with Legal Mail Claims

### A. Right of Access to Courts

**\*4** It is well established that prisoners have a constitutional right to "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 346 (1996); *Bourdon v. Loughren,* 386 F.3d 88, 92–93 (2d Cir.2004); *Davis v. Goord,* 320 F.3d 346, 351–52 (2d Cir.2003). The Supreme Court has alternately grounded this right in the constitutional guarantees of equal protection, due process, privileges and immunities, and the right to petition the government for grievances. *Bourdon,* 386 F.3d at 92.

> Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong. However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim without which a plaintiff cannot have suffered injury by being shut out of court.

*Christopher v. Harbury,* 536 U.S. 403, 414–15 (2002).

The right of access to courts gives rise to a number of derivative rights, including the right of inmates to receive legal mail without interference. *Davis,* 320 F.3d at 351 ("Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."); *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008) (noting that "[t]he constitutional right of access to the courts gives rise to a number of derivative rights"). This right requires state prisons "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds,* 430 U.S. at 825.

"To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." *Davis,* 320 F .3d at 351 (internal quotation marks and citations omitted). *See also Collins,* 581 F.Supp.2d at 573 (finding plaintiff must show actual injury, that is that "the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim." (citing *Lewis,* 518 U.S. at 353)). "Unlike prisoners who bring a claim for the violation of a constitutionally protected right, who have standing to assert that right even if the denial of the right did not cause an 'actual injury,' prisoners who bring a claim for the violation of a derivative right of access to the courts must demonstrate 'actual injury' in order to have standing." *Id.* (citing *Benjamin v. Fraser,* 264 F.3d 175, 185 (2d Cir.2001)). This requirement "ensures that courts provide relief to claimants only when they have suffered or will imminently suffer actual harm and prevents courts from undertaking tasks assigned to the other political branches," *Id.* (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)).

**\*5** In the context of the derivative right to legal libraries in prisons, the Supreme Court has articulated that the actual injury requirement "is not satisfied by just any type of frustrated legal claim." *Lewis,* 518 U.S. at 354. In *Lewis,* the Court noted that right does "not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id.* at 355. Instead, the right requires that inmates be provided with what they need to "attack their sentences, directly or collaterally, and ... challenge the conditions of confinement," *id.,* and not be impeded in these actions. Claims that have provided the basis for actual injury in access to courts cases include direct

2011 WL 2848141

appeals of convictions, " 'civil rights actions'—i.e., actions under 42 U.S.C. § 1983 to vindicate 'basic constitutional rights.' " *Id.* at 354 (citations omitted). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* at 355 (emphasis in original). *See also Hoffenberg v. Bodell,* No. 01 Civ. 9729(LAP), 2002 WL 31163871 (S.D.N.Y. Sept. 30, 2002) (rejecting argument that statute of limitations should be tolled in legal malpractice action due to prison official's depriving inmate of related legal documents (citing *Lewis,* 518 U.S. at 355)).

Here, the Amended Complaint alleges that Clark read, photocopied, and withheld mail from the Court Appointed Settlement Administrator in *Wilson v. Airbourne* (AC ¶ 11), that Clark and Holland withheld the Settlement Check (*id.* ¶ 15), that on another separate occasion Defendant Clark opened, read, copied, and withheld legal correspondence in connection with a class action of "TRACK 1 AWP" (*Id.* ¶ 18.), that the practice of opening, reading, copying, and withholding legal correspondence was "wide spread" and included the same with regard to legal mail related to the class action of *Wilson v. Airbourne* sent to inmates Marcelo Rogriguez, DIN# : 76–A–3247, Francisco Jaureuqi, DIN# : 87–A–2530, and Juan Martinez, DIN# : 90–A–3108. (*Id.* ¶ 14.) The Amended Complaint additionally alleges that Plaintiff did not recover what he otherwise would have, namely the check, because of interference with his mail and that the deprivation of documents relating to the "TRACK 1 AWP" class action prevented his participation in that suit. In sum, Plaintiff alleges that Clark and Holland effectively deprived him of various legal materials and that such deprivation impeded his ability to successfully pursue and receive remedies in two civil class actions, as well as unnamed others.

Bellezza's allegation that he is precluded from participating in future unspecified class-action litigation is insufficient to state an actual injury. *Bellezza v. Holland,* 730 F.Supp.2d 311, 316 (S.D.N.Y.2010); *see also Christopher v. Harbury,* 536 U.S. 403 (dismissing access to courts claim where plaintiff did not identify underlying cause of action as insufficiently alleging actual injury); *Amaker v. Haponik,* No. 98 Civ. 2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999) (granting motion to dismiss access to courts claim for failure to demonstrate actual injury). The remainder of Plaintiff's access to courts claim is based on allegations regarding the *Airbourne* and Track 1 AWP class actions. A broad range of causes of action could be understood to fall within the right of access to courts

guaranteed to inmates, and it might well be reasonable to permit a greater range of claims with regard to interference with legal mail than with respect to the affirmative provision of legal materials in a prison library or otherwise-that is, where an inmate seeks to avoid interference with a claim, not to gain tools (and use state resources) to pursue one. However, the class actions at issue here do not fall within the range of those previously recognized, and the Court will not today expand the right so as to encompass them. Plaintiff's access to courts claim is therefore dismissed.

## B. First Amendment Right to Free Flow of Mail

**\*6** "In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351. A prisoner's mail may only be restricted to further " 'one or more of the substantial governmental interests of security, order, and rehabilitation' " and the restriction " 'must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v.. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims.

A prisoner has a right to be present when his legal mail is opened, but "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Id.* (citing *Wolff v. McDonnell,* 418 U.S. 539, 574–76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Washington,* 782 F.2d at 1139). Rather, an inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Id.* When balancing the competing interests implicated by restricting prison mail, "courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989); *Washington,* 782 F.2d at 1138–39; *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982)).

In *Washington v. James,* 782 F.2d 1134, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis,* 320 F.3d at 351 (citing *Washington,* 782 F.2d at 1139);

2011 WL 2848141

*see also Turner v. Safley,* 482 U.S. 78, 84–91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

As noted above, the Amended Complaint alleges that Clark read, photocopied, and withheld mail from the Court Appointed Settlement Administrator in *Wilson v. Airbourne* (AC ¶ 11), that Clark and Holland withheld the Settlement Check (*id.* ¶ 15), that on another separate occasion Defendant Clark opened, read, copied, and withheld legal correspondence in connection with a class action of "TRACK 1 AWP" (*Id.* ¶ 18.), that the practice of opening, reading, copying, and withholding legal correspondence was "wide spread" and included the same with regard to legal mail related to the class action of *Wilson v. Airbourne* sent to inmates Marcelo Rogriguez, DIN# : 76–A–3247, Francisco Jaureuqi, DIN # : 87–A–2530, and Juan Martinez, DIN# : 90–A–3108. (*Id.* ¶ 14.)

**\*7** The AC further alleges that Holland and Clark fabricated rules "requiring inmates to get permission from the facility superintendent before corresponding with court appointed settlement administrators, participating in civil litigation, or receiving court authorized settlement funds" (*id.* ¶ 17), and that Holland created a policy requiring inmates to "prove their legal claims to [the Department of Correctional Services] before raising same in a legal claim" (*id.* ¶ 18).

Plaintiff has adequately plead that Defendants engaged in an ongoing practice of censorship. Defendants make no effort to justify the alleged interference with the Plaintiff's mail in terms of a substantial governmental interest.[1] Plaintiff has therefore made sufficient allegations to state a First Amendment claim for interference with legal mail, and Defendants' motion to dismiss that claim is accordingly denied.

[1]  Because Plaintiff alleges that the check and related correspondence was confiscated and as was legal mail relating to the "Track 1 AWP" litigation, Defendants cannot successfully argue that the Amended Complaint alleges a mere delay in the plaintiff's receipt of the mailed items. *See Davis,* 320 F.3d at 352 ("Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation,' ") (quoting *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.)).

## II. Defendants' Qualified Immunity Claim

Defendants argue that they are entitled to qualified immunity because it was reasonable for them to believe that their actions did not violate clearly established law.

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). While not mandatory, Courts utilize the two-step analysis articulated in *Saucier v. Katz,* 533 U.S. 194, 201 (2001), when appropriate in assessing a claim of qualified immunity. *Pearson v. Callahan,* 55 U.S. 223, 129 S.Ct. 808, 821 (2009) ("Because the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case."). Qualified immunity is appropriate either if Plaintiff's allegations, if true, do not establish a constitutional violation, or if the right was not clearly established at the time it was allegedly infringed. *See Pearson,* 55 U.S. 223, 129 S.Ct. at 815–16; *Taravella v. Town of Wolcott,* 599 F.3d 129, 133 & n. 2 (2d Cir.2010) (citations omitted).

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). An official is therefore entitled to immunity if his action was "objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir.1999) (citing *Anderson,* 483 U.S. at 63 9) (quotation marks and alterations omitted).

*Taravella,* 599 F.3d at 133. In determining whether a particular right was clearly established, courts look to: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *See Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

2011 WL 2848141

**\*8**  It is clear that prohibiting a prisoner from receiving legal mail may violate the First Amendment. Defendants' contention that "they could not know that Plaintiff had a constitutionally protected ability to participate in class action lawsuits" (Def. Mem. Of Law in Support of Def. Mot. to Dismiss 22) misses the point.

On a number of occasions prior to the events in question, the Supreme Court has recognized that prisoners have a protected First Amendment right in sending and receiving correspondence. *See, e.g ., Thornburgh,* 490 U.S. at 407, 415; *Procunier v. Martinez,* 416 U.S. 396, 406, 415 (1974). So, too, has the Second Circuit. *See, e.g., Davis,* 320 F.3d at 351; *Allen v. Coughlin,* 64 F.3d 77, 81 (2d Cir.1995); *Purcell v. Coughlin,* 790 F.2d 263, 264 (2d Cir.1986); *Washington,* 782 F.2d at 1139. Both the Supreme Court and the Second Circuit have held that inmates' right to receive mail may be impinged only by regulations that are "reasonably related to legitimate penological interests." *See Turner,* 482 U.S. at 89; *Davidson v. Mann,* 129 F.3d 700, 701 (2d Cir.1997) (noting that prison regulation limiting stamps available to prisoners for non-legal mail was subject to *Turner* analysis and upholding the regulation under *Turner* ); *see also Nicholas v. Miller,* 189 F.3d 191 (2d Cir.1999) (vacating and remanding for failure to apply *Turner* factors to prison regulation allegedly impinging First Amendment rights). The Second Circuit has on numerous occasions reversed district court decisions dismissing a prisoner's claim that his right to send or receive mail was being violated. *See Allen,* 64 F.3d at 79–80 (reversing dismissal of claim relating to prison regulaitons forbidding the receipt of newspapers other than those sent directly from the publisher or an approved distributor); *Purcell,* 790 F.2d at 265 (reversing dismissal of claims relating to the interference of inmate's outgoing and incoming mail); *Washington,* 782 F.2d at 1139(same).

Given the existing precedent, Defendants should have been aware that Plaintiff's First Amendment right to receive mail could only be impinged by reasonable regulations connected to the legitimate concerns of prison officials. *See Amaker v. Haponik,* No. 98 Civ. 2663(JCK), 1999 WL 76798 (S.D.N.Y. Feb. 17, 1999) (addressing issue similar to that here and finding that right to receive mail absent reasonable prison regulation was well established for purposes of qualified immunity inquiry, independent of access to courts claim).[2] Defendants have failed to explain how their actions comport with well-established First Amendment law or how reasonable officials should have so concluded, and they fail to cite any case law in support of their argument.

[2] As here, *Amaker* involved alleged interference with an inmate's legal mail, assertedly in violation of prison regulations; Plaintiff alleged both an access to courts claim and a First Amendment free flow of legal mail claim; and Defendants asserted qualified immunity on a motion to dismiss. No. 98 Civ. 2663, 1999 WL 76798. Similarly, the court in *Amaker* was not in possession of the relevant regulations, and Defendants failed to provide information regarding whether a legitimate penological justification existed for the alleged interference. *Id.* at \*8. The Court adopts Judge Koeltl's reasoning in *Amaker* in large part here.

Furthermore, as in *Amaker v. Haponik,* at this stage of the proceedings it is premature to find that Defendants are entitled to qualified immunity. *See Amaker v. Haponik,* No. 98 Civ. 2663, 1999 WL 76798 at \*8. The Court has no information bearing on the *Turner* factors from which it could determine whether the defendants violated any clearly established constitutional right of Plaintiff. Defendants have not provided the Court with information concerning: 1) whether there is a legitimate penological justification for the alleged policy regarding correspondence with court appointed settlement administrators, 2) whether there are alternative means by which Plaintiff could exercise his First Amendment rights, 3) whether an accommodation of Plaintiff's right to receive mail would have an adverse impact on guards, other inmates, and prison resources generally, or 4) whether obvious, easy alternatives to the restriction exist. Nor has the Court been presented with adequate information regarding the regulations at issue in this case, which Plaintiff asserts Defendants' actions violated (AC ¶ 21), or how these regulations were applied to Plaintiff. A finding of qualified immunity is therefore premature. *See, e.g., Amaker v. Haponik,* No. 98 Civ. 2663, 1999 WL 76798, at \*8 (finding qualified immunity defense premature on a motion to dismiss); *Burgess v. Goord,* No. 98 Civ.2077, 1999 WL 33458, at \*6 (S.D.N.Y. Jan. 26, 1999) (same); *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at \*5 (S.D.N.Y. July 13, 1998) (same); *Whitley v. Westchester Correctional Facility,* No. 97 Civ. 0420, 1997 WL 659100, at \*9 (S.D.N.Y. Oct. 22, 1997) (same).

**\*9**  Defendants' motion to dismiss Plaintiff's First Amendment claim based on qualified immunity is therefore denied without prejudice.

2011 WL 2848141

***Conclusion***

Upon the conclusions set forth above, Defendants' motion to dismiss Plaintiff's denial of access to courts claim is granted, and Defendants' motion to dismiss Plaintiff's First Amendment claim is denied.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2848141

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1285648
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Andre ANTROBUS, Plaintiff,

v.

CITY OF NEW YORK, Defendant.

No. 11 Civ. 2524(RA).
|
Signed March 27, 2014.

*OPINION AND ORDER*

RONNIE ABRAMS, District Judge.

**\*1** Plaintiff, Andre Antrobus, brings this action *pro se* under 42 U.S.C. § 1983 against Defendant, the City of New York. He alleges that officers at two city correctional facilities interfered with his mail. The City moves to dismiss the case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The City's motion is granted in part and denied in part.

### I. Background

For purposes of this motion, the Court accepts as true all facts alleged by Plaintiff. *See Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007). The Court will also consider the supporting allegations contained in signed witness statements of fellow inmates which Plaintiff has attached to his Amended Complaint. *See Brass v. Am. Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (noting that, when deciding a motion to dismiss, the court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference").

The gravamen of the Amended Complaint is that Plaintiff's mail has been interfered with at two New York City correctional facilities, the George R. Vierno Center ("GRVC") and the Anna M. Kross Center ("AMKC"). (Am.Compl.1–3.) [1] Plaintiff alleges that correction officers have withheld his mail, stolen it, and failed to send it altogether. He further alleges that they have admitted to regularly opening and reading his legal mail. (*Id.* at 3, 5, 22, 33.) In particular, he states that officers have "been throwing away, [r]eading and thie[v]ing [his] mail" and that

they "stole and thr[e]w [away] garbage [b]ags of mail[,] some stamped." (*Id.* at 3.) Plaintiff also asserts that he would "put something in the mail [and] get no response ..." and that he has "no communication with [his][a]ttorney [be]cause ... mail do[es]n't go out or [it is] held and return[ed] read or takes 3 to 4 weeks." (*Id.* at 5.) The witness statements further allege that an officer in the mail room said she was not sending out Plaintiff's mail on instructions from her supervisors, that his mail was thrown away "many times," and that his mail has been held for a period of time and then returned to him without being sent. (*Id* . at 22, 29, 32, 35–37.)

[1] For ease of reference, any citations to specific pages of the Amended Complaint reflect page number designations made by the Court's Electronic Case Filing system.

One witness statement asserts that there is "a [l]imit on legal mail and when you hit your max you can't send mail to courts, [l]egal agencies and witnesses." (*Id.* at 23.) Another states that Plaintiff and other inmates have been told that they could not "send mail for several months" or "for 12 months." (*Id.* at 23, 26.) The Amended Complaint also appears to assert that Plaintiff has been improperly denied the right to send mail because he has no money to pay for postage. (*See id.* at 3, 22, 28, 30.)

Plaintiff alleges that, as a result, the City was responsible for "hampering and stopping [Plaintiff's] defense [and] not allowing [his] motions to [b]e adopted [be]cause of untimely fashion with courts ...." (*Id.* at 4.) He also accuses the City of "stopping access to legal agencies witnesses [l]awyers [l]osing cases civil and criminal ... and tactics to be unlawfully convicted." (*Id.* at 7.)

**\*2** According to Plaintiff, these events were "ongoing for 26 ½ months" or "24 months," starting when he was in custody at GRVC in 2011 and continuing through his 2013 detention at AMKC. (*Id.* at 2–3, 5.) He contends that he complained to numerous correction officers and attempted to file grievances, but that his complaints and grievances were ignored. (*Id.* at 3, 6.) Plaintiff also seems to indicate that he initiated Article 78 proceedings. (*Id.* at 6, 12.) Since filing his Amended Complaint, Plaintiff has been transferred to Green Haven Correctional Facility in Stormville, NY. (Dkt.65.)

Plaintiff requests a court investigation and "a ruling about indigent persons and legal mail [and] legal mail in general." (Am.Compl.4.) He also seeks $10 million in compensatory damages "for pain suffering, ... health issues

and mental stress disorders ....'' and $20 million in punitive damages. (*Id.* at 4, 7.)

## II. Applicable Legal Standard

"In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint .... [and] draw all reasonable inferences in favor of the plaintiff." *Kassner,* 496 F.3d at 237 (citation omitted). "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)). A *pro se* complaint "must be construed liberally with special solicitude and interpreted to raise the strongest claims that it suggests. Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir.2013) (internal quotation marks and citation omitted).

## III. Discussion

The Second Circuit has explained that tampering with a prisoner's mail may constitute an actionable violation of § 1983 "(1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Interference with a prisoner's mail thus may implicate two distinct rights: the "right of access to the courts" and the "right to the free flow of incoming and outgoing mail." *Id.*

### A. Right of Access to the Courts

Reading the Amended Complaint liberally, Plaintiff alleges that the City violated his constitutional right of access to the courts by interfering with his legal mail. He claims that the correction officers delayed and failed to send his outgoing legal mail, thereby causing him to lose motions and "hampering" his criminal defense. (Am.Compl.4, 7.) Plaintiff also asserts that correction officers violated his rights by reading his legal mail outside of his presence. (*Id.* at 3, 5, 11, 33.)

**\*3** To state a valid access-to-the-courts claim, however, "a prisoner must [also] allege that the prison officials' deliberate and malicious interference resulted in *actual injury,* such as the dismissal of an otherwise meritorious legal claim on direct appeal." *John v. New York Dep't of Corr.,*

130 F. App'x 506, 507 (2d Cir.2005) (internal quotation marks omitted and emphasis added); *see also Christopher v. Harbury,* 536 U.S. 403, 415 (2002) (plaintiff must allege injury to a "nonfrivolous" and "arguable" legal claim). In alleging actual injury, Plaintiff must specify in his Amended Complaint which legal matter the City has hindered him from pursuing. *See Christopher,* 536 U.S. at 415; *see also Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008) (explaining that, to show "actual injury" in this context, "plaintiff must demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim").

The allegations of injury in Plaintiff's Amended Complaint are not specific enough to state a plausible access-to-the-courts claim. Plaintiff appears to assert that he lost one or more motions due to mail delays (Am.Compl.4), but he provides no case names or numbers and does not even specify the court in which his motions were filed. Although Plaintiff further accuses the City of "hampering and stopping my defense ..." and "[l]osing cases civil and criminal sabotage effort and tactics to [b]e unlawfully convicted," (*id.* at 4, 7), these allegations are "no more than conclusions ... not entitled to the assumption of truth." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). Accordingly, Plaintiff's access-to-the-courts claim must be dismissed. *See, e.g., Bellezza v. Holland,* No. 09 Civ. 8434, 2011 WL 2848141, at \*5 (S.D.N.Y. July 12, 2011) (dismissing access-to-the-courts claim for failure to allege injury where plaintiff stated that he was "precluded from participating in future unspecified class-action litigation"); *Amaker v. Haponik,* No. 98 Civ. 2663(JGK), 1999 WL 76798, at \*3 (S.D.N.Y. Feb. 17, 1999) (dismissing access-to-the-courts claim for failure to allege injury where plaintiff asserted that interference with his mail delayed his court filings and caused the possible loss of two legal claims).

To the extent that Plaintiff claims that the City's interference with his mail caused him to be wrongfully convicted, there is another basis for dismissal. "In *Heck v. Humphrey,* 512 U.S. 477, 487 (1994), [the Supreme Court] held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." *Edwards v. Balisok,* 520 U.S. 641, 643 (1997). Plaintiff, therefore, is not permitted to seek monetary relief based on his alleged wrongful conviction, because he has not shown that his conviction has been invalidated. *See, e.g., Blake v.*

*Coughlin,* 205 F.3d 1321 (2d Cir.2000) (affirming dismissal of prisoner's wrongful conviction claim under § 1983 because his "conviction has not been reversed or vacated"); *Hoard v. Reddy,* 175 F.3d 531, 533 (7th Cir.1999) (explaining why monetary damages are not available under *Heck* for an access-to-the-courts claim until after a prisoner's conviction has first been set aside); *Holmes v. Grant,* No. 03 Civ. 3426(RJH) (RLE), 2006 WL 851753, at *12–13 (S.D.N.Y. Mar. 31, 2006) (section 1983 claim that the defendants caused dismissal of prisoner's habeas petition was barred by *Heck* ).

### B. First Amendment Right to the Free Flow of Mail

**\*4**  The Amended Complaint can also be read to assert a claim that the City violated Plaintiff's First Amendment right to the free flow of incoming and outgoing mail.[2] Plaintiff alleges that correction officers regularly read his legal mail outside of his presence and that they withheld, stole, threw away, and refused to send out his mail for months at a time. The City has not responded to this claim.

[2]   Although this claim is not explicitly asserted in the Amended Complaint, as previously noted, the Court must interpret the Amended Complaint "to raise the strongest claims that it suggests." *Hogan,* 738 F.3d at 515.

Prisoners have a First Amendment right to the free flow of incoming and outgoing mail. *See Heimerle v. Attorney General,* 753 F.2d 10, 12–13 (2d Cir.1985). To establish a violation of this right, the prisoner must show that the interference with his mail was both regular and unjustified. *See Davis,* 320 F.3d at 351. "Restrictions on prisoners' mail are justified only if they 'further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* (alterations in original) (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza,* 2011 WL 2848141, at *5–7 (dismissing access-to-the-courts claim for failure to allege injury, but holding that plaintiff adequately alleged a violation of his right to send and receive mail). It is thus not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail. *See, e.g., Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 WL 303713, at *4, 7 (S.D.N.Y. Mar. 29, 2001) (same); *Amaker,* 1999 WL 76798, at *3, 5–6 (same).

Plaintiff's assertions that correction officers read, withheld, threw away, and refused to send out his mail for months at a time adequately allege a constitutional violation. When correction officers regularly and unjustifiably read prisoners' mail, whether legal or non-legal, it violates their First Amendment right to the free flow of incoming and outgoing mail. *See, e.g., Heimerle,* 753 F.2d at 13–14 (plaintiff stated a First Amendment claim where he challenged a prison regulation that permitted guards to routinely read all incoming, non-legal mail); *Bellezza,* 2011 WL 2848141, at *6–7 (plaintiff stated a First Amendment claim where he alleged that the defendants regularly read his incoming legal mail and withheld it). Similarly, if officers regularly and unjustifiably withheld or threw away Plaintiff's mail, that would also violate his First Amendment rights. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 264–65 (2d Cir.1986) (plaintiff stated a claim where he alleged that the defendants refused to deliver periodicals to him and interfered with his outgoing mail on one occasion); *Moore v. Gardner,* 199 F.Supp.2d 17, 20, 25, 34–36 (W.D.N.Y.2002) (plaintiff stated a First Amendment claim where plaintiff accused the defendant of "withholding his mail, reading his mail, and disposing of his legal documents").

**\*5**  In addition, Plaintiff has asserted that the interference with his mail continued for approximately two years (Am.Compl.2–3, 5), which is more than sufficient to allege that the City's conduct was regular. *See Washington,* 782 F.2d at 1139 (although *pro se* prisoner specifically described only two instances of mail interference he had adequately alleged a "continuing activity"). The City's motion to dismiss is therefore denied as to Plaintiff's claim that it violated his First Amendment right to the free flow of incoming and outgoing mail.

### C. Municipal Liability

The City contends that Plaintiff "has failed to allege a basis for municipal liability." (Def.'s Mem. of Law 7.) "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir.2007) (alteration in original) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

Although Plaintiff has not pointed to an official, written policy, it can reasonably be inferred from the Amended

Antrobus v. City of New York, Not Reported in F.Supp.3d (2014)
2014 WL 1285648

Complaint that Plaintiff has alleged the existence of a policy or custom which was established at the supervisory level or which was "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y. City Police Dep't,* 971 F.2d 864, 870–71 (2d Cir.1992). Reading the Amended Complaint liberally, it alleges that numerous correction officers withheld, threw away, stole, and refused to send out Plaintiff's mail regularly and without justification for approximately two years. (Am.Compl.2–3, 5, 22–23, 26, 28–30, 32, 35–37.) Plaintiff asserts that the events occurred at two different facilities and that he filed grievances and made repeated complaints. (*Id.* at 2–3, 5–6.) Plaintiff explicitly refers to the existence of a "policy," asserting that, when he complained to a correction officer in the mail room "she gave me attitude about that[']s the[ir] policy." [3] (*Id.* at 5.)

[3]    Plaintiff also refers to the personal involvement of the former Kings County District Attorney and two Assistant District Attorneys. (Am.Compl.3, 27, 31.) In addition to the fact that the District Attorney is a representative of New York State, not the City, *see Baez v. Hennessy,* 853 F.2d 73, 77 (2d Cir.1988), other than bare conclusory allegations, Plaintiff has not alleged any facts from which the Court could plausibly infer that these individuals were involved in the alleged interference with Plaintiff's mail.

Beyond Plaintiff's own assertions, the signed witness statements incorporated into his Amended Complaint support Plaintiff's allegation regarding the existence of a policy or custom. One statement alleges that "the mail lady" said she had read Plaintiff's mail and that she was not sending out Plaintiff's mail, "[b]ecause her supervisors and courts told her she won't get paid." (Am.Compl.22.) Another alleges that "superiors and sub[ord]inates" have placed "a [l]imit on legal mail and when you hit your max you can't send mail to courts, [l]egal agencies and witnesses" and that Plaintiff and other inmates were informed that they could not "send mail for several months." (*Id.* at 23.) Yet another asserts that "they" were "holding [b]ack mail [be]cause the [ir] supervisors and courts told them to or they don't get paid." (*Id.* at 35.)

**\*6** Taking into account the liberal pleading standards applicable to *pro se* litigants, the Court finds that Plaintiff has adequately stated a claim for municipal liability. In *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 437 (S.D.N.Y.2004), a *pro se* prisoner asserted "that the City [was] liable for causing his injuries ... by failing to provide him

with a seatbelt," and the district court concluded that "[r]ead charitably, Plaintiff's complaint alleges that the City has adopted the policy of not providing prisoners with adequate protection on corrections bus[ ]es ." *See also Gachette v. Metro N. High Bridge,* No. 12 Civ. 3838(AJN), 2013 WL 144947, at \*5–6 (S.D.N.Y. Jan. 14, 2013) (inferring from *pro se* plaintiff's assertions of pay- and work-assignment disparities that he had alleged discrimination due to a municipal policy or custom). Plaintiff's Amended Complaint therefore meets the standard for a *pro se* litigant to assert municipal liability in this Circuit.

### D. Relief Available

As described above, Plaintiff seeks, among other things, $10 million in compensatory damages and $20 million in punitive damages. (*Id.* at 4, 7.) The Prison Litigation Reform Act precludes plaintiffs from recovering damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury ." 42 U.S.C. § 1997e(e). Although Plaintiff alleges that, in addition to "[e]motional distress, emotional d[e]spair, mental anguish, post traumatic stress disorder, ... [and] paranoia disorder," he also suffers from "kidney diseases" and other physical injuries, he has not explained how these alleged physical injuries are connected in any way to the asserted interference with his mail. (Am.Compl.3.) Accordingly, Plaintiff is barred from recovering damages for mental or emotional injuries.

Plaintiff is also precluded from recovering punitive damages from the City of New York under § 1983. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981); *Ciraolo v. City of New York,* 216 F.3d 236, 242 (2d Cir.2000). He is similarly unable to obtain declaratory or injunctive relief, because he is no longer in the custody of the City and those claims are thus moot. *See, e.g., Young v. Coughlin,* 866 F.2d 567, 568 n. 1 (2d Cir.1989). If Plaintiff prevails in this action, however, he may be entitled to other relief, such as nominal damages [4] or damages for the loss of any property. *See Thompson v. Carter,* 284 F.3d 411, 418–20 (2d Cir.2002). Therefore, his lawsuit need not be dismissed at this stage.

[4]    Nominal damages can be defined as "[a] trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated." 447 *Black's Law Dictionary* (9th ed.2009).

### IV. Conclusion

2014 WL 1285648

For the foregoing reasons, Plaintiff's claim that the City violated his constitutional right of access to the courts is dismissed. Plaintiff's First Amendment claim may proceed under the theory that he may be entitled to nominal or compensatory damages for the City's alleged interference with his right to the free flow of mail. The City shall notify the Court by April 3, 2014 if referral for a settlement conference with Magistrate Judge Gorenstein would be productive at this time. The Clerk of Court is respectfully directed to close the motions at docket numbers 47 and 63.

**\*7** SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1285648

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1129870

2020 WL 1129870
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jay BRADSHAW, Plaintiff,
v.
W. BURNS, et al., Defendants.

9:19-CV-0931 (BKS/DJS)
|
Signed 03/09/2020

**Attorneys and Law Firms**

JAY BRADSHAW, 08-A-3654, Plaintiff, pro se, Southport
Correctional Facility, P.O. Box 2000, Pine City, NY 14871.

**DECISION AND ORDER**

BRENDA K. SANNES, United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Jay Bradshaw commenced this action by filing
a pro se civil rights complaint pursuant to 42 U.S.C. §
1983 ("Section 1983"), together with an application for leave
to proceed in forma pauperis ("IFP"), and a motion for
preliminary injunctive relief. Dkt. No. 1 ("Compl."); Dkt. No.
6 ("IFP Application"); Dkt. No. 4 ("Preliminary Injunction
Motion"). [1] By Decision and Order of this Court filed on
October 1, 2019, plaintiff's IFP Application was granted in
accordance with 28 U.S.C. § 1915(g) based on the Court's
determination that plaintiff made a preliminary showing
that he is entitled to the "imminent danger" exception, and
following review of the complaint pursuant to 28 U.S.C. §
1915(e)(2)(B) and 28 U.S.C. § 1915A(b), some of plaintiff's
claims and some of the named defendants were dismissed and
service and a response was directed for the claims against
certain named defendants that survived sua sponte review.
Dkt. No. 9 ("October 2019 Order"). [2]

[1]     Plaintiff's initial application to proceed IFP
        was denied as incomplete and the action was
        administratively closed. Dkt. No. 5. Plaintiff then
        re-filed his IFP Application, and this action was re-
        opened. Dkt. Nos. 6, 7.

[2]     The Court also directed a response to plaintiff's
        Preliminary Injunction Motion and advised
        plaintiff of his obligation to take reasonable steps
        to ascertain the identity of the "Doe" defendants
        remaining in the case. *See* October 2019 Order at
        26-27.

Following the issuance of the October 2019 Order, plaintiff
was transferred to Southport Correctional Facility, one of the
named defendants was served, and counsel for that defendant
filed an opposition to the Preliminary Injunction Motion. *See*
Dkt. No. 11 ("Notice of Change of Address"); Dkt. No. 14
("Acknowledgment of Service for Defendant Russell"); Dkt.
No. 16 ("Opposition to Preliminary Injunction Motion"). By
Decision and Order filed on December 12, 2019, plaintiff's
Preliminary Injunction Motion was denied. Dkt. No. 25.

On December 19, 2019, an answer was filed on behalf of
defendants Burns, Huntley, Kotory, Russell, Smoyer, and
Trotz, and the next day, a Mandatory Pretrial Discovery and
Scheduling Order was issued. Dkt. No. 27 ("Answer"); Dkt.
No. 28 ("Scheduling Order").

Presently before the Court is plaintiff's amended complaint.
Dkt. No. 31 ("Am. Compl.").

**II. DISCUSSION**

**A. The Complaint and October 2019 Order**

In his original complaint, plaintiff asserted claims based on
alleged wrongdoing that occurred while he was incarcerated
at Mid-State Correctional Facility ("Mid-State C.F.") in the
custody of the New York State Department of Corrections and
Community Supervision ("DOCCS"). *See generally* Compl.

The complaint was construed to assert the following
claims: (1) a Fourth Amendment unlawful search claim
against defendants Creigo and Corrections Sergeant
John Doe #1; (2) Eighth Amendment conditions-of-
confinement claims against defendants Kotory, Russell,
Palmer, Huntley, Jennings, Smoyer, Whitman, Corrections
Officers John Doe #1-14, and Corrections Sergeants John
Doe #2-10 based on interference with plaintiff's sleep; and
(3) Eighth Amendment conditions-of-confinement claims
against defendants Huntley, Corrections Sergeant John Doe
#10, Corrections Officer Jane Doe, Trotz, and Shorts based
on interference with plaintiff's access to meals. *See* October
2019 Order at 11-12.

Bradshaw v. Burns, Not Reported in Fed. Supp. (2020)
2020 WL 1129870

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 159 of 212

**\*2** After reviewing the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), the Court found that plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Burns, Kotory, Russell, Smoyer, Whitman, Huntley, Trotz, Corrections Officers John Doe #11-13, Corrections Officer Jane Doe, and Corrections Sergeants John Doe #8-10 in their individual capacities survived sua sponte review and required a response. *See* October 2019 Order at 25. Plaintiff's official capacity claims were dismissed with prejudice, and his remaining claims were dismissed without prejudice for failure to state a claim upon which relief may be granted. *Id.* at 25-26. Defendants Creigo, Palmer, Jennings, Shorts, Corrections Officers John Doe #1-10, Corrections Officers John Doe #14-15, and Corrections Sergeants John Doe #1-7 were also terminated as defendants. *Id.* at 26.

### B. Overview of the Amended Complaint

Plaintiff's amended complaint re-asserts each of the claims contained in the original complaint, and also asserts new claims based on events that allegedly occurred after the filing date of the original complaint. *See generally*, Am. Compl. The amended complaint contains new allegations in support of plaintiff's claims, and names all of the defendants named in the original complaint except defendant Shorts, as well as several new defendants. *Id.* The following facts are set forth as alleged in the amended complaint.

### 1. Strip Search

On May 24, 2019, plaintiff was confined in the special housing unit ("SHU") at Downstate Correctional Facility, where he was "compelled to submit[ ] to a strip search by removing all of his clothing, lifting his genitals and spreading his buttock while bending over at the waist." Am. Compl. at 2. "After the strip search, [plaintiff] was placed on a bus and was continuously under officers' surveillance." *Id.* at 3. Despite having "no opportunity to obtain contraband[,]" and DOCCS' directives and policies "prohibit[ing] strip searches of inmates transferred from one SHU to another," defendant Corrections Officer Creigo forced plaintiff to submit to a strip search upon his arrival at Mid-State C.F. *Id.*

### 2. Cell Conditions

Throughout plaintiff's confinement at Mid-State C.F., i.e., between May 24 and October 6, 2019, he resided in a SHU cell in which a 15-Watt florescent night light remained on twenty-four hours a day. Am. Compl. at 4. A "stadium style" light also "beam[ed] in to the cell through the cell window and recreation pen door window directly over the bed[,]" and remained on twenty-fours hours a day. *Id.* Plaintiff complained to defendant Deputy Superintendent for Security and Acting Superintendent W. Burns about the lighting in his cell on June 14, 2019, and separately filed "numerous complaints" about this condition. *Id.* Defendant Burns advised plaintiff that he ordered the night lights installed, and that the lights "must remain on all night" and plaintiff is "not to cover the night light[.]" *Id.*

On May 25, 2019, at approximately 11 p.m., defendant Corrections Officer Kotory "appeared" at plaintiff's cell and directed him to remove the towel covering the night light. Am. Compl. at 5. Plaintiff refused to comply with the directive and told defendant Kotory that "the brightness of the night light made it difficult [to] sleep[.]" *Id.* Defendant Kotory then left, and shortly thereafter, the "area supervisor" arrived at plaintiff's cell and similarly instructed plaintiff to remove the towel covering the night light. *Id.* Plaintiff once again refused the directive. *Id.* at 5-6.

Over the next several hours, defendant Kotory and defendant Corrections Officer Doe #1, at the direction of defendant Corrections Sergeant Doe #1, proceeded to "bang on [plaintiff's] cell door during rounds to awake or keep [plaintiff] awake[.]" Am. Compl. at 6. [3] The next night, the same defendants engaged in the same conduct. *Id.*

[3] The amended complaint names several "Doe" defendants, but does identify these defendants with a "Jane" or "John" designation, as plaintiff did in the original complaint.

**\*3** Each night thereafter, until plaintiff was transferred to Southport Correctional Facility, a corrections sergeant directed the corrections officer(s) on night duty in the SHU to "bang on" plaintiff's cell door during rounds to keep him awake. Am. Compl. at 6-14. The following additional defendants were involved in this conduct: Corrections Sergeants Doe #2-29; Corrections Officers Doe #2-79; Corrections Officer Russell; Corrections Officer Palmer; Corrections Officer Huntley; Corrections Officer Jennings; Corrections Officer Smoyer; Corrections Officer Whitman;

2020 WL 1129870

Corrections Officer Rella; Corrections Officer Toozer; and Corrections Officer Mason. *Id.*

On July 15, 2019, plaintiff submitted a grievance regarding the banging on his cell door at the direction of the supervising sergeant. Am. Compl. at 10-11. Defendant Burns was also "placed on notice of the officers['] conduct and the affects [sic] on [plaintiff's] health." *Id.* at 14.

### 3. Meals

Between July 27 and August 1, 2019, plaintiff was denied thirteen out of eighteen meals by various corrections officers. Am. Compl. at 14-15. After each denial, one of the corrections officers who participated in the denial would notify a corrections sergeant of the denial "over the radio." *Id.* The following defendants were involved in denying plaintiff meals: Huntley; Corrections Officer Doe #80; Corrections Officer Sweet; Corrections Officer Rogers; Corrections Officer Lynch; Corrections Sergeant Trotz; Corrections Sergeant Doe #30; Corrections Sergeant Doe #31; and Corrections Sergeant Doe #32. *Id.*

On August 9, 2019, defendants Russell and Corrections Officer Matlock denied plaintiff "his two milks from his breakfast tray, which deprived him of an adequate diet, in retaliation [for plaintiff] filing grievances regarding the officers, including defendant Russell, banging on [his] cell door during the night ... and ... [depriving him of] food." Am. Compl. at 16. That same day, defendant Corrections Officer Pesek "deprived [plaintiff] his matzos and juice[,] which is part of his religious diet[.]" *Id.*

On August 10, 2019, defendant Rogers also denied plaintiff "his matzo and juice[.]" Am. Compl. at 16. On August 12 and 13, 2019, defendants Matlock and Smoyer denied plaintiff "his breakfast milks to deprive him of an adequate diet, in retaliation for [plaintiff] filing grievances." *Id.*

Plaintiff was also denied "matzos and juice" by defendant Pesek on August 16, 2017, by defendant Rogers on August 17, 2019, by defendant Trotz on August 23, 2019, by defendant Corrections Officer Witzigman on August 24, 2019, and by defendant Doe #81 on August 31, 2019. Am. Compl. at 16-17.

On September 10, 2019, defendant Jennings denied plaintiff a dinner tray, which was part of his necessary and religious diet.

Am. Compl. at 17. On September 21 and 22, 2019, defendant Smoyer denied plaintiff his "breakfast milks[.]" *Id.*

### 4. Mail

On June 4, 2019, plaintiff "attempt[ed] to send a notice of intention to file a claim, certified mail - return receipt requested, to the attorney general." Am. Compl. at 17. Plaintiff "attached to the envelope a disbursement form and an advance request form because he had no monies in his inmate accounts." *Id.*

On June 12, 2019, defendant Corrections Officer Doe #82 returned the mail, along with the disbursement and advance forms, with a note that read, "special handling must have money." Am. Compl. at 18. The next day, plaintiff "re-sent the mail with another disbursement and advance form [and a] notation simply stating [that] advance postage for a notice of intention to file claim, certified mail - return receipt requested, to the attorney general is permissible per DOCCS directive." *Id.* Thereafter, defendant Corrections Officer Doe #83 "returned the mails with the disbursement and advance forms [and a] note[,]" which read, "must have money to cover special handling." *Id.*

**\*4** On or about June 30, 2019, plaintiff submitted a grievance about "being indigent and denied funds to pay the certified mail - return receipt requested." Am. Compl. at 18. "It is DOCCS policy to provide funds for indigent prisoners who send a notice of intention to file a claim, certified mail - return receipt requested, to the attorney general." *Id.*

On August 7, 2019, plaintiff received a letter from his attorney, who "expressed his efforts to communicate with him, and that his correspondence sent to Mid-State had been returned to him with a note[, which read,] 'recipient could not be read.' " Am. Compl. at 18. On August 14, 2019, plaintiff attempted to send two notices of intention to file a claim by certified mail to the attorney general. *Id.* at 19. The next day, defendant Corrections Officer Doe #84 returned plaintiff's mail with a note, which stated, "special handling cannot be encumbered or advanced." *Id.*

On August 20, 2019, plaintiff received "five (5) legal mails that were unnecessarily held for several days before they were delivered to him." Am. Compl. at 19. On August 28, 2019, plaintiff received "two (2) legal mails[,]" which were date-stamped "Received Aug. 26, 2019[.]" *Id.* The previous day,

**Bradshaw v. Burns, Not Reported in Fed. Supp. (2020)**
Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 161 of 212

2020 WL 1129870

defendant Smoyer delivered legal mail during rounds, but did not deliver anything to plaintiff. *Id.*

On October 2, 2019, defendant Corrections Officer Glinton visited plaintiff at his cell and "mockingly stated, 'Bradshaw, you have legal.' " Am. Compl. at 19. Defendant Glinton, however, did not give plaintiff his legal mail until the next day. *Id.*

### 5. Recreation

On July 28, 2019, defendant Trotz ordered defendant Corrections Officer Doe #85 not to open the recreation pen door in plaintiff's cell "to deprive him of recreation in retaliation for his misbehavior" the previous day. Am. Compl. at 19-20. Between July 29 and August 1, 2019, defendant Corrections Sergeant Doe #33 ordered defendant Corrections Officer Doe #86 not to open plaintiff's cell recreation pen door "to deprive him of recreation in retaliation for [his] misbehavior on July 27, 2019." *Id.* at 20.

### 6. Plaintiff's Claims

Liberally construed, the amended complaint asserts the following claims against the named defendants in their individual capacities: (1) a Fourth Amendment unlawful search claim against defendant Creigo; (2) Eighth Amendment conditions-of-confinement claims against defendants Burns, Kotory, Russell, Smoyer, Whitman, Huntley, Trotz, Palmer, Jennings, Rella, Toozer, Corrections Officers Doe #1-79, and Corrections Sergeants Doe #1-29 based on interference with plaintiff's sleep; (3) Eighth Amendment conditions-of-confinement claims against defendants Huntley, Trotz, Sweet, Rogers, Lynch, Russell, Matlock, Pesek, Smoyer, Witzigman, Jennings, Corrections Officers Doe #80-81, and Corrections Sergeants Doe #30-32 based on interference with plaintiff's access to meals; (4) Eighth Amendment conditions-of-confinement claims against defendants Trotz, Corrections Officers Doe #85-86, and Corrections Sergeant Doe #33 based on denying plaintiff access to recreation; (5) First Amendment free exercise claims against defendants Russell, Matlock, Pesek, Rogers, Smoyer, Trotz, Witzigman, Jennings, and Doe #81;[4] (6) First Amendment retaliation claims against defendants Russell, Matlock, Pesek, Rogers, Smoyer, Trotz, Witzigman, Jennings, Corrections Officers Doe #81, #85, and #86, and Corrections Sergeant Doe #33; and (7) First Amendment free-

flow-of-mail and access-to-courts claims against defendants Smoyer, Glinton, and Corrections Officers Doe #82-84.

[4]     Although plaintiff alleges that he was denied 13 out of 18 meals between July 27 and August 1, 2019, he does not assert a free exercise claim with respect to these alleged denials. *See* Am. Compl. at 21. Instead, plaintiff's free exercise claim is asserted against only the officials who allegedly denied him "matzos and juice" between August 9 and September 22, 2019. *See id.* at 14-17, 20-21.

 **\*5** For a more complete statement of plaintiff's claims, reference is made to the amended complaint.

### C. Analysis

Because plaintiff is proceeding in forma pauperis and is an inmate suing government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) was discussed at length in the October 2019 Order and it will not be restated in this Decision and Order. *See* October 2019 Order at 6-8.

### 1. Strip Search Claim

The legal standard governing unlawful search claims was discussed at length in the October 2019 Order and it will not be restated in this Decision and Order. *See* October 2019 Order at 15-16. The Court would add only that the Second Circuit held, in the context of a Fourth Amendment claim brought on behalf of detained juveniles subjected to strip searches before and after their transfer from one detention facility to another, even though they had been shackled and supervised during the pendency of the transfer, that the State does not have an "interest sufficient to warrant repeated strip searches simply because of transfers to other facilities." *N.G. v. Connecticut*, 382 F.3d 225, 233-34 (2d Cir. 2004). The court further determined that the state's ability to "maintain surveillance during custody after an initial strip search ... render[ed] unreasonable a subsequent strip search in the absence of a reasonable suspicion of possession of contraband." *Id.* at 234. Since then, the Circuit has reaffirmed that a strip search policy is not "reasonably related to penological interests" where inmates are searched "when there was no possibility that they could have obtained

contraband." *See Turkmen v. Hasty*, 789 F.3d 218, 260 (2d Cir. 2015), *rev'd in part on other grounds sub nom. Ziglar v. Abasi*, 17 S. Ct. 1843 (2017).

Although the Court previously dismissed this claim, the amended complaint expressly alleges that plaintiff had no opportunity to obtain contraband between when he was searched at Downstate Correctional Facility and when he was searched at Mid-State C.F., and that DOCCS' policies and directives prohibit inmates from being strip searched when transferred from one SHU location to another. Accepting these new allegations as true, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's Fourth Amendment unlawful search claim against defendant Creigo survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 2. Conditions-of-Confinement Claims

The legal standard governing plaintiff's conditions-of-confinement claims based on interference with sleep and access to meals was discussed at length in the October 2019 Order and it will not be restated in this Decision and Order. *See* October 2019 Order at 17-23. With respect to plaintiff's conditions-of-confinement claim based on the denial of recreation, the legal standard is discussed more fully below.

### (a) Cell Conditions

 **\*6**  In the October 2019 Order, the Court found that plaintiff's claims based on his cell conditions at night warranted a response from defendant Burns and the defendants allegedly involved in "banging" on his cell to keep him awake on more than one occasion. *See* October 2019 Order at 19-21.

The allegations in the amended complaint are more specific than the allegations in the original complaint with respect to plaintiff's conditions-of-confinement claims based on interference with his sleep, and plausibly suggest that (1) the "banging" on plaintiff's cell occurred every night between May 25 and October 6, 2019, (2) almost every defendant allegedly involved in "banging" on plaintiff's cell either

engaged in this activity more than once, or was directed to engage in this activity by a superior officer who was aware that this activity had previously occurred, and (3) the "banging" prevented plaintiff from sleeping. *Compare* Compl. *with* Am. Compl.

Accordingly, and for the reasons set forth in the October 2019 Order, plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Burns, Kotory, Russell, Smoyer, Whitman, Huntley, Trotz, Palmer, Jennings, Rella, Toozer, Corrections Officers Doe #1-79, and Corrections Sergeants Doe #1-29 based on interference with his sleep survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### (b) Meals

In the October 2019 Order, the Court found that plaintiff's claims against the defendants allegedly involved in denying him more than one meal on July 26 and July 27, 2019, survived sua sponte review and required a response. *See* October 2019 Order at 22.

The amended complaint contains supplemental allegations regarding alleged meal deprivations that occurred on five consecutive days after the filing date of the original complaint, as well as an allegation that each of these meal deprivations was recorded in the "log book per DOCCS policy." *See* Am. Compl. at 14-15. Plaintiff also separately alleges that certain officials denied him an "adequate diet" by depriving him of meal items on a limited number of occasions between August 9 and September 22, 2019. *Id.* at 16-17.

Insofar as plaintiff has asserted a conditions-of-confinement claim based on being denied thirteen out of eighteen meals over a six-day period, the Court finds, for the reasons set forth in the October 2019 Order, that a response to this claim is warranted. Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claim against defendants Huntley, Trotz, Sweet, Rogers, Lynch, Corrections Officer Doe #80, and Corrections Sergeants Doe #30-32 based on denying him access to meals between July 27 and August 1, 2019, survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

The Court, however, reaches a different conclusion with respect to plaintiff's Eighth Amendment "inadequate diet" claim, which is based on allegations that various corrections officials deprived him of a constitutionally adequate diet by denying him "matzos and juice" on eight occasions, "two milks" on four occasions, and a dinner meal on one occasion between August 9 and September 22, 2019. *See* Am. Compl. at 16-17. [5]

[5]    Plaintiff's free exercise and retaliation claims based on alleged denials of food and drink items between August 9 and September 22, 2019, are addressed separately, below.

**\*7** As an initial matter, the amended complaint does not allege that plaintiff did not receive anything to drink on the occasions in which he was denied milk or juice, or say anything about whether the sink in his cell was dispensing safe drinking water during this time. Similarly, plaintiff does not allege that he did not receive anything else to eat on the occasions in which he was denied matzos. Furthermore, the amended complaint is devoid of any allegations which plausibly suggest that any of the alleged food or drink deprivations placed plaintiff's health and well being in any danger. *See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (noting that the Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." (quotation marks and citation omitted)). Thus, there is no basis for the Court to plausibly infer that plaintiff was denied a nutritionally adequate diet based on the alleged deprivations he experienced between August 9 and September 22, 2019. *See, e.g., Crichlow v. Fischer*, No. 9:17-CV-00194 (TJM/TWD), 2017 WL 6466556, at \*14 (N.D.N.Y. Sept. 5, 2017) (rejecting argument that providing "general population" meals instead of special diet meals on three out of four consecutive days was sufficient to state an Eighth Amendment claim), *report and recommendation adopted by* 2017 WL 6459512 (N.D.N.Y. Dec. 18, 2017); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at \*8-9 (S.D.N.Y. Mar. 8, 2012) (alleged denial of two meals, one-time denial of prescribed therapeutic diet soy milk, and one-time denial of a "second chicken patty" over a six-month period was insufficient to state an Eighth Amendment claim); *Barclay v. New York*, 477 F. Supp. 2d 546, 554-55 (N.D.N.Y. 2007) (being denied food for two or three days for a messhall violation did not amount to a constitutional violation).

In addition, even if the Court were to assume that plaintiff was denied a nutritionally adequate diet by being deprived of a single dinner meal out of the approximately 132 meals he received between August 9 and September 22, 2019, along with milk or juice for 13 of these meals and matzos for 9 of these meals, the amended complaint is devoid of any allegations which plausibly suggest that any of the corrections officials who allegedly denied plaintiff these meal items did so despite knowing that plaintiff was suffering from complications as a result of an inadequate diet. Indeed, the amended complaint lacks any allegations which plausibly suggest that plaintiff notified any corrections official, after any of the alleged occasions in which he did not receive a particular food or drink item, that he was not receiving nutritionally adequate food or drink. *Cf. Evans v. Albany Cnty. Corr. Facility*, No. 9:05-CV-1400, 2009 WL 1401645, at \*9 (N.D.N.Y. May 14, 2009) (finding that if a prisoner fails to advise staff of his medically prescribed dietary needs, "deliberate indifference does not exist"); *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) ("Mere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation[.]"). Thus, the allegations in the amended complaint are also insufficient to satisfy the subjective element of this Eighth Amendment claim.

Accordingly, plaintiff's Eighth Amendment "inadequate diet" claim against defendants Russell, Matlock, Pesek, Smoyer, Witzigman, Jennings, and Corrections Officer Doe #81 is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### (c) Recreation

"Because exercise is one of the basic human needs protected by the Eighth Amendment, prisoners must be afforded some opportunity for exercise." *Davidson v. Coughlin*, 968 F. Supp. 121, 129 (S.D.N.Y. 1997) (citing *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996)). The right to exercise, however, is not limitless, nor does it guaranty an inmate's ability to participate in all forms of recreation. *Id.* Moreover, isolated interruptions or denials of the right to exercise do not amount to a violation of an inmate's Eighth Amendment rights. *See Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment);

2020 WL 1129870

*Barnes v. Craft*, No. 04-CV-1269 (MAD/GHL), 2008 WL 3884369, at *9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation"); *Gibson v. City of New York*, No. 96-CV-3409, 1998 WL 146688, at *3 (S.D.N.Y. Mar. 25, 1998) (denial of recreation for eight days in a sixty-day period and the opportunity to exercise on two consecutive days found not constitutionally actionable).

**\*8** In this case, plaintiff alleges that he was denied outdoor exercise on five consecutive days between July 28 and August 1, 2019. Am. Compl. at 19-20. As noted, courts have rejected Eighth Amendment claims based on similar isolated limitations on outdoor exercise. *See Branham*, 77 F.3d at 630-31; *Barnes*, 2008 WL 3884369, at *9. Morever, the amended complaint lacks any allegations which plausibly suggest that plaintiff was unable to exercise in his cell during this time period. *See Huggins v. Schriro*, No. 14-CV-6468, 2015 WL 7345750, at *6 (S.D.N.Y. Nov. 19, 2015), *report and recommendation adopted by* 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016) (dismissing claim where plaintiff had not alleged that he could not exercise in his cell).

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claim based on the denial of recreation is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Free Exercise Claims

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See* U.S. Const. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

To state a claim under the Free Exercise Clause of the First Amendment, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75

(articulating test that inmates "must show at the threshold that the disputed conduct ... burdens his sincerely held religious beliefs," prior to advancing to the *Turner* test and "legitimate penological interests that justify the impinging conduct"). "For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith." *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at *22 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 Fed. App'x 82 (2d Cir. 2015) (summary order); *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) (rejecting the argument that in deciding what constitutes a substantial burden, courts must "be made to decide the number of violations of a particular religious tenet that make a sin grievous").

In this case, the amended complaint alleges that between August 9 and September 22, 2019, plaintiff was denied one meal, as well as certain food and drink items that are part of a religious meal on eight occasions. The amended complaint, however, fails to identify plaintiff's religion. Moreover, plaintiff does not allege that eating matzos and drinking juice is a central tenet of his religion. Thus, the Court has no basis to plausibly infer that the alleged food and drink deprivations placed a substantial burden on plaintiff's sincerely held religious beliefs. *See Sassi v. Dutchess Cty.*, No. 9:16-CV-1450 (TJM), 2017 WL 4773320, at *8 (N.D.N.Y. Oct. 20, 2017) (finding, where "[p]laintiff allege[d] that he was prevented from accessing a Bible (either his own or one purchased from the Jail's commissary) for seven days, and denied participation in Bible study classes while incarcerated at the Warren County Jail[,]" that the amended complaint failed to state a free exercise claim because it was "devoid of any allegations that would establish that Plaintiff has a sincerely held religious belief, or that preventing him from accessing a Bible for seven days or attending Bible study classes substantially burdened that belief"); *Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 (S.D.N.Y. Feb. 2, 2017) ("Plaintiff does not allege that the specific services were central or important to his faith.... Accordingly, the Court grants Defendants' Motion to Dismiss Plaintiff's First Amendment claims on the grounds that Plaintiff has failed to make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs.") (internal quotation marks and citations omitted); *Abreu v. Travers*, No. 9:15-CV-0540 (MAD/ATB), 2016 WL 6127510, at *14 (N.D.N.Y. Oct. 20, 2016) ("Here, plaintiff fails to identify his religion, thus making it impossible for the Court to determine if the

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 165 of 212

Bradshaw v. Burns, Not Reported in Fed. Supp. (2020)

2020 WL 1129870

denial of one kosher meal placed a substantial burden on his religious beliefs. Plaintiff alleges no facts to suggest that defendants interfered with a tenet or belief that is central to any religious doctrine. Accordingly, plaintiff's First Amendment free exercise claims against defendants Forbes, Jarvis, and Santamore are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted."); *Shapiro v. Cmty. First Servs.*, Inc., No. 11-CV-4061, 2014 WL 1276479, at *10 (E.D.N.Y. Mar. 27, 2014) ("At the motion to dismiss stage, a complaint must assert sufficient allegations necessary to establish that [the] plaintiff's claim is based upon a sincerely held religious belief.") (alteration and internal quotation marks omitted); *Leach v. New York City*, No. 12-CV-3809, 2013 WL 3984996, at *2 (S.D.N.Y. Aug. 2, 2013) ("Leach does not assert that eating matzos on a regular basis is a central tenet of Judaism, nor does he specify how often he was denied access to Kosher meals, if at all. The intermittent failure to provide incarcerated individuals with food complying with their religious dietary restrictions is a de minimis imposition falling far short of the substantial burden requirement."); *cf. Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) ("Because [the plaintiff] has neither alleged nor submitted any proof that he sincerely holds to any religious belief that mandates the use of Tarot cards, we conclude that summary judgment was appropriate on the free exercise claim.").

 *9 Accordingly, plaintiff's First Amendment free exercise claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. Retaliation Claims

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected

speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492).

The Second Circuit has defined "adverse action" as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Davis*, 320 F.3d at 353). Conduct that is "de minimis" does not give rise to actionable retaliation. *Dawes*, 239 F.3d at 493. Moreover, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Insofar as plaintiff asserts a First Amendment retaliation claim based on allegations that he was denied recreation "for his misbehavior on July 27, 2019," *see* Am. Compl. at 20, plaintiff's unidentified "misbehavior" is not protected activity. Accordingly, plaintiff's retaliation claims based on being denied recreation are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

Insofar as plaintiff asserts a First Amendment retaliation claim based on allegations that he was denied food and drink items because of grievances he filed, the amended complaint lacks any allegations which plausibly suggest that any of the officials who allegedly denied plaintiff meal items other than defendant Russell were aware of any of plaintiff's prior grievances. *See Brooks v. Hogan*, No. 9:14-CV-0477 (LEK/DJS), 2017 WL 1025966, at *3 (N.D.N.Y. Mar. 16, 2017) (finding "no basis in the Complaint for a First Amendment retaliation claim against Velte" where there was "no indication that he was aware of any protected speech that Brooks had engaged in, or that he was retaliating against Brooks for that speech"); *Wilson v. Kelly*, No. 9:11-CV-0030 (MAD/RFT), 2012 WL 3704996, at *9 (N.D.N.Y. Aug. 27, 2012) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity); *Smith v. Miller*, No. 15-CV-9561, 2017 WL 4838322, at *7 (S.D.N.Y. Oct. 23, 2017) ("While there may exist instances in which retaliation claims may be established against defendants who were not personally involved in the original incident, at a minimum, plaintiffs must allege that such defendants have personal knowledge of the protected activity that purportedly motivated the retaliatory conduct.").

2020 WL 1129870

**\*10** Furthermore, with respect to defendant Russell, the amended complaint alleges that he denied plaintiff matzos and juice on one occasion. *See* Am. Compl. at 16. The Court has no basis to plausibly infer that the alleged denial of matzos and juice -- items that were apparently part of a larger meal -- on one occasion would chill a person of ordinary firmness from continuing to engage in First Amendment activity. *See, e.g., Hill v. Laird*, No. 06-CV-126, 2014 WL 1315226, at \*11 (E.D.N.Y. Mar. 31, 2014) (holding that the defendant's alleged "refusal to give [the] [p]laintiff his food" on one occasion "[did] not rise to the level of adverse actions"); *Edwards*, 2012 WL 760172, at \*14 n.13 ("The denial of meals on two occasions, separated by more than three months, is de minimis and not actionable." (italics omitted)); *Holmes v. Grant*, No. 03-CV-3426, 2006 WL 851753, at \*15 (S.D.N.Y. Mar. 31, 2006) (finding that the plaintiff's allegation that the defendants "served him a meal without veal" did not state a claim for retaliation); *Snyder v. McGinnis*, No. 03-CV-902, 2004 WL 1949472, at \*11 (W.D.N.Y. Sept. 2, 2004) ("But even if the Court were to assume that the denial of food to the plaintiff on two occasions constituted acts of retaliation, the Court finds that the actions complained of were de minimis and not actionable; such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity.").

Accordingly, plaintiff's retaliation claims based on being denied food and drink items are also dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 5. Access-to-Courts Claims

In *Bounds v. Smith*, the Supreme Court held that access to the courts is a fundamental right that requires prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. 817, 828 (1977). The right of access to the courts is also implicated when a prisoner experiences interference with his mail. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).

The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds*, 430 U.S. at 828, *modified on other grounds, Lewis*

*v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004). [6] "However, this right is not 'an abstract, freestanding right....' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

[6]  "[A] person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment." *Lasher v. Dagostino*, No. 9:16-CV-0198 (BKS), 2016 WL 1717205, at \*4 (N.D.N.Y. Apr. 28, 2016) (collecting cases).

To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. *Lewis*, 518 U.S. at 353; *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261 (N.D.N.Y. 2003) ("Prison officials may only be held liable for such injury if they frustrated or impeded a prisoner's efforts to pursue a non-frivolous legal claim.").

"A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at \*3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 349, 351-53 (noting that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense").

The Supreme Court has stated that in order to allege a denial of access to the courts claim, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint...." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The Supreme Court instructed that the underlying claim "must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 415-16. "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417-18 (footnote omitted).

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 167 of 212
Bradshaw v. Burns, Not Reported in Fed. Supp. (2020)
2020 WL 1129870

**\*11** "Finally, ... the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. Rather, the injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] ... to challenge the conditions of [his] confinement." *Id.* at 355. "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

Here, plaintiff does not allege that he was continuously denied access to legal mail or legal materials while incarcerated at Mid-State C.F. Rather, he alleges that he was prevented from filing notices of claims with the New York Attorney General on three occasions between June 4 and August 15, 2019, based on his failure to pay the cost of sending the notices by certified mail, and that he separately experienced a delay in his receipt of incoming legal mail. Am. Compl. at 17-19.

The amended complaint is devoid of any allegations which plausibly suggest that plaintiff suffered an "actual injury" in any legal proceeding as a result of the alleged issues he experienced with his mail. Plaintiff does not allege, for example, that he continued to be prevented from filing notices of claims with the New York Attorney General after August 15, 2019, and despite his alleged filing of a grievance on June 30, 2019, or that the refusal to send one or more of his notices by certified mail rendered one or more of his claims untimely. *See Davis*, 320 F.3d at 352 ("Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " (quoting *Jermosen v. Coughlin*, 877 F.Supp. 864, 871 (S.D.N.Y. 1995)); *see also Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (dismissing claim for interference with access to courts where plaintiff did not make showing as to how challenged conduct hindered him). Furthermore, the amended complaint lacks any allegations regarding the underlying claim(s) that were the subject of the notices of claims that plaintiff attempted to file, and thus the Court also has no basis to plausibly infer that the arguable nature of the underlying claim(s) was more than hope.

Accordingly, plaintiff's First Amendment access-to-courts claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 6. Free-Flow-of-Mail Claims

"In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis*, 320 F.3d at 351. A prisoner's mail may only be restricted to further " 'one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011) (dismissing access-to-the-courts claim for failure to allege injury, but holding that plaintiff adequately alleged a violation of his right to send and receive mail). "It is thus not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail." *Antrobus v. City of New York*, No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (citations omitted).

**\*12** As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, ... an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

At this stage of the proceeding, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's First Amendment free-flow-of-mail claims against defendants Smoyer, Glinton, and Corrections Officers Doe #82-84

Bradshaw v. Burns, Not Reported in Fed. Supp. (2020)

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 168 of 212

2020 WL 1129870

survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

**III. CONCLUSION**
**WHEREFORE**, it is hereby

**ORDERED** that the amended complaint, as modified by this Order, is accepted for filing and is the operative pleading; and it is further

**ORDERED** that the Clerk shall revise the docket to add Corrections Officers Rella, Toozer, Sweet, Rogers, Lynch, Matlock, Pesek, Witzigman, and Glinton as defendants, and identify the "Doe" defendants individually or by group as follows: (1) Corrections Officers John Doe #1-79; (2) Corrections Officer John Doe #80; (3) Corrections Officer John Doe #81; (4) Corrections Officers John Doe #82-84; (5) Corrections Officers John Doe #85-86; (6) Corrections Sergeants John Doe #1-29; (7) Corrections Sergeants John Doe #30-32; and (8) Corrections Sergeant John Doe #33; and it is further

**ORDERED** that the following claims **SURVIVE** sua sponte review and require a response: (1) plaintiff's Fourth Amendment unlawful search claim against defendant Creigo; (2) plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Burns, Kotory, Russell, Smoyer, Whitman, Huntley, Trotz, Palmer, Jennings, Rella, Toozer, Corrections Officers Doe #1-79, and Corrections Sergeants Doe #1-29 based on interference with his sleep; (3) plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Huntley, Trotz, Sweet, Rogers, Lynch, Corrections Officer Doe #80, and Corrections Sergeants Doe #30-32 based on denying him access to meals between July 27 and August 1, 2019; and (4) plaintiff's First Amendment free-flow-of-mail claims against defendants Smoyer, Glinton, and Corrections Officers Doe #82-84; and it is further

**ORDERED** that all remaining claims are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the amended complaint, to the United States Marshal for service on defendants Whitman,

Creigo, Palmer, Jennings, Rella, Toozer, Sweet, Rogers, Lynch, and Glinton;[7] and it is further

[7]  Because Joshua E. McMahon, on behalf of the Office of the New York State Attorney General, has appeared in this action as counsel for defendants Burns, Kotory, Russell, Huntley, Smoyer, and Trotz, the Clerk need not issue a summons for these defendants.

**\*13 ORDERED** that upon the completion of service on defendants Whitman, Creigo, Palmer, Jennings, Rella, Toozer, Sweet, Rogers, Lynch, and Glinton, a response to plaintiff's amended complaint be filed by these defendants and defendants Burns, Kotory, Russell, Huntley, Smoyer, and Trotz, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that plaintiff must continue to take reasonable steps to ascertain the identity of the "Doe" defendants remaining in this action, and when identified, seek to amend the amended complaint to add the individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

2020 WL 1129870

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff and counsel for the defendants who have appeared in this action.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1129870

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 210317

2020 WL 210317
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony D. AMAKER, Plaintiff,
v.
A. BOYD, et al., Defendants.

9:19-CV-1253 (LEK/ATB)
|
Signed 01/14/2020

**Attorneys and Law Firms**

Anthony D. Amaker, Brooklyn, NY, pro se.

## DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

**\*1** The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff Anthony D. Amaker asserting claims pursuant to 42 U.S.C. §§ 1981 and 1983, the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq., and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq. Dkt. No. 2 ("Complaint"). [1]

[1] This action was originally commenced in the Southern District of New York. By Order filed May 12, 2017, the Honorable Colleen McMahon of the Southern District of New York denied Plaintiff's application to proceed in forma pauperis pursuant to 28 U.S.C. § 1915(g). Dkt. No. 4. Judge McMahon found Plaintiff had acquired more than "three strikes" before commencing the action and failed to show that he was in imminent danger of serious physical injury at the time of filing. Id. Thereafter, Plaintiff paid the $400.00 filing fee, and by Order filed August 26, 2019, the action was re-opened. Dkt. No. 12. By Order filed October 3, 2019, Plaintiff's claims arising out of his incarceration at Bare Hill Correctional Facility were severed and transferred to the Northern District of New York. Dkt. No. 13.

## II. SUFFICIENCY OF THE COMPLAINT

### A. Governing Legal Standard

Under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." § 1915A(a)–(b); see also Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting § 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

A court may not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In assessing whether this standard has been met, courts "must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party's favor." In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007) (internal citation omitted). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Twombly, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Id. (internal quotation marks and alterations omitted).

**\*2** The Court must construe pro se complaints liberally, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 171 of 212

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted).

**B. Summary of the Complaint**

Plaintiff asserts allegations of wrongdoing that occurred while he was incarcerated at Bare Hill Correctional Facility ("Bare Hill C.F.") and in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). See generally Compl. The following facts are set forth as alleged in the Complaint.

In March 2015, Plaintiff suffered from knee discomfort, "lower herniated discs[,] and sciatica" while incarcerated at Otisville Correctional Facility ("Otisville C. F."). Id. at 3.

On June 30, 2016, Plaintiff was transferred to Bare Hill C. F. from Fishkill Correctional Facility. Id. at 13. Upon his arrival at Bare Hill C. F., Plaintiff "witnessed a racism assault on a dark skin[ned] Hispanic prisoner" and "was subjected to racial intimidation and harassment." Id. Plaintiff was also denied his Ramadan meal for two days despite informing the sergeant in the reception room of his desire for religious meals. Id. at 13–14. After Plaintiff received his Ramadan meals, he was denied permission to attend religious services for two weeks, until he filed a grievance. Id. at 14. The issue was then corrected. Id.

On or about July 30, 2016, Plaintiff slipped in the shower and injured "the second toe on [his] left foot." Id. at 15. [2] Following the injury, Plaintiff was transported by van to "the clinic." Id. at 15–16. Upon arriving at the clinic, Plaintiff was examined by Nurse M. Harmon, who pressured Plaintiff to move his toe even after plaintiff informed her that he was unable to "wiggle [his] toe" and was "in pain." Id. at 16. Thereafter, Harmon asked Plaintiff to sign the injury report that she completed, which he refused to do because the document contained "misinformation" about the condition of his toe. Id. at 16–17. After Plaintiff refused to sign the injury report, Harmon walked away, placed a call on "the phone on the back wall[,]" left the room, and then returned with two corrections officials. Id. at 17. One of those corrections officials, Sergeant Coleman, [3] "asked [Plaintiff] what the problem was and kept ... disrespectfully telling [Plaintiff] [that he] was harassing the nurse." Id. Plaintiff explained

that Harmon wanted him to sign something that contained incorrect information, and Coleman directed Plaintiff to correct the document as he desired and then sign it. Id. Plaintiff then signed the form, and Coleman told Harmon and another correction officer, Albert, [4] to "write a misbehavior report for harassment[.]" Id.

[2]     Plaintiff states that his slip-and-fall happened thirty days after his arrival at Bare Hill C. F. Id. at 13, 15.

[3]     Plaintiff has not alleged a first name or initial.

[4]     Plaintiff has not alleged a first name or initial.

Following the issuance of the misbehavior report, Plaintiff was "cube confine[d]." Id. at 17. As a result of the misbehavior report, Plaintiff had to "wait four days to see a doctor for [his] dislocated toe[,]" during which time he was in "extreme pain." Id. at 18.

*3 Thereafter, Plaintiff received a disciplinary hearing on the misbehavior report, which was presided over by Correction Lieutenant Flint. [5] Id. at 17–18. Flint denied Plaintiff's request to introduce into evidence copies of the "schedule for de-escalation of writing [a] misbehavior report and re-training of the staff throughout the State of New York." Id. Flint also caused Plaintiff's statements and objections to be deleted from the transcript of the hearing and denied Plaintiff's request to call a doctor as a witness, even though the proposed witness would have offered testimony that Plaintiff's toe was actually injured. Id. at 18. Flint found that the misbehavior report was justified because Plaintiff "had no injury." Id. Following the hearing, Flint sentenced Plaintiff to thirty days of lost privileges and "cube confinement." Id. Correction Captain A. Boyd upheld this determination. Id.

[5]     Plaintiff has not alleged a first name or initial.

Plaintiff also raises additional allegations about the manner in which religious practices were handled at Bare Hill C. F. On an unidentified date during Eid-Ul-Fitr, Correction Officer Benior [6] "refused to supply the Sahor [sic] bag to start the fast, despite being told to do so." Id. at 14. In addition, on or before January 11, 2017, Reverend Ranney [7] caused an "erroneous packet" to be distributed, which directed that members of the Nation of Islam to pick up Sahor [sic] bags from the mess hall on February 25, 2017, and return to the gym to eat at 12:30. Id. On January 11, 2017, Plaintiff notified the "facilitator" that the timing and consumption location

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 172 of 212

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

for the meal was wrong. Id. However, this error was not corrected, and as a result, Plaintiff was not allowed to take food back to his cell. Id. Superintendent B. Yelich, Deputy Superintendents D. Phelix and S. Barton, and Ranney were responsible for the violation of Plaintiff's religious rights because they "allow[ed] non-Nation of Islam members to dictate [the] practice of religion" at Bare Hill C. F. Id.

6      Plaintiff has not alleged a first name or initial.

7      Plaintiff has not alleged a first name or initial.

Plaintiff also seems to suggest that Ranney impaired the rights of Nation of Islam members in other ways, including (1) not placing a DVD in the locker for class; (2) ending the class at 9:00 p.m. instead of 10:00 p.m.; and (3) failing to submit paperwork for a fundraiser. Id. at 15. 8 According to Plaintiff, this is because Ranney has a "conflict of interest" because of "deep-seated racial animosity at Bare Hill C. F." Id.

8      Plaintiff has not clarified what this "class" entailed.

Additionally, at some unidentified point during Plaintiff's confinement at Bare Hill C. F. and upon Phelix's authorization, Correction Officer Russell 9 refused to pick up mail from Plaintiff's dorm area bound for Plaintiff's attorney because Russell "claim[ed] prisoners [were] smoking." Id. at 20. Plaintiff alleges that as a result of Russell's refusal to pick up his mail, he is "being denied" the ability to file "a post-conviction remedy motion." Id. at 19, 22. Plaintiff also accuses D. Willet 10 and Yelich of "operating under illegal policy [and] overriding the Commissioner['s] authority" regarding Plaintiff's access to legal mail. Id. at 19. Barton was also "in charge of the unconstitutional policy governing the internal and external mail at Bare Hill C. F." Id. Finally, Plaintiff alleges that he has not received timely responses to his grievances and, on one occasion while he was incarcerated at either Otisville C. F. or Bare Hill C. F., did not receive mail from his brother containing "religious photos." Compl. at 19–20.

9      Plaintiff identifies Russell as "John Doe" in the case caption, but then clarifies in the body of the Complaint he believes the individual in question is, in fact, Russell. Id. at 1, 20. Plaintiff has not alleged a first name or initial for Russell.

10     The Complaint does not clarify Willet's position at Bare Hill C. F.

*4   The improper conduct at Bare Hill C. F. was a product of DOCCS Commissioner Annucci, Deputy Commissioner Joseph Bellnier, and Deputy Commissioner Jeffrey McCoy's "blind eye in management." Id. at 19. Plaintiff "has suffered and continues to suffer from the pain of [his] dislocated toe," which he "has not been able to bend" since July 30, 2016, yet has been refused follow up treatment with "a foot doctor[.]" Id. at 21. During Plaintiff's confinement at Bare Hill C. F., he also "suffer[ed] from the denial of reasonable accommodation of bus services[,]" was "made to walk long hill and distance [sic] [,]" and "never received adequate or follow up treatment concerning his knee braces and elbow sleeve[.]" Id. at 23.

Construed liberally, Plaintiff asserts the following claims: (1) RLUIPA and First Amendment free exercise claims against Benior, Yelich, Phelix, Barton, and Ranney; (2) First Amendment retaliation claims against Harmon, Coleman, and Albert; (3) First Amendment access-to-courts claims against Willet, Yelich, Barton, Russell, and Phelix; (4) First Amendment free-flow-of-mail claims against Willet, Yelich, Barton, Russell, and Phelix; (5) Eighth Amendment medical indifference claims against Harmon, Coleman, and Albert; (6) Fourteenth Amendment due-process claims against Coleman, Harmon, Albert, Flint and Boyd; (7) Fourteenth Amendment equal-protection claims against Benior, Yelich, Phelix, Barton, Ranney, Harmon, Albert, and Coleman; (8) supervisory liability claims against Annucci, Bellnier, and McCoy based on the aforementioned alleged constitutional violations; and (9) ADA and Rehabilitation Act of 1973 claims based on Plaintiff's alleged failure to receive bus services at unidentified times.

Plaintiff seeks declaratory, injunctive, and monetary relief. Id. at 26–28. For a complete statement of Plaintiff's claims, reference is made to the Complaint.

### C. Analysis

#### 1. Section 1983 claims

"42 U.S.C. § 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of the right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. Id. (citing City of Oklahoma City v. Tuttle, 471

2020 WL 210317

U.S. 808 (1985)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." Id.

It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)); Iqbal, 556 U.S. at 676. "[A] Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). "[V]icarious liability is inapplicable to ... § 1983 suits." Iqbal, 556 U.S. at 676.

#### a. Request for Injunctive Relief

Plaintiff's Complaint includes a request for injunctive relief. Compl. at 26–27. After filing the Complaint, however, Plaintiff submitted a letter to the Pro Se Intake Unit for the Southern District of New York in which Plaintiff indicated he is no longer incarcerated. See Dkt. No. 6.

"In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." Shepherd v. Goord, 662 F.3d 603, 610 (2d Cir. 2011) (quoting Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006)). Inasmuch as the Complaint requests the Court order officials at Bare Hill C. F. to provide Plaintiff with medical treatment and accommodation, his release from prison moots this request for relief. Khalil v. Laird, 353 F. App'x 620, 621 (2d Cir. 2009) ("When Khalil was released from prison, he no longer had a 'continuing personal stake' in the outcome of this action, and his claims were rendered moot.") (quoting Muhammad v. City of N.Y. Dep't of Corr., 126 F.3d 119, 123 (2d Cir. 1997)). Accordingly, Plaintiff's request for injunctive relief is dismissed without prejudice.

#### b. RLUIPA and Free Exercise Claims

**\*5** RLUIPA affords prison inmates certain protections relevant to exercising their religious beliefs, and provides, in pertinent part, that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

"RLUIPA does not authorize claims for monetary damages against state officers in either their individual or official capacities." Holland v. Goord, 758 F.3d 215, 220–22 (2d Cir. 2014). Moreover, as set forth above, since plaintiff is no longer incarcerated, he may not pursue claims for injunctive relief against the named defendants. Accordingly, Plaintiff's RLUIPA claims are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

Additionally, the First Amendment of the United States Constitution guarantees the right to free exercise of religion. See U.S. Const. amend. I; Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). As is true with regard to the First Amendment generally, the Free Exercise Clause applies to prison inmates, subject to appropriate limiting factors. Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause") (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).

To state a claim under the Free Exercise Clause, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin, 467 F.3d at 274–75. "For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith." Booker v. Maly, No. 12-CV-246, 2014 WL 1289579, at *22 (N.D.N.Y. Mar. 31, 2014), aff'd, 590 F. App'x 82 (2d Cir. 2015).

Plaintiff has failed to state a claim against Benior for violating his right to free exercise of religion. While Plaintiff alleges

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 174 of 212

Benior "refused to supply the Sahor [sic] bag to start the fast" during Eid-Ul-Fitr even though he was "told to do so," Compl. at 14, Plaintiff does not allege that he never received the bag or allege other facts that might plausibly suggest Benior's purported conduct substantially burdened the exercise of Plaintiff's religion. See Salahuddin, 467 F.3d at 274–75. Consequently, the Court dismisses Plaintiff's free exercise claim against Benior pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

Plaintiff has also failed to state a claim against Yelich, Phelix, and Barton for violating his right to free exercise of religion. Plaintiff alleges that these officials are responsible for the alleged violations of Plaintiff's religious rights because they have "allow[ed] non-Nation of Islam members to dictate [the] practice of religion" at Bare Hill C. F. Compl. at 13-14. Yet this allegation is entirely conclusory as Plaintiff fails to explain who these "non-Nation of Islam members" are, how Yelich, Phelix, and Barton "allowed" said members to "dictate" the practice of Plaintiff's religion, or how Yelich, Phelix, and Barton's alleged conduct substantially burdened the exercise of Plaintiff's religion. Thus, Plaintiff's free exercise claims against defendants Yelich, Phelix, and Barton are dismissed pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

 *6  In contrast to the other defendants and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be construed liberally, see, e.g., Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008), Plaintiff has alleged sufficient facts to warrant a response from Ranney. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

c. Retaliation Claims

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation– can be characterized as a constitutionally proscribed retaliatory act.' " Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)). To state a plausible retaliation claim, a plaintiff must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action

against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." Davis, 320 F.3d at 352 (quoting Dawes, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, Plaintiff has alleged sufficient facts to warrant a response to his retaliation claims against Harmon, Coleman, and Albert. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion

d. Access-to-Courts Claims

The "right of access to the courts" requires states "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." Bounds v. Smith, 430 U.S. 817, 828 (1977), modified on other grounds by Lewis v. Casey, 518 U.S. 343, 350 (1996); see also Bourdon v. Loughren, 386 F.2d 88, 92 (2d Cir. 2004). "However, this right is not 'an abstract, freestanding right....' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " Collins v. Goord, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting Lewis, 518 U.S. at 351). The right of access to the courts is also implicated when a prisoner experiences interference with his mail. Davis, 320 F.3d at 351.

To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. Lewis, 518 U.S. at 353. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " Davis, 320 F.3d at 352 (quoting Jermosen v. Coughlin, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)). The injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] ... to challenge the conditions of [his] confinement." Lewis, 518 U.S. at 355. "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Id.

 *7  Plaintiff alleges that, upon Phelix's authorization, Russell refused to pick up mail from Plaintiff's dorm area bound for Plaintiff's attorney because Russell "claim[ed] prisoners [were] smoking." Compl. at 20. Plaintiff alleges that as a

result of Russell's refusal to pick up his mail, he is "being denied" the ability to file "a post-conviction remedy motion." Id. at 19, 22.

Plaintiff appears to have suffered no more than a "delay in being able to work on" his request for post-conviction relief, which does not rise to the level of constitutional violation. See Davis, 320 F.3d at 352 (internal quotation marks omitted) (quoting Jermosen, 877 F. Supp. at 871). Furthermore, Plaintiff does not allege facts regarding the contents of his mailings that would allow the Court to plausibly infer such mailings supported Plaintiff's request for post-conviction relief. Hence, Plaintiff has not sufficiently alleged that he suffered an "actual injury" as a result of Russell's purported refusal to retrieve Plaintiff's mail with Phelix's permission. Lewis, 518 U.S. at 353, 355.

Furthermore, Plaintiff alleges Barton was "in charge of the unconstitutional policy" that affected Plaintiff's access to mail —and, ultimately, to the courts—and under which Willet and Yelich "operat[ed]." Compl. at 19. Yet Plaintiff has not alleged any facts regarding the content of this purportedly unconstitutional policy to plausibly suggest that Barton, Willet, and Yelich violated his constitutional rights.

In sum, Plaintiff's First Amendment access-to-courts claims are dismissed pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

### e. Free-Flow-of-Mail Claims

"In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." Davis, 320 F.3d at 351. A prisoner's mail may only be restricted to further "one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Id. (internal quotation marks omitted) (quoting Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." Bellezza v. Holland, No. 09-CV-8434, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011) (dismissing access-to-courts claim for failure to allege injury, but holding that plaintiff adequately alleged a violation of his right to send and receive mail). "It is thus not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail." Antrobus v. City of New York, No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (citations omitted).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]" Davis, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, ... an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." Davis, 320 F.3d at 351 (citations omitted). However, in Washington v. James, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." 782 F.2d at 1139; see also Turner v. Safley, 482 U.S. 78, 84–91 (1987) (noting prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

**\*8** Plaintiff's allegations regarding interference with access to mail—either incoming or outgoing—are largely conclusory.

As noted with respect to outgoing mail, Plaintiff alleges Russell prevented him from mailing documents to his attorney, which inhibited his ability to seek post-conviction relief. See Compl. at 19. However, the Complaint lacks allegations regarding the contents of the mailings or the number of occasions Russell prevented Plaintiff from mailing material to his attorney. Hence, there is no basis for the Court to plausibly infer that Russell's actions (1) suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) unjustifiably chilled Plaintiff's right of access to the courts or impaired his legal representation. See Davis, 320 F.3d at 351 (citing Washington, 782 F.2d at 1139).

Similarly, with respect to incoming mail, Plaintiff alleges that he has not received timely responses to his grievances and, on one occasion while he was incarcerated at either Otisville C. F. or Bare Hill C. F., did not receive mail from his brother containing "religious photos." See Compl. at 19–20. However, it is unclear from the allegations in the Complaint whether (1) the delay in receiving a response to a

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 176 of 212

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

grievance was the result of any prison official's interference with Plaintiff's mail, or (2) Plaintiff was even incarcerated at Bare Hill C. F. when mail from his brother was confiscated. Consequently, there is no basis for the Court to plausibly infer that Plaintiff's incoming mail was tampered with in any respect by any official at Bare Hill C. F.

Finally, since, as discussed above, Plaintiff has not alleged any facts regarding the content of a policy promulgated by Barton and executed by Willet and Yelich that purportedly prevented Plaintiff from sending or receiving his mail, the Court does not find these defendants to have plausibly violated Plaintiff's rights regarding access to his mail.

Therefore, Plaintiff's free-flow-of-mail claims are dismissed pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

#### f. Medical Indifference Claims

Where an inmate was allegedly deprived of medical care, courts construe the rights the plaintiff seeks to vindicate as arising under the Eighth Amendment's prohibition against cruel and unusual punishment. Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and that is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102, 104 (1976). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious," Chance, 143 F.3d at 702 (internal quotation marks and citations omitted), i.e., "a condition of urgency, one that may produce death, degeneration, or extreme pain ...," Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted). "Second, the defendant must act with a sufficiently culpable state of mind," Chance, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and

disregard[ed] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837.

**\*9** Non-medical personnel may be held liable for deliberate indifference to medical needs where a plaintiff demonstrates that the prison personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once it was prescribed. See Banks v. No. 8932 Corr. Officer, No. 11-CV-8359, 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); see also Estelle, 429 U.S. at 104–05 (1976) (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

Here, Plaintiff alleges he suffered from a "dislocated toe" from a slip and fall injury that occurred on or about July 30, 2016, as well as knee discomfort, "lower herniated discs[,] and sciatica" that occurred over a year before that injury. Compl. at 3, 15, 18, 23.

As an initial matter, the Complaint lacks any allegations which plausibly suggest that any of the named defendants from Bare Hill C. F. were aware of—let alone denied Plaintiff treatment for—any knee or back condition from which Plaintiff purportedly suffered. Accordingly, to the extent Plaintiff's medical indifference claim is based on an alleged failure to treat Plaintiff for a knee or back condition during his confinement at Bare Hill C. F., the claim is dismissed pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

Regarding Plaintiff's dislocated toe, at this stage of the proceeding—and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed—Plaintiff has alleged sufficient facts to warrant a response. In so ruling, the Court expresses no opinion as to whether Plaintiff's medical indifference claims against Harmon, Coleman, and Albert can withstand a properly filed dispositive motion.

#### g. Due-Process Claims

To successfully state a claim under § 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 177 of 212

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

deprived of that interest without being afforded sufficient process. Shakur v. Selsky, 391 F.3d 106, 118 (2d Cir. 2004) (citing Kentucky Dep't of Corrs. v. Thompson, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under Sandin. Id. at 485–86. "[T]he Second Circuit generally takes the position that restrictive confinement, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under 'normal conditions.' " Vance v. State of N.Y. Dep't of Corr., No. 18-CV-748, 2018 WL 6047828, at *5 (N.D.N.Y. Nov. 19, 2018) (quoting Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009)). The "atypicality" inquiry under Sandin is normally a question of law. Colon v. Howard, 215 F.3d 227, 230–31 (2d Cir. 2000); Sealey v. Giltner, 197 F.3d 578, 585 (2d Cir. 1999). In making a determination of atypicality and significant hardship, the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof. Id.

 *10  Plaintiff's thirty-day disciplinary sentence, Compl. at 18, does not, in and of itself, implicate atypicality. See Colon, 215 F.3d at 231; Elleby v. Martucello, No. 16-CV-1335, 2018 WL 3769965, at *3 (N.D.N.Y. Aug. 9, 2018) ("The Court notes that Plaintiff was sentenced to 90 days in SHU which, without additional allegations, is insufficient to establish that he suffered from an atypical and significant confinement as required by Sandin."). Plaintiff's Complaint is completely devoid of any facts regarding the conditions of his SHU confinement. Thus, there is no basis for this Court to plausibly infer that Plaintiff's SHU confinement resulted in the deprivation of a liberty interest, thereby triggering the procedural safeguards of due process. See, e.g., Elleby, 2018 WL 3769965, at *3 ("Plaintiff does not allege that the conditions in which he was kept were more onerous than normal SHU conditions. Because Plaintiff fails to allege that he suffered from an atypical and significant confinement, Magistrate Judge Peebles correctly found Plaintiff's due process claim should be dismissed."); Shuler v. Brown, No.

07-CV-937, 2009 WL 790973, at *1, *9 (N.D.N.Y. Mar. 23, 2009) ("[A] motion to dismiss can be granted where a prisoner who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU conditions."); Mortimer Excell v. Fischer, No. 08-CV-945, 2009 WL 3111711, at *9 (N.D.N.Y. Sept. 24, 2009) ("[C]ourts have roundly rejected the notion that ... a short period of confinement, without additional hardships, creates a liberty interest even when confinement is completely segregated, such as when an inmate is sent to ... [the SHU].") (citing Sealey, 197 F.3d at 589–90).

Without the denial of a cognizable liberty interest, there can be no due-process violation. See Scott v. Albury, 156 F.3d 283, 287 (2d Cir. 1998) ("No right to due process is implicated in the prison context unless a liberty interest has been deprived...."); Gill v. Riddick, No. 03-CV-1456, 2005 WL 755745, at *14 (N.D.N.Y. Mar. 31, 2005) ("If, however, no liberty interest is implicated, then a fortiori, our analysis ceases and the claim should be dismissed.")

However, even if Plaintiff had adequately alleged a protected liberty interest, the Court would not find that Plaintiff has sufficiently pled violations of due process. As an initial matter, the Court notes the due-process protections afforded inmates facing disciplinary hearings affecting liberty or property interests include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing, inter alia, Wolff v. McDonnell, 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by some reliable evidence. Id. (internal citations omitted). "Notwithstanding, '[t]hese procedures, of course, must in certain circumstances give way to institutional safety or correctional goals.' " Sims v. Goord, No. 03-CV-1099, 2007 WL 952071, at *16 (N.D.N.Y. Mar. 29, 2007) (Kahn, J.) (quoting Young v. Hoffman, 970 F.2d 1154, 1156 (2d Cir. 1992), cert. denied, 510 U.S. 837 (1993)).

Plaintiff alleges that Albert and Harmon, at the direction of Coleman, issued him a false misbehavior report. Compl. at 17. The alleged issuance of a false misbehavior report does not, without more, give rise to a cognizable § 1983 claim. See Freeman v. Rideout, 808 F.2d 949, 950, 953 (2d Cir. 1986) ("[T]he filing of unfounded charges is not

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

per se a constitutional violation under section 1983[.]");
Mitchell v. Senkowski, 158 F. App'x 346, 349 (2d Cir. 2005)
("The issuance of false misbehavior reports and provision of
false testimony against an inmate ... violates due process ...
where ... procedural protections were denied that would have
allowed the inmate to expose the falsity of the evidence
against him...." (internal citations omitted)). Plaintiff has
failed to allege facts to suggest he was not adequately
afforded a hearing on his claim that he was falsely accused.
Consequently, Plaintiff's due-process claims against Albert,
Harmon, and Coleman are dismissed pursuant to § 1915A(b)
for failure to state a claim upon which relief may be granted.

**\*11** Plaintiff also alleges and that, upon the issuance
of Coleman, Harmon, and Albert's misbehavior report, he
received a disciplinary hearing over which Flint presided.
Compl. at 17–18. Flint denied Plaintiff's request to introduce
into evidence copies of the "schedule for de-escalation of
writing [a] misbehavior report and re-training of the staff
throughout the State of New York." Id. Flint also caused
Plaintiff's statements and objections to be deleted from the
transcript of the hearing and denied Plaintiff's request to call
a doctor as a witness, even though the proposed witness
would have offered testimony that Plaintiff's toe was actually
injured. Id. at 18. Flint found that the misbehavior report
was justified because Plaintiff "had no injury." Id. Following
the hearing, Flint sentenced Plaintiff to thirty days of lost
privileges and "cube confinement," which Boyd upheld. Id.

"To establish a procedural due process claim in connection
with a prison disciplinary hearing, an inmate must show that
he was prejudiced by the alleged procedural errors, in the
sense that the errors affected the outcome of the hearing."
Clark v. Dannheim, 590 F. Supp. 2d 426, 429 (W.D.N.Y.
2008) (citing Powell v. Coughlin, 953 F.2d 744, 750 (2d
Cir. 1991)). Plaintiff has not explained how the exclusion of
the documentary and testimonial evidence at issue impacted
the outcome of the hearing since "[w]itnesses or documents
may ... be denied because of lack of relevance or necessity."
Sims, 2007 WL 952071, at \*16 (quoting Branch v. Goord,
2006 WL 2807168, at \*4 (S.D.N.Y. Sept. 28, 2006)). Because
the Court cannot plausibly conclude that the exclusion of this
evidence or the purported deletion of Plaintiff's statements
and objections from the record prejudiced Plaintiff, the Court
must dismiss Plaintiff's due-process claims against Flint and
Boyd pursuant to § 1915A(b) for failure to state a claim upon
which relief may be granted.

h. Equal-Protection Claims

The Equal Protection Clause of the Fourteenth Amendment
requires that the government treat all similarly situated
people alike. City of Cleburne, Tex. v. Cleburne Living
Ctr., 473 U.S. 432, 439 (1985). Specifically, the Equal
Protection Clause "bars the government from selective
adverse treatment of individuals compared with other
similarly situated individuals if 'such selective treatment was
based on impermissible considerations such as race, religion,
intent to inhibit or punish the exercise of constitutional rights,
or malicious or bad faith intent to injure a person.' " Bizzarro
v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair
v. Saunders, 627 F.2d 606, 609–10 (2d Cir. 1980)). To state
a viable claim for denial of equal protection, a plaintiff
generally must allege "purposeful discrimination ... directed
at an identifiable or suspect class." Giano v. Senkowski, 54
F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a
"class of one" theory, a plaintiff must allege that he has been
intentionally treated differently from others similarly situated,
with no rational basis for the difference in treatment. Village
of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); DeMuria
v. Hawkes, 328 F.3d 704, 706 (2d Cir. 2003).

Liberally construed, Plaintiff asserts equal-protection claims
against Benior, Yelich, Phelix, Barton, Ranney, Harmon,
Albert, and Coleman based on "racial and religious
discrimination[.]" Compl. at 14–15, 18–19, 24. Plaintiff
claims that members of the Nation of Islam were treated
differently than "non-Nation of Islam members" at Bare Hill
C. F. in terms of their ability to engage in religious expression,
and that he was denied adequate medical care because of his
race. See id. Plaintiff's allegations of discrimination, however,
are entirely conclusory in that he does not clarify how he
or other Bare Hill C. F. inmates subscribing to the Nation
of Islam were treated differently than non-Nation of Islam
members. See Thomas v. Pingotti, No. 17-CV-300, 2017
WL 3913018, at \*7 (N.D.N.Y. Sept. 6, 2017) ("Conclusory
allegations of disparate treatment or a plaintiff's personal
belief of discriminatory intent are patently insufficient to
plead a valid claim under the Equal Protection clause.").

**\*12** Hence, Plaintiff's Fourteenth Amendment equal-
protection claims are dismissed pursuant to § 1915A(b) for
failure to state a claim upon which relief may be granted.

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 179 of 212

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

i. Supervisory Claims

Supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."). Rather, supervisory personnel may be considered "personally involved" in an alleged constitutional violation only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). [11]

[11]    The Second Circuit has not yet addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of Iqbal on Colon because the complaint "did not adequately plead the warden's personal involvement even under Colon"). "The Court need not put its oar in the water concerning the continued vitality of Colon, however, because," as in another case decided within this circuit, "Plaintiff's complaints founder even under Colon." See Samuels v. Fischer, 168 F. Supp. 3d 625, 635–36 (S.D.N.Y. 2016).

Plaintiff alleges Annucci, Bellnier, and McCoy are liable for the aforementioned alleged constitutional violations because they are supervisors within the DOCCS prison system. See Compl. at 19. Yet Plaintiff has not averred any facts to plausibly suggest Annucci, Bellnier, and McCoy are liable under Colon.

Thus, Plaintiff's claims against Annucci, Bellnier, and McCoy are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

j. ADA and Rehabilitation Act of 1973 Claims

Title II of the ADA "proscribes discrimination against the disabled in access to public services." Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. (citing 42 U.S.C. § 12132). Similarly, § 504 of the Rehabilitation Act of 1973 requires that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

*13  The Second Circuit has noted that "the standards under both statutes are generally the same[.]" Wright v. N.Y.S. Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016). Moreover, where, as here, the subtle distinctions between the statutes are not implicated, courts " 'treat claims under the two statutes identically.' " Id. (quoting Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)).

"In order to establish a prima facie violation under these acts, [an inmate] must show that (1) he is a qualified individual with a disability; (2) DOCCS is an entity subject to the acts; and (3) he was denied the opportunity to participate in or benefit from DOCCS's services, programs, or activities or DOCCS otherwise discriminated against him by reason of his disability." Wright, 831 F.3d at 72 (citing Henrietta D., 331 F.3d at 272).

"[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001). Thus, Plaintiff's ADA and Rehabilitation Act of 1973 claims are dismissed with prejudice to the extent these claims are asserted against any of the named defendants in their individual capacities.

Moreover, to the extent Plaintiff intended to assert official capacity claims against one or more of the named defendants, his ADA and Rehabilitation Act of 1973 claims are nonetheless deficient because the Complaint lacks any allegations that plausibly suggest that (1) Plaintiff is a

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 180 of 212

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

qualified individual with a disability, or (2) he was denied the opportunity to participate in or benefit from DOCCS services, programs, or activities or that DOCCS otherwise discriminated against him by reason of his disability.[12]

[12]    DOCCS is undoubtedly subject to the ADA and Rehabilitation Act of 1973. See Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009).

Plaintiff identifies his "disability" as a "condition in [his] right and left knees, lower back, herniated discs, and sciatica." Compl. at 3. Plaintiff's vague description of his condition is insufficient to plausibly suggest that it constitutes a "disability" within the meaning of the ADA or Rehabilitation Act of 1973. See Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 147 (2d Cir. 2002) (noting that a plaintiff qualifies as disabled under the ADA when he (1) shows that he "suffers from a physical or mental impairment[;]" (2) identifies an "activity claimed to be impaired and establish[es] that it constitutes a major life activity[,]" and (3) shows that the impairment "substantially limits the major life activity previously identified" (internal quotation marks omitted)).

Furthermore, even if the Court were to find Plaintiff disabled under the ADA and Rehabilitation Act of 1973, the Complaint is entirely devoid of any allegation that Plaintiff was discriminated against on the basis of his alleged disability. Indeed, the only alleged deprivation Plaintiff suffered was a denial of bus transportation. See Compl. at 23. However, Plaintiff does not allege he ever requested this accommodation during his confinement at Bare Hill C. F., let alone notified any Bare Hill C. F. officials of his purported disability. Thus, there is no basis for the Court to plausibly infer that Plaintiff was denied bus transportation because of any disability. See Henrietta D., 331 F.3d at 278 (stating that the term "by reason of his disability" in [the ADA] really means that the "plaintiff must prove that the denial is because of the disability").

*14 Hence, Plaintiff's ADA and Rehabilitation Act of 1973 claims are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

* * *

Although Plaintiff has paid the filing fee, he may request the Court order "that service be made by a United States marshal." Fed. R. Civ. P. 4(c)(3). Therefore, in order to advance the disposition of this action, and in light of the fact that Plaintiff is proceeding pro se, Plaintiff is advised that he may submit a motion requesting service by the U.S. marshals on the following conditions: (1) Plaintiff must pay in full the service fee due to the U.S. marshal in advance by money order or certified check;[13] and (2) he must provide all necessary papers for service, including a completed U.S. Marshals Form (USM-285 Form) and copy of the Complaint for each defendant to be served. Plaintiff is directed to send the service documents and payment of the service fee to the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367, to be forwarded by the Clerk to the U.S. marshals.

[13]    Payment in cash or by personal check is not acceptable. For service by mail, the fee is $8.00 per summons and complaint. The cost of service by mail on the surviving defendants in this action is therefore $32.00. Plaintiff is also advised that, if initial service is unsuccessful, he will be required to pay the U.S. marshal any additional fee, also in advance, for subsequent service attempts according to the fee schedule set by the U.S. marshal.

And if Plaintiff wishes to amend his Complaint, he must file an amended complaint that complies with Rule 15 of the Federal Rules of Civil Procedure. Any amended complaint, which shall supersede and replace the original Complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant, which Plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. Any amended complaint filed by Plaintiff must be signed by him and must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

III. CONCLUSION

Accordingly, it is hereby:

ORDERED, that the following of Plaintiff's § 1983 claims SURVIVE sua sponte review and require a response: (1) First Amendment free exercise claim against Ranney; (2) First Amendment retaliation claims against Harmon, Coleman, and Albert; and (3) Eighth Amendment medical indifference claims against Harmon, Coleman, and Albert; and it is further

ORDERED, that Ranney, Harmon, Coleman, and Albert (or their counsel) respond to the Complaint as provided for in the Federal Rules of Civil Procedure; and it is further

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 181 of 212

Amaker v. Boyd, Not Reported in Fed. Supp. (2020)

2020 WL 210317

**ORDERED**, that Plaintiff's claims against the above-captioned defendants in their individual capacities for violations of the ADA and Rehabilitation Act of 1973 are **DISMISSED with prejudice**.

**ORDERED**, that the following of Plaintiff's claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) RLUIPA and First Amendment free exercise claims against Benior, Yelich, Phelix, Barton, and Ranney; (2) First Amendment access-to-courts claims against Willet, Yelich, Barton, Russell, and Phelix; (3) First Amendment free-flow-of-mail claims against Willet, Yelich, Barton, Russell, and Phelix; and (4) Fourteenth Amendment due-process claims against Coleman, Harmon, Albert, Flint and Boyd; (5) Fourteenth Amendment equal-protection claims against Benior, Yelich, Phelix, Barton, Ranney, Harmon, Albert, and Coleman; (8) supervisory liability claims against Annucci, Bellnier, and McCoy based on the aforementioned alleged constitutional violations; and (9) ADA and Rehabilitation Act of 1973 claims against the above-captioned defendants in their official capacities.

 **\*15 ORDERED**, that Benior, Yelich, Phelix, Barton, C.O. John Doe (a.k.a. Russell), Willet, Flint, Boyd, Annucci, Bellnier, and McCoy are **DISMISSED without prejudice** as defendants in this action; and it is further

**ORDERED**, that the Clerk shall issue summonses and forward them, along with copies of the Complaint, to Plaintiff. It is Plaintiff's responsibility to immediately serve Ranney, Harmon, Albert, and Coleman each with a summons and a copy of his Complaint in accordance with the Federal Rules of Civil Procedure. The Clerk shall forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that Plaintiff may submit a motion requesting service of process by the U.S. marshal in accordance with Federal Rule of Civil Procedure 4(c)(3). The Clerk shall send Plaintiff four blank USM-285 Forms for his use should he choose to request such service. As a courtesy, the Clerk shall also send Plaintiff one copy of his Complaint for his use in making additional copies; and it is further

**ORDERED**, that all pleadings, motions, and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 210317

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Acevedo v. Fischer, Not Reported in Fed. Supp. (2015)

2015 WL 7769486

2015 WL 7769486
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Francisco ACEVEDO, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

12 Civ. 6866(RA)(AJP)
|
Signed December 2, 2015

**Attorneys and Law Firms**

Francisco Acevedo, Alden, NY, pro se.

Frederick Hongyee Wen, Attorney General of the State of New York, Mary Kim, New York State Office of the Attorney General, New York, NY, Rory Carleton McCormick, Corporation Counsel, City of Yonkers, Yonkers, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

ANDREW J. PECK, United States Magistrate Judge

*1 **To the Honorable Ronnie Abrams, United States District Judge:**

Pro se plaintiff Francisco Acevedo brings this action pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated while he was incarcerated at Green Haven, Great Meadow and Sullivan Correctional Facilities. *(See generally* Dkt. No. 56: 2d Am. Compl.) Acevedo seeks injunctive relief, and compensatory and punitive damages. (2d Am. Compl. § V at 33.) Judge Abrams previously dismissed Acevedo's claims except for his First Amendment claims against defendants Warrington, Geiss, Serrano and Lee for monitoring and interfering with his mail. *Avecedo v. Fischer,* 12 Civ. 6866, 2014 WL 5015470 (S.D.N.Y. Sept. 29, 2014). Presently before the Court are defendants' summary judgment motions pursuant to Fed.R.Civ.P. 56(c) for the dismissal of Acevedo's remaining First Amendment claims. (Dkt. No. 173: Serrano, Lee & Warrington Notice of Motion; Dkt. No. 180: Geiss Notice of Motion.)

For the reasons set forth below, defendants' summary judgment motions should be *DENIED* as to Acevedo's claim

against defendant Geiss for interference with his *legal* mail, and *GRANTED* in all other respects. [1]

[1]     Acevedo concedes that he is unable to establish a constitutional violation with respect to defendant Warrington, and is "not opposed to this Court dismissing [his] claims against Officer Warrington for want of proof." (Dkt. No. 199–8 at 14: Acevedo Aff. (Serrano & Lee) ¶ 15.) Accordingly, all of Acevedo's First Amendment mail tampering claims against Officer Warrington should be *DISMISSED* with prejudice.

### FACTS

Acevedo is an inmate at Wende Correctional Facility. In 2009, Acevedo was serving a one to three year sentence at Gowanda Correctional Facility for a conviction of driving while intoxicated. (Dkt. No. 176: Kim Aff. Ex. B: Acevedo Dep. at 7–8.) In November 2009, based on a positive DNA match with three victims, Acevedo became the lead suspect in a Yonkers Police Department investigation of three homicides. (Dkt. No. 183: Geiss Aff. ¶¶ 2, 4.) On November 13, 2009, defendant John Geiss, a detective in the Yonkers Police Department Cold Case Unit, met with Acevedo at Gowanda and advised him that he was a suspect in the case. (Geiss Aff. ¶¶ 1–2, 4; Dkt. No. 199 at 14: Acevedo Aff. (Geiss) ¶ 5; Dkt. No. 199 at 21: Acevedo 56.1(e) Stmt. (Geiss) ¶ 7.) [2]

[2]     Acevedo's opposition submissions are voluminous. For the sake of clarity, the Court will identify the first page of each submission by its ECF pagination, and then will refer to pages or paragraphs within the submission.

On November 17, 2009, Detective Geiss requested a mail watch on Acevedo's incoming and outgoing prison mail, "to ensure that [Acevedo] did not solicit any individuals to provide false testimony on his behalf" or "attempt[ ] to threaten or intimidate any witnesses that would testify against him at any subsequent court proceedings." (Geiss Aff. ¶ 5.) Acevedo claims that the mail watch was "uninformed," did not "serv[e] any legitimate penological interest" and was "for investigative purposes." (Dkt. No. 56: 2d Am. Compl. ("SAC") at 5.) [3]

2015 WL 7769486

3       Acevedo also claims (but does not submit any
        proof) that at each prison where he has been an
        inmate, the contents of his mail have been disclosed
        to other inmates and staff. (SAC at 6.)

**\*2** Defendant Anselmo Serrano, a senior investigator in
the DOCCS Office of Special Investigations, serves "as a
liaison between ... law enforcement agencies and DOCCS,
when an inmate in DOCCS' custody is the subject of any
law enforcement investigation." (Kim Aff. Ex. 1: Serrano
Aff. ¶¶ 1, 4.) Investigator Serrano received Detective Geiss'
mail watch request and relayed it to defendant William Lee,
the Superintendent of Green Haven Correctional Facility
(Serrano Aff. ¶¶ 5–6), where Acevedo was incarcerated
between February 10, 2010 and July 2012 (Dkt. No. 199–8 at
14: Acevedo Aff. (Serrano & Lee) ¶ 3). Superintendent Lee
instituted the mail watch at Green Haven "by instructing the
Correspondence Department at Green Haven to forward all
of [Acevedo's] incoming and outgoing mail, except ... legal
mail, to the Captain's office for copying." (Kim Aff. Ex. 2:
Lee Aff. ¶¶ 1, 5, 6.)

On December 21, 2009, at Investigator Serrano's request,
Detective Geiss memorialized his mail watch request by
letter. (Geiss Aff. ¶ 6; Dkt. No. 185: McCormick Aff.
Ex. C: 12/21/09 Ltr.) Detective Geiss asked "that inmate
Francisco Acevedo (09A2456) incoming and out going mail
be reviewed and copied in regards to ... three Yonkers
homicides," and that "any mail marked legal mail also be
reviewed and if said mail is determined not to be legal mail
a copy of said letter be made...." (12/21/09 Ltr.) On February
21, 2010, Detective Geiss reviewed twenty-five pieces of
Acevedo's incoming and outgoing mail, dated September 23,
2009 to February 4, 2010. (Geiss Aff. ¶ 7; McCormick Aff.
Ex. D: 2/21/10 Case Notes.)

In April 2010, Acevedo was indicted on three second degree
murder charges. (Acevedo Dep. at 11; Geiss Aff. ¶ 7.)
Acevedo learned that his prison mail was being monitored
when he testified at a pretrial suppression hearing and was
asked to read aloud from a letter that his wife had sent to him,
a copy of which was in the prosecutor's possession. (Acevedo
Dep. at 13–14.) Acevedo's mail was not used as evidence
at trial. (Acevedo Dep. at 45; Geiss Aff. ¶ 9.) Acevedo
was convicted on three counts of second degree murder and
sentenced to seventy-five years to life in prison. (Acevedo
Dep. at 29–30.) As of Acevedo's April 30, 2015 deposition,
his appeal from his conviction still was pending. (Acevedo
Dep. at 32.)

## ANALYSIS

## I. LEGAL STANDARDS

### A. *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure provides
that the "court shall grant summary judgment if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a); *see also, e.g., Celotex Corp. v. Catrett,*
477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–
10 (1986); *Humphreys v. Cablevision Sys. Corp.,* 553 F. App'x
13, 14 (2d Cir.2014); *Connolly v. Calvanese,* 515 F. App'x 62,
62 (2d Cir.2013); *Lang v. Ret. Living Publ'g Co.,* 949 F.2d
576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists
rests on the party seeking summary judgment. *See, e.g.,
Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598,
1608 (1970); *Alzawahra v. Albany Med. Ctr.,* 546 F. App'x
53, 54 (2d Cir.2013); *Chambers v. TRM Copy Ctrs. Corp.,*
43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential
Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The
movant may discharge this burden by demonstrating to the
Court that there is an absence of evidence to support the non-
moving party's case on an issue on which the non-movant has
the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477
U.S. at 323, 106 S.Ct. at 2552–53; *Dolan v. Cassella,* 543 F.
App'x 90, 90 (2d Cir.2013).

To defeat a summary judgment motion, the non-moving
party " 'must do more than simply show that there is some
metaphysical doubt as to the material facts.' " *Scott v. Harris,*
550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007) (quoting
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.
574, 586, 106 S.Ct. 1348, 1356 (1986)). Instead, the non-
moving party must "cit[e] to particular parts of materials
in the record" to show that "a fact ... is genuinely disputed."
Fed.R.Civ.P. 56(c)(1); *see, e.g., Matsushita Elec. Indus. Co.
v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356;
*Alzawahra v. Albany Med. Ctr.,* 2013 WL 6284286 at \*1;
*Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000)
(at summary judgment, "[t]he time has come ... 'to put up or
shut up' "), *cert. denied,* 540 U.S. 811, 124 S.Ct. 53 (2003).

**\*3** In evaluating the record to determine whether there is a
genuine issue as to any material fact, "[t]he evidence of the

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 184 of 212

Acevedo v. Fischer, Not Reported in Fed. Supp. (2015)

2015 WL 7769486

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.[4] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. *See,* e.g., *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

[4]   *See also,* e.g., *Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.,* 552 F. App'x 47, 49 (2d Cir.2014); *Alzawahra v. Albany Med. Ctr.,* 2013 WL 6284286 at *1; *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See,* e.g., *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See,* e.g., *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also,* e.g., *Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11–12.

"The Court recognizes that it must extend extra consideration to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998) (Peck, M.J.) (citations & internal quotations omitted); *see,* e.g., *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[5] "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,'

unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[6]

[5]   *See also,* e.g., *Ferran v. Town of Nassau,* 471 F.3d 363, 369 (2d Cir.2006); *Fuller v. Armstrong,* 204 F. App'x 987, 988 (2d Cir.2006), cert. denied, 552 U.S. 906, 128 S.Ct. 209 (2007); *Gildor v. U.S. Postal Serv.,* 179 F. App'x 756, 758 (2d Cir.2006); *Porter v. Coughlin,* 421 F.3d 141, 144 n.2 (2d Cir.2005); *Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004); *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Johnson v. Buffalo Police Dep't,* 46 F. App'x 11, 12 (2d Cir.2002), cert. denied, 539 U.S. 959, 123 S.Ct. 2645 (2003).

[6]   *See also,* e.g., *United States v. Acomb,* No. 99–6308, 216 F.3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); *James v. Phillips,* 05 Civ. 1539, 2008 WL 1700125 at *3 (S.D.N.Y. Apr. 9, 2008); *Thompson v. Tracy,* 00 Civ. 8360, 2008 WL 190449 at *5 (S.D.N.Y. Jan. 17, 2008); *Bunting v. Nagy,* 452 F.Supp.2d 447, 454 (S.D.N.Y.2006); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 234 & n.52 (S.D.N.Y.2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 78 (S.D.N.Y.2004); *Rector v. Sylvania,* 285 F.Supp.2d 349, 353 (S.D.N.Y.2003); *Walker v. Vaughan,* 216 F.Supp.2d 290, 296–97 (S.D.N.Y.2002); *Hussein v. The Waldorf–Astoria,* 134 F.Supp.2d 591, 596 (S.D.N.Y.2001), *aff'd,* 31 F. App'x 740 (2d Cir.2002).

**B. Qualified Immunity Standard**

**\*4** "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)); *accord,* e.g., *Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015); *Griffin v. Amatucci,* 611 F. App'x 732, 733 (2d Cir.2015). When a government official charged with violating federal constitutional rights invokes qualified immunity to support a summary judgment motion, the Court considers, as a threshold matter, whether the facts when viewed in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156

(2001); *accord, e.g., Tolan v. Cotton,* 134 S.Ct. 1861, 1865–66 (2014) (per curiam); *Golodner v. Berliner,* 770 F.3d 196, 201 (2d Cir.2014). If the answer to this question is no, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156; *see also,* e.g., *Golodner v. Berliner,* 770 F.3d at 201; *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir.1999) (observing that resolution of this first question favorable to defendant "moots" further inquiry into qualified immunity). "The reason for this rule is that, where there is no viable constitutional claim, defendants have no need of an immunity shield." *Walczyk v. Rio,* 496 F.3d 139, 154 (2d Cir.2007). [7]

[7]    *See also, e.g., Farrell v. Burke,* 449 F.3d 470, 499 n.14 (2d Cir.2006) (Sotomayor, C.J.) ("Because we have found no cognizable violation of [plaintiff's] rights in this case, we need not reach the question of qualified immunity."); *Holcomb v. Lykens,* 337 F.3d 217, 223–25 (2d Cir.2003) (declining to decide qualified immunity question and affirming summary judgment on ground that, as a matter of law, defendants did not violate plaintiff's due process rights); *Muhammad v. Jenkins,* 12 Civ. 8525, 2013 WL 5225573 at *8 (S.D.N.Y. Sept. 13, 2013) ("If the answer to [the first prong of *Saucier]* is no, the case is over–not because the defendant is entitled to qualified immunity, but because the defendant did nothing wrong.").

If, however, the answer to the first question is yes, the Court must decide whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan,* 555 U.S. at 232, 129 S.Ct. at 816 (citing *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156; *accord,* e.g., *Tolan v. Cotton,* 134 S.Ct. at 1866. "[T]his question is not answered by reference to how courts or lawyers might have understood the state of the law." *Walczyk v. Rio,* 496 F.3d at 154. When the right at issue is not clearly established by then existing precedent, qualified immunity shields the defendant. *Pearson v. Callahan,* 555 U.S. at 243–45, 129 S.Ct. at 822–23; *accord,* e.g., *Tolan v. Cotton,* 134 S.Ct. at 1866 (" '[T]he salient question ... is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.' " (quoting *Hope v. Pelzer,* 536 U.S. 730,

741, 122 S.Ct. 2508, 2511 (2002))); *see also, e.g., Griffin v. Amatucci,* 611 F. App'x at 734. "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio,* 496 F.3d at 154 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986)). [8] "In this respect, the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Walczyk v. Rio,* 496 F.3d at 154 (quoting *Malley v. Briggs,* 475 U.S. at 341, 106 S.Ct. at 1096); *accord, e.g., Mullenix v. Luna,* 136 S.Ct. at 308.

[8]    *See also, e.g., Mullenix v. Luna,* 136 S.Ct. at 308; *Betts v. Shearman,* 751 F.3d 78, 83 (2d Cir.2014); *Iqbal v. Hasty,* 490 F.3d 143, 167 (2d Cir.2007), *rev'd on other grounds,* 556 U.S. 662, 129 S.Ct. 1937 (2009); *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001); *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

**\*5** The Supreme Court clarified in *Pearson* that the rigid application of *Saucier's* two-step protocol is not appropriate in every qualified immunity case, but recognized that it:

"is often beneficial," such as where the analysis of the facts under clearly established law "make[s] it apparent that ... the relevant facts do not make out a constitutional violation at all" and where the question presented does "not frequently arise in cases in which a qualified immunity defense is unavailable."

*Dean v. Blumenthal,* 577 F.3d 60, 67 (2d Cir.2009) (discussing Pearson's holding that Saucier's two-step framework is no longer mandatory), *cert. denied,* 559 U.S. 1058, 130 S.Ct. 2347 (2010); see also, e.g., *Tolan v. Cotton,* 134 S.Ct. at 1866 ("Courts have discretion to decide the order in which to engage these two prongs."); *Pearson v. Callahan,* 555 U.S. at 236, 129 S.Ct. at 818 (the "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

### C. *Constitutional Protection of Inmate Mail*

"To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that [an] official, acting under color of state law, caused the deprivation of a federal right." *Johnson v. Goord,* 445 F.3d

2015 WL 7769486

532, 534 (2d Cir.2006) (citation & quotations omitted). That the defendants are state actors for purposes of liability under § 1983 is not in dispute. *(See generally* Dkt. No 177: Serrano & Lee Br. at 10–12.)

" '[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison,' " but "it must be recognized that a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system." *United States v. Felipe,* 148 F.3d 101, 107 (2d Cir.) (quoting *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877 (1979)), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998). The Second Circuit has recognized that a prisoner's right to the " 'free flow of incoming and outgoing mail' " is guaranteed by the First Amendment. *Johnson v. Goord,* 445 F.3d at 534 (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). An inmate's incoming mail may be regulated if the regulation is "reasonably related to legitimate penological interests." *Thornburgh v. Abbott,* 490 U.S. 401, 404, 109 S.Ct. 1874, 1877 (1989); *see also, e.g., Klimas v. Lantz,* 531 F. App'x 6, 7 (2d Cir.2013) ("Regulations restricting prisoners' right to send and receive mail are valid if they are 'reasonably related to legitimate penological interests,' and are not an 'exaggerated response' to prison concerns." (quoting *Turner v. Safly,* 482 U.S. 78, 90–91, 107 S.Ct. 2254, 2262 (1987))). An inmate's outgoing mail is afforded greater First Amendment protection than incoming mail, and restrictions are justified only if they further " 'one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Davis v. Goord,* 320 F.3d at 351 (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)); *accord, e.g., Acevedo v. Fischer,* 12 Civ. 6866, 2014 WL 5015470 at *3 (S.D.N.Y. Sept. 29, 2014) (Abrams, D.J.) (citing *Thornburgh v. Abbott,* 490 U.S. at 413, 109 S.Ct. at 1881–82).

**\*6** Similarly, " '[i]n balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail.' " *Johnson v. Goord,* 445 F.3d at 534 (quoting *Davis v. Goord,* 320 F.3d at 351). "With regard to *legal* mail, 'an isolated incident of mail tampering is usually insufficient to establish a constitutional violation.' Rather, the inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." ' " *Ahlers v. Rabinowitz,* 684 F.3d 53, 64 (2d Cir.), *cert. denied,* 133 S.Ct. 466 (2012). Notwithstanding this protection, "interception

of [an inmate's] prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail." *United States v. Felipe,* 148 F.3d at 108; *accord, e.g., United States v. Workman,* 80 F.3d 688, 698 (2d Cir.), *cert. denied,* 519 U.S. 938, 117 S.Ct. 319 (1996).

## II. APPLICATION TO ACEVEDO'S CLAIMS

### A. *Defendants' Mail Watch on Acevedo's Non–Legal Mail*

#### 1. *Defendants Had Good Cause To Institute A Mail Watch*

A mail watch "allow[s] a prison superintendent to authorize the inspection of outgoing and incoming mail if there is reason to believe that the correspondence threatens the safety of any person or the good order of the facility." *United States v. Felipe,* 148 F.3d 101, 105 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *see also* Dkt. No. 176: Kim Aff. Ex. C: DOCCS Directive 4422, § III(B)(9), § III(G)(5)-(6). Acevedo contends that defendants were "involved in an uninformed mail watch for investigative purposes as opposed to serving any legitimate penological interest." (Dkt. No. 56: SAC at 5.) Detective Geiss asserts that he requested the mail watch "to ensure that [Acevedo] did not solicit any individuals to provide false testimony on his behalf" or "threaten or intimidate any witnesses that would testify against him." (See page 2 above.)

"[T]he Second Circuit has already determined that facility instituted mail watches are constitutional as a reasonable measure 'to ensure the good order of the prison and the rehabilitation of prisoners by preventing a prisoner from engaging in illegal activities while incarcerated.' " *Williams v. Fischer,* No. 08–CV–413, 2010 WL 3910129 at *8 (N.D.N.Y. Aug. 17, 2010) (quoting *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002)), *report & rec. adopted,* 2010 WL 3893952 (N.D.N.Y. Sept. 30, 2010); *see also, e.g., Butti v. Unger,* 04 Civ. 1515, 2005 WL 1676739 at *3 (S.D.N.Y. July 15, 2005). While Acevedo makes much of Investigator Serrano's statement that the mail watch "request was in connection with the 'investigation of three homicides' " (Dkt. No. 199 at 32: Acevedo Opp. Br. (Geiss) at 12), Detective Geiss has stated that he "requested [Acevedo's] mail to be monitored to ensure that [Acevedo] did not solicit any individuals to provide false testimony on his behalf, (i.e. coordinating false alibis), at any subsequent court proceedings." (Dkt. No. 183: Geiss Aff. ¶ 5.) Detective Geiss

Acevedo v. Fischer, Not Reported in Fed. Supp. (2015)

2015 WL 7769486

also "believed it was necessary to monitor [Acevedo's] mail to determine whether he attempted to threaten or intimidate any witnesses that would testify against him at any subsequent court proceedings." (Geiss Aff. ¶ 5.) Decisions within this Circuit, and elsewhere, have found that there is no First Amendment violation when a mail watch is imposed to monitor an inmate's efforts to improperly influence a trial or disciplinary proceeding against him. *See, e.g., Gassler v. Wood,* 14 F.3d 406, 409 (8th Cir.1994); *Ford v. Smith,* No. 09–CV–723, 2012 WL 4748848 at *1 n.1 (N.D.N.Y. Oct. 4, 2012), *aff'd,* 539 F. App'x 19 (2d Cir.2013); *Newson v. Frank,* No. 06–C–913, 2008 WL 4282591 at *10 (E.D.Wis. Sept. 17, 2008); *Ford v. Phillips,* 05 Civ. 6646, 2007 WL 946703 at *14 (S.D.N.Y. Mar. 27, 2007); *Minigan v. Irvin,* 977 F.Supp. 607, 610 (W.D.N.Y.1997). Indeed, Detective Geiss' suspicions were born out when Acevedo spoke to his wife from prison on April 1, 2010 and informed her that "it was important that he meet and speak to persons unknown so they can get their story straight" prior to the grand jury proceeding. (Geiss Aff. ¶ 5; Dkt. No. 185: McCormick Aff. Ex. J.) Likewise, in an April 11, 2010 letter, Acevedo wrote "tell Aaron to call John and make sure he comes to see me before he speaks to my attorney." (Dkt. No. 199–5: Acevedo Ex. E at 88.)

**\*7** Accordingly, defendants' summary judgment motion should be *GRANTED* on Acevedo's mail watch claim as it pertains to his non-legal mail.

## 2. *In Any Event, Defendants Serrano And Lee Are Entitled To Qualified Immunity on the Non–Legal Mail Claim*

Assuming arguendo (and contrary to the conclusion in the prior section) that defendant Geiss did not have good cause to institute a mail watch on Acevedo's non-legal mail, defendants Serrano and Lee still would be entitled to summary judgment on qualified immunity grounds.[9]

[9] Because Detective Geiss did not seek summary judgment on qualified immunity grounds (*see* Dkt. No. 181: Geiss Br.; Dkt. No. 204: McCormick Reply Aff.), the Court should not grant him summary judgment on that basis.

Acevedo argues that defendants did not have good or reasonable cause to inspect his mail because he did not commit any crimes or issue any threats while in DOCCS custody. (Dkt. No. 199–7 at 34: Acevedo Opp. Br. (Serrano

& Lee) at 12–13; *see also* Acevedo Opp. Br. (Serrano & Lee) at 4–7.) Even if Acevedo were correct that the mail watch was "an attempt to obtain information, evidence and assist in the criminal investigation and prosecution" (Dkt. No. 199 at 21: Acevedo 56(e) Stmt. (Geiss) ¶ 16C; *see also* Acevedo Opp. Br. (Geiss) at 5), there is no clearly established law in the Second Circuit as to what constitutes good cause to intercept and read inmate non-legal mail. *See, e.g., Acevedo v. Fischer,* 12 Civ. 6866, 2014 WL 5015470 at *3 (S.D.N.Y. Sept. 29, 2014) (Abrams, D.J.) ("The Second Circuit has not provided a precise definition of what constitutes 'good or reasonable cause' to read an inmate's mail."); *Minigan v. Irvin,* 977 F.Supp. 607, 611 (W.D.N.Y.1997) ("Thus, at the time the mail incident complained of occurred, defendants at the very least could reasonably have believed that the inspection and opening of plaintiffs letter was well within constitutional bounds...." Summary judgment on qualified immunity granted).

Defendants Serrano and Lee argue that they thus are entitled to qualified immunity. (Dkt. No. 177: Serrano & Lee Br. at 10–12.) In support of their argument, Serrano and Lee assert that they were not aware of any law preventing them from honoring a law enforcement request for a mail watch on an inmate under DOCCS custody. (Dkt. No. 176: Kim Aff. Ex. 1: Serrano Aff. ¶ 8; Kim Aff. Ex. 2: Lee Aff. ¶ 7.)[10] The Court has not found any caselaw that would have put defendants on notice that the investigation of an inmate's completed crime does not constitute good cause to read inmate mail, or is insufficiently related to legitimate penological purposes to justify a mail watch. In fact, cases such as *United States v. Green,* No. 92–CR–159C, 1994 WL 178139 at *5 (W.D.N.Y. Feb. 10, 1994), in which the court declined to suppress evidence from an improperly authorized mail watch, may have given defendants the opposite impression. *See also, e.g., Neree v. O'Hara,* No. 09–CV–802, 2011 WL 3841551 at *11 (N.D.N.Y. July 20, 2011), *report & rec. adopted,* 2011 WL 3841553 (N.D.N.Y. Aug. 29, 2011).[11]

[10] Acevedo asserts that Serrano and Lee should have known that Geiss' initial verbal request for a mail watch and the continuation of the watch between formal requests were violations of DOCCS Directive 4422. (Dkt. No. 199 at 14: Acevedo Aff. (Geiss) ¶ 9(e); Acevedo 56(e) Stmt. (Geiss) ¶ 11(b); Acevedo Opp. Br. (Geiss) at 16–17; Acevedo Opp. Br. (Serrano & Lee) at 6–7.) As Acevedo acknowledges (Acevedo

Acevedo v. Fischer, Not Reported in Fed. Supp. (2015)
2015 WL 7769486

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 188 of 212

Opp. Br. (Serrano & Lee) at 1), a violation of DOCCS Directives does not establish a claim for a constitutional violation under § 1983. *Dillhunt v. Theriault,* 07–CV–0412, 2009 WL 4985477 at *11 (N.D.N.Y. Dec. 15, 2009).

11    Moreover, as discussed above, the caselaw supports the use of a mail watch to prevent interference with possible trial witnesses, which was Detective Geiss' rationale for the mail watch. (*See* pages 12–13 above.)

**\*8** Acevedo further argues that the mail watch continued without justification "well past [his] conviction in November of 2011." (Dkt. No. 199–1 at 35: Acevedo 2d Aff. (Geiss) ¶ 2(a); *see also* Acevedo Opp. Br. (Serrano & Lee) at 14.) To support this assertion, Acevedo provides copies of letters marked received by the Superintendents' offices of Sullivan and Great Meadow Correctional Facilities in 2013. (Dkt. No. 199–7 at 18: Acevedo Ex. M.) Acevedo seems to contend that if he were not on a mail watch as of that date, his mail would not have gone to the Superintendent's office before being distributed to him. (Dkt. No. 199 at 32: Acevedo Opp. Br. (Geiss) at 28–29.) Even if that were so, the law as to "what factors warrant the continuation of a mail watch and the extent to which the reasons for continuing mail watch must be documented" is not clearly established. *Ford v. Fisher,* 539 F. App'x 19, 20 (2d Cir.2013) ("Given the dearth of case law analyzing what factors warrant the continuation of a mail watch and the extent to which the reasons for continuing mail watch must be documented, we conclude that the law is not clearly established."). Moreover, there is no evidence that Superintendent Lee of Green Haven had anything to do with a mail watch (if there was one) at Sullivan or Great Meadow. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation & quotation omitted). Acevedo has not presented any evidence that Serrano continued to direct the correctional facilities where he was housed to forward all mail to the Superintendents' offices for review even after his trial.

Given the lack of case law analyzing what constitutes good cause to initiate or continue a mail watch, no reasonable jury could conclude that the mail watch violated a clearly established right. Accordingly, defendants Serrano and Lee are entitled to qualified immunity on Acevedo's mail watch claim as it pertains to his non-legal mail.

**B. *Defendants' Interference With Acevedo's Legal Mail***

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *see also,* e.g., *Antrobus v. City of N.Y.,* 11 Civ. 2524, 2014 WL 1285648 at *2 (S.D.N.Y. Mar. 27, 2014) (Abrams, D.J.). "While a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation. Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Davis v. Goord,* 320 F.3d at 351 (citations & quotations omitted). "[A]s few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis v. Goord,* 320 F.3d at 351 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)).

Acevedo contends that defendants intercepted and reviewed numerous pieces of his legal mail. (Dkt. No. 199 at 32: Acevedo Opp. Br. (Geiss) at 13–16.) Legal mail dated September 23, 2009, November 12, 2009, November 13, 2009 and February 4, 2010 appears in Geiss' February 21, 2010 case notes. (Dkt. No. 185: McCormick Aff. Ex. D: 2/21/10 Case Notes; *see also* Dkt. No. 199 at 14: Acevedo Aff. (Geiss) ¶ 8; Dkt. No. 199 at 21: Acevedo 56(e) Stmt. (Geiss) ¶ 14.) Acevedo states that the incoming 2009 legal letters were from Robert Lenski, administrator of the Erie County Bar Association Assigned Counsel Program (Dkt. No. 199–3 at 17: Acevedo Ex. C at 1–2); the New York State Division of Criminal Justice Services (Acevedo Ex. C at 3); and Krin Flaherty at Prisoners' Legal Services of New York (2/21/10 Case Notes; *see also* Dkt. No. 199–7 at 3: Acevedo Ex. L at 151). Acevedo states that he sent the February 4, 2010 letter to his trial counsel, Janet A. Gandolfo. (Acevedo 56(e) Stmt. (Geiss) ¶ 10(B); 2/21/10 Case Notes.) Acevedo provides copies of other mail "defendant [Geiss] reviewed and maintained in his case file" (Dkt. No. 199–8 at 14: Acevedo Aff. (Serrano & Lee) ¶ 7), including an outgoing September 24, 2010 letter addressed to the New York State Library Prisoner Services Project (Dkt. No. 199–4: Acevedo Ex. E at 43–44) and a 2014 envelope sent to Acevedo from the same organization bearing a "privileged correspondence" stamp (Acevedo Ex. E at 89). Further, Acevedo testified that his appellate counsel received only one of seven letters that

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 189 of 212

Acevedo v. Fischer, Not Reported in Fed. Supp. (2015)

2015 WL 7769486

he sent her during his incarceration at Great Meadow. (Dkt. No. 176: Kim Aff. Ex. B: Acevedo Dep. at 61–63.) Each of these letters falls within the DOCCS definition of "privileged correspondence." (Dkt. No. 199–3 at 32: Acevedo Ex. D: DOCCS Directive 4421 § II.) [12]

[12]    Defendants cite *Standley v. Lyder,* 99 Civ. 4711, 2001 WL 225035 at *1 n.1 (S.D.N.Y. Mar. 7, 2001) (Lynch, D.J.) for the proposition that "legal mail" generally is defined as only "attorney-client communications and actual litigation documents." (Dkt. No. 207: Serrano & Lee Reply Br. at 3.) Accordingly, they contend that Acevedo has not established interference with any "legal" mail. *(Id.)* Other decisions have addressed non-attorney mail when analyzing claims for interference with legal mail. *See, e.g., Davis v. Goord,* 320 F.3d at 350, 352 (letter addressed to state court); *Amaker v. Haponik,* 98 Civ. 2663, 2002 WL 523385 at *9–10 (S.D.N.Y. Mar. 29, 2002) (packages from inmate's mother containing legal materials), *aff'd,* 125 F. App'x 375 (2d Cir.2005); *Cancel v. Goord,* 00 Civ 2042, 2001 WL 303713 at *1, *7 (S.D.N.Y. Mar. 29, 2001) (two notarized documents to opposing party in family court matter). Because the letters to Acevedo's criminal trial and appeals counsel clearly satisfy the strictest definition of legal mail, the Court will not grant defendants summary judgment on this basis.

**\*9** Detective Geiss asserts that he did not review Acevedo's mail after his trial in November 2011, and never reviewed his legal mail. (Geiss Aff. ¶ 8.) A December 22, 2009 mail watch authorization from Investigator Serrano, however, requests initiation of a mail watch on "all incoming and outgoing mail including [Acevedo's] legal mail." (Dkt. No. 199 at 10: 12/22/09 Mail Watch Request.) Additionally, notes about Acevedo's legal mail appear in Geiss' case notes (2/21/10 Case Notes), and pieces of Acevedo's legal mail were in Geiss' case file (Acevedo Ex. E at 43–44, 89).

### 1. *Acevedo's First Amendment Claim: Denial of Access to the Courts*

As required by *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003), Acevedo has presented evidence of interference with his legal mail. "To state a claim for denial of access to the courts," however, "a plaintiff must allege that the

defendant 'took or was responsible for actions that "hindered [a plaintiff's] efforts to pursue a legal claim." ' " *Davis v. Goord,* 320 F.3d at 351 (quoting *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997)); *see also, e.g., Smith v. City of N.Y.,* 14 Civ. 443, 2015 WL 1433321 at *3 (S.D.N.Y. Mar. 30, 2015); *Antrobus v. City of N.Y.,* 11 Civ. 2524, 2014 WL 1285648 at *3 (S.D.N.Y. Mar. 27, 2014) (Abrams, D.J.).

Acevedo concedes that his appeal was not injured as a result of interference with his legal mail. *(See, e.g.,* Dkt. No.176: Kim Aff. Ex. B: Acevedo Dep. at 65 ("Q: ... [E]ven assuming that letter didn't get to your appellate counsel, what affect did it have on your legal position as far as your appeal goes? ... A: [A]re you asking me if I suffered an injury in the legal sense with regards to court? Q: As far as your criminal appeal. A: No."); Acevedo Dep. at 72.) Acevedo cites no other case or meritorious legal claim that was hindered or lost as a result of the mail watch. Accordingly, to the extent Acevedo's First Amendment claim is that he was denied access to the courts due to interference with his legal mail, that claim should be dismissed. *See, e.g., Zimmerman v. Seyfert,* No. 03–CV–1389, 2007 WL 2080517 at *31 (N.D.N.Y. July 19, 2007) ("Plaintiff has made an inadequate showing that the mail watch somehow caused or contributed to his conviction. Plaintiff cites no other case that was hindered or lost because of the mail watch. Thus, any First Amendment claim of denial of access to courts based upon the mail watch must be dismissed."); *Ford v. Phillips,* 05 Civ. 6646, 2007 WL 946703 at *13 (S.D.N.Y. Mar. 27, 2007) (Plaintiff "has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference.... Thus, we ... grant summary judgment in favor of defendants.").

### 2. *Acevedo's First Amendment Claim: Right to the Free Flow of Legal Mail*

To the extent Acevedo's claim concerning his legal mail is part of his broader First Amendment claim for interference with the free flow of incoming and outgoing mail, it implicates different principles. As to Acevedo's incoming legal mail, inmate correspondence violations have been found sufficiently related to legitimate penological interests to justify a mail watch. *See, e.g., Ford v. Smith,* No. 09–CV–723, 2012 WL 4748848 at *1 (N.D.N.Y. Oct. 4, 2012), *aff'd,* 539 F. App'x 19 (2d Cir.2013); *LeBron v. Selsky,* No. 05–CV–172, 2009 WL 6312275 at *11 (N.D.N.Y. Sept. 11, 2009), *report & rec. adopted as modified on other grounds,* 2010 WL 1235593 (N.D.N.Y. Mar. 31, 2010). Acevedo concedes

2015 WL 7769486

that he instructed his wife to mark mail that she sent him "legal." (Dkt. No. 176: Kim Aff. Ex. B: Acevedo Dep. at 17; Dkt. No. 185: McCormick Aff. Ex. C: 12/21/09 Ltr.) Defendants had a legitimate interest in ensuring compliance with facility rules for privileged correspondence. (*See* Dkt. No. 199–3: Acevedo Ex. D at 21–24: DOCCS Directive 4421 § 721.3(C)(1).) Indeed, Acevedo acknowledges that "violation of legal mail procedure would entitle corrections officials to authorize a mail watch." (Dkt. No. 199 at 32: Acevedo Opp. Br. (Geiss) at 9.) Accordingly, defendants' review of Acevedo's incoming "legal" mail to ensure that it was in fact legal mail may not have violated his First Amendment rights. However, the timing of the mail watch is inconsistent with the asserted justification: Detective Geiss states that the mail watch began on November 17, 2009. (Dkt. No. 204: McCormick Reply Aff. ¶ 3.) The first piece of mail on the list of mail reviewed by Geiss is dated September 23, 2009. (Dkt. No. 185: McCormick Aff. Ex. D: 2/21/10 Case Notes.) Geiss' *attorney* attempts to explain this by stating that "it is unknown when that letter was received by the facility or how long the letter remained in the possession of the facility after it was received." (McCormick Reply Aff. ¶ 4.) Additionally, it does not seem that defendants became aware of Acevedo's request that his wife mark mail "legal" until December 8, 2009. (McCormick Aff. Ex. C: 12/21/09 Ltr.) Three pieces of Acevedo's incoming legal mail with dates prior to December 8, 2009 were copied for Geiss' review. (2/21/10 Case Notes.) Thus, factual issues as to timing, *i.e.,* whether the legal mail watch began before there was a basis for it, preclude summary judgment.

**\*10** The Court also is hard pressed to understand the substantial government interest served by monitoring Acevedo's outgoing legal mail. *See Thornburgh v. Abbot,* 490 U.S. 401, 408, 109 S.Ct. 1874, 1879 (1989) (quoting *Procunier v. Martinez,* 416 U.S. 396, 413–414, 94 S.Ct. 1800, 1811 (1974)); *Davis v. Goord,* 320 F.3d at 351 (2d Cir.2003); *Cancel v. Goord,* 00 Civ.2042, 2001 WL 303713 at \*7 (S.D.N.Y. Mar. 29, 2001) ("Because interference with outgoing legal mail cannot be based on a general prison security interest, Defendants must provide additional justification for their actions."). A mail watch should be limited based upon the perceived threat. *See Ford v. Fischer,* No. 09–CV–723, 2011 WL 856416 at \*6 (N.D.N.Y. Jan. 31, 2011) ("The Second Circuit has suggested that, although prison officials are entitled to considerable deference in ordering a mail watch for security reasons, justification for a mail watch should be relatively current, and the duration of the screening of mail should be reasonably limited based

on the perceived threat." (citing *Duamutef v. Hollins,* 297 F.3d 108, 113 (2d Cir.2002)) (Sotomayor, C.J.)), *report & rec. adopted,* 2011 WL 846860 (N.D.N.Y. Mar. 9, 2011). Defendants have not provided a specific justification for the interference with Acevedo's outgoing legal mail. The threat that Acevedo might intimidate witnesses through legal service providers seems minimal, as does the threat posed by his potentially sending non-legal mail to legal organizations.

The factors to be considered in determining whether a prison regulation restricting an inmate's constitutional rights is permissible are:

> (1) whether a valid rational connection between the prison regulation and governmental interest exists; (2) whether alternative means of exercising the right remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards or other inmates, and on the allocation of resources generally; and (4) how the challenged regulation relates to the proposed alternatives.

*Klimas v. Lantz,* 531 F. App'x 6, 7 (2d Cir.2013) (citing *Johnson v. Goord,* 445 F.3d 532, 535 (2006)). The connection between the restriction on Acevedo's outgoing legal mail and the government interest served is not clear. Allowing Acevedo to send legal mail without interference would not have adversely impacted guards, inmates or prison resources. An obvious alternative would have been to follow the procedure for incoming privileged correspondence prescribed by DOCCS Directeve 4421§ 721.3(B), and open Acevedo's outgoing legal mail in his presence. (Dkt. No. 199–3 at 21: Acevedo Ex. D at 21–24: DOCCS Directive 4421.)

However, Acevedo has not established a claim as to his outgoing legal mail against Superintendent Lee. Acevedo has presented evidence that while he was at Green Haven a September 24, 2010 letter to Prisoner Services Project was intercepted and copied, but interference with a single piece of legal mail usually is insufficient to establish a constitutional violation. *Davis v. Goord,* 320 F.3d at 351. Acevedo has not presented evidence of further interference with his outgoing legal mail at Green Haven. [13] Accordingly, defendant Lee 's

Acevedo v. Fischer, Not Reported in Fed. Supp. (2015)

2015 WL 7769486

summary judgment motion should be granted as to Acevedo's legal mail claim.

| 13 | Acevedo alleges that while he was an inmate at Green Haven, Officer Warrington tampered with a package of his legal mail (Acevedo Dep. at 67–69), but he does not assert that Superintendent Lee was involved in this incident. Accordingly, it does not support his claim against Superintendent Lee. *See, e.g., Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). |

Investigator Serrano argues that he is entitled to qualified immunity. (Dkt. No. 177: Serrano & Lee Br. at 10–12.) It is clear that interference with inmate mail may violate the First Amendment. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987); *Amaker v. Haponik,* 98 Civ. 2663, 1999 WL 76798 at *8 (S.D.N.Y. Feb. 17, 1999) ("Given the existing precedent the defendants should have been aware that plaintiff's First Amendment right to receive mail could only be impinged by reasonable regulations connected to the legitimate concerns of prison officials."); *see also* cases cited at pages 10–11 above. The law as to what constitutes good cause to institute a mail watch is not clear. *(See* cases cited at pages 13–14 above.) Serrano asserts that he was not aware of any law preventing him from honoring a law enforcement request for a mail watch on an inmate under DOCCS custody. *(See* page 14 above.) Given the lack of precedent, an officer of reasonable competence could have concluded that it was constitutionally permissible for a mail watch to extend to an inmate's legal mail. Accordingly, Serrano is entitled to qualified immunity and should be granted summary judgment as to Acevedo's legal mail claim.

 **\*11** Detective Geiss has not moved for summary judgment on qualified immunity grounds. *(See generally* Dkt. No. 181: Geiss Br.; Dkt. No. 204: McCormick Reply Aff.) Questions of fact as to the timing, extent and duration of interference with Acevedo's legal mail preclude summary judgment. Accordingly, Geiss' summary judgment motion should be denied as to Acevedo's legal mail claim.

### C. Acevedo Has Not Established a Claim for Mail Tampering

Acevedo asserts that his personal and legal mail, and the information contained therein, has been disseminated to officers and other inmates on every housing block where he has been an inmate since February 2010. (Dkt. No. 176: Kim Aff. Ex. B: Acevedo Dep. at 38–39; Dkt. No. 199 at 14:

Acevedo Aff. (Geiss) ¶ 11; Dkt. No. 199 at 21: Acevedo 56(e) Stmt. (Geiss) ¶ 18; Dkt. No. 199 at 32: Acevedo Opp. Br. (Geiss) at 1, 25–26.) Acevedo contends that the dissemination of his mail began as a "psychological ploy to extort and coerce a false confession" from him before and during his criminal trial (Acevedo Dep. at 28; Acevedo 56(e) Stmt. (Geiss) ¶ 20), then became a campaign to threaten and intimidate him into voluntarily dismissing his appeal (Acevedo Dep. at 32–33; Dkt. No. 199–1 at 35: Acevedo 2d Aff. (Geiss) ¶ 2(D)).

Acevedo has not provided any evidence to demonstrate that defendant Geiss, Serrano or Lee personally was involved in the dissemination of his mail to other inmates and prison staff. *(See, e.g.,* Acevedo Dep. at 42–43.) "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation & quotation omitted); *see also, e.g., Ford v. Phillips,* 05 Civ. 6646, 2007 WL 946703 at *15 (S.D.N.Y. Mar. 27, 2007) (a section 1983 plaintiff "must allege and support personal involvement in the constitutional violations to prevail"). Accordingly, defendants' summary judgment motions should be granted as to Acevedo's mail tampering claim.

### CONCLUSION

For the reasons set forth above, defendants' summary judgment motions (Dkt. Nos. 173 & 180) should be *DENIED* as to Acevedo's claim against defendant Geiss for interference with his legal mail, and in all other respects defendants' motions should be *GRANTED.* The Joint Pretrial Order is due January 8, 2016.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams, 500 Pearl Street, Room 2203, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Abrams (with a courtesy copy to my

2015 WL 7769486

chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *Ingram v. Herrick,* 475 F. App'x 793, 793 (2d Cir.2012); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health* & Human Servs., 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7769486

---

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 884909

2016 WL 884909
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Francisco ACEVEDO, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

No. 12-CV-6866 (RA)
|
Signed 03/02/2016

**Attorneys and Law Firms**

Francisco Acevedo, Alden, NY, pro se.

Frederick Hongyee Wen, Mary Kim, New York State Office of the Attorney General, New York, NY, Rory Carleton McCormick, Corporation Counsel, City of Yonkers, Yonkers, NY, for Defendants.

OPINION & ORDER

RONNIE ABRAMS, United States District Judge

**\*1** Proceeding *pro se,* Plaintiff Francisco Acevedo originally brought this action against twenty-three Defendants alleging constitutional violations for events that occurred while he was incarcerated at Green Haven, Great Meadow, and Sullivan Correctional Facilities. On September 29, 2014, the Court dismissed all of Plaintiff's claims except his First Amendment claim against Defendants Detective John Geiss, Superintendent William Lee, Investigator Anselmo Serrano, and Officer Eric Warrington. Sept. 29, 2014 Op. 9. These Defendants now move for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The Court referred Defendants' motions to Magistrate Judge Peck, and now before the Court is Judge Peck's thorough and well-reasoned Report and Recommendation (the "Report"), which recommends that all Plaintiff's First Amendment claims be dismissed, with the exception of the claim that Detective Geiss interfered with Plaintiff's legal mail. Detective Geiss objects to the Report, arguing that Judge Peck erred on the legal mail claim, but neither Acevedo nor any other party filed objections.[1] For the reasons that follow, the Court adopts Judge Peck's Report in its entirety.

[1]     As Judge Peck warned in his Report, failure to object waives any objections and precludes appellate review. R. & R. 24 (citing *Thomas v. Arn,* 474 U.S. 140 (1985)).

STANDARD OF REVIEW

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* When no timely objection is made, "a district court need only satisfy itself that there is no clear error on the face of the record." *Wilds v. United Parcel Serv., Inc.,* 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003) (quoting *Nelson v. Smith,* 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)). In undertaking such a review, the Court "read[s] the pleadings of a *pro se* plaintiff liberally and interpret[s] them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)).

DISCUSSION [2]

[2]     The Court assumes familiarity with the facts and procedural history, as set forth in Judge Peck's Report.

Detective Geiss objects to the Report on two grounds. First, he argues that he is entitled to summary judgment on Plaintiff's claim that he interfered with Plaintiff's legal mail because he was not personally involved in the alleged violation. Specifically, Geiss argues that his own involvement was limited to making a "lawful mail watch request of plaintiff's mail," which "made clear that he did not seek to review any legal mail of plaintiff" but only requested that Plaintiff's legal mail be reviewed "to ensure the contents were in fact legal mail." Geiss Obj. 4. Second, Geiss argues that, because the Second Circuit has held that an isolated incident of mail tampering is insufficient to establish a constitutional violation, he is entitled to summary judgment because only one of the letters he reviewed constituted legal mail. *Id.* 5. Neither of Geiss's objections has merit.

**\*2** As to the first objection, Geiss contends that he was not personally involved in the monitoring of Plaintiff's legal

Acevedo v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 884909

mail because he made clear that he did not seek to personally review any legal mail accurately labeled as such, requesting only that "if said mail is determined not be legal mail a copy of said mail be made and forwarded to the assigned." Dkt. 185-1 at Ex. C: Dec. 21, 2009 Letter from Geiss to Serrano. Defendant's objection, however, is premised on the false assumption that to be personally involved in the alleged violation Geiss had to personally review Plaintiff's legal mail. Indeed, Geiss's own admissions evidence his personal involvement. Geiss affirmed that, in November 2009, he requested that the New York Department of Corrections and Community Supervision (the "DOCCS") monitor Acevedo's mail and that he memorialized this request in a letter dated December 21, 2009, which specifically requested "that any mail marked legal mail also be reviewed." Dkt. 183 at 2: Geiss Aff ¶¶ 5-6; Dkt. 185-1 at Ex. C: Dec. 21, 2009 Letter from Geiss to Serrano. In any event, Geiss's February 21, 2010 case notes indicate that he reviewed twenty-five pieces of Acevedo's incoming and outgoing mail, including four pieces of legal mail: (1) a September 23, 2009 letter from Robert D. Lenski, administrator of the Erie County Bar Association Assigned Counsel Program, regarding providing representation; (2) a November 12, 2009 letter from the New York State Division of Criminal Justice Services regarding expungement of DNA; (3) a November 13, 2009 letter from Krin Flaherty at Prisoners' Legal Services of New York regarding expungement of DNA; and (4) a February 4, 2010 letter from Acevedo to his trial counsel, Janet A. Gandolfo. Dkt. 185-1 at Ex. D: Geiss' Feb. 21, 2010 Case Notes; Dkt. 199-3 at 17: Acevedo Ex. C at 1-2; Dkt. 199-7 at 3: Acevedo Ex. L at 142. There is thus sufficient evidence that Geiss was personally involved in the monitoring of Acevedo's legal correspondence.

Geiss's second objection is equally unavailing. He urges that his personal review of only one piece of legal mail (he denies that the other three letters constitute legal mail) is insufficient to establish a constitutional violation. As noted above, however, Geiss requested that DOCCS institute an ongoing watch of all of Plaintiff's incoming and outgoing legal mail, which lasted from in or about November 2009 to at least February 2010. This case is therefore distinguishable from those in which a plaintiff alleges "an isolated incident of mail tampering," which the Second Circuit has held is "usually insufficient to establish a constitutional violation." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir. 2003) (internal citations omitted). The Court agrees with Judge Peck's finding that there is a genuine issue of material fact as to whether there was a reasonable basis for the legal mail watch prior to

December 8, 2009—the date Geiss first learned that Acevedo had instructed his common law wife to mark her personal letters as legal mail, Dkt. 185-1 at Ex. C—in light of Geiss's representation that he requested the watch in November 2009 and the evidence that he reviewed legal mail dated as early as September 23, 2009. Unlike in *Davis,* here, there is a triable issue of fact as to whether Geiss requested a mail watch that "regularly and unjustifiably interfered with incoming legal mail." *Id.* [3] The Court therefore adopts the Report's recommendation that summary judgment be denied as to Plaintiff's claim that Geiss interfered with his legal mail. [4]

[3]  As noted above, Geiss contends that he reviewed only one piece of mail that constituted legal mail because only attorney-client communications and actual litigation documents are legal mail for the purposes of the First Amendment. Geiss Obj. 5 (citing *Standley v. Lyder,* 99-CV-4711 (GEL), 2001 WL 225025, at *2 n.1 (S.D.N.Y. March 6, 2001)). The Court need not reach the question of what constitutes legal mail for First Amendment purposes as there is sufficient evidence that Geiss requested that DOCCS institute a regular practice of monitoring Acevedo's legal mail.

[4]  As Judge Peck noted, unlike his co-Defendants, Detective Geiss did not argue he was entitled to summary judgment on the grounds of qualified immunity.

## CONCLUSION

The Court has reviewed the remainder of the Report and finds no clear error. For the reasons stated above, it is hereby:

ORDERED that the Court adopts Judge Peck's Report in its entirety. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 170, 173, and 180.

IT IS FURTHER ORDERED that a telephone conference is hereby scheduled for March 25, 2016 at 3 p.m. The Court will issue a separate order to arrange Plaintiff's participation in the conference.

SO ORDERED.

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 195 of 212

Acevedo v. Fischer, Not Reported in Fed. Supp. (2016)
2016 WL 884909

**All Citations**

Not Reported in Fed. Supp., 2016 WL 884909

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 8146896

2005 WL 8146896
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rudolph ROSSI, Plaintiff,

v.

B. STEVENS, R. Pangborn, M. Miller, R. Snedden, M.
Rynders, Correction Officers; A. Montegari, Sergeant;
J. Temple, Hearing Officer; Donald Selsky, Director of
Special Housing; William Phillips, Superintendent of
Green Haven Prison; and Glenn Goord, Commissioner
of the Department of Correction, Defendants.

04 Civ. 1836 (CM)(LMS)
|
Signed 05/02/2005

**Attorneys and Law Firms**

Evan Mandel, Rishi Bhandari, Mandel Bhandari, L.L.P., New
York, NY, for Plaintiff.

Rudolph Rossi, Malone, NY, pro se.

Jose Luis Velez, Daniel A. Schulze, Inna Ringh, State of New
York Office of the Attorney General, New York, NY, for
Defendants.

## REPORT AND RECOMMENDATION

LISA MARGARET SMITH, UNITED STATES
MAGISTRATE JUDGE

**\*1 TO: THE HONORABLE COLLEEN MCMAHON,
UNITED STATES DISTRICT JUDGE**

Plaintiff Rudolph Rossi, proceeding pro se and in forma
pauperis, brings this Complaint pursuant to 42 U.S.C. §
1983 against the above-named Defendants. Plaintiff filed his
Complaint on February 20, 2005, [1] seeking money damages
and declaratory and injunctive relief based on Defendants'
alleged violations of Plaintiff's First, Fourth, Eighth, and
Fourteenth Amendment rights. The claims arise from an
incident that occurred at Green Haven Correctional Facility.

[1]    Plaintiff's Complaint was stamped "Received" by
this Court's Pro Se office on that date.

On July 14, 2004, Defendants filed a Motion to Dismiss
under Federal Rule of Civil Procedure 12(b)(6), asserting that
Plaintiff has failed to exhaust his administrative remedies, and
has failed to state a claim upon which relief can be granted.
Defendants also assert that they are entitled to Eleventh
Amendment immunity and that Plaintiff is not entitled to
injunctive relief. For reasons stated below, I conclude, and
respectfully recommend that Your Honor should conclude,
that Defendants' Motion to Dismiss should be granted in part
and denied in part. Specifically, I conclude, and respectfully
recommend that Your Honor should conclude, that Plaintiff
has stated a claim of excessive force, Plaintiff has stated
a denial of due process claim, but only with respect to
Defendant Temple, Plaintiff has failed to state a denial of
religious accommodation claim, and Plaintiff has stated a
denial of access to courts claim, but only with respect
to Superintendent Phillips. Accordingly, I conclude, and
respectfully recommend that Your Honor should conclude,
that Plaintiff's excessive force claim should proceed as
against Defendants Stevens, Pangborn, Miller, Snedden,
Rhynders, and Montegari; Plaintiff's due process claim
should proceed only as against Defendant Temple; Plaintiff's
religious accommodation claim should be dismissed; and
Plaintiff's access to courts claim should proceed only as
against Defendant Phillips.

## Facts Alleged in Plaintiff's Complaint [2]

[2]    For purposes of this Motion, the allegations in
Plaintiff's Complaint are accepted as true.

At all relevant times, Plaintiff was an inmate at Green Haven
Correctional Facility. [3] See Complaint (Docket #2) at ¶ 3.
Plaintiff alleges that on July 30, 2003, he was "arbitrarily
singled out from a group of prisoners under the false pretext
that [he] had contraband in [his] left pocket." Id. at ¶ 13.
Plaintiff next alleges that Correction Officer Stevens and
Correction Officer Panghorn escorted Plaintiff to a "secluded
corner," where he was searched. [4] Id. at ¶ 14. According to
Plaintiff's Complaint, Rossi was then "pushed into the wall,
struck in the back of the head and wrestled to the floor." [5]
Id. Plaintiff contends that following this alleged assault he
was handcuffed and again assaulted by Correction Officers
Stevens, Panghorn, Miller, Snedden, and Rhynders [6] "under
the supervision of Sgt. Montegari." Id. at ¶¶ 15-16. [7]

[3]    Plaintiff is currently incarcerated at Southport
Correctional Facility.

Case 9:18-cv-00336-AMN-TWD  Document 74  Filed 05/31/22  Page 197 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)
2005 WL 8146896

4
> According to Plaintiff's Complaint, the Correction Officers did not find any contraband on Plaintiff's person. See Complaint at ¶ 14.

5
> It appears that only Correction Officers Stevens and Panghorn were involved in this initial assault.

6
> Although this Defendant's name is spelled "Rynders" in the caption, the correct spelling is Rhynders. See Eagen Declaration, Ex. B (Inter-Departmental Communication filed by Correction Officer Rhynders).

7
> Following the initial assault by Correction Officers Stevens and Panghorn, Plaintiff claims that he was assaulted two more times, the latter of which involved only Correction Officers Miller and Rhynders and an unknown correction officer. This unknown correction officer is not named as a Defendant in Plaintiff's Complaint.

**\*2**  Following this incident Plaintiff was taken to the Special Housing Unit ("SHU") at Green Haven Correctional Facility, where he was "seen by medical" and where he had his injuries photographed. Id. at ¶ 17. Plaintiff claims that as a result of the alleged assaults he sustained injuries to his head, ribs, back, legs, shoulder, and arm. Id. at ¶ 18. Plaintiff states that physical therapy was "required" for his shoulder and that he continues to suffer from pain. Id.

Plaintiff further claims that after the alleged incident occurred, Correction Officers Stevens, Panghorn, Miller, Snedden, Rhynders, and Sergeant Montegari "falsified documents to justify their brutal conduct." Id. at ¶ 19. Specifically, Rossi contends that Correction Officers Stevens and Panghorn wrote a misbehavior report falsely accusing Plaintiff of refusing a direct order, violating pat frisk procedure, and assaulting prison staff. Id. at ¶ 20.

Plaintiff's Complaint also contains allegations concerning the Tier III hearing that was conducted following the filing of the misbehavior report. Plaintiff asserts that Defendant Temple, the hearing officer who presided over Plaintiff's Tier III hearing, violated Plaintiff's due process rights by denying Plaintiff the right to have his hearing conducted by a fair and impartial hearing officer, the right to "present documentary evidence," the right to receive "written specification" of the grounds for the Tier III hearing, and the right to "substantial evidence." Id. at ¶ 21. Plaintiff was found guilty of all charges.

As a result, Plaintiff was placed in SHU confinement for a period of twelve months and lost all privileges. Id. at ¶ 22.

Plaintiff appealed Defendant Temple's decision to Defendant Selsky, who is the Director of the Special Housing Unit. Plaintiff states the following as grounds for his appeal: (1) the misbehavior report read into the record during the hearing did not state that Plaintiff assaulted prison staff, (2) Plaintiff was denied the right to submit relevant documentary evidence, (3) an extension was not granted to continue the hearing beyond the fourteen-day time period, 8 (4) Plaintiff was denied the right to have his hearing conducted by a fair and impartial hearing officer, and (5) the "statement of evidence" upon which Defendant Temple relied in rendering his decision did not support the charge brought against Plaintiff that he had assaulted prison staff. Id. at ¶ 23. Plaintiff further states that after Defendant Temple's decision was affirmed, Plaintiff's request for reconsideration was "ignored." Id. at ¶ 24, 25. Plaintiff contends that Defendant Selsky violated Plaintiff's due process rights by affirming Defendant Temple's decision. Id. at ¶ 23-24, 28.

8
> Section 251-5.1(b) of Title 7 of the Official Compilation of Codes, Rules and Regulations of the State of New York provides, "[t]he disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals." Here, Defendants have not offered evidence to rebut Plaintiff's claim that the hearing was not completed within the fourteen-day time period, nor is there evidence in the record to show that informing Plaintiff of the reasons for such a delay would have jeopardized institutional safety or correctional goals.

**\*3**  Plaintiff further alleges that during his confinement in SHU he was, inter alia, not given "a proper diet consistent with [his] religious beliefs," and that his outgoing mail, including legal mail, was "discrimina[torily] thrown out." Id. at ¶ 26.

## DISCUSSION

**Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act provides,

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The Supreme Court has held that this mandatory exhaustion requirement "applies to all inmate suits about prison life, whether they involve general or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). [9] The Supreme Court's decision in Porter makes clear that a prisoner must exhaust every claim that he or she wishes to assert before filing a suit in federal court. See Porter, 534 U.S. at 532. Exhaustion is required even where the specific form of relief sought is not available through administrative procedures. See e.g. Boddie v. Churner, 532 U.S. 731 (2000). In addition, an inmate plaintiff's complaint must plead the elements of exhaustion with sufficient particularity and support. See e.g. Fields v. Brown, 2002 U.S. Dist. LEXIS 18548, at *8 (S.D.N.Y. Oct. 1, 2002) (holding that a plaintiff "must allege in his [or her] complaint that he [or she] has exhausted his [or her] administrative remedies and attach the appropriate documentation, including administrative decisions, demonstrating exhaustion.")

[9]     Prior to Porter, the law in the Second Circuit was that the exhaustion requirement under the PLRA did not apply to all claims. See e.g. Nussle v. Willette, 224 F.3d 95 (2d Cir. 2000) (holding that the exhaustion requirement was not meant to apply to assault and excessive force claims). The Supreme Court's holding in Porter modified the law of the Second Circuit such that exhaustion of administrative remedies is required in all cases involving incidents or events within prison walls regardless of whether available administrative remedies are adequate.

Although the law remains unsettled as to precisely what constitutes exhaustion, it is generally accepted that a prisoner must grieve his or her complaint about prison conditions through the highest level of administrative review before filing a lawsuit in federal court. See Abney v. McGinnis, 01 Civ. 8444 (SAS), 2002 U.S. Dist. LEXIS 12180, at *8 (citing Hemphill v. New York, 198 F. Supp. 2d 546, 548 (S.D.N.Y. Apr. 19, 2002) ("Inmates must therefore exhaust all administrative remedies, at all levels of appeal, in order for their claims to survive a motion to dismiss."))

In New York, inmates may file grievances with respect to nearly every aspect of custody. See Sulton v. Greiner, 00 Civ. 0727 (RWS), 2000 U.S. Dist. LEXIS 17887, at *7 (S.D.N.Y. Dec. 11, 2000) ("New York inmates can file grievances with the inmate grievance committee on practically any issue affecting their confinement.") For instance, under 7 N.Y.C.R.R. § 701.2(a) an inmate may grieve the application of any prison regulation. The Inmate Grievance Program in New York entails a three-step review process under which an inmate's grievance is first reviewed by a committee of inmates and Department of Correction employees; the committee's decision is subject to review by the superintendent of the correctional facility. Inmates may then appeal the decision of the superintendent to the Central Office Review Committee ("CORC") for a final administrative determination. It is only upon such a final determination that an inmate can be said to have exhausted his or her administrative remedies.

**\*4** Courts have delineated circumstances under which exhaustion may be excused. For instance, in Thomas v. New York State Dep't of Corr. Servs., No. 00 Civ. 7163 (NRB), 2002 WL 31164546, at *3 (S.D.N.Y Sept. 30, 2002), the district court determined that the prisoner's failure to exhaust was excused because the prisoner made a reasonable attempt to file a grievance and was prevented from doing so by prison officials, thus rendering the grievance procedure "unavailable" for purposes of exhaustion.

Here, Plaintiff's Complaint asserts excessive force, denial of due process, denial of religious accommodation, and denial of reasonable access to the courts claims. Plaintiff's religious accommodation claim has two prongs. Specifically, Plaintiff contends that prison regulations violate Plaintiff's First and Fourteenth Amendment rights by restricting Plaintiff's ability to maintain a diet that is consistent with his religious beliefs

2005 WL 8146896

(Directive 4932) and by restricting Plaintiff from wearing a religious head covering (Directive 4202).

Defendants concede in their moving papers that Plaintiff has exhausted his administrative remedies with respect to his excessive force claim. Defendants also concede in their moving papers that Plaintiff has exhausted his administrative remedies with respect to the religious head covering component of his religious accommodation claim and his denial of access to courts claim, although Defendant maintains that none of the Defendants were named in Plaintiff's head covering and access to courts grievances. Accordingly, Defendants contend, Plaintiff's religious head covering and access to courts claims have not been exhausted as against Defendants Goord and Phillips because a grievance was not filed and/or fully exhausted by Plaintiff against Defendants Goord and Phillips for denying him religious accommodation and reasonable access to the courts. Defendants also contend that a grievance was not filed and/ or fully exhausted by Plaintiff against Defendants Stevens, Pangborn, Temple, and Selsky for denying Plaintiff due process. In addition, at a pretrial conference before the undersigned on April 5, 2005, Defendants conceded that Plaintiff has exhausted his administrative remedies with respect to the religious diet component of his religious accommodation claim, and may have exhausted his religious head covering claim. [10]

[10]    In a letter to the Court dated April 12, 2005, Defendants concede that Plaintiff has exhausted his religious head covering claim, but reiterate the claim first asserted in their moving papers that Plaintiff has not exhausted this claim as against Defendants Goord and Phillips because neither of these Defendants was named in Plaintiff's grievance.

Because Defendants have conceded that Plaintiff has exhausted his excessive force and religious diet claims, I will address the exhaustion issue only with respect to Plaintiff's denial of due process, religious head covering, and access to courts claims.

Plaintiff's Denial of Due Process Claim

Defendants assert correctly that Congress has replaced the "general rule of non-exhaustion with a general rule of exhaustion," Porter, 534 U.S. at 525. This Circuit has, however, held that the affirmative defense of exhaustion is subject to estoppel. See Ziemba v. Wezner, 366 F.3d 161, 162,

163 (2d Cir. 2004) (finding that prison officials prevented the plaintiff from exhausting his administrative remedies by beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another prison, and thus were estopped from asserting failure to exhaust as an affirmative defense).

**\*5** Shortly after deciding Ziemba this Circuit considered a quintet of cases concerning the nature and scope of the exhaustion requirement, and directed the district courts to ascertain, inter alia, whether a plaintiff has plausibly alleged "special circumstances" to justify his or her failure to comply with the PLRA's exhaustion requirement. Hemphill v. State of New York, 380 F.3d 680 (2d Cir. 2004); Ortiz v. McBride, 380 F.3d 649 (2d Cir. 2004); Giano v. Goord, 380 F.3d 670 (2d Cir. 2004); Johnson v. Testman, 380 F.3d 691 (2d Cir. 2004); Abney v. McGinnis, 380 F.3d 663 (2d Cir. 2004).

The Second Circuit's decision in Giano is particularly instructive. The plaintiff in Giano submitted to a urine test on September 30, 1996. Subsequently the defendants tampered with the plaintiff's urine sample and, as a result, a misbehavior report was issued against the plaintiff. The plaintiff claimed that the defendants took these actions in retaliation for the plaintiff having filed a lawsuit against prison officials. At the ensuing disciplinary hearing several of the defendants allegedly presented false documents and false testimony. Retaliation against the plaintiff by the defendants continued in November 1996. At a second disciplinary hearing the defendants again presented false documents and false testimony. The plaintiff appealed the decision to Commissioner Goord. The plaintiff's appeal contained arguments similar to that which Rossi has raised. In particular, Giano claimed that the hearing officer "could not act in an impartial manner," and that "no proper foundation had been laid" for the charges brought against him. Giano, 380 F.3d at 674 (quoting Petitioner's appeal to Commissioner Goord). Commissioner Goord affirmed the result of the second disciplinary hearing.

The district court (Arcara, J.) sua sponte issued an order requiring the plaintiff to detail his efforts to exhaust his administrative remedies. In response to that order, Giano submitted a statement explaining that he had pursued his retaliation claims through the disciplinary process via an appeal to Commissioner Goord, arguing, as has Rossi, that New York prison regulations and Directive 4040 state that disciplinary decisions and dispositions are non-grievable and

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 200 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)
2005 WL 8146896

that Giano was therefore prohibited from filing a grievance for the harm that the defendants allegedly caused.

The district court dismissed Giano's complaint, concluding that he had failed to satisfy the PLRA's exhaustion requirement. The Court of Appeals vacated the district court's decision based on its holding in Lawrence v. Goord, 238 F.2d 182 (2d Cir. 2001), in which the Court determined that the PLRA did not require inmates to exhaust retaliation claims. Following Porter the case was remanded to the district court, and Giano filed a timely Notice of Appeal.

On appeal the Second Circuit determined that special circumstances justified Giano's failure to comply with administrative procedural requirements. Specifically, the Court of Appeals determined that "the plaintiff reasonably interpreted DOCS regulations to mean that his only administrative recourse was to appeal his disciplinary conviction." Giano, 380 F.3d at 676. The Court of Appeals further stated that it was not appropriate to analogize the PLRA's exhaustion requirement to the procedural default rule applicable in the habeas context. Id. at 678. The Court of Appeals explained that "[w]hat is justification in the PLRA context for not following procedural requirements ... must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." Id.

 *6  Directive 4040 provides, in pertinent part, "... the individual decisions or dispositions of the following are not grievable: ... disciplinary proceedings." Understandably this provision could have led an uncounselled inmate such as Plaintiff to believe that he could not pursue matters relating to his disciplinary hearing through the Inmate Grievance Procedure. Defendants argue that because Plaintiff's allegations regarding his disciplinary hearing do not concern the disposition of the hearing, Directive 4040 is inapplicable. In other words, Defendants argue that because Plaintiff's claims regarding his disciplinary hearing are at heart due process claims, such claims were grievable and Plaintiff was not precluded by Directive 4040 from grieving such claims. Plaintiff cannot be expected to grasp such legal niceties. As with the plaintiff in Giano, Plaintiff's failure to file a grievance with respect to his denial of due process claim "was justified by his reasonable belief that DOCS regulations foreclosed such recourse." Giano, 380 F.3d at 678.

Because New York rules preclude Plaintiff from filing a grievance with respect to this issue now, I find,

and respectfully recommend that Your Honor find, that administrative remedies are not "available" to Rossi, and that such lack of availability is due to justified behavior by Plaintiff. See 7 N.Y.C.R.R. § 701.7(a)(1) ("An inmate must submit a complaint to the grievance clerk within 14 calendar days of an alleged occurrence on Inmate Grievance Complaint Form #2131"); see also Giano, 380 F.3d at 679-80. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has exhausted his denial of due process claim.

Plaintiff's Denial of Access to Courts Claim

As with Plaintiff's religious head covering claim, Defendants contend that a grievance was not filed and/or fully exhausted by Plaintiff against Defendants Goord and Phillips for denying him access to the courts. Defendants assert that "[i]f plaintiff wanted to pursue a claim against [Defendants Goord and Phillips], he should have filed a grievance against them to put them on notice and should have provided the Inmate Grievance Resolution Committee with enough detail regarding the alleged incident[s] so that it could evaluate the merits of his grievance and take the appropriate course of action." Defendants' Memorandum at 6. In support of their argument Defendants point to the Sixth Circuit's requirement that an inmate's grievance "name each person who will be a defendant in the lawsuit." See Curry v. Scott, 249 F.3d 493, 504-05 (6th Cir. 2001).

Defendants' argument is unavailing not only because Sixth Circuit case law is not binding on this Circuit, but also because case law in this Circuit adheres to a less stringent approach. The PLRA's exhaustion requirement is designed to " ‘afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d at 697 (quoting Porter, 534 U.S. at 524-25). This Circuit has construed the PLRA's exhaustion requirement to be akin to the rules of notice pleading, which prescribe that a complaint "must contain allegations sufficient to alert the defendants to the nature of the claim and to allow them to defend against it." Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004). This Circuit has thus determined that a grievance is sufficient if it alerts prison officials to the nature of the wrong for which redress is sought. Johnson, 380 F.3d at 697 (citation omitted). As with notice pleading, " ‘ ‘the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.' " Id. (quoting Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002)). Based upon this standard, the

2005 WL 8146896

Court of Appeals found that although the plaintiff in Johnson v. Testman did not name the defendant in the answer he gave initially during his disciplinary proceeding, Johnson's submissions on appeal described the defendant clearly and afforded prison officials all the information necessary to commence an investigation into the underlying incident. Further, under New York's Administrative Code Rossi was not required to name either Defendant in his grievance. 7 N.Y.C.R.R. 701.7(a)(1)(i) provides,

> **\*7** In addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint.

Here, Plaintiff's submissions with respect to his denial of access to courts claim comport with the exhaustion requirements as construed in this Circuit. Plaintiff's submissions were sufficient in terms of putting prison officials on notice of Rossi's concerns regarding the integrity of outgoing mail from SHU. On August 20, 2003, Plaintiff filed a "Grievance Complaint" that contained two headings: "Description of Incident" and "Action Requested." See Plaintiff's Opposition, Ex. C. Plaintiff maintains that he never received a response to this grievance. Plaintiff further states that he filed a second "complaint and grievance" on August 30, 2003, and a third "complaint" on February 10, 2004.[11] These two submissions were addressed to Defendant Goord and state explicitly that they concern the inaction of Defendant Phillips. The content of these submissions, considered in the context of this Circuit's liberal approach to exhaustion, lead me to conclude that Plaintiff had identified Defendants Goord and Phillips clearly and had afforded prison officials all the information necessary to commence an investigation into Plaintiff's allegations concerning outgoing mail from SHU. Further, accepting as true Plaintiff's allegation that prison officials never responded to his initial grievance, Plaintiff cannot be found to have failed to exhaust. See Giano, 380 F.3d at 677 (citing Foulk v. Charrier, 262 F.3d 687 (8th Cir 2001) (noting that special circumstances may render administrative remedies "unavailable," and finding that remedies were not available to

the plaintiff where the warden did not respond to the inmate's grievance during the time period required by regulations)). I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has exhausted his access to courts claim as against Defendants Goord and Phillips.

11   Plaintiff explains that this latter filing was made after Plaintiff received notice from the District Court for the Northern District of New York that his objections to a magistrate judge's ruling were not received by the district court and that a decision had been rendered against him. See Plaintiff's Opposition at 3.

Plaintiff's Religious Head Covering Claim

The same can be said of Plaintiff's efforts to exhaust the religious head covering component of his religious accommodation claim. As with the grievances filed with respect to Plaintiff's access to courts claim, Plaintiff's submissions with respect to the head covering claim were sufficient in terms of putting prison officials on notice of Rossi's concerns regarding his desire to wear a religious head covering, and how Directive 4202 allegedly infringed Plaintiff's First and Fourteenth Amendment rights. See Eagen Declaration, Ex. C. Further, the superintendent's decision makes clear that Plaintiff's submissions sufficiently apprised the prison of the situation to which Rossi objected. See id. I therefore find, and respectfully recommend that Your Honor find, that Plaintiff has exhausted his religious head covering claim as against Defendants Goord and Phillips.

**\*8** Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has exhausted his administrative remedies with respect to all claims raised in the underlying action.

**Eleventh Amendment Immunity**

Absent a waiver on the part of the state or a valid congressional override, the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against the states. Kentucky v. Graham, 473 U.S. 159, 167 n. 14 (1985). The Eleventh Amendment also bars suits against state officials if the state is the real party interest, regardless of whether the state is named as a party to the action. Edelman v. Jordan, 415 U.S. 651, 663 (1974). Accordingly, when a state official is named as a party to litigation, as is the case here, the court must determine whether the action is in reality a suit against the state. Pennhurst State School & Hospital

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 202 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)

2005 WL 8146896

v.Halderman, 465 U.S. 89, 101 (1984). As a general rule a suit is against the sovereign if the parties are seeking damages that would be paid from public funds in the state treasury.

The Eleventh Amendment thus bars recovery against a state official who is sued in his or her official capacity. The Eleventh Amendment does not, however, protect a state official from personal liability if he or she is sued in his or her individual or personal capacity. Graham, 473 U.S. at 166-67. The Eleventh Amendment does not protect state officials from personal liability when their actions violate Federal law, even if a state official is following a state law that purports to require such action. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citation omitted) (noting Justice Frankfurter's discussion of the intervening years following enactment of the original Civil Rights Act of 1866 during which every case before the Supreme Court invoking "under color of state law" provisions " 'involved action taken either in strict pursuance of some specific command of state law or within the scope of executive discretion in the administration of state laws,' " and noting that the Supreme Court uniformly found that acting in conformity with state law did not shield actors from liability). State officials thus can be personally liable for carrying out unconstitutional state policies. Id.

Here, Defendants contend that although Plaintiff is suing Defendants in their personal and official capacities, "there is really no question that plaintiff is suing these defendants in their official capacity." Defendants' Memorandum at 11. Defendants maintain that the state is the real party in interest in the underlying suit and that the Eleventh Amendment therefore bars the suit, including any claim for money damages against the Defendants in their official capacity. In assessing whether the Eleventh Amendment bars recovery in this action, it is thus incumbent upon this Court to determine whether Plaintiff has sued Defendants in their personal or official capacities. In other words, the Court must ascertain whether the state is the real party in interest.

Personal or individual capacity suits seek to impose personal liability on a government official for actions he or she took under color of state law. Shabazz v. Coughlin, 852 F.2d 697, 700 (2d Cir. 1988) (citing Graham, 473 U.S. at 165). Official capacity suits effectively are suits against a governmental entity. Shabazz, 852 F.2d at 700 (citing Graham, 473 U.S. at 165-66); see also Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 n.55 (1978) (noting that official capacity suits "generally represent another way of pleading an action against an entity of which an officer is an agent.")

*9 Here, the record demonstrates that Plaintiff has in fact brought suit against Defendants in their personal capacities. First, Rossi seeks compensatory and punitive damages, which are unavailable in an official capacity action. See e.g., Shabazz, 852 F.2d at 700 (finding that state official Defendants were not immune from suit under the Eleventh Amendment where Plaintiff sought punitive and compensatory damages). Second, Rossi alleges the personal involvement of each of the Defendants in the alleged constitutional violations, an issue that is relevant only to personal capacity claims. Third, Defendants acknowledge the existence of personal capacity claims by arguing lack of personal involvement in their Motion to Dismiss.

I therefore conclude, and respectfully recommend that Your Honor should conclude, that although the Eleventh Amendment bars Rossi from prosecuting his damages action against Defendants in their official capacities, the Eleventh Amendment does not bar Rossi from pursuing his claims against Defendants in their individual capacities. See e.g., Gittens v. Sullivan, 720 F. Supp. 40, 44 (S.D.N.Y. Sept. 19, 1989) ("[W]here ... a defendant is sued in his [or her] personal capacity as well [as his or her official capacity], he [or she] loses the protection of the Eleventh Amendment and may be held personally liable for damages.") To establish personal liability on a § 1983 claim, it is sufficient to demonstrate that the state official, acting under color of law, caused the deprivation of a federal right. Graham, 473 U.S. at 166 (citing Monroe v. Pape, 365 U.S. 167 (1961). A state official in a personal capacity action may, however, be able to assert personal immunity defenses, such as lack of personal involvement, which will be discussed infra.

### Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a 12(b)(6) motion to dismiss, "the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint," and is to "assume all well-pleaded factual allegations to be true, and to view all reasonable inferences that can be drawn from such allegations in the light most favorable to the plaintiff." Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 138 (2d Cir. 1999) (internal citations omitted). An action will not be dismissed pursuant to Rule 12(b)(6) " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 203 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)
2005 WL 8146896

[or her] to relief.' " Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). This rule applies with "even greater force" to claims of civil rights violations. Easton v. Sundram, 947 F.2d 1011, 1015 (2d Cir. 1991). When determining whether a plaintiff has alleged facts sufficient to withstand a motion to dismiss, complaints from pro se plaintiffs are construed liberally and held " 'to less stringent standards than formal pleadings drafted by lawyers.' " Boddie v. Schneider, 105 F.3d 857, 860 (2d Cir. 1997) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam)). Moreover, the Second Circuit has held that "[a] complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." Baker v. Cuomo, 58 F.3d 814, 818 (2d Cir. 1995).

### Plaintiff's Excessive Force Claim

Plaintiff alleges that he was subjected to excessive force by Defendants Stevens, Panghorn, Miller, Snedden, and Rhynders "under the supervision of Sgt. Montegari." Complaint at ¶ 15. At a pretrial conference before the undersigned on April 5, 2005, Defendants conceded that Plaintiff has exhausted his excessive force claim and that he states a claim that should proceed with discovery. Moreover, Defendants have not moved to dismiss as to Plaintiff's excessive force claim. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's excessive force claim should proceed with discovery.

### Plaintiff's Denial of Due Process Claim

 **\*10** Plaintiff argues that Defendants Stevens, Pangborn, Temple and Selsky violated his due process rights. To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he or she possessed a protected liberty or property interest and that he or she was deprived of that interest without due process of law. Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996); Frazier v. Coughlin, 81 F.3d 313, 316 (2d Cir. 1996).

The constitutionally protected interest in this case is the right of liberty. "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Palmer v. Richardson, 364 F.3d 60, 64 (2d Cir. 2004) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)); see also Welch v. Bartlett, 196 F.3d 389, 394 n. 4 (2d Cir. 1999) (New York state law "create[s] a liberty interest in not being confined to the SHU.") In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has

directed the district courts to consider both the conditions of confinement and their duration, noting that "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." Palmer, 364 F.3d at 64 (quoting Sealey v. Giltner, 197 F.3d 578, 586 (2d Cir. 1999)).

Defendants contend that even if the Court finds that Plaintiff has demonstrated that his SHU confinement amounted to a violation of Rossi's liberty interest, thus triggering due process protections, Plaintiff received all the process that he was due.

The Supreme Court has set forth a balancing test for determining the process due an inmate. Mathews v. Eldridge, 424 U.S. 319 (1976). Under this balancing test courts consider (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedural safeguards would entail. Mathews, 424 U.S. at 335.

To comply with the minimum requirements of due process in connection with a prison disciplinary proceeding, the state must afford the following to prisoners: (1) written notice of the charges brought against the inmate at least twenty-four hours before the hearing, (2) the opportunity to call witnesses and present evidence so long as doing so will not jeopardize institutional safety or correctional goals, (3) a fair and impartial hearing officer, and (4) a written statement of the disposition, including the evidence relied on and the reasons for the disciplinary action taken. Samuels v. Selsky, 01 Civ. 8235 (AGS), 2002 U.S. Dist. LEXIS 17089, at *11 (S.D.N.Y. Sept. 12, 2002); see also Gittens v. Sullivan, 720 F. Supp. 40, 42 (S.D.N.Y. Sept. 19, 1989) (citing Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974)). Since Wolff the Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence. Welch v. Kennedy, No. 03-CV-0293 (SR), 2005 WL 735941, at *4 (W.D.N.Y. Mar. 30, 2005). This standard is satisfied if there is any evidence in the record to support the disciplinary ruling so long as such evidence is reliable. Id.

### Defendants Stevens and Pangborn

 **\*11** Plaintiff contends that Defendants Stevens and Pangborn violated his due process rights by filing a

misbehavior report that falsely accused Plaintiff of refusing a direct order, violating pat frisk procedure, and assaulting prison staff. Complaint at ¶ 20. Although inmates have the right not to be deprived of a protected liberty interest without due process of law, inmates do not have constitutionally guaranteed immunity from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest. Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986); see also Greaves v. State of New York, 958 F. Supp. 142, 144 (S.D.N.Y. Jan. 29, 1997) (citation omitted) ("... [T]he failure to conduct a constitutionally adequate disciplinary hearing may give rise to a Section 1983 action, but the mere filing of a false misbehavior report against an inmate does not.")

I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has failed to state a viable due process claim as to Defendants Stevens and Pangborn.

*Defendants Temple and Selsky*
Plaintiff contends that Defendant Temple violated Plaintiff's right to have his hearing conducted by a fair and impartial hearing officer, right to "present documentary evidence," right to receive "written specification" of the grounds for the Tier III hearing, and right to "substantial evidence." Complaint at ¶ 21. Plaintiff further contends that Defendant Selsky violated his due process rights by affirming Defendant Temple's decision. Complaint at ¶¶ 21, 22. I will first address Plaintiff's allegations as against Defendant Temple.

As to the impartial hearing officer prong of Plaintiff's due process claim, Wolff requires that a hearing officer not be so insufficiently impartial as to present "a hazard of arbitrary decision making." Wolff, 418 U.S. at 571. In New York there is a "presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47 (1975). This Circuit has held that such a presumption of honesty and integrity applies to prison officers, and that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts. Rivera v. Senkowski, 62 F.3d 80, 86 (2d Cir. 1995) (noting the presumption that a prison official's acts to maintain order are done for a proper purpose); see also Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996). Such a presumption notwithstanding, under some circumstances the bias of a hearing officer may rise to the level of a due process violation. See Powell v. Ward, 392 F. Supp. 628, 633 (S.D.N.Y. Apr. 23, 1975), modified, 542 F.2d 101 (2d Cir. 1976) (finding that it is implicit in the notions

of fairness in the Due Process Clause that a hearing officer should not have been an investigative officer or witness).

Here, Plaintiff asserts that Defendant Temple testified on behalf of Defendants Stevens and Pangborn, explaining that the correction officers could not recall the incident in question. See Plaintiff's Opposition at 8. Defendants have not offered any evidence to rebut either this particular allegation, or Plaintiff's primary allegation that Defendant Temple was not impartial. Moreover, the Court has not been provided with a transcript from the hearing and is therefore unable to ascertain whether Defendant Temple conducted the hearing in a fair and impartial manner. Because the Court is constrained on a Motion to Dismiss to accept as true Plaintiff's allegations, and because Defendants have not presented evidence to rebut such allegations, I find, and respectfully recommend that Your Honor find, that Plaintiff has stated a claim with respect to the impartial hearing officer prong of his due process claim.

**\*12** Plaintiff also claims that he was denied the right to present documentary evidence. As noted supra, inmates have the right to present documentary evidence at a disciplinary hearing so long as doing so does not threaten institutional safety or correctional goals. Wolff, 418 U.S. at 566. "... [A]n inmate's right to present documentary evidence in his [or her] defense does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests for his [or her] case." Crawford v. Braun, 99 Civ. 5851 (JCF), 2002 U.S. Dist. LEXIS 22978, at * 28 (S.D.N.Y. Sept. 4, 2002). Further, " 'prison officials must have the necessary discretion to keep [a prison disciplinary] hearing within reasonable limits." Id. (quoting Wolff, 418 U.S. at 566).

Defendant contends that because Plaintiff has failed to specify what documents he had in his possession, or that DOCS had in its possession, that would have been material or relevant to the charges brought against him, Plaintiff's conclusory assertions fail to plead a claim for relief. Although Plaintiff's Complaint is devoid of such specificity, Plaintiff identifies in his Opposition to Defendants' Motion the documents that he sought to present at his disciplinary hearing. Plaintiff states that he sought permission to present as evidence the photographs of his injuries and a copy of Defendant Stevens' injury report. See Plaintiff's Opposition at 8. Plaintiff contends that both of these requests were "denied without explanation."[12] Id. Accordingly, I find, and respectfully recommend that Your Honor find, that Plaintiff has stated a

claim with respect to the documentary evidence prong of his due process claim.

> 12    The Court notes that Defendant's alleged refusal to let Rossi present this evidence does not appear to be justified by either institutional safety or correctional goals.

Plaintiff further asserts that he did not receive "written specification of the particulars." The Court construes this prong of Plaintiff's due process claim to be an assertion that Rossi was not afforded written notice of the charges brought against him. Plaintiff claims that "[t]he misbehavior report read into the record [at the disciplinary hearing] did not say that [Plaintiff] assaulted anyone," and that "no misbehavior report charging [Plaintiff] for assault on staff was read into the record [at the disciplinary hearing]." Complaint at ¶¶ 23-24. Plaintiff further explains in his Opposition to Defendants' Motion that the misbehavior report that was read into the record at the hearing "was written by [Defendant] Panghorn[,] who alleged that after disobeying a direct order and violating pat frisk procedures, plaintiff spun off the wall to his left, was wrestled to the floor, handcuffed and taken to the box. The misbehavior report did not allege or charge plaintiff with assault on staff and no other misbehavior report was read into the record." Plaintiff's Opposition at 7.

Defendants argue that Plaintiff did in fact receive written specification of the charges brought against him, including the allegation that he assaulted staff. As support for this argument, Defendants point to Paragraph 20 of Plaintiff's Complaint wherein Plaintiff states, "Defendants Stevens and Pangborn wrote misbehavior reports that falsely accused me of refusing a direct order, violating pat frisk procedure and assault on staff." Defendants contend that because Plaintiff "concedes" that the misbehavior report charged him with assault, he received written specification of the charges against him. Although the reports filed by Correction Officers Pangborn and Stevens do not use words such as "assault," the language contained therein is sufficient to apprise Plaintiff that he was being charged with assaulting staff. The Inter-Departmental communication filed by Defendant Pangborn states that Plaintiff "swung and hit C.O. Stevens with his right closed fist." Eagen Declaration, Ex. B. Defendant Stevens similarly states, "Inmate Rossi spun to his left and with a closed right hand struck me in the left side of my head in the temple area." Id. Accordingly, I find, and respectfully recommend that Your Honor find, that Plaintiff has failed to establish that he was not afforded sufficient notice of the charges brought against him.

**\*13** Finally, Plaintiff contends that he was denied the right to "substantial evidence." The Court construes this prong of Plaintiff's due process claim to be an assertion that Defendant Temple failed to marshal substantial evidence to support the charge of assault.

"A misbehavior report by itself can constitute substantial evidence to support a determination of guilt in a prison disciplinary matter." Pearsall v. Coughlin, 182 A.D.2d 884 (3rd Dept. Apr. 2, 1992) (citing Matter of Curl v. Kelly, 125 A.D.2d 948 (4th Dept. Dec. 19, 1986)); see also Godwin v. Goord, 270 A.D.2d 881 (4th Dept. Mar. 29, 2000) ("The misbehavior reports, augmented by the testimony of several staff members, constitute substantial evidence supporting the determination that petitioner violated various inmate rules.") Here, the record contains several detailed eyewitness reports of Plaintiff's alleged assault on prison staff. See Eagen Declaration, Ex. B. In particular, the reports filed by Defendants Pangborn and Stevens set forth the time, date and place as well as the circumstances leading to the alleged assault. The reports also detail how Plaintiff allegedly assaulted Correction Officer Stevens. Such reports were therefore sufficiently relevant and probative to support the finding that Plaintiff assaulted prison staff. Moreover, although Plaintiff maintains that Defendants' characterization of how Plaintiff assaulted correction officers is "physically impossible" and "unbelievable," such contradictions with Plaintiff's version of the underlying events simply presented a question of credibility for Defendant Temple to resolve. See Flynn v. Coombe, 239 A.D.2d 725 (3rd Dept. May 15, 1997). Accordingly, I find that the substantial evidence prong of Plaintiff's due process claim fails to state a claim for relief.

As to Defendant Selsky, Plaintiff argues that Defendant Selsky violated his due process rights by affirming Defendant Temple's decision. Complaint at ¶¶ 23-24. The Supreme Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence. See e.g. Douglas v. Buder, 412 U.S. 430, 432 (1973) (per curiam) (revocation of probation); Schware v. Board of Bar Examiners, 353 U.S. 232, 239 (1957) (denial of admission to bar); United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 106 (1927) (deportation). In Superintendent, Massachusetts Correctional Institution, Walpole v. Hill, 472 U.S. 445 (1985), a case involving revocation of good time credits following disciplinary proceedings, the Supreme Court held that "... the

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 206 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)

2005 WL 8146896

requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board...." Hill, 472 U.S. at 455. The Hill Court further elaborated that "[t]his standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced....' " id. (citing United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. at 106), and that "[a]scertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." Hill, 472 U.S. at 455. Rather, the relevant inquiry is whether there is any evidence in the record to support the conclusion reached by the disciplinary board. Id. Because there was evidence in the record to support Defendant Temple's decision, namely the misbehavior report, I find that Plaintiff has failed to state a due process claim as to Defendant Selsky.

**\*14** I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has failed to state a due process claim as to Defendants Stevens, Panghorn, and Selsky, and that Plaintiff's due process claims as against these Defendants should be dismissed. I further conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has stated a due process claim as to Defendant Temple, but only with respect to his allegations that he was denied a fair and impartial hearing officer and the right to present documentary evidence.

Plaintiff's Religious Accommodation Claim

Plaintiff alleges that during the course of his confinement in SHU he has been denied religious accommodation. Specifically, Plaintiff claims that Defendants infringed his constitutional right to the free exercise [13] of religion by prohibiting Rossi from wearing a religious head covering and by failing to provide Rossi with "a proper diet consistent with [his] religious beliefs," known as an Ital diet. [14] Complaint at ¶ 26.

[13]    Plaintiff also appears to assert a violation of the Establishment Clause by arguing that Directive 4202 "only allows 'certain' Rastafarians to wear a religious head covering but denies me the same right." See Complaint at ¶ 34.

[14]    As to the religious diet component of Plaintiff's religious accommodation claim, Plaintiff claims that during his confinement in SHU he has not been allowed to receive packages or purchase food

from the commissary. Rossi contends that receiving packages and purchasing food at the commissary are his only "alternative" means of accommodating his religious diet. Plaintiff thus appears to argue that Defendants' imposition of said restrictions resulted in Plaintiff being denied an Ital diet.

The First Amendment to the United States Constitution states, in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., Amend. I. Prison inmates retain "those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrective system." Pell v. Procunier, 417 U.S. 817, 822 (1974); see also Bell v. Wolfish, 441 U.S. 520, 545 (1979); Price v. Johnston, 334 U.S. 266, 285 (1948). The Supreme Court has recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," Procunier v. Martinez, 416 U.S. 396, 405 (1974), and accordingly has "tempered" its scrutiny of challenged prison regulations. Benjamin v. Coughlin, 708 F. Supp. 570, 572 (S.D.N.Y. Mar. 13, 1989). In the seminal case of Turner v. Safley, 482 U.S. 78 (1987), the Supreme Court explained that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." Turner, 482 U.S. at 89; see also Farid, 850 F.2d at 926 (citations omitted) (" '[P]rison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of constitutional rights.' ")

In Turner, the Supreme Court identified the following four factors as being relevant to whether a challenged prison regulation is valid as reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it, (2) whether there are alternative means of exercising the right that remain open to prison inmates, (3) what is the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, and (4) whether there is an absence of ready alternatives, which is evidence of the reasonableness of a prison regulation. Turner, 482 U.S. at 89-90.

Plaintiff's Religious Head Covering Claim

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 207 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)

2005 WL 8146896

**\*15** The religious head covering that Rastafarians wear, known as a crown, is worn to keep impurities from a Rastafarian's dreadlocks, to shield Rastafarians from the eyes of non-Rastafarians, and "to keep the curious from touching [Rastafarians]." Benjamin, 708 F. Supp. at 574. Most crowns are large, loosely knit or crocheted circular wool caps. The crown can pose a security risk because it may be used for hiding contraband. Searching the crown necessitates increased contact between guards and inmates and thus increases the threat of confrontations between guards and inmates. It has been noted that prohibitions on wearing the crown are not uniform throughout DOCS facilities. Id. at 574.

Application of the Turner four-part test demonstrates that prison regulations governing the wearing of the crown do not impermissibly infringe on Plaintiff's First Amendment rights. For instance, there is a valid, rational connection between the prohibition on crowns in certain areas of a prison and the security interests put forward to justify such a prohibition. As noted, because of the shape and size of the crown, it can readily be used to conceal and transport weapons, controlled substances, and other contraband and thus poses a threat to prison guards and other inmates. Plaintiff has therefore not met his burden of showing that the restriction on wearing the religious crown impermissibly infringes on his constitutional rights. See e.g., Benjamin, 708 F. Supp. at 575 (holding that the plaintiffs had not met their burden of showing that the restriction on the wearing of the religious crown impermissibly infringed on their constitutional rights). Even if prison officials permit only "certain" Rastafarians to wear a religious crown, as Plaintiff contends, Plaintiff nonetheless has not stated a viable claim under the First Amendment.

*Plaintiff's Religious Diet Claim*

The Ital diet symbolizes "a belief in life and an avoidance of symbols of death." Id. at 575. Individual dietary practices vary among Rastafarian individuals and sects, both inside and outside prison. To name but a few variations of the Ital diet, generally Rastafarians do not eat meat and pork, and some do not eat fish or dairy products. Some Rastafarians refuse to eat vegetables that have been cooked for more than a few minutes, while other Rastafarians will eat only food that they have prepared themselves. Id. at 575. At Green Haven Correctional Facility, when pork is served DOCS provides a meat substitute meats to all inmates to accommodate the religious requirements of Jewish and Muslim prisoners. Id. No such substitute is offered when other types of meat are served. Id. Courts in this district have determined that

it would be both expensive and an administrative burden for Defendants to provide Rastafarian inmates with a diet containing only natural foods and nutritionally adequate meat substitutes. Although there may appear to be inequality of treatment among Jewish and Muslim prisoners on the one hand and Rastafarians on the other, this perceived inequality reflects the fact that it would be more difficult to accommodate Rastafarians because their definitions of the Ital diet are so varied. To provide Rastafarians with an Ital diet that was in accord with the religious views of each and every imprisoned Rastafarian would impose undue financial and administrative burdens on Defendants, and would thus have a significant impact on the allocation of prison resources generally. As with the religious head covering component of his claim, Plaintiff has failed to establish that Defendants' failure to provide him with an Ital diet impermissibly infringes on his constitutional rights.

**\*16** I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's religious accommodation claim should be dismissed because Rossi fails to state a claim upon which relief can be granted.

Plaintiff's Denial of Access to Courts Claim

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his [or her] claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." Washington v. James, 782 F.2d 1134 (2d Cir. 1986) (citing Bounds v. Smith, 430 U.S. 817, 821-23 (1977); Wolff v. McDonnell, 418 U.S. at 577-80; Davidson v. Scully, 694 F.2d 50, 53 (2d Cir. 1982); Corby v. Conboy, 457 F.2d 251, 253-54 (2d Cir. 1972)). Courts have protected the right of reasonable access to the courts by, inter alia, prohibiting state prison officials from actively interfering with inmates' attempts to prepare and file legal documents. See e.g., Johnson v. Avery, 393 U.S. 483, 484, 489-490 (1969); Ex parte Hull, 312 U.S. 546, 547-549 (1941). Interference with legal mail implicates a prison inmate's rights to access to the courts and to free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.

To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" Davis v. Goord, 320 F.3d 346 (2d Cir. 2003) (quoting Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (citation omitted)). To survive a motion to dismiss a plaintiff

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 208 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)

2005 WL 8146896

must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff, such as the dismissal of an otherwise meritorious legal claim. See Lewis v. Casey, 518 U.S. 343, 353 (1996).

Plaintiff's Complaint can reasonably be read to allege that state prison officials intentionally violated Rossi's right of reasonable access to the courts, see Bounds v. Smith, 430 U.S. at 821, and his right to send legal mail. Plaintiff claims that on August 30, 2003, he filed a "complaint and Grievance against Defendant Phillips for refusing to provide the SHU in Green Haven Prison with a closed and sealed mailbox for outgoing mail so the prison guards would not throw out my mail to family and the Court." Complaint at ¶ 44. Plaintiff then refers to two separate incidents of interference with his outgoing mail. Specifically, Plaintiff alleges that on October 30, 2003, he mailed "papers" to the District Court for the Northern District of New York and that such papers were never mailed, id. at ¶ 47, and that in or about December 2003 Plaintiff mailed "another set of legal papers" to the District Court for the Northern District of New York and that these legal papers were never mailed. Id. at ¶ 49. On both occasions Plaintiff handed his mail to the "11-7 night guard," which Plaintiff states is the method for sending mail from SHU. Id. at ¶¶ 47, 49. Plaintiff further alleges that "[a]s a result, an adverse decision was rendered against me by the Court and I am now precluded from appealing the issue." Id. at ¶ 50.

**\*17** Defendants argue that Plaintiff cannot establish violation of his constitutional right to reasonable access to the courts because he has failed to demonstrate that the infringement of such right resulted in actual injury. Defendants' Memorandum at 23; see Christopher v. Harbury, 536 U.S. 403 (2002). In particular, Defendants maintain that Plaintiff "has failed to identify his predicate claim and the remedy to which he would be entitled but for the conduct of the defendants." Defendants' Memorandum at 24.

"However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher, 536 U.S. at 415. In Lewis v. Casey, supra, the Supreme Court made clear that the actual injury requirement applies in equal force in the prison litigation context. Lewis, 518 U.S. at 351-52 (stating that inmates asserting denial of access to the courts were required to demonstrate actual injury, and could do so by showing that the inmate had

suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint). "[T]he underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." Christopher, 536 U.S. at 415. The Christopher Court further explained that the underlying claim must be "described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." Id. at 416.

In Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986), the Second Circuit determined that as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received. The Second Circuit explained in Washington that "[c]ensorship of an inmate's mail is justified only if it furthers 'one or more of the substantial governmental interests of security, order, and rehabilitation.' " Washington, 782 F.2d at 1139 (quoting Procunier, 416 U.S. at 413). Such interference with prisoners' mail "must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Procunier, 416 U.S. at 413.

In Washington, the original complaint and the affidavits updating the complaint refer to two separate incidents of interference with mail, one in the original complaint and one in the subsequently filed affidavit. The Second Circuit found that such facts indicated an alleged continuing activity rather than a single isolated instance. Moreover, the fact that the plaintiff sought injunctive relief further indicated that the plaintiff claimed the conduct was continuous. In this case, Plaintiff's allegations similarly indicate an alleged continuing activity rather than a single isolated instance. Moreover, Plaintiff's request for injunctive relief indicates a pattern of continuing activity. Although Plaintiff does not state explicitly the nature of the underlying claim,[15] the allegations in his Complaint, coupled with his memorandum of law, can fairly be read to allege that state prison officials had intentionally violated his right of reasonable access to the courts and his right to receive and send legal mail. Accepting Plaintiff's allegations as true, and construing all reasonable inferences in Plaintiff's favor, the Court cannot say that under no circumstances could Rossi prove that Defendants' interference with his outgoing legal mail violated

Case 9:18-cv-00336-AMN-TWD   Document 74   Filed 05/31/22   Page 209 of 212

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)

2005 WL 8146896

his constitutional rights. All that the Federal Rules of Civil Procedure require is "a short and plain statement of the claim" that will give the defendant fair notice of the nature of the claim and the grounds upon which it rests. Conley v. Gibson, 355 U.S. at 47; Fed. R. Civ. P. 8(a)(2). Plaintiff has satisfied this standard. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's allegations are sufficient to survive a 12(b)(6) motion.

15    In his Opposition to Defendants' Motion, Plaintiff explains that the "legal papers" that were thrown out by "prison officials" were "Plaintiff's Notice of Objections to the Magistrate Judge's ruling in Rossi v. Goord 00-CV-1521 (LEK)." Plaintiff's Opposition at 7.

Personal Involvement of Defendants Goord and Phillips

**\*18** Personal involvement of a defendant in an alleged constitutional deprivation is "a prerequisite to an award of damages under § 1983." Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). "Liability may not be premised on the *respondeat superior* or vicarious liability doctrines, 'nor may a defendant be held liable merely by his [or her] connection to the events through links in the chain of command.' " Morris v. Eversley, 282 F. Supp. 2d 196, 203 (S.D.N.Y. Sept. 23, 2003) (quoting Reynolds v. Goord, No. 98 Civ. 6722 (DLC), 2000 WL 235278, at \*7 (S.D.N.Y. Mar. 1, 2000)).

A supervisory official can be said to have been personally involved in a constitutional violation only if that official: (1) directly participated in the alleged violation, (2) failed to remedy the wrong after learning of the violation through a report or appeal, (3) created a custom or policy fostering such violations, or allowed such a policy to continue, (4) was grossly negligent in supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986); Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989) (finding that a supervisory official may be found personally liable if he or she has "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act.")

Defendants Goord and Phillips [16] argue that they cannot be held liable because they were not personally involved in the alleged deprivation of Plaintiff's constitutional

rights. Because I concluded supra that Plaintiff's religious accommodation claim should be dismissed for failure to state a claim, I will address Defendants' arguments only in the context of Plaintiff's access to courts claim.

16    Point III in the Table of Contents of Defendants' Reply contains the following heading: "Plaintiff's Claims Against Defendants Goord, Selsky and Phillips Should Be Dismissed For Lack of Personal Involvement." The section covering Defendants' personal involvement argument does not, however, address Defendant Selsky. Even if Defendants meant to include Defendant Selsky in their argument that Plaintiff has failed to establish the personal involvement of Defendants, the point would be moot because of my earlier conclusion that Plaintiff has failed to state a claim as against Defendant Selsky.

As to Defendant Goord, Plaintiff cannot establish the commissioner's personal involvement by any of the five methods enumerated above. First, there is no evidence in the record to establish that Defendant Goord was personally involved in the alleged deprivation of Plaintiff's right of access to the courts. Rather, Plaintiff alleges in his Complaint that unnamed "prison guards" were responsible for throwing out Plaintiff's legal mail. Complaint at ¶ 44. Plaintiff cannot therefore demonstrate that Defendant Goord directly participated in the alleged violation of his rights.

With respect to the other four methods for establishing personal involvement, Plaintiff has failed to show that Defendant Goord was informed of the constitutional violation and did nothing to remedy the wrong, created a policy or custom fostering unconstitutional practices, or allowed such a policy to continue, was grossly negligent in supervising subordinates who caused the violation, or was deliberately indifferent to Plaintiff's rights by his failure to act on information indicating that unconstitutional acts were occurring. Here, Plaintiff's only contact with Defendant Goord consisted of several letters that Rossi wrote to the commissioner and replies that Rossi received from Captain Keyser and Deputy Commissioner Leclaire, the latter of which referenced Plaintiff's letter to Defendant Goord. Such correspondence does not demonstrate personal involvement on the part of Defendant Goord. Neither a "[r]eceipt of letter or grievances," Woods v. Goord, No. 01 Civ. 3255 (SAS), 2002 WL 731691, at \*7 (S.D.N.Y. Apr. 23, 2002) (collecting cases), nor "allegations that an official ignored a prisoner's letter," Atkins v. County of Orange, 251 F. Supp. 2d 1225,

Rossi v. Stevens, Not Reported in Fed. Supp. (2005)

2005 WL 8146896

Case 9:18-cv-00336-AMN-TWD    Document 74    Filed 05/31/22    Page 210 of 212

1233 (S.D.N.Y. Mar. 14, 2003), is sufficient to establish personal involvement for purposes of § 1983. See Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997) (concluding that there was no personal involvement where official received two letters from a prisoner, and referred the first to the official responsible for a decision, and replied to the second by stating that a decision had been rendered). Further, "[i]f a supervisor investigates an inmate's grievances and finds them to be unsubstantiated, there is 'nothing in the record indicating that [defendant] ... turned a blind eye.' " Morris, 282 F. Supp. 2d at 208 (quoting Moncrieffe v. Witbeck, No. 97 Civ. 253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000)). Similarly, where a supervisor refers allegations for investigation, it cannot be said that the supervisor failed to take action to protect a plaintiff. In this case, the letter from Deputy Commissioner Leclaire to Plaintiff indicates that Plaintiff's letter to Defendant Goord apprising the commissioner of alleged mail tampering was forwarded to facility officials at the prison for investigation. See Plaintiff's Opposition at Ex. C. The letter from Captain Keyser indicates that such an investigation was conducted. Id. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has failed to establish the personal involvement of Defendant Goord in the constitutional violations alleged here.

*19 Plaintiff has, however, offered evidence sufficient to establish the personal involvement of Defendant Phillips. Specifically, Plaintiff has sufficiently alleged that Defendant Phillips, because of his supervisory capacity, was in a position to remedy the alleged violation, failed to remedy the alleged violation, or knowingly allowed the alleged violation to continue. Plaintiff states in his Complaint that although he did not know who specifically interfered with his mail, Defendant Phillips was aware of the problem because Rossi spoke with Phillips on at least one occasion and informed the superintendent that his mail was being tampered with, intercepted, or otherwise violated. Complaint at ¶ 46; Plaintiff's Opposition, Ex. C; see e.g. Ayers v. Coughlin, 780 F.2d 205, 209 (2d Cir. 1985) (holding that allegations that a supervisory official had notice of a problem before the fact and failed to remedy it are sufficient allegations of personal involvement to withstand a motion to dismiss). In addition, Plaintiff's letter of complaint to Defendant Goord prompted an investigation into the matter. It can be presumed that the superintendent of the facility was made aware of such an investigation. In fact, a copy of Captain Keyser's letter informing Plaintiff that mail leaving the SHU was being monitored, and a copy of Deputy

Commissioner Leclaire's letter to Plaintiff, were provided to Defendant Phillips. Plaintiff's Opposition, Ex. C. Such evidence is sufficient to show that Phillips failed to remedy the problem, permitted the alleged violation to continue, or neglected to manage those who were committing the alleged violations of which he had been apprised. See e.g. Williams v. Smith, 781 F.2d 319, 323-34 (2d Cir. 1986). Accepting Plaintiff's allegations as true, as the Court must, permits an inference that Defendant Phillips did not take sufficient action to prevent the alleged violation of Plaintiff's constitutional rights. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has established the personal involvement of Defendant Goord in the constitutional violations alleged here.

### Injunctive Relief

In addition to compensatory and punitive damages, Plaintiff seeks declaratory and injunctive relief. With respect to his excessive force and due process claims, Plaintiff seeks declaratory judgment that Defendants violated his right to be free from cruel and unusual punishment and his right to due process of law. Complaint at ¶ 29. Plaintiff also seeks to have the disposition of the Tier III hearing annulled, all references thereto expunged from his record, and his "previous status restored in full." Id. at ¶ 30. With respect to his religious accommodation claim, Plaintiff seeks declaratory judgment that Directive 4202 violates Plaintiff's First and Fourteenth Amendment rights, id. at ¶ 41, and injunctive relief such that Plaintiff would be permitted to wear a religious head covering and would be given "reasonable accommodations in which to exercise his religious dietary needs." Id. at ¶ 42. As to his access to courts claim, Plaintiff seeks declaratory judgment that Defendants Goord and Phillips' failure to remedy the "mail problem" for inmates confined in SHU violates the First Amendment. Id. at ¶ 53. Plaintiff also seeks injunctive relief directing Defendants to provide a closed, pad-locked mailbox in the SHU for outgoing mail. Id. at ¶ 54.

"[I]nterim injunctive relief is an 'extraordinary and drastic remedy which should not be routinely granted.' " Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) (quoting Medical Society of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977)). A federal court should grant injunctive relief against a state or municipal office "only in situations of most compelling necessity." Vorbeck v. McNeal, 407 F. Supp. 733, 739 (E.D.Mo.), aff'd, 426 U.S. 943 (1976); see also Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985) (citations omitted), abrogated on other grounds, Fromer v. Scully, 874 F.2d 69, 74 (2d Cir. 1989)

(holding that a mandatory injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested" or where "extreme or very serious damage will result from a denial of preliminary relief.")

In this Circuit the standard for determining whether to grant injunctive relief is well-settled. A movant must make the following showing: (1) irreparable harm and (2) either (a) a likelihood of success on the merits of the claim or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the movant. Covino v. Patrissi, 967 F.2d 73 (2d Cir. 1992). To demonstrate irreparable harm, a plaintiff must show an " 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.' " Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 153 (2d Cir. 1999) (quoting Rodriguez v. DeBuono, 162 F.3d 56, 61 (2d Cir. 1998)). Where an alleged deprivation of a constitutional right is involved, courts generally do not require a further showing of irreparable harm. See e.g. Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984); Paulsen v. County of Nassau, 925 F.2d 65, 68 (2d Cir. 1991) (noting that irreparable harm exists where deprivation of First Amendment rights is alleged).

### Plaintiff's Due Process Claim

 **\*20** Plaintiff alleges that his due process rights were violated when he was, inter alia, denied a fair and impartial hearing officer and the right to present documentary evidence. Expungement is required where there has been a violation of an inmate's fundamental due process rights. See Wolff, 418 U.S. 539; see also e.g. Weiss v. Coughlin, 199 A.D.2d 638, 639 (3d Dept. 1993). Among the fundamental, judicially recognized rights is the right to present documentary evidence. See id. Because I concluded supra that Plaintiff has stated a claim as to the impartial hearing officer and documentary evidence prongs of his due process claim, the proper remedy would be annulment of the disposition of the hearing and expungement of Plaintiff's record. Plaintiff has not, however, established that he would suffer irreparable harm if injunctive relief is not granted. Thus, although Plaintiff has stated a claim that is sufficient to withstand Defendants' Motion to Dismiss, Plaintiff has not established that he is entitled to the injunctive relief that he seeks. As to the third component of Plaintiff's request for injunctive relief —Plaintiff's request to have his "previous status restored in full"—Plaintiff has not articulated what "previous status" he wishes to have restored and has therefore failed to establish that he is entitled to injunctive relief with respect to his

incarcerated status. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff is not entitled to injunctive relief with respect to his due process claim.

### Plaintiff's Religious Accommodation Claim

As noted supra, a mandatory injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested" or where "extreme or very serious damage will result from a denial of preliminary relief." Abdul Wali, 754 F.2d at 1025. Plaintiff cannot make such a showing because, as discussed supra at page 29, Plaintiff has not stated a claim upon which relief can be granted. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff is not entitled to injunctive relief with respect to his religious accommodation claim.

### Plaintiff's Access to Courts Claim

As with Plaintiff's due process claim, I find that because Plaintiff has alleged a deprivation of his First Amendment rights, he has, for purposes of the instant application for injunctive relief, established that he may suffer irreparable harm. Plaintiff has not, however, satisfied the second prong for establishing that he is entitled to injunctive relief. To be precise, Plaintiff has failed to establish sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward the movant. Plaintiff's arguments are devoid of any evidentiary support beyond the self-serving assertions in his Complaint and Opposition to Defendants' Motion. Although Plaintiff has stated a claim that is sufficient to withstand Defendants' Motion to Dismiss, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has not established that he is entitled to the extraordinary remedy of injunctive relief with respect to his access to courts claim.

### CONCLUSION

For the foregoing reasons I conclude, and respectfully recommend that Your Honor should conclude, that Defendants' Motion to Dismiss should be granted in part and denied in part. Specifically, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has stated a claim of excessive force, Plaintiff has stated a denial of due process claim, but only with respect to Defendant Temple, Plaintiff has failed to state a denial of religious accommodation claim, and Plaintiff has stated a

2005 WL 8146896

denial of access to courts claim, but only with respect to Superintendent Phillips. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's excessive force claim should proceed as against Defendants Stevens, Pangborn, Miller, Snedden, Rhynders, and Montegari; Plaintiff's due process claim should proceed only as against Defendant Temple; Plaintiff's religious accommodation claim should be dismissed; and Plaintiff's access to courts claim should proceed only as against Defendant Phillips.

## **NOTICE**

Pursuant to 28 U.S.C. 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(e), or a total of thirteen (13) working days, see Fed. R. Civ. P. 6(a),

from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Colleen McMahon at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

**\*21** Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge McMahon.

### All Citations

Not Reported in Fed. Supp., 2005 WL 8146896

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.